_____

NO. 23-4094

_____


IN THE

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

_____


KENNETH WATKINS

Appellant,

versus

UNITED STATES OF AMERICA

Appellee.

_____

A DIRECT CRIMINAL APPEAL FROM THE
UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA, CHARLOTTE DIVISION

_____


**APPELLANT'S OPENING BRIEF**

PAUL S. KISH
Georgia Bar No. 424277
Kish Law LLC
Suite 2505
229 Peachtree Street, N.E.
Atlanta, Georgia 30303
(404) 207-1338

Attorney for Appellant
KENNETH WATKINS

IN THE UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

KENNETH WATKINS
       Appellant,

              v.                    APPEAL NO. 23-4094

UNITED STATES OF AMERICA
       Appellee,

_____/

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to the Rules of the United States Court of Appeals for the Fourth Circuit, undersigned counsel certifies that, to the best of his present information, knowledge and belief, the following is a complete list of all trial judges, attorneys, persons, associations of persons, firms, partnerships or corporations that have an interest in the outcome of this case:

1.    Conrad, Robert Jr. — U.S. District Judge

2.    Guinn, Lambert - Assistant U.S. Attorney

3.    Hitchens, David - prior counsel for Appellant

4.    Kesler, David — U.S. Magistrate Judge

5.    Kish, Paul - counsel for Appellant

6.    Real, Samuel - prior counsel for Appellant

7.    Scheer, Anthony - prior counsel for Appellant

8.    Sielaff, Timothy - Assistant U.S. Attorney

9.    Spaugh, Stephanie — Assistant U.S. Attorney

10.   Watkins, Kenneth - Appellant

## **STATEMENT REGARDING ORAL ARGUMENT**

Appellant requests oral argument in this appeal from a criminal conviction arising out of a trial. This appeal involves fact-intensive issues. Oral argument will assist the Court in deciding the questions raised on appeal.

## CERTIFICATE OF COMPLIANCE

Counsel for Appellant hereby certifies that the size and style of type used in this brief is COURIER REGULAR 12 POINT. Undersigned counsel hereby certifies that the word processing system used to prepare this Brief has counted 8468 words and 917 lines of monospaced type in this Brief.

_/s/ Paul S. Kish_
Paul S. Kish
Attorney for Appellant

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ...................................................... ii

STATEMENT REGARDING ORAL ARGUMENT ........................... iii

CERTIFICATE OF COMPLIANCE ..................................... iv

TABLE OF CONTENTS ............................................. v

TABLE OF AUTHORITIES ........................................ vii

STATEMENT OF JURISDICTION ................................... viii

STATEMENT OF THE ISSUE ........................................ 1

STATEMENT OF THE CASE ......................................... 2
  Course of proceedings........................................ 2
  Statement of the Facts....................................... 3
    Background ................................................ 4
    Jonquilla Sanders ......................................... 5
    Lateshia Anderson ......................................... 7
    Other Witnesses .......................................... 11
    Rap Lyrics ............................................... 13
    Jury Deliberations ....................................... 14

STANDARD OF REVIEW ........................................... 14

SUMMARY OF THE ARGUMENT ...................................... 15

ARGUMENT AND AUTHORITY ....................................... 16
  I.   INSUFFICIENT EVIDENCE SUPPORTED THE CONVICTION ........ 16
    A. Evaluating Sufficiency in Drug Conspiracy Case ........ 17
    B. Reasonable Inference Versus Impermissible Conjecture ... 18
    C. Insufficient Evidence of "Knowledge" .................. 18
    D. Insufficient Evidence of Joining Conspiracy ........... 22
       1) General Principles.................................. 22
       2) Trips by Ms. Sanders................................ 23
       3) Trip By Ms. Anderson................................ 27

II.   IMPROPER ADMISSION OF RAP LYRICS ...................... 29

III.  FAILURE TO DEFINE REASONABLE DOUBT .................... 31

IV.   ERROR CALCULATING SENTENCING GUIDELINES ............... 32
   A.  Sentencing Evidence and Calculations .................. 32
   B.  Using Untested substances ............................ 34
   C.  Estimates from October 16–17, 2020 ................... 34
   D.  Method for Calculating Drug Quantities ............... 35
   E.  Failure to Consider Departure ........................ 38

CONCLUSION ................................................... 39

CERTIFICATE OF SERVICE ....................................... 40

## TABLE OF AUTHORITIES

**Cases**

United States v. Alerre, 430 F. 3d 681, 693 (4th Cir. 2005) ___ 17

United States v. Allen, 446 F. 3d 522, 577 (4th Cir. 2006) _____ 15

United States v. Bailey, 819 F. 3d. 92, 95 (4th Cir. 2016) _____ 14

United States v. Barnett, 660 Fed. App'x, 235 (4th Cir. 2016) __ 20

United States v. Briley, 770 f. 3d 267, 276 (4th Cir. 2014) ____ 15

United States v. Burgos, 94 F. 3d 849, 857 (4th Cir. 1996) _____ 18

United States v. Hickman, 626 F. 3d 756, 770 (4th Cir. 2010)_ 23, 29

United States v. Montalvo-Murillo, 495 U.S. 711, 722, 110 S. Ct. 2072, 2080, 109 L. Ed. 2d 720 (1990) _____ 4

United States v. Pauling, 924 F. 3d 649 (2nd Cir. 2019) _ 25, 26, 29

United States v. Recio 884 F. 3d 230, 235 (4th Cir. 2018) _____ 31

United States v. Strayhorn, 743 F. 3d 917, 922-23 (4th Cir. 2014) _____ 18

United States v. Van Fossen, 460 F. 2d 38, 40-41(4th Cir. 1972) 18

United States v. Williams, __ F. Supp 3d __, (D. Az. 2022)(2022 WL 17547125 Dec. 9, 2022), at *44-46 _____ 31

United States v. Williams, 152 F. 3d 294, 298 (4th Cir. 1998) __ 31

**Statutes**

21 U.S.C. §841(a) _____ 2

USSG §1B1.3 _____ 37

USSG §2D1.1 _____ passim

**Rules**

FRE 404(a) _____ 29

FRE 801(d)(2)(B) _____ 29

## STATEMENT OF JURISDICTION

This Court has jurisdiction to consider this case pursuant to Rule 4(b) of the Federal Rules of Appellate Procedure and 18 U.S.C. §3742(a). This is a direct appeal from a criminal conviction and sentence.

## STATEMENT OF THE ISSUE

I.   Whether sufficient evidence supported the jury's decision that Appellant knew of and then joined the alleged drug conspiracy?

II.  Whether the admission of rap lyrics was harmful error?

III. Whether the lower court erred when failing to define reasonable doubt?

IV.  Whether the District Court erred in calculating the Sentencing Guidelines for the rarely encountered controlled substance "eutylone?"

## STATEMENT OF THE CASE

### Course of proceedings

Appellant Kenneth Watkins was the last Defendant named in a twenty-three count Third Superseding Indictment issued by the Grand Jury in the United States District Court for the Western District of North Carolina, Charlotte Division. (JA013). Mr. Watkins was named only in Count One, which alleged a conspiracy with eight others to possess with the intent to distribute Controlled Substances, in violation of 21 U.S.C. §841(a). Although the indictment alleged that the conspiracy related to several controlled substances, as set out below the only evidence in the case against Mr. Watkins involved a drug called "Eutylone."

Mr. Watkins pled not guilty. The District Court denied a request for a Judgment of Acquittal after the prosecution's evidence concluded. (JA292-293). After a three-day trial in which he has was the sole Defendant, the jury found him guilty of the single count in which he was named. (JA429). The District Court also denied a post-trial Motion for Acquittal and a request for a New Trial. (JA436-437; JA438-439; JA440-449).

Mr. Watkins objected the Probation Officer's method for calculating drug quantity under U.S. Sentencing Guidelines. (JA504). The District Court rejected those objections, ultimately imposing a 120-month custodial sentence. (JA491-496). Mr. Watkins filed a timely Notice of Appeal and is serving that sentence.

(JA487-498).

## Statement of the Facts

The jury heard the story of co-Defendant Steven Cloud, who was at the heart of a Charlotte-based music label in that city. Investigators determined that Cloud and others in the music business were involved in dealing drugs. Cloud eventually was the first-named Defendant in the case. As already described, Appellant Kenneth Watkins was only named in the fourth indictment issued by the grand jury, and was alleged solely to have been a member of an overall drug-dealing conspiracy. Mr. Watkins was the only Defendant who went to trial.

The evidence involved trips by two women who went from Charlotte to Atlanta at Cloud's direction. The first woman made two trips, on the first of which she obtained drugs from some person who was not Kenneth Watkins. On her second trip this woman got a package from Mr. Watkins, but never knew what it contained (and this package was never found by law enforcement). The second woman made one trip, got drugs, was arrested with those drugs, and she told the jury that the person who gave her those drugs again was not Kenneth Watkins. The questions for this Court are whether there was sufficient evidence to support the jury's verdict, whether Mr. Watkins got a fair trial, and whether the lower court correctly calculated the Sentencing Guidelines.[1]

---

[1] Because this appeal includes challenges to both the sufficiency of the evidence along with arguments about mid-trial evidentiary

## Background

Steven Cloud was known as "Bankroll Ziggy" or simply "Ziggy." He was associated with a group loosely called the "Press Gang". The group was associated with a music label. (JA056-060).

Cloud knew and had sexual relationships with co-Defendants Jonquilla Sanders and Latisha Anderson. Ms. Sanders, who testified for the prosecution, candidly admitted that part of her motivation for having relations with Mr. Cloud was to further her music career. (JA110; JA119; JA230)

Investigators eventually learned about Appellant Kenneth Watkins. The investigators and other prosecution witnesses acknowledged that Mr. Watkins was from Atlanta, had his own music label in that city, and seemed to have music business with Cloud. Investigators also learned that Mr. Watkins performed at various clubs in Atlanta. They discovered also that he owned a music studio called K3Soundz on Covington Highway near Atlanta. (JA061; JA063; JA097; JA273).

The investigators obtained a wiretap for Cloud's telephone. Investigators acknowledged that besides the conversations and actions described below, they heard nothing from Mr. Watkins on the wiretap that indicated he was involved in dealing drugs, other

---

rulings, Appellant will lay out facts beyond those that merely support the jury's verdict. Whether an error had substantial influence on the outcome requires an appellate court to weigh the record as a whole. <u>United States v. Montalvo-Murillo</u>, 495 U.S. 711, 722, 110 S. Ct. 2072, 2080, 109 L. Ed. 2d 720 (1990).

than a conversation during which Cloud said he was "sending my people" to see Mr. Watkins. (JA112-113).

### Jonquilla Sanders

As mentioned already Ms. Sanders was a co-Defendant and a prosecution witness. She described two round trips from Charlotte to Atlanta that she took at Cloud's behest.

Ms. Sanders told the jury that her first trip on behalf of Mr. Cloud was in July or August 2020. She made no mention of Mr. Watkins concerning this trip. Also, Cloud did <u>not</u> give her any money prior to the trip. At Cloud's request Ms. Sanders went to Atlanta and met a person who have her a bag of pills. She was the first witness who mentioned that the person who gave over the package with drugs in Atlanta was a "light-skinned tall" black man who drove a red car. Ms. Sanders told the jury that this man was <u>not</u> Kenneth Watkins, who she had met previously at an Atlanta video production. (JA120-JA122).

Cloud asked Ms. Sanders to take a second trip to Atlanta from Charlotte, which she did during the late night of October 16, 2020, into the daylight of the following day. Cloud told Ms. Sanders it would be the "same thing." Unlike the first trip, for the second Cloud handed a wad of cash to Ms. Sanders prior to her trip to Atlanta. She never counted the money. Also, unlike the first trip Cloud instructed Ms. Sanders to make the drive with someone he was sending to accompany her, a person named "Reggie." (JA128;

JA134-JA135; JA140; JA158).

Investigators were listening to Cloud's phone during Ms. Sanders' trip to Atlanta and back. They intercepted calls among Cloud, Sanders, and Mr. Watkins. The intercepted calls corroborated Ms. Sanders testimony when she explained that Cloud told her to meet Mr. Watkins at "Club Diamonds" in Atlanta where Appellant was performing. Ms. Sanders went to the Club, even though in one of the intercepted calls Mr. Watkins told Cloud he would not have "it" there. Cloud also instructed her to give the wad of cash to Mr. Watkins. (JA1235-JA137; JA138-140).

The wiretaps and Ms. Sanders' testimony established that after Mr. Watkins finished performing at Club Diamonds he and Cloud instructed Ms. Sanders drive to the K3Soundz studio on Covington Highway and later to a residence which was about 15 minutes from the studio. Mr. Watkins came out from that residence with a box which he put inside Ms. Sanders' vehicle. Ms. Sanders never looked inside the box. (JA142-JA144; JA158-JA159).

After receiving the box from Mr. Watkins, Ms. Sanders returned to Charlotte. She delivered the box to Mr. Cloud without ever looking inside the receptacle. (JA142-JA144, JA158). Ms. Sanders did not know what was in the box, she simply assumed it was pills based on Cloud's request that she do "the same thing." (JA159). She also agreed that while Cloud mentioned it being the "same thing" as the first journey, the second trip was different in that

it involved her bringing cash to Watkins, she got the package from someone other than the man in the red car, and on her first trip she was not accompanied by "Reggie." (JA163).

Ms. Sanders was later arrested and held in pretrial detention where she met and conversed with Latecia Anderson, another Defendant. (JA165). Sanders told Anderson that she would do whatever she had to do in order to get out of jail: "I don't give a f*** as long as I don't have to sit in jail." Sanders made clear to Anderson that she was "not fond at all" of Mr. Watkins. (JA308; JA314; JA310-311).

### Latishaa Anderson

Latisha Anderson was another Defendant in the case who also acknowledged having a sexual relationship with Steven Cloud. She told the jury about a trip she took from Charlotte to Atlanta at Cloud's behest on October 24, 2020, one week after Ms. Sanders made her second trip.

Just like Ms. Sanders, Ms. Anderson described going to Atlanta. Just like Ms. Sanders' first trip to Atlanta, Ms. Anderson said she met a light-skinned and tall black male who drove a red sports car. The man was <u>not</u> Appellant Kenneth Watkins. The light-skinned man provided Anderson with a very distinctive "Versace" box which was then placed on the passenger seat of Ms. Anderson's vehicle. She opened the box while driving back to Charlotte and observed numerous plastic bags all containing pills. (JA308; JA310-311, JA315; JA323-JA324).

The government (and the District Court) focused on an intercepted call between Cloud (designated as SC), Mr. Watkins ("KM") and Ms. Anderson ("JS") which took place shortly after midnight. Below is the entirety of that intercepted discussion, found at Government Exhibit 1-f.

SESSION 487: 10/17/2020, 00:21, 4703892569 (WATKINS) to 9807770566 (CLOUD)

Three-way conversation with SANDERS, WATKINS, and CLOUD

KM: But I don't have it in there.

SC: I know that, I know that, I know that's what happened, I ain't gonna have them just sitting and shit so they might as well come get some drinks and shit like that, you feel me?

KW:     Aight,     I'm     going     to

ClubDiamonds.

SC: Hey bae, you hear em?

JS: Yeah.

SC: He going, he going to Diamonds so, so meet him at, meet him at Diamonds.

JS: Aight.

SC: You hear me, you got, um, you got money on you?

Investigators listening to Cloud's phone on the wiretap the evening of Ms. Anderson's trip knew that someone had fired a weapon at Mr. Watkins. The calls revealed this incident happened sometime during the period when Ms. Anderson was waiting to obtain the package she had been sent by Cloud to retrieve. (Government Exhibit 1-j; JA-105).

The investigators listing to the calls decided to see if they could stop Ms. Anderson during her return trip to Charlotte. They arranged for a uniformed officer to stop her vehicle on the interstate highway between Atlanta and Charlotte. That stop occurred near the Georgia-South Carolina state line. Ms. Anderson was stopped, drugs were discovered inside the Versace box, she was arrested. During a search of her vehicle officers also found approximately $4,500 in currency in the middle console. (JA180-JA190).

Government's Exhibit 13 is a photo taken by law enforcement of the Versace box and the pills. The pills were later tested and contained a controlled substance called "Eutylone."



Government Exhibit 24 is a photo of Ms. Anderson taken shortly after she was arrested.



Ms. Anderson spoke with federal prosecutors and agents. She told them (and later told the jury) that it was <u>not</u> Kenneth Watkins who provided her with the distinctive Versace box containing pills that was found in her vehicle. The drugs were destined for another person who Ms. Anderson would not identify. (JA315–JA316).

Ms. Anderson also told the jury about the currency found inside her car. She explained that Mr. Watkins gave her this money to be delivered to Mr. Cloud. Because she knew that Cloud and Watkins did music events together, she assumed that the currency

was related to those events. (JA308, JA311). She testified that this transfer of currency between her and Mr. Watkins was the only time she met him (and that she had seen his picture when she told the federal agents and prosecutors that Watkins was not the man from whom she got the Versace box containing the pills). (JA308-JA309).

The government also introduced text messages from Ms. Anderson to Cloud sent shortly before she met Mr. Watkins. In Exhibit 28 Ms. Anderson told Cloud that she was "Bout to leave. I will bring your money when I get back to the city." (JA469).

Ms. Anderson also told the jury about her encounters in custody with Jonquilla Sanders. She explained that when the two women were in the same area of the jail Ms. Sanders said she would say whatever she had to say in order to get out of jail. (JA311-JA312; JA314-JA316).

### Other Witnesses

As just noted, Latecia Anderson was arrested on October 24, 2020, when officers who stopped the vehicle she was driving found the Versace box with 8909 pills inside the various plastic bags. (JA218-JA219). Ms. Anderson told the jury that she received the Versace box from the light-skinned man in the red car she met near the K3Soundz studio off Covington Highway near Atlanta. Two other witnesses observed this encounter.

Ayesha O'Neill is a hairdresser who splits time between

Florida and North Carolina. When in Georgia she plied her trade in a booth she rented at the K3 Soundz Studio. She had also done hair for music videos produce by Mr. Watkins. (JA333-JA334).

Because of her career, Ms. O'Neill recalled seeing a woman with very unattractive hair who met with a light-skinned tall black male on October 24, 2020, at a gas station near the K3Soundz Studio. Ms. O'Neill saw that the man had a very distinctive large Versace box which he handed to the woman with the unattractive hair. The man with the box was <u>not</u> Kenneth Watkins. Ms. O'Neill identified Ms. Anderson from Government Exhibit 24 as the person who got the Versace box from the light-skinned tall man in the red car. (JA338-JA342).

Kizzy Childs is married to and has children with Mr. Watkins. She also helps operate many of the family's businesses. Ms. Childs also recalled the events of October 24, 2020. Ms. Childs was with Ms. O'Neill when they observed the woman with unattractive hair meeting with the light-skinned man who handed over the distinctive Versace box. The two women exchanged a joke about how the woman needed to be in Ms. O'Neill's chair for a hair makeover. (JA346-JA357).

Ms. Childs also saw a second encounter between the woman in Government Exhibit 24 (Latecia Anderson) and her husband, Kenneth Watkins. She observed Mr. Watkins hand a large quantity of currency to the woman depicted in Government Exhibit 24. (JA362-

JA363).

Other government witnesses established that Cloud's calls with Mr. Watkins, Ms. Anderson and Ms. Sanders had been intercepted via the court-authorized wiretap. One witness did a lengthy evaluation of phone tower records which established that the cell phone used by Ms. Sanders went to the locations she described in her testimony, and that Mr. Watkins phone was at the places she said where they met. (JA257-JA283).

## Rap Lyrics

Toward the end of the trial the government began asking witnesses whether they had ever heard certain inflammatory song lyrics written and performed by Mr. Watkins and Mr. Cloud. The District Court sustained an objection the first time when the prosecution tried to elicit a response regarding the line "We got more guns than all of them" was supposedly sung by Watkins and Cloud. (JA359). The prosecution continued to ask such questions, and the lower court thereafter changed course and permitted the use of the lyrics. The District Judge held that the defense had opened the door to this subject when a defense witness told jurors that Mr. Watkins was a "good Muslim." (JA360).

As a result of the lower court's about-face, the jury was informed that Mr. Watkins supposedly had song lyrics about "I'm a doper for real," and "Truckloads and bales, don't even put 'em on a scale." (JA361, JA364).

## Jury Deliberations

The jury asked several questions, indicating at one point that there was confusion about the testimony from Leticia Anderson. Jurors were confused whether she <u>knew</u> versus she merely <u>met</u> Mr. Watkins. (JA422). As already noted, Anderson clearly said that the exchange of currency between she and Mr. Watkins was the only time in her life she had seen him (other than observing his photo that was shown to her when she told the authorities that Watkins was not the man who gave her the Versace box). The District Court instructed the jury to rely on their individual memories of her testimony. (JA308–JA309).

The jury sent later a note indicating it could not reach a decision. (JA426). The District Court simply instructed jurors to continue their deliberations. (JA427). On the second day of deliberations the jury found Mr. Watkins guilty. (JA429).

## <u>STANDARD OF REVIEW</u>

A criminal conviction will only be upheld when supported by substantial evidence, viewed in the light most favorable to the government and looking to whether a reasonable finder of fact could accept the evidence as adequate and sufficient to support the conclusion that the Defendant is guilty beyond a reasonable doubt. <u>United States v. Bailey</u>, 819 F. 3d. 92, 95 (4th Cir. 2016).

Evidentiary rulings are reviewed for abuse of discretion. When a trial court errs, this Court looks to whether that error was harmful. <u>United States v. Briley</u>, 770 f. 3d 267, 276 (4th Cir.

2014).

When considering a challenge to the District Court's application of the Sentencing Guidelines the appellate court reviews factual findings for clear error while legal conclusions are reviewed de novo.  United States v. Allen, 446 F. 3d 522, 577 (4ᵗʰ Cir. 2006).

### SUMMARY OF THE ARGUMENT

I.  The lower court erred in denying the request for a judgment of acquittal in that the evidence was insufficient to establish to a rational juror that Appellant knew of and then joined in Stephen Cloud's drug dealing conspiracy. Even if the jury was allowed to reject defense witnesses who said it was a different person who provided the box with drugs to the courier, the remaining evidence failed to establish beyond a reasonable doubt that Appellant knew of and then joined in with the distribution of the drugs found in the Versace box found inside the courier's car.

II.  It was harmful error to allow the use of irrelevant and prejudicial rap lyrics in such a close case.  The songs had nothing to do with the evidence and were highly prejudicial (which of course is why the prosecution wanted to use them). These lyrics were unduly harmful in such a close case.

III. The lower court erred when refusing to define "reasonable doubt."  Appellant recognizes contrary authority in this

Circuit but preserves this issue for possible future litigation.

IV. The District Court erred when calculating drug quantity under the Sentencing Guidelines. Eutylone is a relatively rare drug and can be calculated in multiple ways. The District Court erred in several ways when using the "converted drug weight" as opposed to using the table for "typical weight per pill or dose". Those errors resulted in an incorrect calculation of the Sentencing Guidelines.

**ARGUMENT AND AUTHORITY**

## I. INSUFFICIENT EVIDENCE SUPPORTED THE CONVICTION

In a case involving a challenge to the sufficiency of evidence in a criminal case appellate courts view all inferences in favor of the jury's verdict of guilty. On the other hand, this and all appellate courts routinely reverse convictions for insufficiency when the inference of guilt is merely a series of guesses or assumptions. This case asks the Court to determine if the evidence was enough for a reasonable inference, of if a reasonable juror was simply guessing about whether Kenneth Watkins knew about and then participated in Stephen Cloud's drug trafficking.

Reduced to the basics, investigators knew Cloud and Watkins did business together. Evidence established that one woman got drugs from the light-skinned man in the red car, and that on her second trip she got a box from Mr. Watkins and merely assumed it also contained drugs (even though there were significant

distinctions between her first and second trip). The second woman was heard on the wiretap with Cloud and Watkins discussing a meeting and the retrieval of something from Watkins to be delivered back to Cloud. However, this woman and other witnesses established that the Versace box with the pills was delivered to the woman by the light-skinned man in the red car, and <u>not</u> by Kenneth Watkins. This evidence was insufficient from which a rational juror could infer that Kenneth Watkins knew about and was part of the delivery of drugs from Atlanta to Mr. Cloud in Charlotte.

## A. Evaluating Sufficiency in Drug Conspiracy Case

This Court will review *de novo* the District Court's ruling on a motion for judgment of acquittal. The Court will uphold the verdict if, viewing the evidence in the light most favorable to the government, it is supported by substantial evidence. <u>United States v. Alerre</u>, 430 F. 3d 681, 693 (4th Cir. 2005). Substantial evidence is "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." <u>Id</u>. (internal quotation and citation omitted).

In a drug conspiracy prosecution, the government is required to prove three elements beyond a reasonable doubt. First, the prosecution must prove an agreement between two or more persons to possess with the intent to distribute some controlled

substance.[2] Next, the government needs to establish that the Defendant on trial knew of the conspiracy. Finally, there must be sufficient proof that the accused individual knowingly and voluntarily became part of that conspiracy. United States v. Burgos, 94 F. 3d 849, 857 (4th Cir. 1996)(en banc).

**B. Reasonable Inference Versus Impermissible Conjecture**

While the evidence is viewed on appeal in the light most favorable to the government, there is a limit to the leaps of logic allowed in order to sustain a verdict. "Conjecture and suspicion" are not enough, nor is a good "guess" sufficient to support a criminal conviction. United States v. Strayhorn, 743 F. 3d 917, 922-23 (4th Cir. 2014) (reversing Hobbs Act robbery conviction for insufficient evidence) citing United States v. Van Fossen, 460 F. 2d 38, 40-41(4th Cir. 1972)(reversing conviction when evidence led only to impermissible conjecture and suspicion).

**C. Insufficient Evidence of "Knowledge"**

The government was required to produce sufficient evidence from which a rational juror could conclude that Kenneth Watkins "knew" about the illegal conspiracy between Stephen Cloud and others. The evidence in this trial was far short of that mark.

The evidence showed that Cloud dealt in drugs. He instructed Sanders and Anderson to go to Atlanta retrieve packages which contained pills then drive back to Charlotte and bring the drugs

---

[2] As noted already, the only drug mentioned in the trial of this case was a Controlled Substance called "eutylone."

to Cloud. The evidence also demonstrated that Cloud knew Mr. Watkins, they appeared friendly on intercepted phone calls, they apparently had business dealings with each other, and the two spoke on the phone in seemingly coded language in the time frame surrounding the trips by Sanders and Anderson. However, neither the friendship, business activities, personal relationship nor the language of the intercepted calls demonstrated that it was a reasonable inference that Mr. Watkins knew about the contents of the closed packages transported by the two women from Atlanta to Charlotte for Mr. Cloud.

The closest the prosecution came to presenting any evidence about "knowledge" was the intercepted calls surrounding Ms. Anderson's trip on October 24, 2020. As noted, Government's Exhibit 1-f contains a statement at the beginning of a call in which Mr. Watkins tells Cloud "but I don't have it in there." There is no context to the statement, and the best that can be said is that it refers to something that will be delivered at some point to someone else, nothing more, nothing less. However, a rational juror would engage in impermissible conjecture to make the leap that this single statement proved that Mr. Watkins "knew" that Cloud sent Anderson to pick up drugs. Just because there was plenty of evidence showing the Cloud drug-retrieval from Atlanta business, this does not also demonstrate that every person with whom Cloud communicated was aware of those illegal deals.

This court faced a somewhat similar situation in United States v. Barnett, 660 Fed. App'x, 235 (4th Cir. 2016), which although unreported and not binding is nevertheless instructive. The Court reversed for insufficient evidence the RICO conspiracy and extortion racketeering convictions of Ms. Williams. There was evidence she "played a central role in the gang as a primary source and conduit of information and as an advisor integral to the success and coordination of gang activities." Id., at 248. From this the prosecution claimed that the jury could infer she "knew" that other gang members engaged in the requisite racketeering crimes in order to prove a RICO conspiracy. Reversing the conviction, the Court noted that "mere association" with other conspirators does not prove "knowledge" of what other conspirators are doing. "Were we to accept the government's argument, almost any individual affiliated with a gang could be presumed to know about and agree to the commission of racketeering acts generally and therefore be guilty of conspiracy to violate RICO." Id.

Barnett is a good example of how people working with others who are engaged in criminal activities are not always aware of the crimes committed by those other individuals. Merely because a Defendant "plays a central role" in a group's activities, this does not mean she has "knowledge" of the conspiracy's acts. Simply because a Defendant is a "primary source or conduit of information" within a group, by itself this does not show that

Defendant "knew" what the others were up to.  And even when there is evidence that the Defendant is "an advisor integral to the success and coordination" of the group's activities, this does not mean that such a Defendant "knows" what the other members of the conspiracy have done.

The government will undoubtedly argue that the confluence of the evidence shows that Cloud obtained drugs from Atlanta, that Cloud sent couriers to that city, and on two occasions had couriers meet with Mr. Watkins.  During the final trip they confirmed that the courier was transporting drugs when the investigators had her vehicle stopped and the noteworthy Versace box was discovered.  What the jury never heard was any evidence that Kenneth Watkins <u>knew</u> what was inside that box.

The prosecution will also certainly contend that the jury is allowed to "infer" that all this evidence shows that Mr. Watkins was the source of the pills found in the Versace box.  The problem, of course, is that inferences must be "reasonable." Such an inference makes no sense when considering the $4,500 in currency found in the center console of Ms. Anderson's vehicle.  If Mr. Watkins was the source of the drugs for Cloud, it makes no sense that he would also sending $4,500 to the person making the drug purchase.  It is just as reasonable to infer that the "I don't have it in here" statement on Government Exhibit 1-j relates to the money, not to the Versace box.  Recall that Ms. Anderson was

the only person who provided evidence about the source of the Versace box.  She clearly and repeatedly said she got the box from the light-skinned tall man in the red car, and not from Kenneth Watkins.

The jury was entitled to reject Ms. Anderson's testimony (along with the supporting evidence from Ms. O'Neil and Ms. Childs).  But even removing the defense witness testimony, the record is absolutely lacking in anything from which a rational juror could use to make a "reasonable inference" that Mr. Watkins "knew" what was in the Versace box. Not one piece of evidence established that Mr. Watkins had anything to do with that box.

**D. Insufficient Evidence of Joining Conspiracy**

There also were insufficient facts from which a reasonable juror could conclude that Appellant joined Cloud's drug conspiracy. Assessing general principles and cases along with an analysis of the evidence from the drug couriers demonstrates that there was insufficient proof from which a juror could conclude Appellant joined the Cloud drug conspiracy.

1)   General Principles

The District Court provided the jury with standard principles for assessing whether a criminal Defendant knowingly joined a drug conspiracy on at least one occasion.  The District Judge told the jury it must determine if "the defendant joined in the agreement knowingly and voluntarily; that is with the intent to further its unlawful purpose."  The Court then explained that:

Merely associating with others and discussing common goals, mere similarity of conduct between or among such persons, merely being present at the place where a crime takes place or is discussed, or even knowing about criminal conduct does not of itself make someone a member of the conspiracy nor a conspirator.

You may not infer that the defendant is a member of a conspiracy merely from the fact that he was present at the time and place when the conspiracy was being carried on and had knowledge that it was being carried on.

(JA411). These standard principles demonstrate that there was insufficient proof in this case that Kenneth Watkins knowingly joined in any drug conspiracy.

Elements of a drug conspiracy must be established beyond a reasonable doubt. A mere hunch or intuition is insufficient. A jury cannot "simply guess at the magnitude and frequency of unknown criminal activity." United States v. Hickman, 626 F. 3d 756, 770 (4th Cir. 2010) (internal quotation marks omitted)(rejecting prosecution argument that four-month course-of-conduct between supplier and distributor could yield reasonable inference of an additional 174 grams of heroin in ongoing conspiracy). A jury may not "simply guess at the magnitude and frequency of unknown criminal activity." Unbridled speculation is an impermissible basis for conviction beyond a reasonable doubt." Id.,

### 2) Trips by Ms. Sanders

The only evidence in this case pertaining to whether Kenneth Watkins knowingly and voluntarily joined in a drug conspiracy comes from the trips by the women who traveled at the request of Stephen

Cloud.  This evidence also failed to establish that Appellant joined the alleged conspiracy.

Ms. Sanders knew she got drugs for Cloud on her first trip. The drugs were in a box given to her by the light-skinned man in the red car.  On her second trip she got a box, this time from Mr. Watkins.  She did not look into this box.  Unlike her first trip, on the second journey she was accompanied by "Reggie".  She assumed this was because Cloud would not trust her with drugs.  Neither she nor the prosecution ever explained to the jury why if Reggie was needed to stop her from misusing the drugs, why no such "minder" went with her on the first trip when Ms. Sanders knew for a fact that the box contained drugs.  These two trips by Ms. Sanders fail to demonstrate that Mr. Watkins joined in a drug conspiracy with Cloud and others.  No evidence shows he was associated in any way with the first trip by Ms. Sanders.  There is no evidence that her second trip involved drugs.

The government will probably point to testimony that Cloud told Sanders that her second trip was to be like the "first time." Appellant already has demonstrated that the two trips were different from one another.  Furthermore, as set out in a somewhat similar case from the Second Circuit, references to earlier transactions are an impermissible basis from which to prove elements of a current drug conspiracy.

In United States v. Pauling, 924 F. 3d 649 (2nd Cir. 2019), the question was whether there was sufficient evidence that a heroin conspiracy between the Defendant and a supplier named Low exceeded 100 grams. The parties agreed on 89 grams worth of transactions in the Pauling-Low conspiracy. The question was whether a call by Mr. Pauling with his own customer named "Steve" referred to an earlier 14-gram transaction which should be included in the quantity calculations. In this call Steve used the code "14" and said he wanted "same thing as last time." If this call referenced an earlier 14-gram deal in which the heroin came from Low, then the overall quantity exceeded the 100-gram threshold for sentencing purposes. The Second Circuit acknowledged that while this "could have been a reference to a prior 14-gram sale [between Low and Pauling]…we hold that no reasonable jury could have found beyond a reasonable doubt that those 14 grams were sourced by Low." Id., at 659. As a result, the Court found insufficient evidence to support the jury's finding that the Pauling-Low conspiracy exceeded 100 grams of heroin.

In Pauling, the prosecution raised two arguments in support of the jury's verdict. First, it contended the language of the call itself sufficed to support the verdict. Alternatively, the government contended that it would have been rational for a juror to conclude based on the ongoing relationship between Pauling and his supplier that the two conspired to distribute at least another 11 grams of heroin. The Second Circuit rejected each claim.

First, the Second Circuit noted that it was neither the Defendant Pauling nor his supplier Mr. Low who uttered this five-word reference to the earlier transaction with Steve. Such a statement from a third party was not enough to prove an essential element of a federal drug conspiracy. "To conclude so much based on so little amounts to impermissible speculation." Id.

Second, the appellate court rejected the prosecution's "ongoing relationship" argument. The government pointed to five areas of the relationship as supposedly supporting the inference that the heroin conspiracy between the two men must have included at least another 11 grams of the drug. While that might be reasonable speculation, "it still is speculation and therefore is an insufficient basis on which to rest a guilty verdict." Id., at 660.

In reversing the conviction, the Second Circuit in Pauling noted the difficulty when drawing the line between a permissible inference and impermissible speculation. While an appellate court must draw reasonable inference in favor of the prosecution, "we may not permit that rule to displace the even more important rule that all elements of an offense must be proved beyond a reasonable doubt." Id., at 662(citation omitted). In other words, it is not enough to find that the accused is "probably" guilty. Id

Pauling holds lessons for the present case. A reference to an earlier transaction is not enough by itself to demonstrate sufficient proof of guilt. Here, Cloud's reference to Ms. Sanders that her

second trip was like the "first time" is so imprecise as to be almost meaningless.  Certainly, the two trips both involved travel from Charlotte to Atlanta, and perhaps it was the destination to which Cloud was referring when discussing the second trip with Sanders. On both occasions she drove instead of taking a plane or a bus, which also could be the context for Cloud's mention of the "same thing" for the second journey. Each time she came back to Cloud's residence when she returned from Atlanta, and this could have been why Cloud said what he said.  The speculation is almost endless, but it remains <u>speculation</u>.  What the jury did know for a fact was that the first trip involved drugs that were given to her by someone other than Kenneth Watkins, whose name was never mentioned in relation to the first trip. The jury also knew on the second trip Sanders got a box of something, but there was no evidence at all about what was inside that receptacle.  It is merely a guess or a hunch as to whether the package Ms. Sanders got from Appellant contained illegal drugs.

### 3)   Trip By Ms. Anderson

Latisha Anderson went to Atlanta at Cloud's behest.  She spoke with Cloud and Mr. Watkins to make arrangements to meet Appellant. Cell phone evidence corroborated that her phone was in proximity with Appellant's at the relevant locations. She got the Versace box and was stopped by law enforcement.  Officers discovered the 11 bags of pills and the $4,500 in currency.  Other than the intercepted

calls and her phone being near Mr. Watkins' device, the prosecution presented no evidence connecting Appellant with the drugs in the Versace box.

The defense called Ms. Anderson to testify. She explained that she got $4,500 from Mr. Watkins which seemed normal to her in that she knew the two men had music business with one another. She also unswervingly told jurors that the Versace box was delivered by someone matching the description of the person who handed the box with drugs to Ms. Sanders, the light-skinned tall man driving the red car.

Of course, the jury was entitled to reject Anderson's testimony, in whole or in part. However, rejecting her testimony is not the same as sufficient evidence from which the jury was entitled to conclude that Mr. Watkins knowingly and voluntarily joined Cloud's drug conspiracy. Put simply, the Government produced no evidence at all connecting Mr. Watkins to the Versace box other than the <u>fact</u> that Cloud had calls with Appellant and Ms. Anderson connecting the two in order to meet.

The most troubling part of Ms. Anderson's trip is that the government has no explanation of how a rational jury could conclude that Watkins supplied drugs yet was making a simultaneous cash payment to his customer. It begs credulity to think that drug deals (or any other rational economic transaction) take place this way. While the jury was entitled to reject Ms. Anderson's testimony that

Watkins gave her the money to deliver back to Cloud, that then leaves no evidence whatsoever pertaining to the currency found in Ms. Anderson's vehicle right next to where the arresting officer found the Versace box containing the drugs.

As this Court held in United States v. Hickman, supra, hunches or intuition are not enough to support federal drug conspiracies. Like the Second Circuit discussed in Pauling, it is not enough for the government to establish that the Defendant is "probably guilty." Our Constitution demands more. This Court should reverse the conviction here.

## II.   IMPROPER ADMISSION OF RAP LYRICS

This was a case involving an alleged Eutylone conspiracy. When cross-examining Appellant's wife, over objection the prosecution was allowed to ask questions about incendiary lyrics supposedly written and published by Mr. Watkins on social media. This was a harmful error which tainted the conviction and should therefore result in a remand for a new trial.

Toward the end of the trial the Government began asking witnesses whether they had ever heard certain inflammatory song lyrics written and performed by Mr. Watkins. The District Court sustained a defense objection this first time this happened. The prosecution continued to ask such questions. Over defense objections based on relevance, the lower court thereafter allowed all such questions. As a result, the jury was informed that Mr.

Watkins had song lyrics about "I'm a doper for real," and "Truckloads and bales, don't even put 'em on a scale." (JA361, JA364).

The government never even established that these out-of-court statements were made or adopted by Mr. Watkins. The prosecution merely assumed it was his words in questions posed to defense witnesses. These out-of-court statements were therefore clearly hearsay, and not otherwise admissible as statements of a party-opponent under FRE 801(d)(2)(B).

In addition to being hearsay, the lyrics were inadmissible and irrelevant attacks on Mr. Watkins character. After the defense relevancy objection was overruled, the prosecutor asked a defense witness whether the "Truckloads is also a song about dealing drugs, right"? (JA363). This was pure propensity evidence that was inadmissible under FRE 404(a).

The lower court erred in holding that the defense witnesses' statement that Appellant is a "good Muslim" somehow opened the door to an attack on Appellant's character using incendiary song lyrics. The lyrics had little connection to the remaining evidence, which showed a pill distribution conspiracy involving Cloud and others. The references to "Truckloads and bales" might have some weak relevance in a marijuana case but had nothing to do with a Eutylone conspiracy with drugs transported in Versace boxes. See United States v. Williams, __ F. Supp 3d __, (D. Az. 2022)(2022

WL 17547125 Dec. 9, 2022), at *44-46(lyrics that did not mirror charged crimes rejected).  <u>Compare</u> <u>United States v. Recio</u> 884 F. 3d 230, 235 (4th Cir. 2018) (lyrics relevant and permissible when matched details of alleged crime).

Not only did the District Court err when allowing the government to use these lyrics, this error harmed Mr. Watkins.  As already discussed, this was a very close case.  The jury clearly struggled with the evidence, at one point demonstrating that at least some jurors had a difficult time comprehending Ms. Anderson's testimony.  Jurors also sent a note explaining that they were unable to reach an agreement.  When considering the facts of the case and the jury's struggles, the impact of the error here was harmful.  This Court therefore should reverse the conviction and remand for a new trial.

**III. FAILURE TO DEFINE REASONABLE DOUBT**

Mr. Watkins proposed a jury instruction that fully defined "reasonable doubt." The District Court rejected this suggestion, based on <u>United States v. Williams</u>, 152 F. 3d 294, 298 (4th Cir. 1998). The lower court thereafter told the jury that "reasonable doubt means what it says…its meaning is no doubt self-evident and understood by you…".  At 353.  Despite the confidence that lay jurors are easily able to understand supposedly "self-evident" legal terms, the lower court's decision was erroneous.

Mr. Watkins fully recognizes that <u>Williams</u> and other cases

are binding decisions in this Circuit.  Appellant preserves his right to bring this claim to other courts if necessary.

## IV.  ERROR CALCULATING SENTENCING GUIDELINES

The only drug in this case was a rarely encountered substance called "eutylone."  The pills in the bags found inside the Versace box contained this substance.  The District Court overruled defense objections and calculated the drug quantities by using the ratios found in the "Drug Conversion Table" which follows USSG §2D1.1. Then, the District Court included quantities that were not reasonably foreseeable to Appellant.  Furthermore, the lower court refused to follow the suggestion in an Application Note that downward departures should be considered in cases involving these rarely encountered controlled substances.  Based on these errors, the District Judge miscalculated the Guidelines.  This Court therefore should reverse and remand for a new sentencing hearing.

### A. Sentencing Evidence and Calculations

The only evidence about any controlled substance in this case comes from testing 11 pills seized from the bags inside the Versace box.  The forensic chemist testified that there were 8,909 pills contained in 11 bags.  He tested one pill from each bag, finding that all 11 pills he analyzed contained Eutylone. (JA504). Eutylone is one of a class of chemicals called "synthetic cathinones." (JA512).

Eutylone is not in the Drug Quantity Table. Application Note 8 following U.S.S.G. §2D1.1 explains that a Court can also use the

"Drug Conversion Table" for substances not found in the Drug Quantity Table.  When using the "Drug Conversion Table", controlled substances are assigned a "Converted Drug Weight" based on the various ratios in this part of this Application Note.

The PSR recommended and the lower court used the portion of the Drug Conversion Table involving substances called "synthetic cathinones."  Under this part of the Drug Conversion Tables, one gram of a synthetic cathinone converts to 380 grams of "Converted Drug Weight."

The PSR calculated drug quantity in the following way.  First, the PSR looked to the 2,391 grams, which is the weight the chemist assigned to the 8,909 pills seized on October 24, 2020, from the box in a car driven by Latisha Anderson.  Next, the PSR added 2,000 grams, based on a law enforcement estimate of the weight of whatever was in the box that Jonquilla Sanders got for Steven Cloud on October 16 and 17, 2020. Adding these quantities together yields 4,391 grams.  When multiplied by the 380:1 conversion for synthetic cathinones this yields 1,668,580 grams (or 1,668.58 kilograms) of "Converted Drug Weight."  This amount of "Converted Drug Weight" leads to an offense level of 30 under the Drug Quantity Tables. (JA512).

Mr. Watkins filed three distinct objections to the method used in the final PSR for reaching this offense level. The lower court erred when rejecting these objections.

**B. Using Untested substances**

Appellant's first objection focused on how he should only be held accountable for the 11 pills that were tested when calculating drug quantity under U.S.S.G. §2D1.1. There was no evidence that any other pill for which Mr. Watkins should be held responsible contained Eutylone, or any other controlled substance.

The District Court rejected this objection, suggesting that "sampling" is an appropriate method for calculating drug quantity. (JA465–466). Mr. Watkins conceded that cases have approved this method, but nevertheless contends that in the context of this relatively rare substance that process was inappropriate. Furthermore, in most sampling cases the analytical chemist removes a small portion from a larger sample, and thus courts are on firmer ground when deciding that a test of that sample likely is similar to remainder of the substance. Here, in contrast, the chemist tested 11 out of 8,909 pills, and the District Court decided that this was sufficient from which the decide that all the pills in this case (seized or not) contained Eutylone.

The Government had the burden to establish the facts supporting drug quantity. The lower court erred when ruling that the prosecution had met its burden by testing only 11 pills.

**C. Estimates from October 16–17, 2020**

The Government (and the final PSR) pointed to the October 16–17, 2020 trip made to Atlanta by Ms. Sanders on behalf of Steven

Cloud.  Although no drugs were seized (and Ms. Sanders never looked inside the box) the Government contended this trip involved 2,000 grams of Eutylone.   This was purely on an estimate from law enforcement officials.  Mr. Watkins objected to using this estimated quantity of eutylone.   The District Court rejected that objection. (JA476-477).

There was insufficient evidence to support using this phantom 2,000 grams of Eutylone should be used when calculating Defendant's sentence under the Guidelines. There was no proof it was reasonably foreseeable to Mr. Watkins.  As a result, the District Court erred when including this quantity.

**D. Method for Calculating Drug Quantities**

No matter how many pills, how much they weighed, or whether any of it was foreseeable to Appellant, the method for calculating drug quantity was wrong.  Other methods for calculating drug quantity more closely aligned with the Guidelines and the facts in this case.

The most appropriate way to calculate the drug quantity based on the facts here would have been to assign a weight to each pill and then perform the conversions using the Drug Quantity Table. The Guidelines suggest using this method.

Application Note 9 following U.S.S.G. §2D1.1 recognizes this method for calculating drug quantity.   This method looks to the usual weight found by the Sentencing Commission for certain illegal substances.  Application Note 9 contains yet another table for

converting dosage units to weight. This is called the "Typical Weight Per Unit (Dose, Pill or Capsule) Table". Mr. Watkins will refer to this as the "Typical Weight Per Pill Table."

Eutylone is not mentioned in the "Typical Weight Per Pill Table" table, but MDMA is. Appellant presented unrefuted evidence from the DEA saying that MDMA is analogous to Eutylone. A DEA publication notes that Eutylone is a synthetic cathinone with chemical structural and pharmacological similarities to Schedule I and II amphetamines and cathinones such as MDMA, methylone and pentylone. (JA467).

In the "Typical Weight Per Pill Table" one MDMA pill equates to 250 milligrams of "Converted Drug Weight." This was the most appropriate method for calculating drug quantity in that it aligned closely with what the chemist found here. Recall, the chemist testified that the 8,909 seized pills weighed a total of 2,391 grams. This meant that each seized pill weighed approximately 268 milligrams, remarkably close to the 250 milligram per pill weight assigned to MDMA pills under the Typical Weight Per Pill Table. This strikingly close weight calculation was even more important when considering that DEA says that Eutylone is a synthetic cathinone with chemical structural and pharmacological similarities to Schedule I and II amphetamines and cathinones such as MDMA, methylone and pentylone.

Mr. Watkins therefore objected to using the 380:1 conversion table related to "synthetic cathinones." The DEA's publication on Eutylone, and the facts here show that the better method was to use the Typical Weight Per Pill Table.

Multiplying the figure from the Typical Weight Per Pill Table by the 8,909 seized pills would have equated to 2,227.25 grams of "Converted Drug Weight", yielding an offense level 8 under §2D1.1. Even if the phantom 2000 grams supposedly in the box from Ms. Sanders October 17, 2020, trip was included, the offense level would not have increased beyond level 10.

The District Court rejected each of these objections to calculating the drug quantity. With absolutely no factual support, the Court decided that Cloud's ongoing drug dealing was somehow attributable to Mr. Watkins, and therefore the facts supported the use of offense level 30. (JA474-477). The lower court erred.

It is axiomatic that the sentencing court must correctly calculate the Sentencing Guidelines. The prosecution has the burden to establish facts that support using a particular drug quantity for purposes of finding the Offense Level. Under USSG §1B1.3 a Defendant can be held accountable for substances handled by others if the actions of those co-conspirators were reasonably foreseeable to him.

### E. Failure to Consider Departure

Application Note 27(D) following §2D1.1 discusses how downward departures can be considered in cases involving synthetic cathinones such as Eutylone. This Application Note recognizes that for these somewhat rare compounds there can be situations in which the controlled substance is either more or less potent than other synthetic cathinones. For example, when a smaller quantity of a substance yields the same effect on the central nervous system, an upward departure might be considered. "In contrast, a downward departure may be warranted in cases involving methylone, a substance of which a greater quantity is usually needed to produce an effect on the central nervous system similar to the effect produced by the typical synthetic cathinone."

Recall that the DEA publication recognizes that Eutylone is very similar to methylone. Application Note 27(D) explains that downward departures can be considered for cases involving methylone.

The lower court rejected, with no explanation, Mr. Watkins' suggestion that a departure was appropriate under this Application Note. The lower court erred, and this Court should reverse and remand for a proper application of Application Note 27(D) following USSG §2D1.1.

The lower erred when calculating the sentence here. The only fact proven even by the preponderance evidentiary standard was that Ms. Anderson was stopped with 8,909 pills weighing 2391 grams.

Only 11 pills were tested. Furthermore, the method for converting eutylone to the offense levels on the Drug Quantity Table was erroneous. Finally, the District Court erred in rejecting the suggested departure with no explanation.

**CONCLUSION**

Appellant asks that this Court reverse his convictions and remand for a new trial, or remand for a new sentencing hearing.

Dated: This 3rd day of April 2023.

Respectfully submitted,

*/s/ Paul S. Kish*
PAUL S. KISH
ATTORNEY FOR KENNETH WATKINS
GEORGIA STATE BAR NO. 424277

Kish Law LLC
Suite 2505
229 Peachtree Street, N.E.
Atlanta, Georgia 30303
404-207-133
paul@kishlawllc.com

**CERTIFICATE OF SERVICE**

This is to certify that I have this day served a copy of the foregoing filing into this Court's ECF System, which will automatically forward a copy to counsel of record in this matter.

Dated: This 3rd day of April 2023.

/s/ Paul S. Kish
PAUL S. KISH
ATTORNEY FOR KENNETH WATKINS
GEORGIA STATE BAR NO. 424277

Kish Law LLC
Suite 2505
229 Peachtree Street, N.E.
Atlanta, Georgia 30303
404-207-1338
paul@kishlawllc.com