———————————————

NO. 23-4094

———————————————

IN THE

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

———————————————

KENNETH WATKINS

Appellant,

versus

UNITED STATES OF AMERICA

Appellee.

—————————————————————————————————

A DIRECT CRIMINAL APPEAL FROM THE
UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA, CHARLOTTE DIVISION

—————————————————————————————————

**JOINT APPENDIX — VOLUME 1**

PAUL S. KISH                          AMY E. RAY
Georgia Bar No. 424277               North Carolina Bar No. 22762
Kish Law LLC                         United States Attorney's Office
Suite 2505                           Room 233
229 Peachtree Street, NE             100 Otis Street
Atlanta, Georgia 30303               Asheville, North Carolina 28801
(404) 207-1338                       (828) 271-4661

Attorney for Appellant               Attorney for Appellee
KENNETH WATKINS                      UNITED STATES OF AMERICA

Table of Contents
Volume 1

District Court Docket report . . . . . . . . . . . . . . . . . JA001

Third Superseding Indictment . . . . . . . . . . . . . . . . JA013

Trial Transcript Day 1 of 3 . . . . . . . . . . . . . . . JA023

Trial Transcript Day 2 of 3 . . . . . . . . . . . . . . . JA224

Trial Transcript Day 3 of 3 . . . . . . . . . . . . . . . JA424

Defendant's Motion for Acquittal . . . . . . . . . . . . . JA436

Defendant's Motion for New Trial . . . . . . . . . . . . . JA438

Defendant's Memorandum in Support of Motion for Acquittal &
New Trial . . . . . . . . . . . . . . . . . . . . . . . . . JA440

Government's Response to Defendant's Motion for New Trial &
Acquittal . . . . . . . . . . . . . . . . . . . . . . . . . JA450

Defendant's Reply to Government's Response . . . . . . . . JA458

Order denying Motions for a Judgment of Acquittal or for
a New Trial . . . . . . . . . . . . . . . . . . . . . . . . JA461

Sentencing Hearing Transcript . . . . . . . . . . . . . . JA466

APPEAL

# U.S. District Court
## Western District of North Carolina (Charlotte)
## CRIMINAL DOCKET FOR CASE #: 3:20-cr-00385-RJC-DCK-9

Case title: USA v. Cloud et al

Date Filed: 11/17/2020

Date Terminated: 02/13/2023

---

Assigned to: District Judge Robert J. Conrad, Jr
Referred to: Magistrate Judge David Keesler

Appeals court case number: 23-4094
Fourth Circuit

### Defendant (9)

**Kenneth Jerome Watkins**
*TERMINATED: 02/13/2023*

represented by **C. Samuel Rael**
The Rael Law Firm
1201 W. Peachtree St. N.W.
Suite 2300
Atlanta, GA 30309
404-229-2519
Fax: 678-623-5211
Email: samuelrael@gmail.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Paul Kish**
Kish Law LLC
229 Peachtree Street, NE
Suite 2505, International Tower
Atlanta, GA 30303
404-207-1338
Email: paul@kishlawllc.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Anthony G. Scheer**
Rawls, Scheer, Foster, Mingo & Culp, PLLC

1011 East Morehead Street
Suite 300
Charlotte, NC 28204
704-376-3200
Fax: 704-332-2716
Email: tscheer@rscmlaw.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**David LaMonte Hitchens**
212 North McDowell St. Ste. 208
Suite 208
Charlotte, NC 28204
704-332-5856
Fax: 888-310-9648
Email: dhitchens@davidhitchensesq.com
*ATTORNEY TO BE NOTICED*

| **Pending Counts** | **Disposition** |
| --- | --- |
| 21:846 - CONSPIRACY TO DISTRIBUTE AND POSSESS WITH INTENT TO DISTRIBUTE COCAINE, COCAINE BASE, METHAMPHETAMINE (actual), AND EUTYLONE (1) | 120 months imprisonment, 3 years supervised release, $100 special assessment |

**Highest Offense Level (Opening)**

Felony

| **Terminated Counts** | **Disposition** |
| --- | --- |
| None | |

**Highest Offense Level (Terminated)**

None

| **Complaints** | **Disposition** |
| --- | --- |
| None | |

---

**Plaintiff**

| **USA** | represented by | **Lambert F. Guinn** |
| --- | --- | --- |
| | | U.S. Attorney's Office |
| | | 227 W Trade Street |

https://ecf.ncwd.uscourts.gov/cgi-bin/DktRpt.pl?999952465879008-L_1_0-1

Suite 1650, Carillon Building
Charlotte, NC 28202
704-344-6222
Fax: 704-344-6229
Email: lambert.guinn@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**J. Seth Johnson**
United States Attorney's Office
227 West Trade Street, Suite 1650
Charlotte, NC 28202
704-338-3159
Email: seth.johnson@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Stephanie Laboy Spaugh**
US Attorney's Office
227 W Trade Street
Suite 1650
Charlotte, NC 28202
704-344-6222
Email: stephanie.spaugh@usdoj.gov
*TERMINATED: 06/01/2022*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Timothy Sielaff**
DOJ-USAO
United State's Attorney's Office
Western District of North Carolina
227 West Trade Street, Ste 1650
Charlotte, NC 28202
704-287-4943
Email: timothy.sielaff@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/15/2021 | 91 | MOTION to Seal Indictment by USA as to Kenneth Jerome Watkins. (mek) (Entered: 06/16/2021) |
| 06/15/2021 | **92** | **ORDER granting 91 Motion to Seal Indictment as to Kenneth Jerome Watkins (9). Signed by Magistrate Judge David Keesler on 6/15/2021. (mek)** (Entered: 06/16/2021) |

| 06/15/2021 | 93 | SEALED THIRD SUPERSEDING INDICTMENT as to Steven Lamar Cloud (1) count(s) 1sss, 3sss, 4sss, 19sss, 21sss, 22sss, 23sss, Laquail Wallace (2) count(s) 1ss, 2ss, 3ss, 4ss, 5ss, 8ss, Akeem Olajuwan Davis (3) count(s) 1sss, 15sss, 16sss, 17sss, 18sss, 19sss, 20sss, Jeremy Thomas Latham (4) count(s) 1ss, 6ss-7ss, 9ss, 13ss, Melissa Renee Eagly (5) count(s) 1ss, 10ss, Maenard Burgess (6) count(s) 1ss, 11ss-12ss, 14ss, Latisha Anderson (7) count(s) 1s, Jonquilla Sanders (8) count(s) 1s, Kenneth Jerome Watkins (9) count(s) 1. (Attachments: # 1 Unredacted Signature Page, # 2 Cover Sheet) (mek) (Entered: 06/16/2021) |
| 06/16/2021 | 94 | Arrest Warrant Issued *(Sealed - Case Participants)* in case as to Kenneth Jerome Watkins. (Attachment: # 1 Warrant Page Identifier)(mek) (Entered: 06/16/2021) |
| 10/26/2021 | 164 | MOTION to Unseal Indictment by Kenneth Jerome Watkins. Motions referred to David Keesler (mek) (Entered: 10/26/2021) |
| 10/26/2021 | 165 | **ORDER granting 164 Motion to Unseal Indictment as to Kenneth Jerome Watkins (9). Signed by Magistrate Judge David Keesler on 10/26/2021. (mek)** (Entered: 10/26/2021) |
| 10/26/2021 | | Arrest of Kenneth Jerome Watkins in Northern District of Georgia (Atlanta). (rth) (Entered: 10/27/2021) |
| 10/27/2021 | 166 | Rule 5(c)(3) Documents Received as to Kenneth Jerome Watkins (Attachments: # 1 Minutes/Order Pursuant to the Due Process Protections Act, # 2 Order Appointing Counsel, # 3 Docket Sheet), # 4 Order Setting Conditions of Release, # 5 Appearance Bond) (rth). (Entered: 10/27/2021) |
| 10/28/2021 | 167 | Arrest Warrant Returned Executed on 10/26/2021 in case as to Kenneth Jerome Watkins. (kab) (Entered: 10/28/2021) |
| 11/02/2021 | 169 | PRETRIAL REPORT *(SEALED - Attorney)* as to Kenneth Jerome Watkins (available to USA, Kenneth Jerome Watkins) (Amanda Martin - lhc) (Entered: 11/02/2021) |
| 11/03/2021 | | NOTICE OF HEARING as to Kenneth Jerome Watkins: Initial Appearance set for 11/17/2021 10:00 AM in Courtroom #1A, 401 W Trade St, Charlotte, NC 28202 before Magistrate Judge David Keesler. *This is your only notice - you will not receive a separate document.*(mga) (Entered: 11/03/2021) |
| 11/03/2021 | 170 | Notice of Substitution of Counsel in case as to Steven Lamar Cloud, Laquail Wallace, Akeem Olajuwan Davis, Jeremy Thomas Latham, Melissa Renee Eagly, Maenard Burgess, Latisha Anderson, Jonquilla Sanders, Kenneth Jerome Watkins. Attorney Stephanie Laboy Spaugh added on behalf of USA. Attorney Regina Hinson Pack terminated. (Spaugh, Stephanie) (Entered: 11/03/2021) |
| 11/12/2021 | | **TEXT-ONLY ORDER as to Kenneth Jerome Watkins** *Text of Order: continuing initial appearance. Hearing RESET for 12/6/21 at 10:00 a.m. So Ordered.* **Entered by Magistrate Judge David Keesler on 11/12/21. (mga)** (Entered: 11/12/2021) |
| 11/19/2021 | 179 | MOTION to Continue Docket Call/Trial by USA as to Steven Lamar Cloud, Jeremy Thomas Latham, Maenard Burgess. Responses due by 11/26/2021 (Guinn, Lambert) Modified text on 11/22/2021 (brl). (Entered: 11/19/2021) |

| 11/23/2021 | 185 | MOTION for Leave to Appear Pro Hac Vice as to C. Samuel Rael (Filing fee $ 288, receipt number ANCWDC-5330211) by Kenneth Jerome Watkins. Motions referred to David Keesler (Hitchens, David) (Entered: 11/23/2021) |
| 11/23/2021 | 186 | **ORDER granting 185 Motion for Leave to Appear Pro Hac Vice added C. Samuel Rael for Kenneth Jerome Watkins** *(Pro Hac Vice Attorney served via NEF)* **as to Kenneth Jerome Watkins (9). Signed by Magistrate Judge David Keesler on 11/23/2021. (brl)** (Entered: 11/23/2021) |
| 11/23/2021 | | Notice to C. Samuel Rael: Pursuant to Local Rule 83.1 you are required to **Register** for E-Filing Access or Link Existing Account **Link**. *(Attorney served via NEF)* Deadline by 11/30/2021. (brl) (Entered: 11/23/2021) |
| 12/06/2021 | | Minute Entry: INITIAL APPEARANCE and ARRAIGNMENT as to Kenneth Jerome Watkins (9) Count 1 held before Magistrate Judge David Keesler. Defendant pled not guilty. Defendant advised of rights & charges. Defendant retained counsel. Defendant released on conditions of bond set in NDGA (see document 166-5). Government attorney: Lambert Guinn. Defendant attorney: C. Samuel Rael. Court Reporter: DCR. (mga) (Entered: 12/06/2021) |
| 12/06/2021 | | **SCHEDULING ORDER as to Kenneth Jerome Watkins. (Click on this link to obtain the** <u>Standard Arraignment Order</u>**) . Status Conference set for 1/24/2022 09:30 AM in Courtroom #4A, 401 W Trade St, Charlotte, NC 28202 before District Judge Robert J. Conrad Jr. Docket Call set for 2/7/2022 09:30 AM in Courtroom #4A, 401 W Trade St, Charlotte, NC 28202 before District Judge Robert J. Conrad Jr. Entered by Magistrate Judge David Keesler on 12/6/21. (mga)** (Entered: 12/06/2021) |
| 12/06/2021 | | **Standard Discovery Order in case as to Kenneth Jerome Watkins. (Click on this link to obtain the** <u>Standard Criminal Discovery Order</u>**) . Entered by Magistrate Judge David Keesler on 12/6/21. (mga)** (Entered: 12/06/2021) |
| 12/06/2021 | 212 | **ORDER pursuant to the Due Process Protection Act as to Kenneth Jerome Watkins. Signed by Magistrate Judge David Keesler on 12/6/21. (mga)** (Entered: 12/06/2021) |
| 12/07/2021 | 214 | Original Notice Regarding US Passport *(Sealed - Attorney)* as to Kenneth Jerome Watkins; (available to: USA, Kenneth Jerome Watkins) (Sherain Teel - me) (Entered: 12/07/2021) |
| 01/18/2022 | 217 | Consent MOTION for Leave to Appear Remotely *via zoom or equivalents* Attorney: C. Samuel Rael. by Kenneth Jerome Watkins. (Rael, C.) Modified to move referral on 1/19/2022 (mga). (Entered: 01/18/2022) |
| 01/20/2022 | | **TEXT-ONLY ORDER granting 217 Motion for Leave to Appear Remotely as to Kenneth Jerome Watkins (9). Counsel will be emailed a Microsoft Teams meeting link by the Clerk's Office. Entered by District Judge Robert J. Conrad, Jr on 1/20/2022. (brl)** (Entered: 01/20/2022) |
| 01/24/2022 | | Minute Entry: STATUS CONFERENCE as to Kenneth Jerome Watkins held before District Judge Robert J. Conrad, Jr. Government attorney: Lambert Guinn. Defendant attorney: C. Samuel Rael, David Hitchens. Court Reporter: Kathy Cortopassi. (brl) (Entered: 01/24/2022) |

| | | |
|---|---|---|
| 01/24/2022 | | ORAL MOTION to Continue Docket Call/Trial by Kenneth Jerome Watkins. (brl) (Entered: 01/24/2022) |
| 01/24/2022 | | **ORAL ORDER granting the Oral Motion to Continue Docket Call/Trial as to Kenneth Jerome Watkins (9). Status Conference RESET for 3/21/2022 09:30 AM in Courtroom #4A, 401 W Trade St, Charlotte, NC 28202 before District Judge Robert J. Conrad Jr. Docket Call RESET for 4/4/2022 09:30 AM in Courtroom #4A, 401 W Trade St, Charlotte, NC 28202 before District Judge Robert J. Conrad Jr. Entered by District Judge Robert J. Conrad, Jr on 1/24/2022. (brl)** (Entered: 01/24/2022) |
| 03/17/2022 | [235](#) | Unopposed MOTION to Continue Docket Call/Trial by Kenneth Jerome Watkins. Responses due by 3/24/2022 (Rael, C.) Modified text on 3/18/2022 (brl). (Entered: 03/17/2022) |
| 03/18/2022 | [236](#) | **ORDER granting [235](#) Motion to Continue Docket Call/Trial as to Kenneth Jerome Watkins (9). Status Conference RESET for 5/24/2022 09:30 AM in Courtroom #4A, 401 W Trade St, Charlotte, NC 28202 before District Judge Robert J. Conrad Jr. Docket Call RESET for 6/6/2022 09:30 AM in Courtroom #4A, 401 W Trade St, Charlotte, NC 28202 before District Judge Robert J. Conrad Jr. Signed by District Judge Robert J. Conrad, Jr on 3/18/2022. (brl)** (Entered: 03/18/2022) |
| 05/12/2022 | | Set/Reset Hearings as to Kenneth Jerome Watkins: Status Conference **RESET** for 5/25/2022 02:00 PM in Courtroom #4A, 401 W Trade St, Charlotte, NC 28202 before District Judge Robert J. Conrad Jr. (brl) (Entered: 05/12/2022) |
| 05/13/2022 | 241 | DELETED DOCUMENT - REFILED AS DOCUMENT 242 Modified on 5/16/2022 (brl). (Entered: 05/13/2022) |
| 05/13/2022 | [242](#) | Consent MOTION for Leave to Appear Remotely via zoom or the equivalent Attorney: C. Samuel Rael. by Kenneth Jerome Watkins. (Rael, C.) Modified on 5/16/2022 to remove referral (mek). (Entered: 05/13/2022) |
| 05/16/2022 | | **TEXT-ONLY ORDER granting [242](#) Motion for Leave to Appear for Leave to Appear Remotely via zoom or the equivalent as to Kenneth Jerome Watkins (9). Counsel will be emailed a Microsoft Teams meeting link by the Clerk's Office. Entered by District Judge Robert J. Conrad, Jr on 5/16/2022. (brl)** (Entered: 05/16/2022) |
| 05/23/2022 | [243](#) | NOTICE *of Expert Testimony* by USA as to Kenneth Jerome Watkins (Guinn, Lambert) (Entered: 05/23/2022) |
| 05/23/2022 | [244](#) | NOTICE *of Intent to Introduce Wiretap Evidence* by USA as to Kenneth Jerome Watkins (Guinn, Lambert) (Entered: 05/23/2022) |
| 05/25/2022 | | Minute Entry: STATUS CONFERENCE as to Kenneth Jerome Watkins held before District Judge Robert J. Conrad, Jr. Government attorney: Steven Kaufman. Defendant attorney: David Hitchens, C. Samuel Rael. Court Reporter: Kathy Cortopassi. (brl) (Entered: 05/25/2022) |
| 05/25/2022 | | NOTICE OF HEARING as to Kenneth Jerome Watkins: Jury Trial set for 6/6/2022 09:30 AM in Courtroom #4A, 401 W Trade St, Charlotte, NC 28202 before District Judge Robert J. Conrad Jr. *This is your only notice - you will not receive a separate* |

| | | |
|---|---|---|
| | | *document*.(brl) (Entered: 05/25/2022) |
| 05/26/2022 | | NOTICE OF HEARING as to Kenneth Jerome Watkins: Pretrial Conference Hearing set for 6/1/2022 09:00 AM in Courtroom #4A, 401 W Trade St, Charlotte, NC 28202 before District Judge Robert J. Conrad Jr. *This is your only notice - you will not receive a separate document*.(brl) (Entered: 05/26/2022) |
| 05/26/2022 | 245 | (Ex Parte) EX PARTE MOTION for Application for Writ of Habeas Corpus ad Testificandum for appearance of Latisha Anderson as to Kenneth Jerome Watkins. (Attachments: # 1 Proposed Order) (Rael, C.) Motion referred to Magistrate Judge David Keesler. Modified event, text and security on 5/26/2022 (brl). Modified to add referral(mga). (Entered: 05/26/2022) |
| 05/26/2022 | 246 | (Ex Parte) EX PARTE MOTIONI for Application for Writ of Habeas Corpus ad Testificandum for appearance of Melissa Eagly as to Kenneth Jerome Watkins. (Attachments: # 1 Proposed Order) (Rael, C.) Motion referred to Magistrate Judge David Keesler. Modified event, text and security on 5/26/2022 (brl). Modified to add referral on 5/31/2022 (mga). (Entered: 05/26/2022) |
| 05/27/2022 | 247 | NOTICE *of Intent to Introduce 902(11) Evidence* by USA as to Kenneth Jerome Watkins (Guinn, Lambert) (Entered: 05/27/2022) |
| 05/27/2022 | 248 | NOTICE *of Expert Witness Supplement* by USA as to Kenneth Jerome Watkins (Guinn, Lambert) (Entered: 05/27/2022) |
| 05/27/2022 | 249 | MOTION for Leave to Appear Motion to Appear Remotely Attorney: C. Samuel Rael. by Kenneth Jerome Watkins. (Rael, C.) Modified to remove referral on 5/31/2022 (mga). (Entered: 05/27/2022) |
| 05/31/2022 | | **TEXT-ONLY ORDER granting 249 Motion for Leave to Appear Remotely as to Kenneth Jerome Watkins (9). Counsel will be emailed a Microsoft Teams meeting link by the Clerk's Office. Entered by District Judge Robert J. Conrad, Jr on 5/31/2022. (ams)** (Entered: 05/31/2022) |
| 05/31/2022 | | Motion Referred as to Kenneth Jerome Watkins: 245 EX PARTE MOTION.Application for Writ of Habeas Corpus ad Testificandum for appearance of Latisha Anderson (mga)Motions referred to David Keesler (Entered: 05/31/2022) |
| 05/31/2022 | | Motion Referred as to Kenneth Jerome Watkins: 246 EX PARTE MOTION for.Application for Writ of Habeas Corpus ad Testificandum for appearance of Melissa Eagly (mga)Motions referred to David Keesler (Entered: 05/31/2022) |
| 06/01/2022 | 250 | **(Ex Parte) ORDER granting 246 Ex Parte Motion as to Kenneth Jerome Watkins (9). Signed by Magistrate Judge David Keesler on 5/31/22. (mga)** Modified text on 6/1/2022 (mga). (Additional attachment(s) added on 6/1/2022: # 1 Writ of Habeas Corpus Ad Testificandum) (mga). (Entered: 06/01/2022) |
| 06/01/2022 | 251 | **(Ex Parte) ORDER granting 245 Ex Parte Motion as to Kenneth Jerome Watkins (9). Signed by Magistrate Judge David Keesler on 5/31/22. (mga)** Modified text on 6/1/2022 (mga). (Additional attachment(s) added on 6/1/2022: # 1 Writ of Habeas Corpus Ad Testificandum) (mga). (Entered: 06/01/2022) |
| 06/01/2022 | | Minute Entry: Pretrial Conference as to Kenneth Jerome Watkins held on 6/1/2022. Government attorney: Lambert Guinn. Defendant attorney: C. Samuel Rael, David Hitchens. Court Reporter: Kathleen Cortopassi. (ams) (Entered: 06/01/2022) |

| 06/01/2022 | 252 | (Ex Parte) EX PARTE MOTION for Writ *of Habeas Corpus Ad Test*. by Kenneth Jerome Watkins. Responses due by 6/8/2022 (Attachments: # 1 Proposed Order)Motions referred to David Keesler (Rael, C.) Modified access on 6/1/2022 (mga). (Entered: 06/01/2022) |
| --- | --- | --- |
| 06/01/2022 | 253 | Notice of Substitution of Counsel in case as to Kenneth Jerome Watkins. Attorney Timothy Sielaff added on behalf of USA. Attorney Stephanie Laboy Spaugh terminated. (Sielaff, Timothy) (Entered: 06/01/2022) |
| 06/02/2022 | **254** | **SEALED EX PARTE ORDER** *(Sealed - Attorney)*: **granting re: 252 Motion for Writ of Habeas Corpus Ad Test as to Kenneth Jerome Watkins . Signed by Magistrate Judge David Keesler on 6/1/22. (mga) Modified text on 6/6/2022 (brl). (Entered: 06/02/2022)** |
| 06/02/2022 | 255 | (Ex Parte) Ex Parte Document: Writ of Habeas Corpus Ad Testificandum by Kenneth Jerome Watkins (mga) (Entered: 06/02/2022) |
| 06/05/2022 | 256 | Proposed Voir Dire by Kenneth Jerome Watkins (Rael, C.) (Entered: 06/05/2022) |
| 06/06/2022 | 257 | WITNESS LIST *(Sealed - Participants)* by USA as to Kenneth Jerome Watkins (Guinn, Lambert) (Entered: 06/06/2022) |
| 06/06/2022 | 258 | EXHIBIT LIST by USA as to Kenneth Jerome Watkins (Guinn, Lambert) (Entered: 06/06/2022) |
| 06/06/2022 | | Minute Entry: JURY TRIAL as to Kenneth Jerome Watkins held before District Judge Robert J. Conrad, Jr. Jury selected and sworn. Opening Statements. Evidence Introduced. Jury Trial set for 6/7/2022 09:30 AM in Courtroom #4A, 401 W Trade St, Charlotte, NC 28202 before District Judge Robert J. Conrad Jr.Government attorney: Lambert F. Guinn, Timothy Sielaff. Defendant attorney: C. Samuel Rael, David Hitchens. Court Reporter: Kathy Cortopassi. (brl) (Entered: 06/06/2022) |
| 06/06/2022 | | ORAL MOTION to Suppress as to Wiretap Evidence by Kenneth Jerome Watkins. (brl) (Entered: 06/07/2022) |
| 06/06/2022 | | **ORAL ORDER denying the Oral Motion to Suppress Evidence as to Kenneth Jerome Watkins (9). Entered by District Judge Robert J. Conrad, Jr on 6/6/2022. (brl) (Entered: 06/07/2022)** |
| 06/07/2022 | 259 | MOTION Defendant's Proposed Request To Charge, Reasonable Doubt by Kenneth Jerome Watkins. Responses due by 6/14/2022 (Rael, C.) (Entered: 06/07/2022) |
| 06/07/2022 | | **ORAL ORDER denying 259 Motion Defendant's Proposed Request To Charge, Reasonable Doubt as to Kenneth Jerome Watkins (9). Entered by District Judge Robert J. Conrad, Jr on 6/7/2022. (brl) (Entered: 06/07/2022)** |
| 06/07/2022 | | Minute Entry: JURY TRIAL as to Kenneth Jerome Watkins held before District Judge Robert J. Conrad, Jr. Evidence continued. Government rested. Defendant rested. Closing arguments. Courts charge. Jury retired to deliberate. Oral Rule 29 Motion by defendant is denied by court. Jury Trial set for 6/8/2022 08:30 AM in Courtroom #4A, 401 W Trade St, Charlotte, NC 28202 before District Judge Robert J. Conrad Jr.Government attorney: Lambert F. Guinn, Timothy Sielaff. Defendant attorney: C. Samuel Rael, David Hitchens. Court Reporter: Kathy Cortopassi. (brl) (Entered: 06/07/2022) |

| | | |
|---|---|---|
| 06/08/2022 | | Minute Entry: JURY TRIAL as to Kenneth Jerome Watkins held before District Judge Robert J. Conrad, Jr. Jury returns verdict. Government attorney: Lambert F. Guinn, Timothy Sielaff. Defendant attorney: C. Samuel Rael, David Hitchens. Court Reporter: Kathy Cortopassi. (brl) (Entered: 06/08/2022) |
| 06/08/2022 | | **ORAL ORDER of Remand to Custody as to Kenneth Jerome Watkins. Entered by District Judge Robert J. Conrad, Jr on 6/8/2022. (brl)** (Entered: 06/08/2022) |
| 06/08/2022 | 260 | JURY VERDICT as to Kenneth Jerome Watkins (9) Guilty on Count 1. (Attachments: # 1 Unredacted Signature Page)(brl) (Entered: 06/09/2022) |
| 06/08/2022 | 261 | Jury/Judge Notes *(Sealed - Court)* as to Kenneth Jerome Watkins (brl) (Entered: 06/09/2022) |
| 06/09/2022 | 263 | JERS Exhibits *(Restricted - Court Access Only)* as to Kenneth Jerome Watkins. Proceeding: Jury Trial held 6/6/2022-6/8/2022 (brl) (Entered: 06/09/2022) |
| 06/14/2022 | 264 | **SEALED ORDER *(Sealed - Court)* Term of Jury Service. Signed by District Judge Robert J. Conrad, Jr on 6/14/2022. (brl)** (Entered: 06/16/2022) |
| 06/23/2022 | 265 | MOTION for Acquittal by Kenneth Jerome Watkins. Responses due by 6/30/2022 (Rael, C.) (Entered: 06/23/2022) |
| 06/23/2022 | 266 | MOTION for New Trial by Kenneth Jerome Watkins. Responses due by 6/30/2022 (Rael, C.) (Entered: 06/23/2022) |
| 06/23/2022 | 267 | MEMORANDUM in Support by Kenneth Jerome Watkins re 265 MOTION for Acquittal , 266 MOTION for New Trial (Rael, C.) (Entered: 06/23/2022) |
| 06/29/2022 | 268 | MOTION for Extension of Time to File Response/Reply by USA as to Kenneth Jerome Watkins. (Guinn, Lambert) Modified to remove referral on 6/29/2022 (mga). (Entered: 06/29/2022) |
| 06/29/2022 | 269 | **ORDER granting 268 Motion for Extension of Time to File Response/Reply as to Kenneth Jerome Watkins (9). Responses due by 7/7/2022. Signed by District Judge Robert J. Conrad, Jr on 6/29/2022. (brl)** (Entered: 06/29/2022) |
| 07/07/2022 | 270 | RESPONSE in Opposition by USA as to Kenneth Jerome Watkins re 265 MOTION for Acquittal , 266 MOTION for New Trial (Guinn, Lambert) (Entered: 07/07/2022) |
| 07/18/2022 | 271 | REPLY TO RESPONSE to Motion by Kenneth Jerome Watkins re 265 Motion for Acquittal and 266 Motion for New Trial (Rael, C.) Modified to link to correct motions on 7/25/2022 (brl). (Entered: 07/18/2022) |
| 08/01/2022 | 272 | NOTICE OF ATTORNEY APPEARANCE: Anthony G. Scheer appearing for Kenneth Jerome Watkins (Scheer, Anthony) (Entered: 08/01/2022) |
| 08/01/2022 | 273 | MOTION for Leave to Appear Pro Hac Vice as to Paul Kish (Filing fee $ 288, receipt number ANCWDC-5679007) by Kenneth Jerome Watkins. Motions referred to David Keesler (mek) (Entered: 08/01/2022) |
| 08/01/2022 | 274 | **ORDER granting 273 Motion for Leave to Appear Pro Hac Vice added Paul Kish for Kenneth Jerome Watkins as to Kenneth Jerome Watkins (9) Signed by Magistrate Judge David Keesler on 8/1/22. (mga)** (Entered: 08/01/2022) |

| | | |
|---|---|---|
| 09/09/2022 | 277 | TRANSCRIPT of Trial Day 1 of 3 as to Kenneth Jerome Watkins held on 6/6/22 before Judge Conrad. **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov** Release of Transcript Restriction set for 12/5/2022. (kac) (Entered: 09/09/2022) |
| 09/09/2022 | 278 | TRANSCRIPT of Trial Day 2 of 3 as to Kenneth Jerome Watkins held on 6/7/22 before Judge Conrad. **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov** Release of Transcript Restriction set for 12/5/2022. (kac) (Entered: 09/09/2022) |
| 09/09/2022 | 279 | TRANSCRIPT of Trial Day 3 of 3 as to Kenneth Jerome Watkins held on 6/8/22 before Judge Conrad. **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER. Policy at www.ncwd.uscourts.gov** Release of Transcript Restriction set for 12/5/2022. (kac) (Entered: 09/09/2022) |
| 09/16/2022 | 281 | LETTER by Kenneth Jerome Watkins (Attachments: # 1 Envelope)(Document Received by Chambers)(brl) (Entered: 09/19/2022) |
| 09/27/2022 | 282 | PRESENTENCE INVESTIGATION REPORT (Draft Report) *(SEALED - Attorney)* as to Kenneth Jerome Watkins. Objections to PSI due 10/11/2022. (available to USA, Kenneth Jerome Watkins) (Jaclyn Hoffman - sb) (Entered: 09/27/2022) |
| 09/28/2022 | 283 | MOTION for Extension of Time to File Objections to PSR by Kenneth Jerome Watkins. (Kish, Paul) (Entered: 09/28/2022) |
| 09/29/2022 | 284 | **ORDER granting 283 Motion for Extension of Time to File Objections to PSR as to Kenneth Jerome Watkins (9). The defendant shall file any objections, grounds for variance, or corrections on or before November 1, 2022. Signed by District Judge Robert J. Conrad, Jr on 9/29/2022. (brl)** (Entered: 09/29/2022) |
| 11/01/2022 | 289 | OBJECTION TO PRESENTENCE INVESTIGATION REPORT *(Sealed - Attorney)* by Defendant Kenneth Watkins; (available to: USA, Kenneth Jerome Watkins) (Attachments: # 1 Exhibit Attachment A - January 2020 DEA publication)(Kish, Paul) (Entered: 11/01/2022) |
| 11/04/2022 | 290 | NOTICE *of Change of Address of Counsel* by Kenneth Jerome Watkins (Kish, Paul) (Entered: 11/04/2022) |

JA010

| 11/15/2022 | 291 | PRESENTENCE INVESTIGATION REPORT (Final Report) *(SEALED - Attorney)* as to Kenneth Jerome Watkins. (available to USA, Kenneth Jerome Watkins) Schedule for Sentence on or after 11/22/2022. (Jaclyn Hoffman - sb) (Entered: 11/15/2022) |
| --- | --- | --- |
| 11/16/2022 | 293 | **ORDER denying 265 Motion for Acquittal and 266 Motion for New Trial as to Kenneth Jerome Watkins (9). Signed by District Judge Robert J. Conrad, Jr on 11/15/2022. (brl)** (Entered: 11/16/2022) |
| 11/17/2022 | 294 | RESPONSE to 289 Objection to Presentence Investigation Report *(Sealed - Attorney)* (available to: USA, Kenneth Jerome Watkins) (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Guinn, Lambert) Modified text & access on 11/21/2022 (brl). (Entered: 11/17/2022) |
| 12/01/2022 | 298 | NOTICE *of Secure Leave* by Kenneth Jerome Watkins (Kish, Paul) (Entered: 12/01/2022) |
| 01/25/2023 | | NOTICE OF HEARING as to Kenneth Jerome Watkins: Sentencing set for 2/13/2023 09:30 AM in Courtroom #4A, 401 W Trade St, Charlotte, NC 28202 before District Judge Robert J. Conrad Jr. *This is your only notice - you will not receive a separate document.*(brl) (Entered: 01/25/2023) |
| 02/06/2023 | 321 | SEALED SENTENCING MEMORANDUM *(Sealed - Attorney)* (available to: USA, Kenneth Jerome Watkins) by Kenneth Jerome Watkins. (Kish, Paul) Modified event and text on 2/8/2023 (ef). (Entered: 02/06/2023) |
| 02/07/2023 | 323 | PRESENTENCE INVESTIGATION REPORT (Supplement) *(SEALED - Attorney)* as to Kenneth Jerome Watkins. (available to USA, Kenneth Jerome Watkins) (Jaclyn Hoffman - sb) (Entered: 02/07/2023) |
| 02/08/2023 | 324 | MOTION to Seal *Sentencing Memorandum* by Kenneth Jerome Watkins. Responses due by 2/15/2023 Motions referred to David Keesler (Kish, Paul) (Entered: 02/08/2023) |
| 02/08/2023 | 325 | SEALED DOCUMENT *(Sealed - Attorney)*: Supplemental Sentencing Memorandum Including Character Letters by Defendant Kenneth Watkins; (available to: USA, Kenneth Jerome Watkins) (Attachments: # 1 Exhibit 1 - Letters)(Kish, Paul) (Entered: 02/08/2023) |
| 02/08/2023 | 326 | MOTION to Seal *Supplemental Sentencing Memorandum* by Kenneth Jerome Watkins. Responses due by 2/15/2023 Motions referred to David Keesler (Kish, Paul) (Entered: 02/08/2023) |
| 02/08/2023 | 327 | **ORDER granting 324 Defendant's Motion to Seal 321 Sentencing Memorandum as to Kenneth Jerome Watkins (9). Signed by Magistrate Judge David Keesler on 2/8/23. (mga)** (Entered: 02/08/2023) |
| 02/08/2023 | 328 | **ORDER granting 326 Defendant's Motion to Seal 325 Supplement Sentencing Memorandum as to Kenneth Jerome Watkins (9). Signed by Magistrate Judge David Keesler on 2/8/23. (mga)** (Entered: 02/08/2023) |
| 02/13/2023 | | Minute Entry: SENTENCING as to Kenneth Jerome Watkins held before District Judge Robert J. Conrad, Jr. Government attorney: Lambert F. Guinn, Timothy Sielaff. Defendant attorney: Anthony Scheer, Paul Kish. Court Reporter: Kathy Cortopassi. (brl) (Entered: 02/13/2023) |

| 02/14/2023 | 332 | Disposition Notice Regarding US Passport *(Sealed - Attorney)* as to Kenneth Jerome Watkins; (available to: USA, Kenneth Jerome Watkins) (Jaclyn Hoffman - sb) (Entered: 02/14/2023) |
|---|---|---|
| 02/15/2023 | 341 | **JUDGMENT as to Kenneth Jerome Watkins (9), Count(s) 1, 120 months imprisonment, 3 years supervised release, $100 special assessment. Signed by District Judge Robert J. Conrad, Jr on 2/15/2023. (brl)** (Entered: 02/15/2023) |
| 02/15/2023 | 342 | **STATEMENT OF REASONS *(Sealed - Attorney)* re: 341 Judgment (available to: USA, Kenneth Jerome Watkins). Signed by District Judge Robert J. Conrad, Jr on 2/15/2023. (brl)** (Entered: 02/15/2023) |
| 02/16/2023 | 344 | NOTICE OF APPEAL by Kenneth Jerome Watkins re 341 Judgment. Filing fee $ 505, receipt number ANCWDC-5945369. *Use this link www.ca4.uscourts.gov to retrieve 4th Circuit case opening documents, i.e. Appearance of Counsel, Docketing Statement, Disclosure Statement, Transcript Order Form, and CJA 24 Vouchers.* Note: Your Transcript Order Form (and CJA 24 if applicable) must be served on the District Court as well as the Circuit Court. (Kish, Paul) (Entered: 02/16/2023) |
| 02/16/2023 | 345 | Transmission of Notice of Appeal as to Kenneth Jerome Watkins to US Court of Appeals re 344 Notice of Appeal (brl) (Entered: 02/16/2023) |
| 02/21/2023 | 347 | TRANSCRIPT of Sentencing Hearing as to Kenneth Jerome Watkins held on 2/13/23 before Judge Conrad. **NOTICE RE: REDACTION OF TRANSCRIPTS: The parties have 5 business days to file a *Notice of Intent to Request Redaction* and 21 calendar days to file a *Redaction Request*. If no notice is filed, this transcript will be made electronically available to the public without redaction after 90 calendar days. Transcript may be viewed at the court public terminal or purchased through the court reporter before the 90 day deadline. After that date it may be obtained through PACER.** Policy at www.ncwd.uscourts.gov Release of Transcript Restriction set for 5/19/2023. (kac) (Entered: 02/21/2023) |
| 02/22/2023 | 348 | USCA Case Number as to Kenneth Jerome Watkins 23-4094 for 344 Notice of Appeal, USCA Case Manager: Kirsten Hancock. (nvc) (Entered: 02/22/2023) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 03/30/2023 09:12:01 | | |
| **PACER Login:** | pkishattorney | **Client Code:** | watkins |
| **Description:** | Docket Report | **Search Criteria:** | 3:20-cr-00385-RJC-DCK |
| **Billable Pages:** | 10 | **Cost:** | 1.00 |
| **Exempt flag:** | Not Exempt | **Exempt reason:** | Not Exempt |

JA012

FILED
CHARLOTTE, NC

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**

JUN 15 2021

US DISTRICT COURT
WESTERN DISTRICT OF NC

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **DOCKET NO. 3:20-CR-0385** |
| | ) | |
| | ) | **THIRD SUPERSEDING** |
| v. | ) | **BILL OF INDICTMENT** |
| | ) | |
| | ) | Violations:21 U.S.C. § 841(a) |
| (1) STEVEN LAMAR CLOUD, | ) | 21 U.S.C. § 841(b)(1)(B) |
| (2) LAQUAIL WALLACE, | ) | 21 U.S.C. § 846 |
| (3) AKEEM OLAJUWAN DAVIS, | ) | 18 U.S.C. § 922(g)(1) |
| (4) JEREMY THOMAS LATHAM, | ) | 21 U.S.C. § 841(b)(1)(C) |
| (5) MELISSA RENEE EAGLY, | ) | 18 U.S.C. § 2 |
| (6) MAENARD BURGESS, | ) | 18 U.S.C. § 924(c) |
| (7) LATISHA ANDERSON, | ) | 21 U.S.C. § 841(b)(1)(A |
| (8) JONQUILLA SANDERS, | ) | |
| and | ) | |
| (9) KENNETH JEROME WATKINS | ) | **UNDER SEAL** |

**THE GRAND JURY CHARGES:**

**COUNT ONE**
(Conspiracy to Distribute and Possess with the Intent to Distribute Controlled Substances)

From in or about 2019, the exact date being unknown to the Grand Jury, through in or about December 2020, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendants,

**(1) STEVEN LAMAR CLOUD,**
**(2) LAQUAIL WALLACE,**
**(3) AKEEM OLAJUWAN DAVIS,**
**(4) JEREMY THOMAS LATHAM,**
**(5) MELISSA RENEE EAGLY,**
**(6) MAENARD BURGESS,**
**(7) LATISHA ANDERSON,**
**(8) JONQUILLA SANDERS,**
**and**
**(9) KENNETH JEROME WATKINS**

did knowingly and intentionally combine, conspire, confederate, and agree with each other, and with others known and unknown to the Grand Jury, to distribute and possess with the intent to distribute controlled substances, that is, a mixture and substance containing a detectable amount

JA013

of cocaine, a mixture and substance containing a detectable amount of cocaine base, also known as crack cocaine, and methamphetamine (actual), Schedule II controlled substances, and a mixture and substance containing a detectable amount of Eutylone, a Schedule I controlled substance in violation of Title 21, United States Code, Section 841(a)(1).

It is further alleged that, with respect to the conspiracy offense charged in Count One, at least 50 grams of methamphetamine (actual), was attributable to and was reasonably foreseeable by **(4) JEREMY THOMAS LATHAM, and (5) MELISSA RENEE EAGLY**.  Accordingly, Title 21, United States Code, Section 841 (b)(1)(A) is applicable to them.

It is further alleged that, with respect to the conspiracy offense charged in Count One, at least 500 grams of a mixture and substance containing a detectable amount of cocaine, was attributable to and were reasonably foreseeable by **(1) STEVEN LAMAR CLOUD, (3) AKEEM OLAJUWAN DAVIS and (8) JONQUILLA SANDERS**.  Accordingly, Title 21, United States Code, Section 841 (b)(1)(B) is applicable to them.

All in violation of Title 21, United States Code, Section 846.

## COUNT TWO
*(Possess with Intent to Distribute Cocaine Base)*

On or about July 22, 2019, in Mecklenburg County, within the Western District of North Carolina, the defendant,

### (2) LAQUAIL WALLACE,

did knowingly and intentionally possess with intent to distribute a controlled substance, that is, at least 28 grams of a mixture and substance containing a detectable amount of cocaine base, also known as crack cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B).

## COUNT THREE

On or about January 8, 2020, in Anson County, within the Western District of North Carolina, the defendant,

### (1) STEVEN LAMAR CLOUD,
### and
### (2) LAQUAIL WALLACE,

did knowingly and unlawfully combine, conspire, confederate and agree with others both known and unknown to the Grand Jury, to obstruct, delay and affect commerce, as that term is defined in Title 18, United States Code, Section 1951, and the movement of articles and commodities in such commerce, by robbery, as that term is defined in Title 18, United States Code, Section 1951, in

that the defendant agreed with others to take and obtain personal property consisting of heroin from the person and presence of K.R., against K.R.'s will, and by means of actual and threatened force, violence, and fear of immediate and future injury to the K.R.'s person.

All in violation of Title 18, United States Code, Section 1951(a).

## COUNT FOUR

On or about January 8, 2020, in Anson County, within the Western District of North Carolina, the defendants,

**(1) STEVEN LAMAR CLOUD,**
**and**
**(2) LAQUAIL WALLACE,**

did unlawfully obstruct, delay and affect commerce, as that term is defined in Title 18, United States Code, Section 1951, and the movement of articles and commodities in such commerce, by robbery, as that term is defined in Title 18, United States Code, Section 1951(b)(1), in that they did knowingly and unlawfully take and obtain heroin belonging to K.R., from the person and presence of K.R., against K.R.'s will, and by means of actual and threatened force, violence, and fear of immediate and future injury to K.R's person, and did aid and abet each other in the commission of said offense.

All in violation of Title 18, United States Code, Sections 1951 and 2.

## COUNT FIVE

On or about January 8, 2020, in Anson County, within the Western District of North Carolina, the defendant,

**(2) LAQUAIL WALLACE,**

during and in relation to a crime of violence, that is, interference with commerce by threats and violence, a violation of Title 18, United States Code, Section 1951, as charged in Count Four, for which the defendant may be prosecuted in a court of the United States, he did knowingly, and unlawfully use and carry a firearm, and, in furtherance of such crime of violence, did possess said firearm.

All in violation of Title 18, United States Code, Sections 924(c).

## COUNT SIX
*(Distribute Methamphetamine)*

On or about August 11, 2020, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendant,

**(4) JEREMY THOMAS LATHAM**

aiding and abetting another, did knowingly and intentionally distribute a controlled substance, that is, at least 5 grams of methamphetamine (actual), a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B) and Title 18, United States Code, Section 2.

## COUNT SEVEN
*(Distribute Methamphetamine)*

On or about August 19, 2020, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendant,

**(4) JEREMY THOMAS LATHAM**

aiding and abetting another, did knowingly and intentionally distribute a controlled substance, that is, at least 5 grams of methamphetamine (actual), a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B) and Title 18, United States Code, Section 2.

## COUNT EIGHT
*(Possession of a Firearm by a Convicted Felon)*

On or about August 25, 2020, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendant,

**(2) LAQUAIL WALLACE,**

knowing that he had previously been convicted of at least one crime punishable by imprisonment for a term exceeding one year, did knowingly possess one or more firearms, that is, a Sig Sauer; Model: P226; Caliber: 40 pistol, in and affecting commerce; in violation of Title 18, United States Code, Section 922(g)(1).

## COUNT NINE
*(Distribute Methamphetamine)*

On or about August 27, 2020, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendant,

**(4) JEREMY THOMAS LATHAM**

aiding and abetting another, did knowingly and intentionally distribute a controlled substance, that is, at least 5 grams of methamphetamine (actual), a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B) and Title 18, United States Code,

Section 2.

### COUNT TEN
*(Possess with Intent to Distribute Methamphetamine)*

On or about August 27, 2020, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendant,

**(5) MELISSA RENE EAGLY,**

aiding and abetting another, did knowingly and intentionally possess with intent to distribute a controlled substance, that is, at least 5 grams of methamphetamine (actual), a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B) and Title 18, United States Code, Section 2.

### COUNT ELEVEN
*(Distribute Cocaine Base)*

On or about August 27, 2020, in Mecklenburg County, within the Western District of North Carolina, the defendant,

**(6) MAENARD BURGESS,**

did knowingly and intentionally distribute a controlled substance, that is, a mixture and substance containing a detectable amount of cocaine base, also known as crack cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

### COUNT TWELVE
*(Distribute Cocaine Base)*

On or about September 1, 2020, in Mecklenburg County, within the Western District of North Carolina, the defendant,

**(6) MAENARD BURGESS,**

did knowingly and intentionally distribute a controlled substance, that is, a mixture and substance containing a detectable amount of cocaine base, also known as crack cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

### COUNT THIRTEEN
*(Distribute Methamphetamine)*

On or about September 3, 2020, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendant,

**(4) JEREMY THOMAS LATHAM**

aiding and abetting another, did knowingly and intentionally distribute a controlled substance, that is, at least 5 grams of methamphetamine (actual), a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B) and Title 18, United States Code, Section 2.

## COUNT FOURTEEN
*(Distribute Cocaine Base)*

On or about September 10, 2020, in Mecklenburg County, within the Western District of North Carolina, the defendant,

**(6) MAENARD BURGESS,**

did knowingly and intentionally distribute a controlled substance, that is, a mixture and substance containing a detectable amount of cocaine base, also known as crack cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

## COUNT FIFTEEN
*(Distribute Cocaine Base)*

On or about October 7, 2020, in Mecklenburg County, within the Western District of North Carolina, the defendant,

**(3) AKEEM OLAJUWAN DAVIS,**

did knowingly and intentionally distribute a controlled substance, that is, at least 28 grams of a mixture and substance containing a detectable amount of cocaine base, also known as crack cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B).

## COUNT SIXTEEN
*(Possession of a Firearm by a Convicted Felon)*

On or about October 7, 2020, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendant,

**(3) AKEEM OLAJUWAN DAVIS,**

knowing that he had previously been convicted of at least one crime punishable by imprisonment for a term exceeding one year, did knowingly possess one or more firearms, that is, a Smith & Wesson, Model M&P, Caliber .45, Semi-automatic pistol, in and affecting commerce; in violation of Title 18, United States Code, Section 922(g)(1).

## COUNT SEVENTEEN
*(Possession of a Firearm in Furtherance of a Drug Trafficking Offense)*

On or about October 7, 2020, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendant,

**(3) AKEEM OLAJUWAN DAVIS,**

in furtherance of a drug trafficking crime, that is, distribution of cocaine base, also known as "crack cocaine," a violation of Title 21, United States Code, Section 841(a), as set forth in Count Fifteen of this Indictment, for which the defendant may be prosecuted in a court of the United States, did knowingly and unlawfully possess a firearm in violation of Title 18, United States Code, Section 924(c).

## COUNT EIGHTEEN
*(Possession of a Firearm by a Convicted Felon)*

On or about October 15, 2020, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendant,

**(3) AKEEM OLAJUWAN DAVIS,**

knowing that he had previously been convicted of at least one crime punishable by imprisonment for a term exceeding one year, did knowingly possess one or more firearms, that is, a RG Industries Model .38 special, .38 caliber, Revolver, a Charter Arms Model .38 special, .38 caliber, Revolver, and an Interarms Model AP .380 ACP semi-automatic pistol, in and affecting commerce; in violation of Title 18, United States Code, Section 922(g)(1).

## COUNT NINETEEN
*(Distribute Cocaine)*

On or about October 21, 2020, in Mecklenburg County, within the Western District of North Carolina, the defendants,

**(1) STEVEN LAMAR CLOUD,** and
**(3) AKEEM OLAJUWAN DAVIS**

aiding and abetting each other, did knowingly and intentionally distribute a controlled substance, that is, at least 500 grams of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(B) and Title 18, United States Code, Section 2.

### COUNT TWENTY
*(Possession of a Firearm by a Convicted Felon)*

On or about November 19, 2020, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendant,

**(3) AKEEM OLAJUWAN DAVIS,**

knowing that he had previously been convicted of at least one crime punishable by imprisonment for a term exceeding one year, did knowingly possess one or more firearms, that is, a Glock Inc., Model 23, .40 caliber, Semi-Automatic Pistol and a Ruger, model LCP, .380 caliber, Semi-Automatic Pistol, in and affecting commerce; in violation of Title 18, United States Code, Section 922(g)(1).

### COUNT TWENTY-ONE
*(Possession of a Firearm by a Convicted Felon)*

On or about November 19, 2020, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendant,

**(1) STEVEN LAMAR CLOUD,**

knowing that he had previously been convicted of at least one crime punishable by imprisonment for a term exceeding one year, did knowingly possess one or more firearms, that is, a Draco style AK-47, 7.62x39 Pistol and a Taurus G2C 9mm handgun, in and affecting commerce; in violation of Title 18, United States Code, Section 922(g)(1).

### COUNT TWENTY-TWO
*(Possession with the Intent to Distribute Cocaine)*

On or about November 19, 2020, in Mecklenburg County, within the Western District of North Carolina, the defendant,

**(1) STEVEN LAMAR CLOUD,**

did knowingly and intentionally distribute a controlled substance, that is, a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

## COUNT TWENTY-THREE
*(Possession of a Firearm in Furtherance of a Drug Trafficking Offense)*

On or about November 19, 2020, in Mecklenburg County, within the Western District of North Carolina, and elsewhere, the defendant,

### (1) STEVEN LAMAR CLOUD,

in furtherance of a drug trafficking crime, that is, possession with the intent to distribute cocaine, a violation of Title 21, United States Code, Section 841(a), as set forth in Count Twenty-Two of this Indictment, for which the defendant may be prosecuted in a court of the United States, did knowingly and unlawfully possess a firearm in violation of Title 18, United States Code, Section 924(c).

### NOTICE OF FORFEITURE AND FINDING OF PROBABLE CAUSE

Notice is hereby given of 21 U.S.C. § 853, 18 U.S.C. § 924, and 28 U.S.C. § 2461(c). The following property is subject to forfeiture in accordance with Section 853, 924, and/or 2461(c):

   a.   All property which constitutes or is derived from proceeds of the violations set forth in this bill of indictment;

   b.   All property used or intended to be used in any manner or part to commit or facilitate such violations;

   c.   All firearms or ammunition involved or used in such violations; and

   d.   If, as set forth in 21 U.S.C. § 853(p), any property described in (a), (b), or (c) cannot be located upon the exercise of due diligence, has been transferred or sold to, or deposited with, a third party, has been placed beyond the jurisdiction of the court, has been substantially diminished in value, or has been commingled with other property which cannot be divided without difficulty, all other property of the defendant/s to the extent of the value of the property described in (a), (b), and (c).

The Grand Jury finds probable cause to believe that the following property is subject to forfeiture on one or more of the grounds identified above:

(a)     a Sig Sauer; Model: P226; Caliber: 40 pistol seized on August 25, 2020, during the course of the investigation; and

(b)     a Smith & Wesson, Model M&P, Caliber .45, Semi-automatic pistol seized on October 7, 2020, during the course of the investigation; and

(c)     a RG Industries Model .38 special, .38 caliber, Revolver seized on October 15, 2020, during the course of the investigation; and

(d)     a Charter Arms Model .38 special, .38 caliber, Revolver seized on October 15, 2020, during the course of the investigation; and

(e)     an Interarms Model AP .380 ACP semi-automatic pistol seized on October 15, 2020, during the course of the investigation; and

(f)     a Glock Inc., Model 23, .40 caliber, Semi-Automatic Pistol seized on November 19, 2020, during the course of the investigation; and

(g)     a Ruger, model LCP, .380 caliber, Semi-Automatic Pistol seized on November 19, 2020, during the course of the investigation; and

(h)     a Draco style AK-47, 7.62x39 Pistol seized on November 19, 2020, during the course of the investigation; and

(i)     a Taurus G2C 9mm handgun seized on November 19, 2020, during the course of the investigation; and

A TRUE BILL

███████████████████████████

FOREPERSON

WILLIAM T. STETZER
ACTING UNITED STATES ATTORNEY

LAMBERT GUINN
ASSISTANT UNITED STATES ATTORNEY

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

```
_____
                              )
UNITED STATES OF AMERICA,      )
                              )
                              )   DOCKET NO. 3:20-CR-385
          vs.                  )
                              )
KENNETH JEROME WATKINS,        )
                              )
          Defendant.           )
_____)
```

TRANSCRIPT OF JURY TRIAL DAY 1 OF 3
BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
UNITED STATES DISTRICT COURT JUDGE
MONDAY, MARCH 6, 2022, AT 9:28 A.M.

APPEARANCES:

        On Behalf of the Government:
        LAMBERT F. GUINN, ASSISTANT U.S. ATTORNEY
        TIMOTHY SIELAFF, ESQ., DOJ-USAO
        U.S. Attorney's Office
        227 W. Trade Street, Suite 1650
        Charlotte, North Carolina  28202

        On Behalf of the Defendant:
        C. SAMUEL RAEL, ESQ.
        1201 West Peachtree St. N.W
        Suite 2300
        Atlanta, Georgia 30309

                and

        DAVID L. HITCHENS, ESQ.
        212 N. McDowell Street
        Charlotte, North Carolina  28204


                KATHY CORTOPASSI, RDR, CRR, CRC
                    Official Court Reporter
                 United States District Court
                   Charlotte, North Carolina

JA023

2

1                        I N D E X

2                 * * * * * * * * * *

3

4     PLAINTIFF'S OPENING STATEMENT                16

5

6     DEFENDANT'S OPENING STATEMENT                20

7

8   GOVERNMENT'S CASE IN CHIEF----------------------------

9   WITNESS:                                  Page

10  Stephen Parker

11    Direct Examination by Mr. Sielaff           32

12    Cross-Examination by Mr. Rael               67

13    Redirect Examination by Mr. Sielaff         93

14

15  Jonquilla Denise Sanders

16    Direct Examination by Mr. Guinn             95

17    Cross-Examination by Mr. Rael              125

18    Redirect Examination by Mr. Guinn          144

19

20  Michael Sardelis

21    Direct Examination by Mr. Guinn            149

22    Cross-Examination by Mr. Rael              183

23    Redirect Examination by Mr. Guinn          189

24

25

3

1                          I N D E X (Continued)

2     GOVERNMENT'S CASE IN CHIEF----------------------------

3     WITNESS:                                        Page

4     Eddie Smith

5      Direct Examination by Mr. Guinn                 190

6      Cross-Examination by Mr. Rael                   198

7

8

9

10                             EXHIBITS

11    GOVERNMENT EXHIBITS ---------------------------------

12    NO.     DESCRIPTION                          RECEIVED
      21                                               40
13    4                                               111
      5                                               111
14    6                                               111
      7                                               111
15    12                                              119
      8                                               123
16    9                                               123
      10                                              123
17    11                                              123
      2                                               147
18    26                                              156
      24                                              160
19    14                                              172
      19                                              176
20    20                                              176
      13                                              197
21

22

23

24

25

4

1                              PROCEEDINGS

2              THE COURT:  Good morning, everyone.  We're here in

3     the matter of the United States versus Kenneth Watkins to

4     select a jury and begin trial.

5              Are the parties ready to proceed?

6              MR. GUINN:  Government's ready, Your Honor.

7              MR. RAEL:  Yes, we're ready.  We do have a motion

8     I'd like to bring to the Court before we bring in the jury.

9     Or we can bring them in and do it after.  Any way the Court

10    wishes.

11             THE COURT:  Let's select the jury and then we'll

12    see where we are.

13             Madame Clerk, would you call the jury?

14             (Jury pool enters the courtroom at 9:34 a.m.)

15             (Proceedings involving the jury have been sealed

16    pursuant to court order and are not included in this

17    Certified Transcript.)

18             (Open court at 11:16 a.m.)

19             THE COURT:  All right.  While we have everybody

20    gathered, Mr. Rael, I'd like to hear your motion before we

21    take a break, but I'll assure you that you get a break

22    before.

23             MR. RAEL:  Give me 60 seconds, maybe?

24             THE COURT:  Let's do the motion first.

25             MR. RAEL:  All right.

5

```
 1              THE COURT:  And if you would do it from the podium.
 2              MR. RAEL:  Certainly.  Just give me a minute and
 3    I'll gather what I need, please.
 4              So, Your Honor, I had a little conversation in the
 5    hallway just a few minutes ago with the United States
 6    Attorney who told me that according to him, what happens with
 7    the wire tap evidence is that they give it to the FBI, and
 8    then copies are made.  If that's accurate, that's a huge
 9    problem.  The problem is that my understanding is that
10    10 days after the interception, all the recordings are made
11    available to the judge, who seals that under this Court's
12    direction.  The failure to seal evidence must require a very
13    satisfactory explanation in order for that evidence to be
14    used.  But, essentially, all the evidence must be sealed in
15    order to comply with the federal statute.  This is under
16    Title III.
17              If, in fact, this evidence has not been sealed as
18    it must be sealed under Title III, then none of the evidence
19    that's trying to come in from the Government that deals with
20    the wire tap can come in.
21              THE COURT:  Let me make sure I understand.  Your
22    motion is that the wire tap material was copied by the FBI,
23    not the U.S. Attorney's Office?  Is that --
24              MR. RAEL:  No.  The -- this court must seal the
25    evidence.  If this court -- as soon as -- within, I think,
```

6

1    10 days, as soon as they -- each time apply to the court for
2    a wire tap.
3            THE COURT:  Right.  I'm very familiar with
4    Title III law.
5            MR. RAEL:  Okay.
6            THE COURT:  So tell me -- tell me, the nature of
7    your objection is that --
8            MR. RAEL:  The nature of the objection is that this
9    has not been sealed each time by the court.  If it hasn't
10   been sealed by the court, then the wire tap does not come in.
11           THE COURT:  All right.  Thank you.
12           What says the Government?
13           MR. GUINN:  Your Honor, the wire tap was sealed.
14   What happens is a -- when the wire tap, whatever it is, comes
15   down, a sealing order is -- a sealing application is
16   submitted.  I believe in this case the sealing order was
17   signed by the Court.
18           At the same time that the wire comes down, there's
19   a copy that's created by the FBI, as well.  And that's the
20   court copy that we're able to review and look at.
21           But the wire taps, when they came down, it -- when
22   they came down, I guess, from the main office in Atlanta,
23   they were sent to us and they were sealed pursuant to the
24   order of the court, and they've remained sealed since that
25   time, the original copies.

7

1          But there have been court copies that have been
2     obviously given to the FBI, given to us.  Copies of the
3     transcripts and copies of his calls have been given to
4     defense counsel as part of this case, as well, Your Honor.
5          So I think we -- my argument is that we've complied
6     with the Title III law in that respect.
7          THE COURT:  All right.  I will take your motion
8     under advisement and I'll check my own records on sealing and
9     talk to you about this after the break.
10         MR. RAEL:  All right.  May I bring something else
11    up to the Court's attention?
12         THE COURT:  Sure.
13         MR. RAEL:  The -- we have quite a bit of telephone
14    calls.  And now, to help the jury, there's going to be some
15    information about exactly what those calls said.  And it's on
16    sort of a transcript form.  It was put together right.  But
17    on the top of each page that I've received and to what's
18    proposed to be in evidence, it seems to have the exact date,
19    the exact time, the exact number of how it's being utilized.
20    That's not a transcript.  That's something that is basically
21    hearsay.  Somebody is going to have to be able to testify to
22    that.
23         Further, in that transcript, what we have as to
24    each transcript, we have on the side of that transcript a
25    notation as to who is speaking.  And there is no evidence

8

1   that I've seen presented to have who is speaking from -- by

2   whom.  And that's yet part of the transcript.  That shouldn't

3   be part of the transcript.

4              Now, if, in fact, they can somehow indicate how, in

5   fact, that was accomplished, and by whom, okay.  But --

6              THE COURT:  What says the Government?

7              MR. GUINN:  Your Honor, I guess it's kind of two

8   issues there.

9              So with respect to the date and number that's on

10  top of the transcript, that's not going to appear to the jury

11  in the way that it's presented to them.  What the jury will

12  see is they'll hear a call.  They'll see a blank screen.

13  Then they'll have names -- or, I guess, initials kind of

14  attributing who's kind of saying what at that time.  So

15  they're not going to see the part with the number --

16             THE COURT:  All right.  What about the speakers?

17             MR. GUINN:  With the speakers, Your Honor, the

18  Government anticipates being able to lay an appropriate

19  foundation to identify the speakers.

20             Again, the transcripts are not evidence.  They're

21  illustrative, and we would ask for a limiting instruction

22  with respect to that, Your Honor.

23             THE COURT:  That's what I'll do.  I'm going to deny

24  the motion as to the transcript on the understanding that the

25  date and time will not appear.

9

1          And as to the speakers, the Government needs to lay
2    a foundation for why those names appear.
3          And I'm going to give a limiting instruction
4    telling the jury that the transcripts are not the evidence,
5    that the actual evidence is the recording.
6          MR. RAEL:  Sure.
7          THE COURT:  And to the extent there's any
8    discrepancy between the recording and the transcript, they're
9    to follow the recording, not the transcript.  And I think
10   that should take care of your concerns, Mr. Rael.  So I'm
11   going to deny the motion.
12         I'm going to take the wire tap motion under
13   advisement and deny the transcript motion.
14         Anything else?
15         MR. RAEL:  No.
16         THE COURT:  So then we'll take a 10-minute break
17   and be back here at 11:35.
18         (Recess held.)
19         THE COURT:  All right.  I've taken the one motion
20   under advisement; I'm not prepared to rule at this time.  The
21   other motion's been denied and we're ready for some
22   preliminary instructions to the jury and then opening
23   statements.
24         Are the parties ready for the jury?
25         MR. GUINN:  There's one housekeeping matter.

1          Your Honor, the Government has its witnesses
2     sequestered.  I guess we ask that the defense counsel do the
3     same thing.  We ask that a sequestration order be in place,
4     Your Honor.
5          THE COURT:  Any objection?
6          MR. RAEL:  Not at all.
7          MR. GUINN:  In addition to that, Your Honor, I know
8     that Mr. Rael indicated, gave some indication that he may
9     call witnesses.  We have not received any kind of a witness
10    list.  If we could have some sense of who may be called, Your
11    Honor, that would be helpful.  The Government's filed a
12    witness list this morning and gave a copy to defense counsel.
13         THE COURT:  I'll ask you to file any potential
14    witness lists over the lunch hour.
15         MR. RAEL:  Okay.  Will do.
16         THE COURT:  Ready for the jury?
17         MR. GUINN:  The Government's ready, Your Honor.
18         THE COURT:  Call the jury.
19         Oh, before you do, the practice here is -- in light
20    of the jury's role as judges of the facts, to stand as they
21    enter the courtroom and as they exit it.  You all do that for
22    the judge of the law, and we will do it, as well, for the
23    jury as judge of the facts.  Just a small token of respect
24    for their role in the process.
25         MR. RAEL:  I might add that we have jurors here --

1  I mean, witnesses here.  So if you're a witness, the
2  Government has just said step outside.
3              (Witnesses exited the courtroom.)
4              THE COURT:  All right.  Call the jury.
5              (Jury entered the courtroom at 11:42 a.m.)
6              THE COURT:  Be seated.
7              Madam Clerk, would you impanel the jury?
8              THE CLERK:  Yes, sir.
9              Ladies and Gentlemen of the Jury, you are sworn
10  upon your initial appearance at this term of court and you
11  are now impaneled to try the issue arising in the criminal
12  action 3:20-cr-385, which the United States of America is the
13  plaintiff and Kenneth Watkins is the defendant.  You will sit
14  together, hear the evidence, and render your verdict
15  accordingly.
16              THE COURT:  Members of the Jury, now that you have
17  been sworn and impaneled, I'm going to give you some
18  preliminary instructions to guide you in your participation
19  in the trial.
20              You have two options, neither one of them are very
21  good.  But you can see my face on the monitors in front of
22  you, or those of you who want to swivel in your chairs and
23  listen to me, you can do that, as well.
24              It will be your duty to find from the evidence what
25  the facts are.  You and you alone will be the judges of the

12

1   facts.  You will then have to apply to those facts the law as
2   the Court will give it to you.  Nothing the Court may say or
3   do during the course of the trial is intended to indicate in
4   any way what your verdict should be.  The evidence from which
5   you will find the facts will consist of the testimony of
6   witnesses, documents, and other things received into the
7   record as exhibits, and any facts that the lawyers agree to
8   or stipulate to or that the Court may instruct you to find.
9           Certain things are not evidence.  They include
10  things like statements, arguments, and questions by the
11  lawyers.  Objections to questions are not evidence.  Lawyers
12  have a duty to their clients to make objections when they
13  believe that evidence is being offered for an improper
14  purpose under the Rules of Evidence.  You should not be
15  influenced by the objection.  If it is sustained, you would
16  ignore the question.  If the objection is overruled, you
17  would treat the answer like any other.
18          If you are instructed that some item of evidence is
19  received for a limited purpose only, you must follow that
20  instruction.
21          Testimony that the Court excludes or tells you to
22  disregard is not evidence and must not be considered.
23          And, again, anything you may have seen or heard
24  outside the courtroom is not evidence, must be disregarded.
25  You are to decide the case solely on the evidence presented

13

1   here in the courtroom.

2          Now, the Court instructs you that you are the sole

3   judges of the credibility of the witnesses and the weight

4   their testimony deserves.  While there is no absolute or

5   arbitrary guide or measure by which you determine the

6   truthfulness of a witness, the Court will point out to you

7   some general factors which may assist you in making that

8   determination, and these factors include:  Whether the

9   witness has any motive or reason for being truthful or

10  untruthful; the witness' interest, if any, in the outcome of

11  the case; whether there has appeared from the witness'

12  attitude or conduct any bias, prejudice, or feeling which may

13  cause that person's testimony to be influenced; whether the

14  testimony bears the earmarks of truthfulness; to what extent,

15  if any, it is corroborated or confirmed by other testimony

16  which is not in question; or by known or admitted facts.

17         You may also consider the intelligence and mental

18  capacity of a witness and the witness' opportunity to have

19  accurate knowledge of the matters to which the person

20  testifies.

21         I instruct you that you may believe all that a

22  witness says or none, or believe in part and disbelieve in

23  part.

24         Now, a few words about your conduct as jurors.

25  First, I instruct you that during the trial, you are not to

14

1  discuss the case even amongst yourselves or with anyone else,
2  nor should you permit anyone to discuss it with you.  Until
3  you retire to the jury room at the end of the case to
4  deliberate on your verdict, you simply are not to talk about
5  the case.
6          If anyone should try to talk to you about it, you
7  should bring it to the Court's attention promptly.
8          Second, do not read or listen to anything touching
9  on the case in any way.  You, as jurors, must decide this
10 case based solely on the evidence presented here within the
11 four walls of this courtroom.  This means that during the
12 trial, you must not conduct any independent research about
13 the case, the matters in the case, the individuals or groups
14 involved in the case, or legal concepts.
15         Now, because this is so different from how we
16 conduct our everyday affairs, I really want to stress this
17 point, that you simply are not to do any research on the case
18 while serving as a juror.  And our normal course -- I think
19 we even had it in jury selection, that our normal instinct is
20 to go to the social media and Google something and find an
21 answer.  And you simply are not to do this at all in this
22 case.  You cannot use any electronic device or media, such as
23 telephone, cell phones, smartphone, iPhone, Blackberry, or
24 computer; the Internet, any Internet service, any Internet
25 chatroom, blog, or website such as Facebook, MySpace,

15

LinkedIn, YouTube, or Twitter; or any text or instant
messaging service to communicate to anyone any information
about the case or to conduct any research about the case
while you serve as a juror.

Your duty to follow this instruction is a serious
responsibility. The failure to follow it may result in being
found in contempt of court.

Finally, do not form any opinion until all the
evidence is in. Keep an open mind until you start your
deliberations at the end of the case.

If you wish, you may take notes; but if you do,
remember that your notes serve merely as an aid to your own
memory and not a substitute for it. And, please, leave your
notes in the jury room when you leave at night.

I've already talked about sidebars, and I thank you
for putting up with us when on occasion we have to do that.

Now, the trial is about to begin. First, the
Government will make an opening statement, which is simply a
forecast of the evidence.

Next, the defense attorney may, but does not have
to, make an opening statement. And I'll remind you that
opening statements are neither evidence nor arguments.
They're simply a forecast of the evidence.

Next, the Government will present its witnesses,
and counsel for the defendant may cross-examine them.

16

1          Following the Government's case, the defendant may,

2     if he wishes, present witnesses whom the Government may

3     cross-examine.

4          After all the evidence is in and I've given you

5     general instructions, the attorneys will come back and

6     present their closing arguments.  Then the Court will give

7     you final instructions on the law and ask you to retire to

8     deliberate on your verdict.

9          That's the process that we'll follow from this

10    point forward.

11         Opening statements being so close to the lunch

12    hour, normally we would go to 1 o'clock before breaking for

13    lunch.  But in this case, I'll ask you to listen carefully to

14    the opening statements; and when they're done, we'll break

15    for lunch and come back to hear the presentation of evidence.

16         Is the Government ready to make its opening

17    statement?

18              MR. GUINN:  Yes, sir.

19                   PLAINTIFF'S OPENING STATEMENT

20              MR. GUINN:  If it please the Court, defense

21    counsel.  Again, my name is Lambert Guinn, and I'm here today

22    with my co-counsel Tim Sielaff and the caseworker.  We

23    represent the United States of America in this matter.

24         Now, the defendant in this case, Mr. Watkins, is

25    here today, and he's charged with one count of conspiracy to

1    distribute controlled substances within the Western District

2    of North Carolina; specifically, the Charlotte, North

3    Carolina, area.  And like the judge said, opening statements

4    are not evidence and they're not argument.  What they are is

5    a forecast of what the admissible evidence will be in this

6    case.

7              And so the evidence will show that back in 2020,

8    FBI agents in Charlotte, North Carolina, and CMPD officers

9    were engaged in an investigation.  They were investigating a

10   music group called the Pressure Gang rap label.  Now, most of

11   the individuals in the Pressure Gang rap label were

12   musicians.  They were about the art and they were trying to

13   make music.  Within that organization, there was a smaller

14   group of individuals that sold narcotics.

15             Now, the leader of the Pressure Gang was an

16   individual by the name of Steven Cloud.  Law enforcement

17   officers were monitoring Steven Cloud, and the investigation

18   was focused on him.

19             And so on two occasions in October of 2020, once on

20   October the 17th, 2020, and the second time October the 24th,

21   2020, Mr. Steven Cloud ordered narcotics from Atlanta, had

22   those narcotics brought up to Charlotte, North Carolina.

23             So on October the 17th, 2020, the evidence will

24   show that Mr. Cloud sent a woman named Jonquilla Sanders down

25   to Atlanta, Georgia; that Ms. Sanders met with the defendant,

PLAINTIFF'S OPENING STATEMENT                18

1    Mr. Watkins.  She retrieved a box and brought that box back

2    to Charlotte, North Carolina, and gave that to Mr. Cloud.

3            Mr. Sanders will -- Ms. Sanders will explain that

4    the substance, she knew what was in the box because she had

5    made a similar run for Mr. Cloud before.

6            Now, law enforcement officers were listening to

7    what was going on, but given how quickly everything was

8    happening, they couldn't do anything to intercept that

9    package.

10           So, on October the 24th, 2020, there was a second

11   run.  And on that day, Mr. Cloud sends a woman by the name of

12   Leticia Anderson down to Atlanta, Georgia.  Ms. Anderson

13   meets with Mr. Watkins, and she's on her way back up.  At

14   this point, law enforcement are listening to what happens.

15   They are familiar with what happened the week earlier, and

16   they stop Ms. Anderson.  Her vehicle was searched, and they

17   find a controlled substance called eutylone.  And that's the

18   substance that we're going to be talking about here today.

19           So in this case today, you're going to have an

20   opportunity to hear some wire tap calls, we anticipate, see

21   some phone location information and have the opportunity to

22   hear from one of those women that made that run for

23   Mr. Cloud.

24           As we're kind of going through this case, we're

25   going to ask that you think about three things:  First, the

1   two dates that I mentioned earlier, October the 17th, 2020,

2   and October the 24th, 2020.  Those are very important dates.

3           As you're hearing about those dates, please think

4   about the sequence of events, the order in which things

5   happened, and think about how October the 17th relates to

6   October the 24th.  We think that the events that occur on

7   October the 17th are going to help inform what occurred on

8   the 24th, and the events that occurred on the 24th are going

9   to help shed some additional light about what happened

10  October the 17th.  So think about those two dates.

11          The second thing that we're going to ask you to

12  think about is that Mr. Watkins is charged with participating

13  in the conspiracy.

14          So while it's important to think about who had the

15  controlled substance when -- and when the items were seized,

16  what's -- the additional items that are important, the most

17  important thing is the nature of the agreement.  Who was

18  participating in this transaction and what was going on?

19  Think about all the parties and the role that they played in

20  this particular investigation.

21          And, finally, and what we think is the most

22  important thing, is that you're going to hear additional

23  names, some of which are going to testify in court, some of

24  which may not testify in court.  There's a conspiracy

25  involving multiple people.  But today is Mr. Watkins' day in

DEFENDANT'S OPENING STATEMENT                    20

1  court.  We ask that you think about the role that he played
2  in this case.  Think about the actions that he took in this
3  particular case.
4          We think the evidence will show that none of this,
5  none of these events happened without Mr. Watkins down in
6  Atlanta first putting these items into the stream of
7  commerce.  And because of that, we believe the evidence is
8  going to establish that Mr. Watkins is guilty of conspiring
9  with other individuals to distribute narcotics; and at the
10 end of this trial, we're going to ask that you return a
11 verdict of guilty.
12         Thank you for your time and your participation in
13 this case.
14         THE COURT:  Mr. Rael?
15         MR. RAEL:  Thank you, Your Honor.
16         THE COURT:  You can speak from there or from the
17 center, whichever is your preference.
18                 DEFENDANT'S OPENING STATEMENT
19         MR. RAEL:  All right.  I think I'll stay here.  If
20 you all can move to me.
21         Just a very quick introduction.  As I just said, I
22 think, a few minutes ago, I'm Samuel Rael, and I practice in
23 Atlanta, Georgia, and have been since 1974 doing these kind
24 of cases, which are criminal cases.
25         And sometimes people wonder how can I be in Atlanta

DEFENDANT'S OPENING STATEMENT                21

1   and yet this is in Charlotte?  But in Federal Court, you can
2   try cases anywhere with the judge's permissions.  And I've
3   tried them in Chicago and in New York and Cincinnati and any
4   number of other places I can't remember.  And so that's one
5   thing.
6          And then sometimes people ask:  Why am I doing this
7   in Atlanta instead of in Charlotte here?  Because, you know,
8   Atlanta's just loaded with traffic and loaded with people and
9   all that kind of thing.  And they wonder why am I there
10  instead of here?  I don't know.  But here I am.  And now
11  we're going to deal with this case.
12         As the United States attorney said, this thing
13  started with a gang called the Pressure Gang.  Now, really,
14  they aren't a violent gang, a gang that, for the most part,
15  is in name only a rap gang.  And both the FBI will be here
16  today and ATF and Homeland Security and Mecklenburg police,
17  they all had their eye on this Pressure Gang.
18         Then you have a situation where you have a lot of
19  other people involved.  They're talking about two.  They're
20  talking about a Sanders.  They're talking about an Anderson.
21         I noticed that they indicated that only one of
22  these women who ran for Cloud would be there before the
23  Court.
24         By the way, this fellow named Cloud, really,
25  everybody knows him by Ziggy.  And everybody knows my client

 1   by KennyMan.  And nobody would really know him otherwise.
 2   He -- basically, Ziggy is a mentor for my client.  My client,
 3   who's before you today, is a fellow who is an entertainer and
 4   goes around and does rap and does rap with this Ziggy.  And
 5   his whole life is about nothing but music.  Everything that
 6   he touches is about music and is about the performing of that
 7   music.
 8           And as it happens that Ziggy, who is the mentor to
 9   Mr. Watkins, KennyMan, all of a sudden it turns out -- and I
10   say all of a sudden because everybody doesn't know everybody
11   and how they do business -- this guy, Ziggy, is a bad dude.
12   He's a guy who not only is running the Pressure Gang, but he
13   is running drugs everywhere, cocaine and that eutylone and
14   everything you could imagine.  He has a -- he carries a gun.
15   He's pled guilty to the same thing that Mr. Watkins is now
16   here before you to determine.
17           Not only did he plead guilty, but every single
18   other person who was involved in this conspiracy decided to
19   plead guilty.  And there were many of these people.  Besides
20   the people that were mentioned, there was a fellow named
21   Durnham.  He was buying narcotics 15 times from CIA agents.
22   Then you had one after the next.  Wallace, and he was
23   considered a leader in this Pressure Gang.  And when you get
24   the indictment, you'll see how all of these people were
25   involved one way or the other in this.

1          And so Mr. Watkins sits here and he asks himself:
2     What is he doing here?  He has never been in Charlotte until
3     now.  He knows nothing about it.  The two ladies that they
4     are saying that he dealt with with drugs, he doesn't even
5     know, ever.  And yet somehow -- he does know Ziggy.  He's
6     been around with Ziggy for many, many years.  And the
7     evidence will show that he has been dealing with him on music
8     forever.
9          But, see, in the rap business, the money and the
10    notoriety is in Atlanta.  It's not in Charlotte.  And Atlanta
11    is where everybody wants to be, where Watkins is, KennyMan.
12    And in Atlanta, that's where he goes.
13          So now these two people, he doesn't know them, but
14    they know him, at least one of them, this Sanders lady.
15    Sanders has -- she loves to party.  He knows that.  She knows
16    that.  That's what she does.  And it begins July the 4th, a
17    day that everybody can recognize.  And at that time she wants
18    to be -- the main thing she wants to be is part of some sort
19    of record label.  Whether it's Mr. Watkins, who has a record
20    label, or it is Ziggy, who has a record label, or it's the
21    Pressure Gang folk.  She definitely wants to be part of it.
22    This is her dream is to be part of a situation where she can
23    also, instead of being a wannabe, she's somebody.
24          And so Ms. Sanders then goes to a party July the
25    4th.  And unfortunately or fortunately, Ms. Sanders has some

1   kind of drug habit.  I don't -- we'll let her say what her

2   drug of choice is.  But we know that she's a huge drinker.

3   And at the time of July 4th, she does all of that and more.

4          And the evidence will further show you that then

5   there's a little confrontation.  More than a little

6   confrontation, a large confrontation.  We've got a woman who

7   does a lot of drug talk and comes over and now you've got

8   KennyMan here.  And she goes over and she says some very

9   nasty things.  And he could ignore it but didn't ignore it.

10  And he caught her up on that and he said you will not do this

11  on July 4th, again.

12         She didn't like that.  Not even one little bit.  So

13  when the time came to go to the FBI and say what happened, it

14  was very easy, easy peasy for her to come to say, yeah, he's

15  the one that I got drugs from.  Even though, of course, the

16  evidence shows that she didn't know what was in a box.  But

17  the box was given back to Ziggy.  And from that, they

18  conclude how that's a drug transaction.

19         She supposedly has a wad of cash, several wads of

20  cash, and she gives that to KennyMan.  And from that they

21  conclude, well, there was some wads of cash, we're the FBI,

22  and so she got a box, drugs.  That's the case that they will

23  have as it relates to Ms. Sanders.

24         Now, as to Ms. Anderson, this is really something

25  special because up until just a few days ago, the first of

1  June, no one really knew what was Ms. Anderson going to say?

2  Was she going to say like Ms. Sanders has said, it's him, or

3  something different?  Who knew?  Except that both United

4  States attorneys, as well as a Stephen Parker decided to

5  interview her at the jail that -- where she was housed and

6  where she stays.  And thank goodness, actually, that they

7  did, because then the truth came out, which is verified by

8  witness after witness that we have as to what we know

9  happened.

10         She said she never, ever went to Mr. Watkins'

11  studio.  She said that she never had met him until that very

12  day.  She said that she had never spoke with him on the

13  phone.  It might have been a three-way, but that's it.  She

14  said, more important, that she never, ever, ever got any

15  drugs from him, that she got it from someone else; didn't

16  want to name who that person was, but it was definitely not

17  him whatsoever.

18         And then the money that Mr. Watkins had, he

19  actually gave to Ziggy for stuff that had to do with music.

20  And she said that she didn't really want to be a witness for

21  the defense.  Well, she's under subpoena.  And maybe she

22  will, maybe she won't.  I don't like to bring people in who

23  are under subpoena and examine them like that, but that may

24  well occur, and it may not.

25         But we do know that when the FBI came and both of

DEFENDANT'S OPENING STATEMENT                26

1    those U.S. attorneys came, they said that on that day that
2    they're trying to talk about, which is October the 24th, she
3    said she did not supply any pills to him.  She met someone
4    else.  And here's the evidence.
5            She got there in Charlotte maybe 10 in the morning.
6    When she got money that she was going to get from Mr. Watkins
7    for Ziggy for music, that was about at least 11:30 or
8    thereabouts.  At 10 o'clock she did her deal with this other
9    person who she won't tell you who it is because she says that
10   he's not involved in the conspiracy and I ain't telling.
11   Okay.  That's up to her.  But not him at all.
12           She says that to these fellows, but yet they still
13   want to maintain that when there was telephone calls, maybe
14   she did.  And what calls are the real question here.
15           You will see that there's something also very
16   interesting that happened here.  The very night that he's
17   entertaining at a club, Club Diamond in Atlanta, and they
18   finish late, and what happens?  He gets shot.  Someone comes
19   to his studio and there's a shooting.  It's important because
20   the shooting helps the witnesses know what really occurred
21   between Ms. Anderson, besides what Ms. Anderson says, and
22   knows what happened, knows that what happened there was that
23   he was lucky to save his life; knows, and we have evidence to
24   prove that but for him helping someone, someone would have
25   been in big, big trouble.

1      His interest in trying to do some kind of drug deal
2  after that was something else, zero point zero, nada.  Does
3  not do any drugs of any kind, ever.  He's a Muslim.  It's
4  against his way to do anything like that.  And he has a
5  Muslim wife, which differs, apparently, from a regular wife
6  because they don't live together and they don't stay together
7  and it's different.  Let her explain.

8      But what I know is that at the end of the day, he
9  is a fellow who works, and the evidence will show, all the
10 time, day and night, has a trucking business while he does
11 his studio.  And the most important thing of all is the
12 music.

13     And everyone apparently wants to be involved in the
14 music business, but very few people get to be involved in the
15 music business.  It's not easy.  And it's not easy because
16 it's not how you sing or how you act or how you dance, but
17 it's in distribution.  And if you don't have good
18 distribution, you don't have anything at all.

19     He can distribute like no one can and does that all
20 the time.  That's his life.  Along with his life that he
21 tries to live all the time with his kids and his family and
22 everything in between.  But that's his essence.

23     And yet he works everywhere every time, but they
24 decide to bring a case based upon one person who says he
25 didn't do it and now one person who says, yeah, he did.  But

1    when that one person who says, yeah, he did, no.

2         Look, there's something further.  They're not just

3    coming out of thin air about Ms. Anderson.  Ms. Anderson got

4    stopped right after she met with Mr. Watkins.  When she got

5    stopped -- when I say right after, that may be about 11:30,

6    12 o'clock, something like that.  She gets stopped by the

7    police in Georgia, Franklin, Georgia, small town Georgia,

8    because they say that she's speeding.  And, not really.  It's

9    because the FBI is calling and saying:  We think there may be

10   a drug transaction going on.  And she gets stopped.

11        And when she gets stopped, they find almost $5,000

12   in her money and they find -- which she got from KennyMan,

13   which we'll prove to you is true, and then also got -- and

14   she also had in her car 5.3 pounds of dangerous drugs, this

15   eutylone.  The eutylone is like MDMA, only it's not made by

16   the folks over at Pfizer, it's made, I don't know, somebody

17   in a bathtub.  And they make that, and those drugs were found

18   in her car.

19        So they tried to put two and two together and they

20   say, well, she met with KennyMan, she got stopped at 2 in the

21   afternoon, she must have gotten these drugs from him.  Who

22   else?  Even though 10 a.m. we know precisely that she got the

23   drugs from her own and from other evidence that we will

24   present to you that will have you understand absolutely and

25   completely without hesitation of any kind that she got them

1    from someone else, period.

2          Let the evidence show you what we know:  That

3    person after person after the person has come here from

4    Atlanta and gone to the expense to be here to talk about the

5    details of this case, and every single one of those people,

6    without exception, will show you that this is a terrible

7    injustice.  And we are here to deal with justice.  And you

8    will discover that this man is not guilty.  Thank you.

9          THE COURT:  Members of the Jury, normally we'd go

10   into the evidence.  But it's over the noon hour, and I think

11   what we'll do, rather than start with the evidence and break,

12   we'll take our lunch hour at this time and come back for the

13   presentation of evidence.

14         While you take a lunch break, I would ask you to do

15   two things.  One is not talk about the case with yourselves

16   or anyone else.  The second one is to keep an open mind

17   because all you've heard right now is the opening statements

18   of the attorneys.  You haven't heard any evidence at all.

19         And so with those two instructions, we'll take a

20   lunch break and ask you to be back at 1:15.

21         (The jury left the courtroom at 12:18 p.m., and the

22             following proceedings were had out of the presence of

23             the jury.)

24         THE COURT:  At ease.  We'll come back at 1 o'clock

25   if there's any legal issues to take up then and be ready for

30

1    the jury to come back at 1:15.

2                   (Recess held at 12:19 p.m.)

3                   (Open court at 1:11 p.m.)

4                   (Whereupon, the following proceedings were held in

5    open court outside the presence and hearing of the jury:)

6           THE COURT:  I understand the defendant's complaint,

7    which I take is a motion to suppress, is that the FBI made

8    duplicates of the recordings while under seal.  The statute

9    gives the agency permission to do so for official purposes.

10          There does not appear to be any allegations that

11   the original recordings were altered in any way.  The

12   government has disclosure obligations if they seek to use the

13   recordings in evidence.

14          I find that, at least at this point, the defendant

15   has not shown a basis for suppression under 2518.10 which

16   details the -- details involving intercepted communications.

17          While it does not appear to the Court that the

18   government moved to their statutory and notice and disclosure

19   obligations, I don't find that the technical failure falls

20   within any recognized statutory basis for suppression.

21          So, Mr. Rael, I'm going to deny your motion at this

22   point.  I'm not inviting a motion for reconsideration.

23          MR. BUTLER:  If there is something missed in this

24   oral order that you wish me to further consider, you may file

25   a written motion and I'll react to it.  But at this point the

1    motion's denied.

2              MS. REAVES:  Well, thank you, Your Honor.

3              THE COURT:  So we'll stand in recess until we have

4    our full complement of jurors.

5              (Recess held.)

6              THE COURT:  Be seated.  Apparently the advice from

7    the jury is not to go to Mellow Mushroom for lunch.  So I'll

8    just pass that on to you.  But here they are.

9              MR. RAEL:  Your Honor, I have something we should

10   bring up before we get the jury in and all that -- might be

11   useful.

12             The U.S. attorney has sent me earlier and then just

13   the other day a lot of the -- I guess the photo -- the phone

14   incidents of what occurred and then they do everything on it.

15             The problem that I see is that they constantly

16   mention on it -- Mr. Cloud.  And he's not here.  I can't see

17   how they can admit anything that he will be saying on those

18   phone calls.  Those are out-of-court statements.  They --

19   even if they get to a point where they can indicate that they

20   recognize -- somebody recognizes this as Mr. Cloud, he's not

21   there.

22             And I can't see how anything except those who were

23   there could be able to --

24             THE COURT:  Well, I'll have to rule on that hearsay

25   objection when it comes up, and I'll do that.

32

1           Are we ready for the jury?

2           MR. SIELAFF:  Yes, Your Honor.

3           THE COURT:  Call the jury.

4           (Jury entered the courtroom at 1:31 p.m.)

5           THE COURT:  Be seated.  Members of the jury, I

6    guess the instruction is not to go to Mellow Mushroom for

7    lunch.

8           JUROR:  Correct.

9           THE COURT:  Call your first witness.

10          MR. SIELAFF:  Your Honor, the United States calls

11   Detective Stephen Parker.

12          THE CLERK:  Place your left hand on the Bible and

13   raise your right.

14          THE WITNESS:  (Complies.)

15                      STEPHEN PARKER

16   having been duly sworn was examined and testified as follows:

17          THE WITNESS:  Yes, ma'am, I do.

18          THE CLERK:  Thank you.  Please have a seat.

19                    DIRECT EXAMINATION

20   BY MR. SIELAFF:

21   Q.   Good afternoon, sir.  Will you please state and spell

22   your full name for the record.

23   A.   My name is Stephen Parker.  It's S-T-E-P-H-E-N,

24   P-A-R-K-E-R.

25   Q.   What do you do for a living, sir?

DIRECT OF STEPHEN PARKER BY MR. SIELAFF          33

1  A.   I'm a detective with the Charlotte Mecklenburg Police
2  Department.
3  Q.   And how long have you been with CMPD or Charlotte
4  Mecklenburg Police Department?
5  A.   Since 1996.
6  Q.   And what is your duties right now?
7  A.   Right now I'm assigned to the special investigations
8  bureau, and I am assigned secondly to the FBI Safe Streets
9  Task Force.
10  Q.   Can you explain to these folks exactly -- how does that
11  work?
12  A.   It works -- it's what's known as being a task force
13  officer.  It's -- I am duly sworn as a Charlotte-Mecklenburg
14  police officer with North Carolina accreditation and
15  everything that goes into that, while at the same time sworn
16  in with the FBI to work federal cases in federal matters,
17  basically to supplement the FBI in different cases.
18  Q.   Okay.  And generally what are your primary
19  responsibilities?  Like, for example, do you answer 911
20  calls?
21  A.   I do not answer 911 calls.  My primary responsibility is
22  I'm assigned to work drug cases, gang cases, and racketeering
23  cases are my primary duties.
24  Q.   Okay.  And when you say gang cases and racketeering
25  cases, what's racketeering?

1   A.   Racketeering is what we refer to - what you refer to as

2   RICO if you watch TV.  It's basically corrupt organizations

3   that are involved in multiple type of crimes that benefits

4   the organization as a whole.

5   Q.   And so when you say your primary responsibility is

6   investigating these types of organizations, how is that

7   different than, say, what a patrol officer does?

8   A.   A patrol officer is obviously the backbone of any police

9   department; answers the 911 calls to the citizens who call

10  and reference whatever they have going on in their lives,

11  whether it's a car accident, it's victimization of a crime,

12  helping the community in different things.  It's very -- a

13  patrol job is very vast.  It encompasses a lot of things.

14       With me specifically is I'm very task-oriented.  Hence

15  the task force position.  And so as a patrol officer would be

16  more versed in doing multiple things on a daily basis, I just

17  mainly focus on the things that I've been tasked to do.

18  Q.   And so how long have you been investigating criminal

19  organizations as a task force officer?

20  A.   Since 2007.

21  Q.   And are you familiar with Pressure Gang, LLC?

22  A.   I am.

23  Q.   What's Pressure Gang, LLC?

24  A.   Pressure Gang, LLC -- Pressure Gang is -- it's a rap

25  label that people would either try to get on or produce

DIRECT OF STEPHEN PARKER BY MR. SIELAFF          35

1  different musicians, different rap artists.  And some of the
2  members participated in illegal activity.
3  Q.   And were you somehow involved in an investigation with
4  Pressure Gang, LLC?
5  A.   I was.
6  Q.   How did that start?
7  A.   How -- well, how does the investigation work?
8  Q.   Yeah.  How -- why did you start looking at Pressure
9  Gang, LLC, specifically?
10 A.   I started looking at Pressure Gang, LLC, because there
11 were certain members of the Pressure Gang that -- how do I
12 say this -- had risen to the level of a federal type of
13 investigation.  There's some that had been partaking in crime
14 for a long time, criminal histories, had already been to
15 prison.
16      So there were some of these -- some of these members
17 that had risen to that thing, along with narcotics sales and
18 other crimes of violence.
19      So that's how we began to be -- get involved in Pressure
20 Gang, LLC, and looking at specific individuals inside the
21 Pressure Gang that ultimately led more to an investigation
22 into the Pressure Gang as a whole.
23 Q.   All right.  But you said some people on the rap label
24 were purely music folks, performers?
25 A.   To my knowledge, yes.

1   Q.   So was everybody under the label under investigation by
2   you?
3   A.   No.
4   Q.   So originally when you first started you investigation,
5   who was on your radar originally?
6   A.   Originally it was Corey Dunham, Laquil Wallace, and
7   Steven Cloud.
8   Q.   Corey Dunham, Laquil --
9   A.   Wallace.
10  Q.   For the court reporter, can you spell Laquil.
11  A.   I think we got Laquil.  It was L-A-Q-U-I-L, Laquil.
12  Everybody called him Quail, so Laquil.
13  Q.   And the last person was who?
14  A.   Steven Cloud.
15  Q.   Okay.  And why were you looking at those three
16  specifically?
17  A.   Those three seemed to be the backbone of Pressure Gang.
18  Steven Cloud obviously being the leader; the one that
19  established it.  And he had Laquil Wallace and Corey Dunham
20  as basically his left and right hand at the time the
21  investigation started.
22       So where Mr. Cloud went, Mr. Dunham and Mr. Wallace were
23  not far behind.  They had -- not only did they have the
24  Pressure Gang, they had a car club.  So there were different
25  little facets that everybody played a part in.

DIRECT OF STEPHEN PARKER BY MR. SIELAFF          37

1  Q.   And did your investigation remain focused on just those
2  three individuals?
3  A.   No, it did not.  It grew as the farther we looked into
4  it.
5  Q.   Explain to me how an investigation grows from starting
6  at three people and ending up at more than three?
7  A.   The way an investigation grows is you look into one
8  specific person.  And I'll say the first person we began to
9  look at Corey Dunham, then Laquil Wallace and Steven Cloud --
10 is you begin to look at their prior criminal histories, who
11 they've been involved in crime with.
12      And for me personally, it's never just one occasion.
13 It's are they involved with the same individuals with
14 multiple different interactions with law enforcement?  And
15 then it spreads to, all right, now that we've identified them
16 and their criminal activity, it moves to an investigation
17 into their social media.  You know, who are they tied to in
18 pictures?  Who are they tied to in communication?  Who are
19 they tied to in comments?  Again, for me personally, one
20 interaction is never enough.  It needs to be multiple times
21 that we can put these together.
22      And then as becoming prevalent in the Pressure Gang,
23 they used social media to promote their music.  So there
24 would be videos that were out there, interviews that they
25 would do.  And it would always be the same people.  So that

DIRECT OF STEPHEN PARKER BY MR. SIELAFF          38

1  number three grew.  The more we dug into it, it grew to that
2  number of people that were consistently with Mr. Cloud,
3  Mr. Dunham, and Mr. Wallace.
4  Q.    And before I go any further, you -- you've mentioned
5  Steven Cloud several times.  Did he have another name he went
6  by?  A nickname or a performance name?
7  A.    He went by BankkRoll Ziggy.  And some people called him
8  Bank, BankkRoll, or Ziggy.  Some combination of BankkRoll
9  Ziggy.
10 Q.    When you say Ziggy, that's Z-I-G-G-Y --
11 A.    Yes.
12 Q.    -- Ziggy?
13 A.    Uh-huh.
14 Q.    And how about Jonquilla Sanders?  Did Jonquilla Sanders
15 ever hit your radar?
16 A.    She did.
17 Q.    And in what capacity?
18 A.    She was a runner for Mr. Cloud.  What I mean by runner
19 is when Mr. Cloud needed something done, primarily in this
20 case, when he needed a drug run, Ms. Sanders was one of the
21 people that would make that run for him.
22 Q.    And did you ever come across a Leticia Anderson?
23 A.    I did.
24 Q.    And kind of where in your investigation did you first
25 come across Leticia Anderson?

1  A.   Leticia Anderson was sort of towards the end of the
2  investigation when we had already established interception on
3  Mr. Cloud's phone.
4      She -- there was some other evidence prior in the case
5  of her involvement, but nothing specific until we were on
6  Mr. Cloud's phone.
7  Q.   All right.  And was this a short investigation or a long
8  investigation?
9  A.   It was multi-month investigation.  It can be construed
10 as longer than most.  But I've done some that have been
11 considerably longer.  So it was a multi-month, almost all of
12 2020 type of investigation.
13 Q.   And at some point did Kenneth Watkins come on your radar
14 as part of the investigation?
15 A.   He did.
16 Q.   Was that early on in the process or later on in the
17 process?
18 A.   His involvement became clear earlier on while we were
19 doing the -- while I was doing the social media looking,
20 looking at videos, because Mr. Watkins was in videos with
21 Mr. Cloud on various things.
22     So we -- I knew of him.  But his part became more
23 prevalent when we were already up on Mr. Cloud's phone.
24 Q.   Okay.  And so would that be later on in the --
25 A.   That would be later on in the investigation, yes.

1  Q.   I'm going to show you Government's Exhibit 21.  Do you
2  recognize the person in Exhibit 21?
3  A.   I do.
4  Q.   And who do you recognize it to be?
5  A.   That would be Steven Cloud.
6  Q.   And is that a fair and accurate depiction of what
7  Steven Cloud looks like?
8  A.   Yes.
9  Q.   And would that help show the jury who Steven Cloud is or
10 who BankkRoll Ziggy is as we talk about him in your
11 testimony?
12 A.   I believe so, yes.
13      MR. SIELAFF:  Your Honor, we would move to admit
14 Government's Exhibit 21 and publish to the jury.
15      THE COURT:  Any objection?
16      MR. RAEL:  None.
17      THE COURT:  Let it be admitted and published.
18      (Government's Exhibit Number 21 was received into
19 evidence.)
20 BY MR. SIELAFF:
21 Q.   And so the screen everyone has -- this is Steven Cloud,
22 also known as BankkRoll Ziggy or Bank?
23 A.   Yes.
24 Q.   And what about Kenneth Watkins?  Did he have a different
25 name he went by?

1  A.    Yes.

2  Q.    What was that name?

3  A.    He was most commonly referred to as Kenny or KennyMan.

4  Q.    KennyMan?

5  A.    KennyMan.

6  Q.    Like all one word?

7  A.    I always spelled it as two.  K-E-N-N-Y, space, M-A-N.

8  Q.    Okay.  So as we talk about an investigation -- you've

9  used that term several times, an investigation.  I want to

10 talk about some of the tools you used so the jury is familiar

11 with that process.

12         When you use a term like "intelligence gathering," what

13 are we talking about?

14 A.    Intelligence gathering is the process in which you try

15 to -- an investigator, myself, tries to learn everything we

16 can about the individual that we're looking at.  We use terms

17 like "pattern of life."

18         When does -- literally to the point of when do they get

19 up in the morning to when do they go to bed.  When -- where

20 do they work.  Who do they interact with.  Are they or are

21 they not married, which is important.  What cars that they

22 drive, who they interact with, frequency of where they visit.

23 All these things go into determining pattern of life.

24         And then there are other investigative matters that we

25 do to learn -- because let's -- let's face it, we want to be

1  right.  All right.  That's the biggest thing, we want to be

2  right.

3      And so we dig into this investigative step of

4  intelligence gathering to make sure that what we allege to be

5  true is true.  And so it's a very tedious process of looking

6  into old police reports.  And to me personally, I've looked

7  at reports that may be 10, 15 years old to find different

8  phone numbers for people, different addresses for people, who

9  their relatives are.  Because really, in this tile you learn

10  to live their lives.  And knowing as much as you can

11  intelligence-wise helps in building the investigation

12  properly.

13  Q.   And what about the term "undercover" or

14  "UC surveillance"?  What exactly is that?

15  A.   UC surveillance is basically exactly undercover

16  surveillance.  It's the utilization of people like myself and

17  other people in my unit or other plainclothes officers in the

18  department where we will use unmarked cars and we'll sit in

19  neighborhoods or we'll sit in business parking lots and we'll

20  observe.  We'll watch who people interact with.

21      If they're doing drug deals, we watch to who they're

22  dealing drugs to.  We gather license plates.  We gather car

23  information, different locales.  And that's all done in a

24  covert manner.  Overt would be if we were using a patrol car

25  to do it.  A covert, undercover surveillance is the use of

DIRECT OF STEPHEN PARKER BY MR. SIELAFF        43

1    plainclothes, unmarked vehicles.

2    Q.    And do you also use video or camera surveillance?

3    A.    We do.  We use what is referred to as a pole cam, even

4    though all it actually is, is a camera that's mounted

5    somewhere, whether it's on a pole, whether it's attached to a

6    residence or a fixed structure.  And what that camera does is

7    it records constantly.

8        It's almost not under our control at all.  It records.

9    It sends information to a hard drive.  And off the hard drive

10   is where we view it.  But you can view it in realtime.  And

11   you can watch interactions with people.  You can watch

12   locations; what goes on outside of residences and businesses.

13   Q.    And geolocation.  Is that a tool that you employ --

14   A.    Geolocation is another thing that we use.  What that is,

15   is basically locating where a cellular phone device would be.

16   It's geolocating that device.  And it's centered around the

17   actual device.  And we can geolocate it so when that phone is

18   being utilized, it tells us a certain -- what word --

19   diameter, a certain radius -- that's actually the word I'm

20   looking for -- the radius of where that phone is.

21       And sometimes it's really good; it's like 3 or 4 meters.

22   Sometimes it's 15-, 1,600 meters, which goes into the

23   intelligence gathering of I got such a large radius but I

24   know this is the location of where people are.

25       So geolocation helps us determine where a specific phone

DIRECT OF STEPHEN PARKER BY MR. SIELAFF        44

1  is at a specific time.

2  Q.    All right.  And can you do that to just anybody's phone?

3  Or do you actually need court permission to --

4  A.    I need court permission to do that.

5  Q.    And so we've talked about -- it sounds like a vast

6  amount of resources for the investigation to work.  Were all

7  of these employed in the investigation of the Pressure Gang?

8  A.    Yes.

9  Q.    And you mentioned that you work for both CMPD and the

10  FBI.

11     Do you know all in total how many different law

12  enforcement agencies were part of this investigation at some

13  point in time?

14  A.    There's multiple.  I think it was at one time up to five

15  or six.  It was the FBI, CMPD, Homeland, ATF, DEA, I believe,

16  and some other local agencies.  So it was more than -- it was

17  more than just FBI and CMPD.

18  Q.    Okay.  I want to step back just a moment to

19  Steven Cloud.  Were you able to determine where he was living

20  during the course of this investigation?

21  A.    We were.

22  Q.    Did you do anything specific to monitor that residence

23  during the course of the investigation?

24  A.    We did.  We determined that he was living off of

25  Finchley Drive.  And we had a -- we actually had two cameras

DIRECT OF STEPHEN PARKER BY MR. SIELAFF        45

1  up; two stationary recording devices.  One a little bit
2  farther up the street from the residence so we could see cars
3  coming and going.  And towards the end of the investigation
4  we were able to ascertain another camera that was almost
5  directly in front of the residence.
6  Q.   So you actually have camera footage of who arrives to
7  and leaves from Steven Cloud's residence during this
8  investigation?
9  A.   Yes.
10  Q.   I want to talk to you a little bit about what's known as
11  a wire intercept or a wiretap.
12      Is it ever possible for law enforcement to actually
13  listen in on people's phone calls?
14  A.   It is.
15  Q.   Can you do that any time you feel like it?
16  A.   No.  As much as we see it on TV where it happens like
17  that, it's actually not the case at all.
18  Q.   So walk us through the initial steps.  What needs to
19  happen?  What do you need to have before you can even think
20  about listening in on a phone call?
21  A.   That -- that's a long road.  So before we get to
22  intercepting a person's phone call, the law is pretty clear.
23  It's one of the most intrusive investigative steps that we
24  can utilize.  And it's very much protected for the person.
25      The first thing you have to do is obviously you identify

1  who the target is.  And then the next most important thing is
2  identifying the phone number that he's using; that he or she
3  is using to commit criminal act.  And all these things are
4  good if I know it, but I actually have to be able to prove
5  it.
6      And so with this knowledge we have to prove that the
7  phone the individual is using is what we call dirty.  It's
8  been used for criminal activity.
9      And there are several facets of doing that, but what we
10  had to employ in this case was we began to do undercover
11  narcotics purchases; what's known as a controlled purchase.
12      From Corey Dunham is actually where we began.  We used
13  an undercover vice detective that was introduced to
14  Mr. Dunham, and that vice detective ordered narcotics from
15  Mr. Dunham using his telephone.
16      And once you establish that, it's still not enough.  You
17  have to identify as many other people in the conspiracy as
18  you can.  And you do that by requesting what's known as toll
19  records.  Every time you make a phone call, it generates a
20  toll.  It's basically the phone company.  If you've ever read
21  your phone bill, it tells you when calls were made, so on and
22  so forth in detail, what's known as a toll.
23      And so we have to look at, all right, are there other
24  people that he's talking to that are involved in the
25  narcotics business.  Because it's never good that it's just

DIRECT OF STEPHEN PARKER BY MR. SIELAFF          47

1   one.  It has to be multiple people.

2        And so after we get those tolls, I have to -- no wire is

3   ever given off of one dirty phone call.  It's two or more.

4   And then it's if you want to intercept text messages from

5   this individual, you have to show that he or she is using

6   text messages.  So it's very tedious to get to that point.

7        But even when you're at that point it's still not

8   enough.  Because it's so intrusive, we have to prove to the

9   Court that there is no other investigative method that we can

10  utilize to advance the investigation.

11       Why won't search warrants in people's houses -- why

12  won't that further it?  Have you done that?  What has been

13  accomplished from that?  What's done is something called mail

14  coverage.  Does the person even get mail at this address?

15  Can you build a case off of that?  Looking through people's

16  trash.  Talking to other people.  Is there a cooperator?  All

17  these things have to be done prior to even asking the Court

18  for permission because of the level of intrusiveness that

19  we're talking about.

20       And then once you've reached what we call exhaustion,

21  which is now it's to the point where we can begin to ask the

22  Court to -- for this ability to do this, the affiant -- and

23  I've written multiple ones -- the affiant has to detail in

24  writing somewhere in the vicinity -- I've written some that

25  are 65 pages and I've written some that are close to 200

DIRECT OF STEPHEN PARKER BY MR. SIELAFF        48

1   pages -- of all the things that we've said and done to try to

2   get this investigation off and running.

3        So after I write my affidavit, or the affiant writes

4   their affidavit, it's approved by the U.S. Attorney's Office,

5   they're the first step to getting it done.  They read it.  We

6   go back and forth on:  Did you do this?  Did you do this?

7        And once that's approved by the U.S. Attorney's Office

8   and their supervisor here in the Western District, it's sent

9   to what is known as OEO, which is the Office of Enforcement

10  Operations in the Department of Justice.

11       There it's assigned another lawyer to look at it, to

12  read it, to evaluate it.  And that lawyer may have, you know,

13  I think we should do this.  Can we do this.  Questions,

14  comments.  Judging all investigative matters and the legality

15  of it.

16       Once that lawyer approves it, it goes to that lawyer's

17  supervisor.  And so now we have another lawyer reviewing it

18  for legality and content and exhaustion.

19       And once that supervisor approves it, it goes through

20  what we know -- what we refer to as the DAG, the Deputy

21  Attorney General of the United States office.  And it goes

22  with a memo where the last attorney writes the memo

23  detailing -- not detailing -- you know, overall the case, why

24  this method should be utilized.

25       And then once that -- once the Deputy Attorney General

DIRECT OF STEPHEN PARKER BY MR. SIELAFF        49

1   of the United States signs the memo, what's referred to as a

2   DAG memo, then that's returned so that it's finally brought

3   to the judge overseeing the case.  To where the judge's final

4   say -- he also -- he or she will also read the document to

5   see if it covers exhaustion and legality and the dirtiness of

6   the phone call; who other members of the conspiracy would be.

7   And it's only then that access to listen to the phone is

8   approved.

9        So even though you see it in TV and movies and it

10  happens like this, it's actually a multiple-week, multiple

11  review steps.  It's very tedious and it's done for the

12  protection of the individuals.

13  Q.   Okay.  So what happens -- you mentioned several

14  different people reviewing this application.  What happens if

15  one of them says, eh, I don't like this; I don't agree with

16  it?

17       Do you just say, well, that's your opinion and move on

18  to the next person?

19  A.   No.  If one person disagrees with it --

20            THE COURT:  Counsel, Counsel, this is -- hang on a

21  second.  It's way too much detail.

22            MR. SEILAFF:  Yes, sir.  I'll move on.

23            THE COURT:  Get to a substantive point.

24            MR. SIELAFF:  Absolutely, sir.

25

JA071

1  BY MR. SEILAFF:

2  Q.    Did you go through this process to listen in on phone

3  calls of Steven Cloud or BankkRoll Ziggy?

4  A.    We did.

5  Q.    And did you get that approval?

6  A.    We did.

7  Q.    All right.  As a general matter, once you have a court

8  order that authorizes you to listen in on phone calls, do you

9  get to listen in on any phone call you want for however long

10 you want?

11 A.    No, we do not.  There are specific rules on what we can

12 listen to and how long we can listen to it.

13 Q.    Okay.  What generally are those rules?

14 A.    Generally -- it's every person is protected by

15 privilege, whether it's a husband-and-wife privilege, a

16 doctor privilege, a clergy-penitent privilege, and I think

17 there's another one that's escaping me at the moment, but

18 they have privileges and we can't listen to them.

19       So if we know that an individual is talking to his

20 lawyer, we can't listen to that at all.  It's marked

21 privilege.  It's shut off.  It doesn't even record the

22 conversation.  The machine doesn't record it.

23       Same thing with different spouses.

24       But then once we've established can we or can we not

25 listen to the content of this call, the call also has to be

DIRECT OF STEPHEN PARKER BY MR. SIELAFF        51

1   pertinent to the investigation.  We set a time standard.  We

2   listen to it for a minute.  If it's not determined to be

3   pertinent to the investigation for a minute, we stop

4   recording it.  And then we spot-check it every 30 seconds to

5   see if the conversation has returned to pertinency.

6        So we do not -- or we're not authorized to listen to

7   anything for however long we want to listen to it.

8   Q.   And is there a term for that?  That process where you

9   stop the recording?

10  A.   It's called minimizing.

11  Q.   Minimizing?

12  A.   Minimizing the conversation.

13  Q.   Okay.  And then you say you then go -- start recording

14  again and check after 30 seconds?

15  A.   30 seconds.

16  Q.   All right.  What happens if you minimize because they're

17  not talking about -- say in this case drugs -- you turn it

18  back on and you realized you've missed half a conversation

19  about drugs.

20       Can you go back and check what you missed?

21  A.   No.  As soon as that conversation is minimized, the

22  machine stops recording the conversation.  It will only start

23  recording again.  So if we miss it, we miss it.

24  Q.   Okay.  And were all these procedures followed in the

25  Pressure Gang wire or the wire intercepts for Steven Cloud?

DIRECT OF STEPHEN PARKER BY MR. SIELAFF          52

1    A.    Yes.

2    Q.    And what is the -- a wire?  What is that?

3    A.    I'm sorry.  I didn't hear you.

4    Q.    The wire room?

5    A.    The wire room is just a secured area, and ours are at

6    the FBI office where it's just wire machines which is

7    computers that work nothing but the wire setup.  And it's

8    where we sit and we listen.

9    Q.    And as you are listening to phone calls, you can hear

10   both participants in a call, or more than one participant in

11   a call?

12   A.    Yes.  Whoever's in that phone call we can hear.

13   Q.    And are you able to determine any other information

14   about the ingoing or outgoing numbers?

15   A.    Yes.  Because of how it's tied up, it tells us about 90

16   percent of the time.  There are some times where it doesn't.

17   The machine doesn't generate the number that they're talking

18   to.  But because it's linked up with tolls, it tells us the

19   date, the time, and the number.  It doesn't tell us the

20   person.  It tells us the number that that call is being

21   involved in.

22   Q.    Is that similar to like your caller I.D. on your cell

23   phone?

24   A.    Yes.

25   Q.    And is that all coming to you essentially realtime?

DIRECT OF STEPHEN PARKER BY MR. SIELAFF        53

1  Meaning, as you're listening to the call, you can see who the
2  number is that it went out to or it came in from?
3  A.    Yes.
4  Q.    And do you record all that information?
5  A.    The machine does, yes.
6  Q.    And where are all of those recordings and all that
7  data -- where are they kept?
8  A.    All the hard, realtime data is housed in a secured wire
9  room in Atlanta, Georgia.  That's where all the hard
10 evidence, all the hard calls go.  And then in realtime it's
11 pushed out to whatever field office is listening to it.
12       So once that -- when all the hard evidence data is
13 secured on hard drives in Atlanta.
14 Q.    And can you make copies of the information that's saved
15 on that data?
16 A.    I can make -- once that data is put onto a disc, from
17 there I can make copies of that.
18 Q.    And were you asked to prepare or review copies of some
19 of the phone calls that came from the wire intercept of
20 Steven Cloud?
21 A.    I was.
22            MR. SIELAFF:  May I approach?
23            THE COURT:  You may.
24 BY MR. SIELAFF:
25 Q.    I'm placing in front of you Government's Exhibit

DIRECT OF STEPHEN PARKER BY MR. SIELAFF        54

1   Number 1.  In general terms, what is Government's Exhibit
2   Number 1?
3   A.   It's a CD.
4   Q.   All right.  And based on just the observation of the CD,
5   can you tell us what's going to be on that CD?
6   A.   This is a CD of copies of some of the phone calls from
7   the wire intercept of Steven Cloud.
8   Q.   And have you actually reviewed the audio files contained
9   on that CD?
10  A.   I have.
11  Q.   And how do you know that's the CD you reviewed?
12  A.   Because there is -- this is my signature and the date on
13  which I listened to each call in its entirety.
14  Q.   And are all the portions of those calls fair and
15  accurate and have they been, you know, modified in any way,
16  changing voices or changing words or anything?
17  A.   No.  Once the machine records it, it's not possible to
18  delete it, erase it, change it.  It's not possible to do.
19  Q.   And how long were you actually listening in on
20  Steven Cloud's phone calls?
21  A.   Steven Cloud's wire intercept started right around
22  October 14th.  And it ended around November 5th.
23  Q.   And how often had you reviewed his posts on social
24  media?
25  A.   At the time I was looking at his posts pretty much

DIRECT OF STEPHEN PARKER BY MR. SIELAFF          55

1  regularly.

2  Q.   Do you know Steven Cloud's voice?

3  A.   I do.

4  Q.   And were you -- are you able to recognize it on those

5  calls?

6  A.   I am.

7  Q.   All right.  What about Leticia Anderson?  Do you know

8  and recognize her voice when you hear it?

9  A.   I do.

10  Q.   How?

11  A.   I've talked to her.  I've sat with her at length and had

12  interactions with her.  And obviously when we recorded --

13  when the machine recorded the intercepts, she was seen there

14  and identified with the phone.

15       So that's how, when she was identified with the phone,

16  we attached her to the phone, and then I've sat and talked to

17  her directly.

18  Q.   What about Jonquilla Sanders?

19  A.   The same thing.  I've talked to her directly; used phone

20  connectivity.  And she was seen on the surveillance outside

21  of Finchley Drive.

22  Q.   Now, we've mentioned Kenny Watkins or KennyMan.  But I

23  have not asked you:  Do you see Kenny Watkins here in court

24  today?

25  A.   I do.

DIRECT OF STEPHEN PARKER BY MR. SIELAFF          56

1  Q.   Can you please point to him and identify something he's
2  wearing for the record.
3  A.   He's sitting at the defense table with the nice black
4  vest on and the white shirt.
5          MR. SIELAFF:  May the record reflect an in-court
6  identification of the defendant.
7          THE COURT:  It will.
8  BY MR. SIELAFF:
9  Q.   Now, have you ever sat down in the same room and had a
10 conversation with the defendant?
11 A.   I have not.
12 Q.   Do you know his voice?
13 A.   I do.
14 Q.   How do you know his voice?
15 A.   There -- during interceptions on Mr. Cloud's wire, he
16 would contact Mr. Watkins, and Mr. Cloud would talk.  And
17 there were several times in those conversations where
18 Mr. Cloud would call him KennyMan, KennyMan, "put KennyMan on
19 the phone."  And Mr. Watkins would then get on the phone.
20 Q.   And does the defendant also have social media posts that
21 you've reviewed?
22 A.   He does.
23 Q.   And does he speak and rap and sing in those media posts?
24 A.   In the ones that I've seen with Mr. Watkins, I have seen
25 the ones in which he talks, he interacts with Mr. Cloud.  I

DIRECT OF STEPHEN PARKER BY MR. SIELAFF        57

1  can't honestly remember if I've watched his music videos.
2  But I have seen him in videos where he interacts and talks
3  with Mr. Cloud.
4  Q.   And you feel comfortable that you recognize his voice
5  when you hear it?
6  A.   I do.
7  Q.   Now, the actual number that the wire intercept was
8  ordered for -- what was Steven Cloud's phone number that you
9  were monitoring?
10 A.   980-777-0566.
11 Q.   And were you able to determine numbers for
12 Leticia Anderson?
13 A.   We were.
14 Q.   What numbers were you able to determine for her?
15 A.   Can I look at my notes.  I want to be right.  I just
16 don't want to --
17 Q.   If you think that would refresh your recollection,
18 please look at your notes.
19 A.   We had two for Ms. Sanders:  704-287-5769 and
20 786-353-3542.
21 Q.   And based on the phone calls that you monitored where
22 you heard the defendant's voice, were you able to determine
23 what phone number he was using?
24 A.   We were.
25 Q.   And what number or numbers were the defendant's?

DIRECT OF STEPHEN PARKER BY MR. SIELAFF          58

1  A.   We had two.  May I look at my notes?

2  Q.   If that would refresh your recollection, please do so.

3  A.   The two we had for the defendant were 678-558-8359 and

4  470-389-2569.

5  Q.   And lastly, Jonquilla Sanders.  Were you able to

6  determine --

7  A.   I'm sorry.  Those were the numbers for Ms. Sanders.  Did

8  I not give those?

9  Q.   I'm sorry.

10  A.   I'm confused.  I know we just did Mr. Watkins.  Did I

11  give the wrong numbers earlier?

12  Q.   No.  I must have confused my two women.  What about

13  Leticia Anderson?

14  A.   I do not remember Ms. Anderson's numbers.

15  Q.   Okay.

16  A.   To be open and honest, I don't remember them.

17  Q.   That's fine.

18       Now, in addition to listening to these phone calls and

19  you've described being able to recognize voices, do you

20  become accustomed to how people talk, their intonations,

21  their pacing?  Phrases that they use?

22  A.   Yes.

23  Q.   And after a while does it become easier to listen to

24  these conversations and understand what's going on?

25  A.   It is.

1   Q.   And as part of your investigation, do you prepare

2   transcripts to assist you in remembering what phone

3   conversations happened but also explain to other people

4   what's in the phone calls?

5   A.   Yes.

6   Q.   And were you asked to review a number of transcripts of

7   the calls that are included on Government's Exhibit 1?

8   A.   Yes, I did.

9           MR. SIELAFF:  May I approach, Your Honor?

10          THE COURT:  You may.

11  BY MR. SIELAFF:

12  Q.   I'm placing in front of you a stack of documents.  In

13  general terms do you recognize what those all are?

14  A.   I do.

15  Q.   And in general terms what are they?

16  A.   These are transcripts of calls, also referred to as

17  sessions, that I have reviewed that -- I'm just making sure

18  these are all the ones.

19       Transcripts of the calls that are on Government's

20  Exhibit 1.

21  Q.   Okay.  So let's quickly go over those.  State's (sic)

22  Exhibit 1A.  There should be a transcript 1A1 in front of

23  you.  Do you see it?

24  A.   I do.

25          MR. RAEL:  Excuse me.  May I see it as well.

DIRECT OF STEPHEN PARKER BY MR. SIELAFF          60

1          MR. SIELAFF:  You should have it on the --
2    BY MR. SEILAFF:
3    Q.   Okay, Detective.  1A1 -- is that one that you reviewed?
4    A.   It is.
5    Q.   And does it fairly and accurately transcribe the call
6    that you listened in -- the call that you actually heard?
7    A.   To the best of my knowledge, yes, it does.
8          MR. RAEL:  Objection, hearsay.
9          THE COURT:  Overruled.
10   BY MR. SIELAFF:
11   Q.   And in the transcript do you also take notes as far as
12   what call you're transcribing?
13   A.   Yes, we do.
14   Q.   And for 1A1, what call were you actually transcribing?
15   A.   This is Session 355, which is the call the machine
16   generates a session for us.  It's a call that was made on
17   October 16, 2020, at 7:06 p.m.
18          MR. RAEL:  Objection, Your Honor.  Putting the
19   session numbers because he has some machine that said it is
20   not good.
21          THE COURT:  Overruled.
22   BY MR. SIELAFF:
23   Q.   And again, all of that information is captured realtime,
24   the phone numbers involved, the session number, the date and
25   time?

DIRECT OF STEPHEN PARKER BY MR. SIELAFF        61

1   A.   Yes.

2   Q.   State's (sic) Exhibit -- I'm sorry.  Government Exhibit

3   1C1.  Did you verify that that was an accurate transcription?

4   A.   I did.

5   Q.   And for what call was that?

6   A.   That was Session 452 on October 16, 2020, at 11:30 p.m.

7   Q.   State's -- sorry.  Government's 1D1.  Did you verify

8   that that's an accurate transcription?

9   A.   Yes.

10  Q.   And for what session?

11  A.   Session 455, 10/16 -- or October 16, 2020, at 11:36 p.m.

12  Q.   Government's Exhibit 1E1.  Did you verify that's an

13  accurate transcription?

14  A.   I did.

15  Q.   And for what session is that?

16  A.   Section 470 on October 16, 2020, at 11:55 p.m.

17  Q.   Government's Exhibit 1G1.  Did you verify that's an

18  accurate transcription?

19  A.   I did.

20  Q.   And for what session phone call?

21  A.   Session 522 on October 17, 2020, at 1:31 in the morning.

22  Q.   Government's Exhibit 1J1, did you verify that's an

23  accurate transcription?

24  A.   I did.

25  Q.   For what session?

DIRECT OF STEPHEN PARKER BY MR. SIELAFF          62

1   A.   Session 1912 on October 24, 2020, at 11:23 a.m.
2   Q.   Did you verify Government's 1K1 was an accurate
3   transcription?
4   A.   I did.
5   Q.   For what session?
6   A.   Session 1937, dated October 24th of 2020 at 11:54 a.m.
7   Q.   Did you verify whether or not Government's 1L1 was an
8   accurate transcription?
9   A.   I did.
10  Q.   And is it an accurate transcription?
11  A.   It is.
12  Q.   And for what session phone call?
13  A.   Session 1939.
14  Q.   Government 1M1.  Is that an accurate transcription?
15  A.   It is.
16  Q.   For what session phone call?
17  A.   Session 1951.
18  Q.   And when did that take place?
19  A.   October 24, 2020, at 12:42.
20  Q.   1N1.  Is that an accurate transcription?
21  A.   It is.
22  Q.   For what session phone call?
23  A.   Session 635 on October 17th.
24  Q.   And it looks like we might have some pages stick
25  together.  Was 1C1 an accurate transcription?

DIRECT OF STEPHEN PARKER BY MR. SIELAFF          63

1   A.   It is.

2   Q.   For what phone call?

3   A.   Session 452.

4   Q.   And when did that take place?

5   A.   October 16, 2020.

6   Q.   And then another one, I believe, got missed.  1F1.  Is

7   that an accurate transcription?

8   A.   It is.

9   Q.   For what phone call?

10  A.   Session 487 on October 17th of 2020.

11  Q.   All right.  Now, Detective, based on your descriptions,

12  you heard these people talk on multiple occasions.  A lot of

13  them you've met in person.

14  A.   Yes.

15  Q.   Would your transcriptions assist the jury in

16  understanding what they are hearing for the first time if

17  these calls are played here in court?

18  A.   It would.

19        MR. SIELAFF:  Your Honor, we would move to admit

20  State's (sic) Exhibit 1 and then 1A through 1N, along with

21  their transcriptions for illustrative purposes.

22        THE COURT:  Any objection?

23        MR. RAEL:  Yes.  This is out-of-court statements

24  that --

25        THE COURT:  Let me see the attorneys at sidebar.

DIRECT OF STEPHEN PARKER BY MR. SIELAFF          64

1          (A bench conference was held on the record but out

2     of the hearing of the jury as detailed below beginning at

3     2:11 p.m.)

4          THE COURT:  This is the hearsay objection that you

5     raised earlier.

6          MR. RAEL:  I did.

7          THE COURT:  What's the government's response?

8          MR. SIELAFF:  Your Honor, this is a statement of

9     co-conspirators in furtherance of conspiracy.  Obviously we

10    may need to connect this up as we go through the trial, but

11    if we can't establish that these are co-conspirators, this

12    case never gets to the jury.

13         THE COURT:  So what's your argument against the

14    801(d)(2)(E) basis for admission?

15         MR. RAEL:  I guess I don't know what 801 --

16         THE COURT:  It's a hearsay.  The co-conspirators'

17    statement.

18         I mean, the offer is that this is a co-conspirator

19    statement made during and in relation to the conspiracy,

20    during and in furtherance of the conspiracy.

21         Well, I'm going to -- there's a hearsay objection,

22    a proffer of admission under 801(d)(2)(E), and I'm going to

23    overrule the objection and I'll conditionally admit the

24    statement subject to you linking up the conspirators during

25    the course of the trial.

DIRECT OF STEPHEN PARKER BY MR. SIELAFF          65

1          MR. SIELAFF:  Yes, Your Honor.

2          THE COURT:  Of course, you run the risk of having

3   it all struck and then we would deal with that.

4          MR. SIELAFF:  Yes, Your Honor.

5          THE COURT:  But I think there's sufficient

6   information in front of me to permit -- to conditionally

7   admit these exhibits at this time.

8          MR. HITCHENS:  Your Honor, I guess while we're back

9   here addressing this issue, there are two individuals.  One's

10  an unidentified female and the other one's a woman by the

11  name of Victoria Artis.  We can't say that they are in the

12  conspiracy, but those statements aren't being offered for the

13  truth of the matter asserted.

14          Those were women that, for example, Victoria Artis

15  answers the phone one day and says:  I'm going to take the

16  phone down to Kenneth Watkins.  You can hear her briefly and

17  then Mr. Watkins takes over.

18          THE COURT:  So I understood that Cloud -- that the

19  government's offer is that Cloud, Sanders, Anderson,

20  Mr. Watkins are co-conspirators.

21          MR. GUINN:  Correct.

22          MR. SIELAFF:  Yes.

23          THE COURT:  So then any -- in any transcripts

24  involving those people I'll conditionally admit both sides of

25  the conversation pursuant to 801(d)(2)(E).

1          MR. RAEL:  Of course there is a problem, Judge,
2   which is that --
3          THE COURT:  Wait.  I'm not done with my ruling.
4          MR. RAEL:  I'm sorry.
5          THE COURT:  With respect to the other transcripts
6   with the unidentified individual, who's the other one?
7          MR. GUINN:  It's a woman by the name of
8   Victoria Artis.  Her initials are VA in the transcript.
9          THE COURT:  I am going to admit the transcripts for
10  the 801(d)(2)(E) of the alleged conspirator, and I'll admit
11  the other side of it for purpose of showing context for the
12  801(d)(2)(E) statement.
13          And so now your objection?
14          MR. RAEL:  Well, throughout the transcripts, there
15  are a lot of -- besides these so-called conspirators, there's
16  a number of unidentified people.  And they certainly have
17  nothing to do with the conspiracy.
18          THE COURT:  So I've made that distinction with the
19  two that I know about.  And I'll have to update that as we go
20  along if there's others.
21          All right.  Let's go back.
22          (The bench conference concluded at 2:16 p.m., and
23  proceedings resumed within the hearing of the jury.)
24          THE COURT:  Mr. Seilaff, you may continue.
25

1   BY MR. SIELAFF:

2   Q.   Just a few more questions, Detective Parker.  October

3   2020.  Was this investigation still ongoing?

4   A.   It was.

5   Q.   And during the course of that investigation, in

6   October 2020, did you see Jonquilla Sanders at all as part of

7   your investigation?

8   A.   I did.

9   Q.   And can you briefly outline that.

10  A.   I saw her in some -- I believe some video we reviewed,

11  but I've sat and I've talked with her.

12            MR. SEILAFF:  Thank you.  No further questions.

13            THE COURT:  Any cross?

14            MR. RAEL:  Thank you.

15                     CROSS-EXAMINATION

16  BY MR. RAEL:

17  Q.   Good afternoon, sir.

18  A.   How are you, sir?

19  Q.   I'm doing wonderful.  We met, I think, just a few months

20  ago.  Just ran into each other, I guess.

21  A.   I believe in this building is where we met each other.

22  Q.   Yes.  So pleasure to see you.

23  A.   You, too.

24            THE COURT:  Mr. Rael, just for your purposes, if

25  you want to swivel that podium, it's capable of that.  Or if

CROSS OF STEVEN PARKER BY MR. RAEL          68

1  you want to do it any other way.  I just wanted to make sure
2  you knew.
3          MR. RAEL:  I had no idea.  Thank you.
4  BY MR. RAEL:
5  Q.   Would you say, sir, you're the lead investigator on this
6  case?  Or not really?
7  A.   As of now, yeah, but I was one of two before.
8  Q.   Now, were you also here on June the 1st when
9  Ms. Anderson gave a statement to you?
10 A.   Was I here?
11 Q.   Were you involved in that conversation June the 1st?
12 A.   Oh, yes.  I was.  I was confused.  I thought you meant
13 was I here.
14      Yes, I was involved in that conversation on June 1st.
15 Q.   Okay.  Now, when you had that conversation with her, did
16 she tell you --
17          MR. SIELAFF:  Objection.
18          THE COURT:  Sustained.
19 BY MR. RAEL:
20 Q.   That conversation that you had lasted about 20 minutes,
21 didn't it?
22 A.   Give or take.  It sounds about right.
23 Q.   And in that conversation did you have a conversation
24 with her about what could happen to her positively if she
25 gave some evidence to you guys?

1  A.    In all fairness I just wrote down notes.  The

2  conversation was mainly between the attorneys and her.  I

3  never asked her anything.  But I believe that -- that came

4  up.

5  Q.    Uh-huh.  It came up.

6        And it came up that if, in fact, you -- Ms. Anderson

7  could help you out, that that would be good for her and good

8  for you; right?

9  A.    No.  I don't believe --

10             MR. SIELAFF:  Objection.

11             THE COURT:  Basis?

12             MR. SIELAFF:  I'll actually withdraw that and allow

13  the detective to answer.

14             THE WITNESS:  I don't believe that was come up.

15  She was -- she was actually told the latter; about what would

16  happen if she was not truthful.

17  BY MR. RAEL:

18  Q.    Oh.  What was that?

19  A.    That she could be looking at a perjury charge which

20  could not be good for her.  She could add to her problems.

21        But it was no -- to my knowledge, there was no

22  conversation about some benefit to her or benefit to us.  To

23  my knowledge that was --

24  Q.    So you thought that what you heard from her was

25  something that might could cause perjury?

CROSS OF STEVEN PARKER BY MR. RAEL          70

1   A.    Yes.

2   Q.    And so she indicated -- and so therefore she's not here

3   right now, is that it?

4             MR. GUINN:  Objection.

5             THE COURT:  Basis?

6             MR. SIELAFF:  I don't know how Detective Parker is

7   supposed to --

8             THE COURT:  Sustained.

9             MR. SEILAFF:  -- tell this jury why she is or isn't

10  here.

11            THE COURT:  Sustained.

12  BY MR. RAEL:

13  Q.    So was this the first time that you had a conversation

14  with Ms. Anderson?

15  A.    It was the first time I had sat with her, yes.

16  Q.    Was this the first time that a photograph of KennyMan

17  was presented to her?

18  A.    I can only say that it's the first time that I witnessed

19  it because that was the first time that I sat with her.

20  Q.    And you showed her a photograph?

21  A.    Mr. Guinn showed her a photograph.

22  Q.    You were on the telephone?

23  A.    No.  I was -- for purposes of illustration, if we look

24  at your table, she was sitting at the end.  Mr. Guinn would

25  have been sitting there.  Mr. Sielaff would have been sitting

1    here, and I would have been sitting here.

2        The picture that was shown to her -- all I saw was the

3    back of a computer.  I asked what confirmation it was, that

4    it was a photo of Mr. Watkins, but I never saw the photo.  I

5    just wanted to be clear.

6    Q.    And to be clear, then, you don't have any idea what

7    photo was presented to Ms. Anderson; is that your testimony?

8    A.    Not off the top of my head.  I do not remember what

9    photo it was.

10   Q.    How about not off the top of your head.  Do you remember

11   it at all?

12   A.    No.  I just could only tell you what -- that it was a

13   picture of Mr. Watkins.  Which photo it was, I have no idea.

14   Q.    Now, you had a conversation with Ms. Sanders in which

15   she gave you some information, did you not?

16   A.    If you mean her record of events, then yes, that's what

17   she told us.

18   Q.    In other words, you met with her and you basically had a

19   debriefing?

20   A.    Yes.

21   Q.    And in that debriefing she said a number of things.  Do

22   you recall?

23   A.    I remember sitting with her and her telling us what

24   happened.  Specificity of what you're asking, I don't know

25   what specific things you want me to say.

1  Q.   Well, did she tell you about her background with --

2          MR. GUINN:  Objection.

3          THE COURT:  Mr. Rael, we're just not going to get

4  into anything that was said out of court on this

5  June 21st/22nd meeting.

6          MR. RAEL:  All right.

7  BY MR. RAEL:

8  Q.   You indicated a few minutes ago that you do intelligence

9  gathering; right?

10 A.   Yes.

11 Q.   And tell the jury what intelligence gathering you did as

12 it relates to Mr. Watkins.

13 A.   As it would relate to Mr. Watkins, it was dealing with

14 the phone numbers.  It was -- because I had seen him in

15 videos with Mr. Cloud, it was -- I did some intelligence

16 gathering into Chain Gang Rich Nation, which was his label,

17 his studio on Covington Highway.  Just broad overview of just

18 his pattern of life, of what he did, of who he was.

19 Q.   Well, did that intelligence gathering lead you to a

20 conclusion that Ms. Sanders is something more than a runner

21 to Ziggy?

22 A.   Yes.

23 Q.   What did it lead you?

24 A.   She had a relationship, physical relationship with him.

25 Q.   And how long was that physical relationship, if you

CROSS OF STEVEN PARKER BY MR. RAEL                73

1  know?

2  A.   I don't remember.

3  Q.   And in that physical relationship, was she supposed to

4  get money for what she did?

5  A.   To that I have no idea.  To me, based on my intelligence

6  gathering, it sounded mutual.

7  Q.   And do you know how much she was supposed to be paid?

8  A.   No.

9  Q.   The relationship -- now, this intelligence gathering

10 that you had with KennyMan, you did controlled purchases like

11 you did with all these others?

12 A.   With Mr. Watkins?  Is that your question?

13 Q.   It is.

14 A.   No.  I did not do a controlled purchase with

15 Mr. Watkins.

16 Q.   Did you find a cooperator?

17 A.   During the course of the investigation?  No.

18 Q.   How about at any time in the investigation?

19 A.   After the investigation it was just the debriefs that we

20 had done in relation to this case.

21      If you're asking if I got somebody to buy drugs from

22 Mr. Watkins, the answer to that is no.

23 Q.   How about trash.  You mentioned trash.  Tell the jury

24 what trash you did to do this intelligence gathering.

25 A.   I did not pull trash with Mr. Watkins' house.

1    Q.   Do I understand, then, the only thing you did is that

2    you got these exhibits that you've now just had admitted, and

3    that's the essence of this case?

4    A.   I don't think that is fair to say.

5    Q.   Well, what would be fair to say?

6    A.   Because there is the calls.  You'll hear in realtime

7    what was said.  There will be other people that will testify.

8    There will be cellular forensics that are introduced.  It's

9    not built -- we haven't built a case just off of a certain

10   number of phone calls.

11   Q.   So when you started this investigation, you have been

12   doing this for a considerable length of time; right?

13   A.   Doing what I do?  Or the investigation?

14   Q.   The entire investigation.

15   A.   This investigation started the beginning of 2020.  I've

16   been doing these types of investigations for a while.

17   Q.   If I told you that U.S. attorney gave me maybe 5,

18   6 terabytes worth of information, would you have reason to

19   dispute me?

20   A.   I know it was in the terabyte, multiple terabytes, but I

21   have no reason to dispute that number.

22   Q.   I mean, this investigation that you did that had these

23   phone wires, had a number of people, had these

24   coconspirators -- I mean, that must have cost a lot of money.

25   A.   I don't write the receipts for it.  I request it and the

CROSS OF STEVEN PARKER BY MR. RAEL          75

1  bureau -- the bureau pays for the investigative technique.
2  How much it costs is really not in my wheelhouse.
3  Q.   How about television.  It was all over the television,
4  wasn't it?
5  A.   What do you mean go over the television?
6  Q.   I said it was all over the television, this case; wasn't
7  it?
8  A.   I don't believe so.  I don't think that's a fair
9  representation.
10  Q.   Not a fair representation it was all over the radio and
11  it was all over the news?
12  A.   If it was all over the radio, I didn't hear.  It was not
13  on any station that I was listening to.
14  Q.   So you certainly have a lot invested in this case as it
15  relates to KennyMan, don't you?
16  A.   I do.
17  Q.   And when you did this intelligence gathering, were you
18  able to determine Ziggy's relationship to the music that
19  KennyMan had with him?
20  A.   I would say in fairness that they knew of each other.
21  That I've seen social media posts where they -- I guess the
22  best way I can tell you is they endorsed each other's label.
23  They conversed.  They were friends.  They were business
24  partners.
25  Q.   And for how long were they business partners when you

1  did this intelligence gathering?

2  A.   That I could not -- I could not tell you.

3  Q.   So if I told you it was for years, would you dispute

4  that?

5  A.   I would have no reason to.  I don't have anything to

6  dispute it with.

7  Q.   And the relationship between Ziggy and KennyMan here --

8  it was something which was just occasional, or it was very

9  frequent?

10  A.   I don't -- I know they were supposed to talk often based

11  off of phone conversations.  But how often they met

12  face-to-face prior to my being involved in the investigation,

13  once I became involved in the investigation, to my knowledge

14  they may have met once or twice, but it was mostly -- all the

15  other times was through the two runners.

16  Q.   This relationship between this runner and Ziggy -- that

17  was one where she was going to supply drugs to -- get from

18  Ziggy to give to somebody?

19  A.   Which runner?  You said in relation to this --

20  Q.   Well, how about -- you're right.

21       How about the Sanders runner?  The one that he had this

22  sexual relationship with that you said.

23  A.   To -- based on the -- based on what I know of the

24  evidence, it was from -- it was for Mr. Cloud.  It went from

25  Mr. Cloud -- she went to Atlanta, met Mr. Watkins and came

1  directly back to Finchley Drive and gave Mr. Cloud whatever
2  it was that --
3  Q.    How many times, if you know, did he have some sort of
4  transaction, a drug transaction with Mr. Watkins?
5  A.    Based off of this investigation and my activity in it,
6  it was twice.  The 16th and the 24th.
7         Prior to that --
8  Q.    And so we're talking about Sanders now; right?
9  A.    Sanders and Anderson.
10 Q.    And Anderson.  Okay.
11        How about Sanders?  On how many occasions was there a
12 drug transaction between Sanders and Watkins?
13 A.    To my knowledge just one.
14 Q.    And how many transactions are we talking about between
15 Anderson and Watkins?
16 A.    To my knowledge just one.
17 Q.    And those two transactions are the transactions which
18 are actually in the documents that were just now admitted?
19 A.    Phone calls, yes.
20 Q.    And those phone calls to you seem to indicate to you
21 that that must have been a drug transaction?
22 A.    Yes.
23 Q.    And tell the -- and that drug transaction was because
24 you heard some conversations between Ziggy and Anderson and
25 Ziggy and Sanders; right?

1  A.   And a conversation between Ziggy and Mr. Watkins.
2  Q.   And a conversation with Mr. Watkins, you say something
3  about drugs?
4  A.   He was sending his people down there.  Mr. Watkins would
5  tell them where to meet them; whether it was at the club or
6  his studio on Covington Highway.  It was part of the totality
7  of everything that was going on.  It wasn't a -- just a
8  random conversation.
9  Q.   And that totality -- where he should meet Sanders or
10 where he should meet Anderson -- that led you to the
11 conclusion that this was all about drugs?
12 A.   Based off the fact that I knew -- based off of phone
13 conversations; what Cloud's intent was -- based off the phone
14 conversations and the investigation what these two runners
15 were there to do -- based off the phone conversations, the
16 investigation of who they were supposed to meet and where,
17 whether it was at Diamond's or whether it was at Covington
18 Highway.  Then there was conversation with coming back.  And
19 then one was intercepted and one was seen on surveillance
20 cameras delivering it to Mr. Cloud.
21      It's not a fair statement to say that it was just this
22 interaction that they had with Mr. Watkins that led me to
23 that.  That's not a fair statement.
24      The fair statement is based on phone calls, law
25 enforcement investigative techniques, and then the

1    interaction, the stopping, coming back the second time on the
2    24th, and the video surveillance.  That's the totality of it
3    all.
4    Q.   Well, it's actually a little more than that.  This is an
5    occasion in which Ms. Anderson was stopped by the police and
6    5.3 pounds in her car were seized; right?
7    A.   Yes.
8    Q.   And also almost $5,000, or 48-some-odd hundred dollars
9    were taken from her; right?
10   A.   Yes.
11   Q.   Now, this $4,800 -- where did she get it?
12   A.   I'm sorry.  Where did she get it?
13   Q.   Where did she get it, sir?
14   A.   According to the call she got it from Mr. Cloud.
15   Q.   So Mr. Cloud gave Ms. Anderson $4,800.
16   A.   He gave her money.  Let's just put it that way.  To my
17   knowledge it was just money.
18   Q.   Well, how about $4,800?  Where did that come from, sir?
19         MR. SIELAFF:  Objection.  That calls for
20   speculation.
21         THE COURT:  Overruled.
22         THE WITNESS:  That's what she had on her at the
23   time of the stop.  That approximately $4,800.
24   BY MR. RAEL:
25   Q.   Right.

CROSS OF STEVEN PARKER BY MR. RAEL                80

1   A.   But I know leading up to that, up to a couple of days in
2   advance, that deal was being planned.  And I believe
3   Mr. Cloud gave her money for the pills that she purchased.
4   Q.   And what evidence do you have that that's true?
5   A.   There is -- to my knowledge there's text messages
6   between Cloud and Ms. Anderson on Ms. Anderson's phone.
7   Q.   And that, in your opinion, shows you that the messages
8   that now the jury will have and that you had will show you
9   that $4,800 came from Ziggy?
10  A.   I can't give you the exact amount because if it's in
11  there, I don't remember.  But I know, based off the
12  conversations and the text messages that were found on
13  Ms. Anderson's phone, that there was money given to her for
14  the purchase of these pills.
15       Now, how much it is, I can't -- I can't accurately or
16  truthfully tell you.
17  Q.   How about when?  When did she get this money from Ziggy?
18  A.   I can't remember that.
19  Q.   You don't remember when.  You don't remember how much.
20  What is it that you do recall, that in fact money transpired
21  between Ziggy and Anderson?
22  A.   On the phone call with Anderson.  When she was leaving
23  Atlanta because she hadn't met with Mr. Watkins yet, and
24  he -- well, Ziggy tells her to go back.  He's ready for you.
25  She says, "I have your money." and when she says that --

CROSS OF STEVEN PARKER BY MR. RAEL                81

```
 1   Q.   She says what?  I'm sorry.
 2   A.   "I have your money."
 3        And since then it correlates to the text message from --
 4   I can't remember if it's a day before or two days before
 5   where he gives her the money to give for the purchase.
 6        So there's a whole lot more to it than just -- I don't
 7   know how much she officially had when they stopped her.  I
 8   can't tell you a date and time that Mr. Cloud gave her the
 9   money.  All I can tell you is what I know.
10   Q.   All right.  Now, you know that according to the
11   transcript that you looked at, she had left at about 6 in the
12   morning to leave Charlotte to come to Atlanta; is that right?
13   A.   I would have to verify that based off what transcript
14   you're talking about.
15   Q.   All right.  Do you know about when she left that day?
16   A.   Are you talking about Ms. Anderson?
17   Q.   Yes.
18   A.   It was early morning.  Exact time?  Without looking at
19   what I had -- what was on those transcripts, I can't give you
20   the --
21   Q.   If I told you that she got to Atlanta at about 10 in the
22   morning, would you have any reason to doubt what I say?
23   A.   No.
24   Q.   And what did she do between 10 in the morning and say
25   around 11:30?
```

CROSS OF STEVEN PARKER BY MR. RAEL          82

1  A.   I don't know what she did.  To my knowledge she was
2  waiting to meet Mr. Watkins and get what she needed.
3  Q.   So she went to sleep?
4  A.   No idea.
5  Q.   If you have no idea, how can you tell the jury that
6  there was no drug transaction that took place at that time?
7  A.   I don't know what she did.  We weren't surveying her as
8  in watching her every move when she was down there.  So if
9  she pulled off the side of the road after a long day, a long
10 trip to Atlanta and took a nap, then that's what she did.
11     I just know based on the calls that she was going there
12 to meet Mr. Watkins and then she was coming back.
13 Q.   Actually, you have no idea of any kind what she did from
14 10 o'clock until at least around 11:30; right?
15 A.   Outside Mr. -- meeting Mr. Watkins, no.  I have no idea
16 what she did.
17 Q.   Okay.  Now, she actually told you what she did, right?
18         MR. SIELAFF:  Objection.
19         THE COURT:  Sustained.
20 BY MR. RAEL:
21 Q.   All right.  Now, the Club Diamond -- do you understand
22 that Mr. Watkins had been at a club, performing at that
23 club --
24 A.   I --
25 Q.   -- the night before the incident with Ms. Anderson?

CROSS OF STEVEN PARKER BY MR. RAEL                83

1  A.    I don't know where Mr. Watkins was performing.  I just
2  knew based on the calls that he said that he was at Diamonds.
3  Q.    Right.  Well, that's how you're basing everything right
4  now.  When you look at those calls, he was -- you knew he was
5  performing that night at Diamond.  Club Diamonds; right?
6  A.    I did not know he was performing.  I knew he was at
7  Diamonds.  Because that's where he told them to meet them.
8  Q.    Oh.  So you didn't know that in order to determine where
9  he was, you-all had to investigate that and do anything like
10 that; right?
11 A.    Well, when he said he was at Diamonds, we just had to
12 look up where Club Diamonds was.
13 Q.    Right.  That's in Atlanta?
14 A.    Right.
15 Q.    And there came a time, didn't it, where when you did
16 these calls recorded, you noticed then and you understood
17 that there was a shooting that took place where Mr. Watkins
18 was shot at.
19       Do you remember that?
20 A.    Yes, to a point.  I don't remember in the calls where it
21 said it happened.  But then I know there was conversations
22 between Mr. Cloud and one of the females.  I can't remember
23 who -- about somebody had shot up his Jeep.  I think he even
24 said he had the doors off of it.  And then later on I believe
25 Mr. Watkins relayed to Mr. Cloud that he had been shot.

CROSS OF STEVEN PARKER BY MR. RAEL          84

1    So I don't know where this -- technically the shooting

2    happened.  But I was aware that Mr. Watkins was a victim of

3    some type of shooting.

4    Q.   Are you familiar with when it happened?

5    A.   Not off the top of my head, I am not.

6    Q.   And if it were after -- all right.  So you have no idea

7    about actually the time that this shooting occurred?

8    A.   I don't want to misspeak so I'm going to say I can't

9    remember definitively when it is.

10   Q.   You have no evidence of any kind to the jury, do you,

11   that any of this shooting had anything whatsoever to do with

12   drugs?

13   A.   I have no idea what the shooting was about; just that it

14   happened.

15   Q.   And it was after the shooting happened that Ms. Anderson

16   met up with Mr. Watkins?

17   A.   Yes.

18   Q.   And your thinking is that she must have met up with him

19   because after all there was some 5.3 pounds of drugs that

20   were found several hours later?

21   A.   No.  I was thinking that she met up with him because

22   that's where she was told to go.

23   Q.   I see.  And she was told to go to 4484, wasn't she?

24   A.   Covington Highway?

25   Q.   Yes.

1  A.    To be honest the numerics are -- I can't remember the
2  exact numerics, but I remember she was told to go to an
3  address on Covington Highway.
4  Q.    When you did this intelligence gathering, did you get a
5  chance to observe the studio that Mr. Watkins is part of?
6  A.    Personally, like in person?  I think it's K3 Sound.  I
7  saw it on social media.  I've never actually been there.
8  Q.    I see.
9        Do you know where it's located in -- compared to the
10 highway?
11 A.    I do not.
12 Q.    Do you know whether or not there is other businesses
13 that are in front of that?
14 A.    To my knowledge I remember being in maybe a business
15 complex or like a little strip building.  The locations of
16 the studio versus its surrounding buildings, I don't know.  I
17 just remember it being in that business plex.
18 Q.    So when you say a strip building, what you mean is that
19 there's a building on one side, a building on another side,
20 and then yet in the back is another building?
21 A.    No.  When I say a strip building, I'm referring to like
22 a strip mall where there's multiple stores in one building.
23        So it was either a strip building or a building complex
24 where it's more, in my opinion -- what would be what you're
25 describing is a building here, a building maybe on the other

1  side of the parking lot, a building in behind.  Just so we're
2  clear on what we're talking about.  I know that that's the
3  topography of it.  But to adequately describe where K3 is in
4  there, I -- I'm not able do that.
5  Q.   And since you didn't go to the location, you don't know,
6  do you, that there might have been one number on one
7  building, another number on another building, and yet another
8  number in the back?
9  A.   If that is the way it is, I don't know.
10 Q.   All right.  And in your investigation did you know that
11 there had been a prior transaction between Ms. Sanders and
12 someone for a drug transaction?
13 A.   The transaction with Ms. Sanders that I'm aware of is
14 the one on October 16th.  Anything prior to that I'm not
15 privy to.
16 Q.   You don't recall that there was a conversation that you
17 had between the two where there may have been a prior
18 transaction?
19 A.   Yes.  I remember in the -- in my debrief, in the debrief
20 of her, I believe she had said she had gone down there
21 before.  And also on one of the calls, Mr. Cloud refers to
22 her as "I need you to do the same thing," quote, "the same as
23 last time."
24      So yes, I take it I understand where you're going, yes.
25 Q.   All right.  And on that first transaction, that was a

1  drug transaction?

2  A.    I would believe so, yes.

3  Q.    Well, it involved 10,000 pills, didn't it?

4  A.    Sounds about right.

5  Q.    If it involves 10,000 pills for some money, that would

6  be a drug transaction; right?

7  A.    Yes.

8  Q.    And at that drug transaction, that was a transaction

9  where it had nothing whatsoever to do with KennyMan; correct?

10 A.    All I know is he said I need you to go to Atlanta.  The

11 same as last time.

12 Q.    You also know that when they had these 10,000 pills, she

13 met somebody who was in a red car, a red sport car.

14        Do you remember that?

15 A.    I do not.  If you want to show that to me, I don't

16 remember it.

17 Q.    Do you remember that not only was it in a red sport car,

18 but when she did that transaction in Atlanta, she did it with

19 a tall, light-skinned, black male.

20        Do you remember that?

21 A.    I do remember that description, but that's about all.

22 Q.    Well, that description -- tell the jury what

23 investigation you performed once you heard that Ms. Sanders

24 had just done a 10,000-pill transaction -- tell the jury what

25 you did to investigate who she did this transaction with.

CROSS OF STEVEN PARKER BY MR. RAEL                88

1    A.    I believe we asked her who she had done it with.

2          MR. SIELAFF:  At this point, Your Honor, I'm going

3    to object to any information provided by --

4          THE COURT:  I'll sustain the objection.

5    BY MR. RAEL:

6    Q.    So you -- she did this -- do you know of your own

7    knowledge whether or not she ever made a nickel on that

8    transaction that didn't involve Mr. Watkins?

9    A.    I don't remember if she made anything, what little she

10   had made.  So that's --

11   Q.    Do you recall that perhaps she just wanted her career to

12   go somewhere, and so all -- what she wanted was to get put

13   into some sort of a record label?

14   A.    I don't remember that for sure.  I know that she was --

15   I believe that she was trying to get into the business.  But

16   she was having a relationship with Mr. Cloud.  That much I

17   know for sure.

18   Q.    Now, do you remember that she wanted to go and do a

19   party on July the 4th before such time as she ever had any

20   conversation with KennyMan?

21         Do you recall that?

22         MR. SIELAFF:  Objection, hearsay.

23         THE COURT:  May I see the lawyers at sidebar.

24         (A bench conference was held on the record but out

25   of the hearing of the jury as detailed below beginning at

1    2:50 p.m.)

2              THE COURT:  So Mr. Rael, I have sustained hearsay

3    objections to statements made by -- I guess it's Ms. Sanders,

4    maybe Ms. Anderson in debriefings.  Is this -- this pursuit

5    that you're making now based upon debriefing statements?

6              MR. RAEL:  I think so.  That's what --

7              THE COURT:  Well, I mean, it either is --

8              MR. RAEL:  I know.

9              THE COURT:  Let me be clear.  Any statements made

10   in a debriefing are hearsay statements.  It's inadmissible in

11   this trial unless there's a hearsay exception, and I haven't

12   heard any.

13             I've made several -- I've sustained several

14   objections to you trying to get hearsay statements in.  This

15   seems to be about the fourth time, and it seems to be an

16   intentional violation of the ruling.  And so you can't go

17   into statements made by Sanders or Anderson in a debriefing.

18             Do you understand that?

19             MR. RAEL:  I do.

20             THE COURT:  All right.  Because you're merging them

21   between statements made in a phone conversation, which I've

22   conditionally admitted as coconspirator statements, and

23   statements which I've kept out as hearsay in the debriefing.

24   And I don't want that merger to continue.

25             And so I don't want you continually asking about

1   inadmissible hearsay.

2          MR. RAEL:  Okay.

3          THE COURT:  So I don't want to come back here and

4   have to do this again.

5          MR. RAEL:  Makes sense.

6          THE COURT:  All right.

7          (The bench conference concluded at 2:52 p.m., and

8   proceedings resumed within the hearing of the jury.)

9          MR. RAEL:  May I review those transcripts that are

10  now in evidence?

11  BY MR. RAEL:

12  Q.   Is it my understanding that when it came to

13  Ms. Anderson, that she had left to go back to Charlotte and

14  then turned back around to come back to Atlanta?

15  A.   Yes.  Mr. Cloud told her to go back.

16  Q.   Uh-huh.  And so she was on her way out of Charlotte and

17  then turned around?

18  A.   No.  She was on her way out of Atlanta.

19  Q.   That's what I meant.  I'm sorry.

20  A.   Yeah.  Okay.

21  Q.   My mistake.

22  A.   She was -- she had made it to Atlanta and turned around,

23  and Mr. Cloud told her to go back.

24  Q.   Right.

25          At any time in all of these conversations did KennyMan

1   ever mention anything to do with drugs?

2   A.   I don't think so.  And I say that to be as transparent

3   as I can.  It was more to me -- or Mr. Cloud saying:  I'm

4   sending my people.

5        But I think what you say is a fair statement.

6   Q.   All right.  In any event, that which you don't remember,

7   this is something that the jury will have and they'll be

8   able --

9   A.   That's demonstrative purposes, yeah.

10  Q.   Right.

11       Now, when Ms. Anderson got caught and got stopped there

12  in Franklin, Georgia with 5.3 pounds of illegal drugs --

13  those drugs, if you know -- how did it come?  Did it come in

14  a box?  Did it come in a carton?  Do you know?

15  A.   Excuse me.  I can't remember.  I know that when it came

16  to me it was already packed up in evidence envelopes.  I'd

17  either have to review different paperwork or somebody else

18  would have to actually testify to how it was actually in the

19  vehicle.  I don't remember.

20  Q.   And who would that person be who could testify?

21  A.   It could be the Georgia trooper that stopped her.

22  Q.   Do you know whether or not this Georgia trooper will be

23  here today?

24            MR. SIELAFF:  Objection.

25            THE COURT:  Sustained.

CROSS OF STEVEN PARKER BY MR. RAEL                92

1    BY MR. RAEL:

2    Q.   So you wouldn't know what kind of -- you wouldn't -- you

3    have no idea whether it was in a box or if it was in a tube.

4    Whether it was in a -- you have no idea whatsoever.

5        When it came on to you it already came into a different

6    way; right?

7    A.   When I saw it, it was in evidence envelopes, which is

8    standard practice.  But for me to be able to sit here and

9    tell these people to tell you it was in a box, it was in a

10   cylindrical container, I don't feel that would be right for

11   me to do because I don't remember.

12   Q.   You don't know.

13       So do you know where in the vehicle these things were

14   found?

15   A.   Again, I'd have to either read the case file.  I can't

16   say.  Somebody else would have to testify.

17   Q.   Not yourself.  Okay.

18       Are you aware of -- let's go back to Ms. Sanders.  Do

19   you know that she has a sister?

20   A.   I know she's got a brother.  I can't really tell you

21   definitively whether she has a sister or not.

22   Q.   Do you know whether or not Ms. Sanders' sister has

23   worked for Ziggy?

24   A.   I don't know.

25   Q.   Okay.  The...

REDIRECT OF STEPHEN PARKER BY MR. SIELAFF        93

1          MR. RAEL:  That's all I have for you, sir.

2          THE COURT:  Any Redirect?

3          MR. SIELAFF:  Just briefly, Your Honor.

4                         REDIRECT EXAMINATION

5    BY MR. SIELAFF:

6    Q.   Detective Parker, you indicated on Cross-Examination you

7    never tried to do a controlled buy with Kenneth Watkins, the

8    defendant.  Why not?

9    A.   It was in Atlanta and I was tied up with doing what we

10   were doing up here.  Plus I didn't have anybody that was -- I

11   didn't have an undercover or a cooperator that could make

12   that purchase.

13   Q.   So what type of resources do you typically need to do a

14   controlled buy?

15   A.   To do a controlled buy, I need somebody that has access

16   to be able to do that.  To -- that has access to the person

17   selling it.  I'd need maybe an undercover officer again that

18   had access.  I'd need access is basically the big, the big

19   incident there.

20   Q.   So during the course of this investigation, did you have

21   many resources at all outside the Charlotte area?

22   A.   Outside of picking up a phone call for like the Georgia

23   people, no.

24          MR. SIELAFF:  Thank you.  No further questions.

25          THE COURT:  Any Recross?

JA115

REDIRECT OF STEPHEN PARKER BY MR. SIELAFF        94

1        MR. RAEL:  No.

2        THE COURT:  You may step down.

3        THE WITNESS:  Thank you, Your Honor.

4        THE COURT:  Members of the jury, we could take an

5   afternoon recess now, or we can go for another half hour and

6   take a recess.  What is your preference?  Recess now?

7        Okay.  Call your next witness.

8        MR. GUINN:  Your Honor, at this time the United

9   States calls Jonquilla Sanders to the stand.

10       THE COURT:  Members of the jury, why don't we take

11  our afternoon recess now.  We'll take a recess for

12  15 minutes.

13       I'll tell you this every time we break:  Don't talk

14  about the case.  Keep an open mind.  And we'll see you in

15  15 minutes.

16       (Recess held.)

17       THE COURT:  Are we ready for the jury?

18       MR. GUINN:  Yes, sir.

19       THE COURT:  Call the jury.

20       Mr. Rael, I think I was a cause of your confusion

21  at a sidebar.  I think I cited 803(d)(2)(E), and I meant to

22  cite 801(d)(2)(E).

23       So I probably sent you in the wrong direction.

24       MR. RAEL:  No.  It's fine.

25       THE COURT:  Be seated.

DIRECT OF JONQUILLA DENISE SANDERS BY MR.     95
GUINN

1     I'm not sure -- I think you called your next
2 witness.  But why don't you start off the late afternoon
3 session by calling that witness again.
4               MR. GUINN:  Yes, sir.  At this time, Your Honor,
5 the United States calls Ms. Jonquilla Sanders to the stand.
6               THE CLERK:  Ms. Sanders, if you would please stand.
7 Place your left hand on the Bible and raise your right.
8                    JONQUILLA DENISE SANDERS
9 having been duly sworn was examined and testified as follows:
10                    DIRECT EXAMINATION
11 BY MR. GUINN:
12 Q.    Ms. Sanders, can you state your full name for the
13 record, please, and spell your last name.
14 A.    Jonquilla Denise Sanders, S-A-N-D-E-R-S.
15 Q.    Okay.  Now, Ms. Sanders, where are you coming from this
16 morning?
17 A.    Catawba County detention center.
18 Q.    Okay.  And why are you in the Catawba County detention
19 center?
20 A.    Because I pled guilty to conspiracy to distribute
21 narcotics.
22 Q.    The narcotics that you pled guilty distributing to -- do
23 you know who you got those from?
24 A.    Yes.
25 Q.    Who was that person?

DIRECT OF JONQUILLA DENISE SANDERS BY MR.      96
GUINN

1   A.   KennyMan.

2   Q.   Okay.  Do you see KennyMan in the courtroom today?

3   A.   Yes.

4   Q.   Can you point him out and describe what he's wearing,

5   please.

6   A.   A black vest, white shirt.

7        MR. GUINN:  Your Honor, I would like the record to

8   reflect that she's identified the defendant,

9   Mr. Kenneth Watkins.

10       THE COURT:  It will.

11  BY MR. GUINN:

12  Q.   The drugs that you got from KennyMan -- who did you

13  deliver those to?

14  A.   BankkRoll Ziggy.

15  Q.   And I'm going to show you what's been already admitted.

16  It's Government's Exhibit Number 21.  If you could just bear

17  with me for one moment.

18       MR. GUINN:  Your Honor, this has been already

19  admitted.  I would like to go ahead and publish this to the

20  jury.

21       THE COURT:  You may.

22  BY MR. GUINN:

23  Q.   Ms. Sanders, do you see that photograph in front of you?

24  A.   Yes.

25  Q.   Who is that?

DIRECT OF JONQUILLA DENISE SANDERS BY MR.          97
GUINN

1   A.   Ziggy.

2   Q.   Now, Ms. Sanders, were you in fact guilty of the charges

3   that you pled guilty to?

4   A.   Yes.

5   Q.   But you're in court testifying today.  Are you hoping to

6   get something out of testifying in court today?

7   A.   Leniency.

8   Q.   Okay.  Has any kind of leniency been promised to you by

9   the government?

10  A.   No.

11  Q.   Who's the only person that can decide your sentence?

12  A.   The judge.

13  Q.   Has that happened yet?

14  A.   No.

15  Q.   Can you get in additional trouble if you don't tell the

16  truth?

17  A.   Yes.

18  Q.   Just a few seconds ago I showed you a picture of

19  Steven Cloud.  Tell the jury how you knew Mr. Cloud.

20  A.   We were in a sexual relationship.

21  Q.   You said a sexual relationship?

22  A.   Yes.

23  Q.   And how long were you in a relationship with him?

24  A.   I knew him for about three years now.

25  Q.   So back in 2020, I guess, was -- you met him around

DIRECT OF JONQUILLA DENISE SANDERS BY MR.    98
GUINN

1   2017, or can you tell us when that was?

2   A.    Yeah.  In August on my birthday.

3   Q.    Of 2017?

4   A.    I think so.

5   Q.    When you would spend time with Mr. Cloud, would you ever

6   spend time outside of Charlotte, North Carolina?

7   A.    Yeah.

8   Q.    What are some of the places that you would go to with

9   Mr. Cloud?

10  A.    We'd go to Atlanta.  We've been to Vegas before.

11  Q.    You mentioned Atlanta.  How often would you go down to

12  Atlanta, Georgia?

13  A.    We went a couple times.  I didn't really count.  But we

14  went a couple times.

15  Q.    Okay.  And when you would go down to Atlanta, Georgia,

16  what kinds of things would you do with Mr. Cloud?

17  A.    Party.  He would shoot music videos.  We'd go to the

18  club.

19  Q.    At some point during that time with Mr. Cloud, did you

20  meet the defendant, Mr. Watkins?

21  A.    Yeah.

22  Q.    Where did you first meet Mr. Watkins at?  Or where do

23  you remember meeting him at?

24  A.    I think at the club or at a video shoot.

25  Q.    Okay.  And it would probably help if I was more

JA120

DIRECT OF JONQUILLA DENISE SANDERS BY MR.        99
GUINN

1   specific.  Was that down in Atlanta, Georgia, or some other

2   place?

3   A.    In Atlanta.

4   Q.    And what was your understanding about who KennyMan was

5   and what he did?

6   A.    I know they just called each other brothers.  And I

7   thought he was a rapper.  They did music videos together.

8   Q.    Okay.  I'd like to direct your attention back to July of

9   2020.  Were you still in your relationship with Mr. Cloud at

10  that point?

11  A.    Yes.

12  Q.    At some point in July of 2020, did you go down to

13  Atlanta?

14  A.    Yeah.

15  Q.    And why did you go down to Atlanta, Georgia, in July of

16  2020?

17  A.    To party.  I think it was Fourth of July.

18  Q.    And this Fourth of July trip down to Atlanta -- did you

19  go by yourself, or did Mr. Cloud go with you?

20  A.    He was there.

21  Q.    At some point in July of 2020, did Mr. Cloud direct you

22  to go down to Atlanta, Georgia?

23  A.    Yeah.

24  Q.    Okay.  Do you remember when about that was?

25  A.    It was between July and August.  I'm not sure when.

DIRECT OF JONQUILLA DENISE SANDERS BY MR.     100
GUINN

1  Q.   Okay.  But on that particular occasion, what did he ask
2  you to do?  Why did he ask you to go down to Atlanta,
3  Georgia?
4  A.   He said he was sending me to pick up some pills.
5  Q.   When he told you this, were you in Charlotte when he
6  told you this or someplace else?
7  A.   In Charlotte.
8  Q.   And did you meet with Mr. Cloud before going down to
9  pick up pills?
10 A.   Yeah.
11 Q.   And did he give you anything before you left to go pick
12 up the pills?
13 A.   No.
14 Q.   What about money?  How were you going to pay for these
15 pills that you were supposed to pick up?  Or did you have any
16 understanding of that?
17 A.   He didn't say.  He just told me to go pick it up.
18 Q.   Okay.  Did you travel with anyone else on that trip?
19 A.   Yeah.
20 Q.   All right.  And when you got down to Atlanta, Georgia,
21 on that particular occasion, tell the jury what happened,
22 please.
23 A.   I pulled out to a street and somebody kind of met me in
24 a red car.
25 Q.   Okay.  And just to be clear, on that particular

DIRECT OF JONQUILLA DENISE SANDERS BY MR.    101
GUINN

1  occasion, it was not the defendant, Mr. Watkins; is that
2  correct?
3  A.    No, it wasn't.
4  Q.    When that person in the red car came up, tell the jury
5  what happened.  What did they give you?  Or what happened?
6  A.    He gave me a bag of pills.
7  Q.    Okay.  And what did these bag of pills look like?  Do
8  you remember?
9  A.    Looked like X pills.  It was in like a grocery bag.
10  Q.    Do you remember what colors they were?  Or were they the
11  same color, different colors?
12  A.    I think different colors on that.
13  Q.    Okay.  You looked inside the bag.  You saw what they
14  were; is that correct?
15  A.    Uh-huh.
16  Q.    You knew -- would it be fair to say that you knew on
17  that trip that you were going to pick up pills?
18  A.    Yes.
19  Q.    After you got these items, what did you do next?
20  A.    I drove back to Charlotte.
21  Q.    And when you got back to Charlotte what did you do?
22  A.    I tried to get in contact with Ziggy.  He wasn't
23  answering the phone, so I left them in his car and went home
24  until I met him later.
25  Q.    Later the same day?

DIRECT OF JONQUILLA DENISE SANDERS BY MR.      102
GUINN

1   A.   Yeah.
2   Q.   Was that the only time that Mr. Cloud or Ziggy asked you
3   to go down to Atlanta to pick up an item?
4   A.   No.  He asked me again in October.
5   Q.   So I'd like to direct your attention October the 16th,
6   2020, and then rolling over into October the 17th, 2020.
7        Do you remember the dates in and around that -- in and
8   around the events that occurred on those days?
9   A.   Do I remember the dates?
10  Q.   Or do you remember the events that occurred on
11  October the 16th, 2020, and October the 17th, 2020?
12  A.   He asked me to go pick something up for him in Atlanta.
13            MR. RAEL:  Objection.  Hearsay.
14            THE COURT:  Overruled.
15  BY MR. GUINN:
16  Q.   You can answer the question.
17  A.   He asked me to pick something up for him in Atlanta.
18  Q.   So on that day, on October the 16th, 2020, at some point
19  did you make a similar trip for Mr. Cloud as to the one that
20  you just described occurring back in July?
21  A.   Yeah.
22  Q.   So can you tell us -- tell the jury how that initial
23  conversation started.  Tell -- how did he ask you to go down
24  to Atlanta for him?
25  A.   He called me.  He asked me what I was doing.  He said --

DIRECT OF JONQUILLA DENISE SANDERS BY MR.      103
GUINN

1   I told him nothing.  He said he needed me to make a trip.  I
2   said:  To where?  He said:  Atlanta.  I said:  For what?  He
3   said:  The same thing.  I said:  I'm supposed to be going to
4   the club.  He said forget the club; he needed some money.
5   And I said okay.
6   Q.   So ma'am, just kind of backing up for a moment.  That
7   was a phone call that you had with Mr. Cloud; is that
8   correct?
9   A.   Yes.
10  Q.   After having that phone conversation with Mr. Cloud,
11  what did you do?
12  A.   I went to meet him at his house.
13  Q.   Now, since being -- at some point later on you were
14  arrested in this case; is that correct?
15  A.   Yes.
16  Q.   And since being arrested, you met with law enforcement
17  officers; is that correct?
18  A.   Yes.
19  Q.   And you became aware that they were photographing
20  Mr. Cloud's house; is that correct?
21  A.   Yes.
22  Q.   And you became aware that they were listening to some of
23  those phone calls with Mr. Cloud; is that correct?
24  A.   Yes.
25  Q.   Have you had a chance to listen to those phone calls

DIRECT OF JONQUILLA DENISE SANDERS BY MR.    104
GUINN

1  before coming into court today?

2  A.   Yes.

3  Q.   With respect to some of those calls, you were actually a

4  participant in the calls in that you could hear your voice;

5  is that correct?

6  A.   Yes.

7  Q.   Now, also in those calls, are you able to recognize

8  anyone else's voice?

9  A.   Yes.

10 Q.   Were you able to recognize Mr. Cloud's voice?

11 A.   Yes.

12 Q.   What about KennyMan, Kenneth Watkins?  Were you able to

13 recognize his voice as well?

14 A.   Yes.

15 Q.   And again, just to be clear, are those individuals that

16 you had met before October the 17th, 2020?  Had you met them

17 before October of 2020?

18 A.   Had I met them before?  Yes.

19      MR. GUINN:  Your Honor, at this time I would like

20 to play what's already been admitted into evidence as

21 Government's Exhibit Number 1A.

22      THE COURT:  Okay.  Is there going to be a

23 transcript that accompanies?

24      MR. GUINN:  Yes, sir.

25      THE COURT:  Then I do want to talk to the jury

DIRECT OF JONQUILLA DENISE SANDERS BY MR.    105
GUINN

1   about that before you play the recording.

2        Members of the jury, the government has indicated

3   that they are going to play a recording that is accompanied

4   by a transcript.  Those items have been admitted into

5   evidence.  The transcripts serve as an aid to identify who is

6   speaking and what was said.  While they serve as an aid, the

7   evidence is actually the recording.  And you are specifically

8   instructed that whether the transcript correctly or

9   incorrectly reflects the content of the conversation or the

10  identity of the speakers is entirely for you to determine.

11       You should make this determination without

12  prejudice or bias based on the testimony regarding

13  preparation of the transcripts, your own comparison of the

14  transcripts to what you hear on the recordings, and any other

15  relevant evidence or testimony.  And should you determine

16  that the transcript is incorrect or inaccurate in any

17  respect, you should disregard it to that extent.  Remember,

18  it is the recording that is the evidence.

19       MR. GUINN:  Just bear with me one for one moment,

20  please.

21       (Audio played in open court for the jury.)

22  BY MR. GUINN:

23  Q.   Ms. Sanders, do you remember that phone call?

24  A.   Yes.

25  Q.   Okay.  And so when you received that call -- and just be

1   to clear, the initials there where it says JS -- who was that

2   speaking?

3   A.    Me.

4   Q.    And the initials there where it said SC -- whose voice

5   was that?

6   A.    It was Ziggy.

7   Q.    Now, when you received that call from Mr. Cloud

8   initially, where were you?  Were you in Charlotte or

9   someplace else?

10  A.    I was in Charlotte.

11  Q.    And were you with Mr. Cloud at that point?

12  A.    No.

13  Q.    Did you hear the point in the call where he mentioned,

14  he said "same thing"?

15  A.    Yeah.

16  Q.    Did that mean something to you at the time?

17  A.    Yeah.

18  Q.    What did that mean to you?

19  A.    I assumed he wanted me to pick up pills.

20  Q.    Why did you assume that or why did you believe that?

21  A.    Because I had went before.

22  Q.    And did you hear the point in the call where he said, "I

23  need you to take a trip for me"?

24  A.    Yes.

25  Q.    Where was your understanding about the -- that trip and

DIRECT OF JONQUILLA DENISE SANDERS BY MR.    107
GUINN

1  where it was supposed to be to?

2  A.    Atlanta.

3  Q.    Why did you think it was Atlanta at that time?

4  A.    Because that's where I went the first time.

5  Q.    Did you continue to have additional conversations with

6  Mr. Cloud at that point?

7  A.    Yes.

8  Q.    And at some point after you received that call, what did

9  you do?

10  A.    I went to his house.

11        MR. GUINN:  All right.  Your Honor, at this time

12  I'd like to play what's already been admitted as Government's

13  Exhibit Number 1B, and I'd like to publish that to the jury,

14  Your Honor.

15        THE COURT:  I don't think you offered that last

16  time.

17        MR. GUINN:  We didn't offer it as an exhibit last

18  time.

19        THE COURT:  Are you offering it now?

20        MR. GUINN:  Yes, sir.  And I can lay an additional

21  foundation.

22        THE COURT:  Very well.  Do that.

23  BY MR. GUINN:

24  Q.    Ms. Sanders, before coming into court today, did you

25  have an opportunity to listen to calls with your voice on

DIRECT OF JONQUILLA DENISE SANDERS BY MR.     108
                        GUINN

1  them?

2  A.   Yes.

3  Q.   At the time that you listened to those calls, did those

4  appear to be accurate phone calls -- or did those phone calls

5  appear to accurately capture the conversations that you

6  remember having with Mr. Cloud?

7  A.   Yes.

8  Q.   Were you able to identify your voice?

9  A.   Yes.

10 Q.   And his voice?

11 A.   Yes.

12 Q.   Okay.  Do you remember making a -- having a phone

13 conversation with Mr. Cloud when you were in close proximity

14 to his residence?

15 A.   Yes.

16           MR. GUINN:  Your Honor, at this time I have what's

17 been -- we have marked as Government's Exhibit Number 1B,

18 1B1, and I'll approach Ms. Sanders, if I could, with a

19 transcript of that conversation.

20           THE COURT:  You may.

21           MR. GUINN:  Your Honor, I would like the record to

22 reflect that I'm showing the witness what's been marked as

23 Government's Exhibit Number 1B1.

24 BY MR. GUINN:

25 Q.   Ms. Sanders, what is that document that you're looking

DIRECT OF JONQUILLA DENISE SANDERS BY MR.    109
GUINN

1   at?  Without -- tell me -- without -- kind of, don't read it
2   but just kind of describe what it is generally, please.
3   A.    A phone call I made to Ziggy.
4   Q.    Okay.  And does that transcript accurately capture the
5   phone conversation that you remember having with Mr. Cloud on
6   that day?
7   A.    Yes.
8           MR. GUINN:  All right, Your Honor, so Government's
9   Exhibit Number 1B is the call.  Government's Exhibit
10  Number 1B1 is the transcript.  And we've merged those for
11  illustrative purposes, Your Honor.
12          THE COURT:  Very well.  I'll admit 1B and 1B1 and
13  remind the jury of the instruction on the transcript and the
14  recording.
15          MR. GUINN:  And if I could just have permission to
16  publish that to the jury, Your Honor.
17          THE COURT:  You may.
18          (Audio played in open court for the jury.)
19  BY MR. GUINN:
20  Q.    Do you remember where you were when you had that phone
21  conversation with Mr. Cloud?
22  A.    In his house.
23  Q.    And as we mentioned earlier, you have since become aware
24  that law enforcement officers had a camera outside of his
25  residence; is that correct?

DIRECT OF JONQUILLA DENISE SANDERS BY MR.    110
GUINN

1  A.   Right.

2  Q.   Do you remember whereabouts Mr. Cloud lived?

3  A.   Off of Shamrock and Eastway.

4  Q.   The address, Finchley Drive -- does that sound familiar

5  to you?

6  A.   Yes.

7  Q.   Just one moment, please.  I have additional exhibits

8  that I want to show.

9       So I'm showing you now what we've got marked here as

10  Government's Exhibit Number 4, 5, 6, and 7.

11       Government's Exhibits Number 4 through 7 -- do you

12  recognize those?

13  A.   Yes.

14  Q.   And what are those pictures of?

15  A.   A picture of me in my car getting out.

16  Q.   Okay.  And do you remember when that was?  Was that the

17  same night as you made the call?

18  A.   Yeah.

19  Q.   Okay.  And do these photographs fairly and accurately

20  depict the events as you remember them that night?

21  A.   Yes.

22  Q.   And would having these photographs help you in your

23  testimony today?

24  A.   Yeah.

25            MR. GUINN:  Your Honor, Government's Exhibits

DIRECT OF JONQUILLA DENISE SANDERS BY MR.     111
GUINN

1    Number 4, 5, 6 and 7.  I'd ask that they be moved into

2    evidence, and I ask for permission to publish them to the

3    jury.

4              THE COURT:  Any objection?

5              MR. RAEL:  None.

6              THE COURT:  Let them be admitted.  You may publish.

7         (Government Exhibits Numbers 4-7 were received into

8          evidence.)

9    BY MR. GUINN:

10   Q.   So, Ms. Sanders, who is this in the vehicle here?

11   A.   Me.

12   Q.   And would it be fair to say that you were kind of

13   wearing your hair a little bit differently during that time?

14   A.   Yes.

15   Q.   What kind of car were you in?  Do you remember?  Was

16   that your car or someone else's car?

17   A.   It was a rental.

18   Q.   Okay.  And here.  Whose driveway is this?

19   A.   Ziggy's.

20   Q.   And then this is you getting out of the car; is that

21   correct?

22   A.   Yes.

23   Q.   So do you remember about what time of day or night this

24   was?

25   A.   Maybe 8 or 9.

DIRECT OF JONQUILLA DENISE SANDERS BY MR.    112
GUINN

1  Q.   And so when you got to Ziggy's residence, did you go
2  inside?
3  A.   Yes.
4  Q.   Tell the jury what happened when you got inside.
5  A.   I went inside.  He gave me some cash in a rubber band
6  and I put it in my purse.
7  Q.   Did you have an understanding about what that cash was
8  for?
9  A.   I was supposed to give it to KennyMan when I picked up
10 the box.
11 Q.   What if anything else did Mr. Cloud say to you while you
12 were inside that home?
13 A.   Nothing.  I asked him for a pill.  He said he didn't
14 have nothing but some shake, and he gave me some.
15 Q.   Okay.  Now, there was a call that was played earlier in
16 which there was a mention of a Reggie.
17      Do you remember that?
18 A.   Yes.
19 Q.   Who is that?
20 A.   Somebody Ziggy knows.
21 Q.   Okay.  Did you see Reggie that night?  Or what role was
22 Reggie going to play in all this?
23 A.   Yeah.  He said he was sending Reggie with me so he told
24 me to go pick him up.
25 Q.   So did this Reggie guy -- did he ride with you after you

DIRECT OF JONQUILLA DENISE SANDERS BY MR.      113
GUINN

1  left Mr. Cloud's residence?

2  A.   Yes.

3  Q.   But did you drive the whole time or did Reggie drive at

4  all?

5  A.   I drove the whole time.

6  Q.   After picking up Reggie, where did you go?

7  A.   To Atlanta.

8  Q.   Okay.  Okay.  You left that same night; is that correct?

9  A.   Yes.

10  Q.   About how long did it take you to get down to Atlanta?

11  A.   Four.  Four or five hours.

12  Q.   While you were traveling, and I guess when you got down

13  to Atlanta, did you have additional phone calls with

14  Mr. Cloud?

15  A.   Yes.

16  Q.   At some point did you have conversations with

17  Mr. Watkins as well?

18  A.   He was three-way.  And I had a conversation with him

19  when I got there.

20       MR. GUINN:  Your Honor, at this time I'd like to

21  play what's been already admitted as Government's Exhibits

22  Number -- sorry -- 1D, 1E, 1F, and 1G.

23       THE COURT:  You may.

24       MR. RAEL:  That's fine.

25       Were you asking me something?  I'm sorry.

DIRECT OF JONQUILLA DENISE SANDERS BY MR.     114
GUINN

1        THE COURT:  No.

2        MR. RAEL:  I'm sorry.

3        THE COURT:  Mr. Guinn, you can publish them.

4        MR. GUINN:  Thank you.

5   BY MR. GUINN:

6   Q.   So I'm going to play for you Government's Exhibit

7   Number 1D.

8        (Audio played in open court for the jury.)

9   BY MR. GUINN:

10  Q.   So during this call, which -- where are you in relation

11  to, I guess, Atlanta, Georgia?  And what's going on here?

12  Can you tell the jury, please.

13  A.   I'm in traffic on my way to Atlanta.

14  Q.   Okay.  And the voice there that was KW -- whose voice

15  was that?

16  A.   KennyMan.

17  Q.   All right.  And did you hear the part in which there was

18  a reference to a club there?

19  A.   Yes.

20  Q.   At some point when you got to Atlanta, would you

21  eventually go to a club?

22  A.   Yes.

23  Q.   Do you remember what the name of that club was?

24  A.   Club Diamond.

25        MR. GUINN:  Your Honor, at this time I'd like to

JA136

DIRECT OF JONQUILLA DENISE SANDERS BY MR.    115
GUINN

1  play what's already been admitted conditionally as
2  Government's Exhibit Number 1C.
3          THE COURT:  You may publish.
4          (Audio played in open court for the jury.)
5  BY MR. GUINN:
6  Q.    Okay.  Now, Ms. Sanders, did you hear the conversation
7  there -- where it said KW -- whose voice was that?
8  A.    KennyMan.
9  Q.    And SC again?
10  A.    Ziggy.
11  Q.    Steven Cloud?
12  A.    Yes.
13  Q.    Okay.  Did you hear the part in the conversation where
14  he said that the person's about -- I guess an hour out or an
15  hour and a half out -- do you remember that part or did you
16  hear that part?
17  A.    Yes.
18  Q.    Okay.  Was there some confusion about -- confusion as to
19  about how far away you were getting, or how close you were
20  getting to Atlanta in or around that time?
21  A.    Yes.
22  Q.    Okay.  And did you hear the part in which there was some
23  mention of a studio there?
24  A.    Yes.
25  Q.    Did you know exactly where you were going when you were

DIRECT OF JONQUILLA DENISE SANDERS BY MR.    116
GUINN

1  getting down to Atlanta?

2  A.    I had an address.

3  Q.    When you arrived in Atlanta, did you go to one location,

4  or were there multiple locations that you went to?

5  A.    Multiple.

6  Q.    At some point did you have a conversation in which you

7  were able to get chogged (ph.) in with Mr. Watkins

8  specifically or there was like a three-way call.

9         Do you remember that?

10 A.    Yes.

11         MR. GUINN:  Your Honor, at this time I'd like to

12 publish Government's Exhibit Number 1F.

13         THE COURT:  You may.

14         (Audio played in open court for the jury.)

15 BY MR. GUINN:

16 Q.    The point in the conversation early on where he says, "I

17 ain't going to have it in there."

18         Did you hear that part?  Were you -- that was a

19 three-way call; is that correct?

20 A.    Uh-huh.

21 Q.    What did that mean to you at the time that you heard it?

22 A.    He didn't have what I was coming to get.

23 Q.    Okay.  And then I'd like to play for you Government's

24 Exhibit Number 1G.

25         MR. GUINN:  I'd like to publish this to the jury,

DIRECT OF JONQUILLA DENISE SANDERS BY MR.    117
GUINN

1  Your Honor.

2              THE COURT:  You may.

3              (Audio played in open court for the jury.)

4  BY MR. GUINN:

5  Q.   At this point when that call was made, did you still

6  have the money with you that Mr. Cloud had given you?

7  A.   Yes.

8  Q.   There was some conversation in the calls about going to

9  a studio.  Do you remember that?

10  A.   Yes.

11  Q.   There was some conversation about going to Club

12  Diamonds.  Do you remember that?

13  A.   Yes.

14  Q.   When you got down to Atlanta, where did you go first?

15  A.   Club Diamonds.

16  Q.   Say it again?

17  A.   Club Diamonds.

18  Q.   And when you got there, tell the jury what happened.

19  A.   I went in.  He was just finished performing, so he was

20  leaving out.

21  Q.   When you -- and Ms. Sanders, I'm going to stop you.

22  When you say "he," who?

23  A.   KennyMan.

24  Q.   He had just finished performing?

25  A.   Yes.

DIRECT OF JONQUILLA DENISE SANDERS BY MR.    118
GUINN

1    Q.   Okay.  And then what happened?

2    A.   He was leaving out.  I gave him the money.  He went to

3    his car and he said something -- I'm going to get something

4    to eat.  I was tired.  He told me to wait at his studio for

5    him.

6    Q.   Okay.  So did you leave Club Diamonds?

7    A.   Yes.

8    Q.   And where did you go after that?

9    A.   To the studio.

10   Q.   Just one moment.

11       Ms. Watkins -- I'm sorry.  Ms. Sanders, I'm going to

12   show you what I've got marked here as Government's Exhibit

13   Number 12.

14       Do you recognize that?

15   A.   Yeah.

16   Q.   And what is that a photograph of?

17   A.   The studio.

18   Q.   Say it again.

19   A.   The studio.

20   Q.   Okay.  Does this photograph fairly and accurately depict

21   the studio as you remember it?

22   A.   I never been inside but I remember it from social media.

23   Q.   Okay.  And do you remember the name of the studio?

24   A.   Yes.

25   Q.   Does this photograph fairly and accurately, I guess,

DIRECT OF JONQUILLA DENISE SANDERS BY MR.     119
GUINN

1   depict the social media information that you saw about the

2   studio?

3   A.   Yes.

4   Q.   And will having this evidence help your -- illustrate

5   your testimony to the jury?

6   A.   That's where I was waiting at for him?

7   Q.   Will it help you tell your story to the jury?

8   A.   Yes.

9        MR. GUINN:  Okay.  Your Honor, at this time I'd

10  like to have Government's Exhibit Number 12 admitted into

11  evidence, and I'd like permission to publish it to the jury.

12       THE COURT:  Any objection?

13       MR. RAEL:  None.

14       THE COURT:  Let it be admitted.

15       (Government's Exhibit Number 12 was received into

16  evidence.)

17  BY MR. GUINN:

18  Q.   And that's the address there -- does that sound right to

19  you?  The 4484 Covington Highway, Decatur, Georgia?

20  A.   Yes, sir.

21  Q.   And the name of the studio there, K3 Soundz studio -- is

22  that familiar?  Is that generally where you remember waiting?

23  A.   Yes.

24  Q.   How long did you wait at the studio there?  Do you

25  recall?

DIRECT OF JONQUILLA DENISE SANDERS BY MR.    120
GUINN

1   A.    Over an hour.
2   Q.    At some point did the defendant, Mr. Watkins, come to
3   that studio location?
4   A.    Yes.
5   Q.    What happens when he gets there?
6   A.    I got in his Jeep.  He told me he didn't have what I was
7   coming to get.  So I had to follow him somewhere.
8   Q.    Now, earlier in the calls do you remember the point in
9   which Mr. Watkins said, "I'm not going to have it with me.
10  I'm not going to have it there."  Do you remember that?
11  A.    Yeah.
12  Q.    Did you expect to get anything from Mr. Watkins at Club
13  Diamonds when you went there initially?
14  A.    I thought so, yes.
15  Q.    Okay.  So you're at K3 Soundz studio, Mr. Watkins
16  arrives and you get in his Jeep; is that right?
17  A.    Uh-huh.
18  Q.    Where do you go in the Jeep?
19  A.    I got back out and I followed him to a house somewhere.
20  Q.    Okay.  You drove separately.  You followed him to a
21  separate location?
22  A.    Yeah.
23  Q.    How far away was the house?  Or how long did it take you
24  to get from his studio to the house?
25  A.    Maybe 15 minutes.

DIRECT OF JONQUILLA DENISE SANDERS BY MR.    121
GUINN

1  Q.   And about -- in terms of night or where we are in the
2  timeline, what time is this roughly, do you remember?
3  A.   I'm not sure.  Maybe after 2.
4  Q.   2 o'clock.  So that would be -- was that 2 a.m., I
5  guess, on the 17th?
6  A.   Yes.
7  Q.   When you got to his house what happened?  Or the
8  defendant's house.  What happened then?
9  A.   He came out with a box.  And I got back on the road.
10 Q.   He came out with a box.  Do you remember what kind of
11 box it was?
12 A.   No.  It was just a black box.
13 Q.   Shoebox, hat box?  Do you remember?
14 A.   It might have been a shoebox.  I don't remember.
15 Q.   Okay.  Did he give you that box?
16 A.   Yeah.
17 Q.   What was your understanding of what was in that box?
18 A.   I thought it was pills in the box.
19 Q.   And why did you think it was pills inside the box?
20 A.   Because I had picked up pills before for Ziggy.
21 Q.   After you got the box from the defendant, what did you
22 do?
23 A.   I drove back to Charlotte, dropped Reggie off, and then
24 took Ziggy the box.
25 Q.   You went back to Mr. Cloud's residence; is that right?

DIRECT OF JONQUILLA DENISE SANDERS BY MR.    122
GUINN

1  A.   Yes.

2  Q.   At this time I'd like to show you what I've got marked

3  here as Government's Exhibits Number 11, 12 -- I apologize.

4  Just one moment.

5      Sorry.  So I'd like to show you what I've got marked as

6  Government's Exhibit Number 8, 9, 10, 11.

7      Do you recognize those photographs?

8  A.   Yes.

9  Q.   And what are those pictures of?

10 A.   It's me coming back to Ziggy's house and giving him a

11 box.

12 Q.   Okay.  And do those photographs fairly and accurately

13 depict the events when you got back to meet with Mr. Cloud to

14 give him the box?

15 A.   Yes.

16 Q.   Does having these photographs help you in your testimony

17 to the jury today?

18 A.   Yes.

19      MR. GUINN:  Your Honor, at this point I'd like to

20 have Government's Exhibits Number 8, 9, 10, and 11 admitted

21 into evidence.

22      THE COURT:  Any objection?

23      MR. RAEL:  No.  That's fine.

24      THE COURT:  Let them be admitted.

25      (Government Exhibits Numbers 8-11 were received into

DIRECT OF JONQUILLA DENISE SANDERS BY MR.      123
GUINN

1          evidence.)
2               MR. GUINN:  I'd like permission to publish them to
3     the jury, Your Honor.
4               THE COURT:  You may.
5     BY MR. GUINN:
6     Q.    So starting with Government's Exhibit Number 8, where my
7     cursor is, is that you in the vehicle there?
8     A.    Yes.
9     Q.    And at that point your hair was a little bit different;
10    is that fair?
11    A.    Yes.
12    Q.    It had like orange in it; is that right?
13    A.    Yes.
14    Q.    Where my cursor is now over here on the left side of the
15    photograph, who is this coming towards the vehicle?
16    A.    It's Ziggy.
17    Q.    And you did send him some sort of communication letting
18    him know that you were outside and that you were back?
19    A.    Yes.
20    Q.    Government's Exhibit Number 9.  All right.  Is that him
21    still continuing towards the vehicle?
22    A.    Yes.
23    Q.    And when Mr. Cloud gets to the vehicle, what, if
24    anything, do you say to him?
25    A.    I can't remember what I said to him.  He said thank you

DIRECT OF JONQUILLA DENISE SANDERS BY MR.      124
GUINN

1   and got out of the car with the box.

2   Q.   When he got to the car, did you give him anything?

3   A.   Yeah.  I gave him the box.

4   Q.   Was there any money that you had to give back to him?

5   A.   No.

6   Q.   Government's Exhibit Number 11.  It's kind of grainy

7   here.  This item here -- was that the box that you gave to

8   Mr. Cloud?

9   A.   Yes.

10  Q.   Ms. Sanders, you were arrested later as part of this

11  investigation; is that correct?

12  A.   Yes.

13  Q.   Did you meet with law enforcement officers, case agents,

14  CPD officers after you were arrested?

15  A.   Yes.

16  Q.   During that meeting did you try to tell them everything

17  that you remembered about the events happening?

18  A.   Yes.

19  Q.   You mentioned earlier in your testimony that at some

20  point you asked for a pill from Ziggy and he gave you some

21  shake instead; is that right?

22  A.   Uh-huh.

23  Q.   Was there anything that you took that night that would

24  prevent your ability to remember accurately the events that

25  occurred?

CROSS OF JONQUILLA DENISE SANDERS BY MR. RAEL    125

1    A.    No.

2    Q.    Anything that you took after that night or leading up to

3    that night that would prevent your ability to remember what

4    happened?

5    A.    No.

6    Q.    Who was the person that you met with in Atlanta to get

7    the box from?

8    A.    KennyMan.

9            MR. GUINN:  Just one moment, Your Honor.

10            No further questions at this time, Your Honor.

11            THE COURT:  Any cross?

12            MR. RAEL:  Yes, thank you.

13                         CROSS-EXAMINATION

14    BY MR. RAEL:

15    Q.    Good morning, ma'am.

16    A.    Good morning.

17    Q.    I'm representing Mr. KennyMan over there.  We've never

18    met, have we?

19    A.    No.

20    Q.    Now, I have some questions for you.  So let's see if you

21    can give me some responses on that.

22            Now, you have a sister; is that right?

23    A.    Yes.

24    Q.    And your sister is Rafael Sanders; is that right?

25    A.    No.  That's my cousin.

CROSS OF JONQUILLA DENISE SANDERS BY MR. RAEL    126

1  Q.   Pardon me?

2  A.   That's my cousin.

3  Q.   That's your cousin.  I see.

4       Now, your cousin -- she worked as a security guard;

5  right?

6  A.   Yeah, it's a he.

7  Q.   Pardon?

8  A.   He.

9  Q.   Oh, it's a he?

10 A.   Yeah.

11 Q.   I see.  So your cousin -- he worked as a security guard

12 for Ziggy; right?

13 A.   Yes.

14 Q.   And he did that for a long time?

15 A.   Yeah.

16 Q.   He needed a security guard?

17 A.   Yes.

18 Q.   And you at some point went down, you indicated, July the

19 4th; didn't you?

20 A.   Yes.

21 Q.   Now, July the 4th -- you went down there to do a party;

22 is that right?

23 A.   Go to a club.

24 Q.   To be involved in a party, go to a party?

25 A.   Uh-huh.

CROSS OF JONQUILLA DENISE SANDERS BY MR. RAEL    127

1   Q.   Now, you also -- you met some people that were members
2   of the Pressure Gang; is that right?
3   A.   Yes.
4   Q.   Okay.  The Pressure Gang -- that's a group of folks that
5   are really involved in some terrible things; is that right?
6   A.   Not that I know of.
7   Q.   You didn't know that the Pressure Gang and the folks in
8   the Pressure Gang were being investigated by the FBI?
9   A.   No; I didn't know that.
10  Q.   You didn't know at the time that they were being
11  investigated by Homeland Security?
12  A.   No; I did not know that.
13  Q.   You didn't know that -- all you wanted to do was just --
14  the Pressure Gang people and you were just going to go and be
15  involved in a party and they were going to be involved with
16  it; right?
17  A.   Uh-huh.
18  Q.   Now, one of those people was Lay Lay; right?
19  A.   Uh-huh.
20  Q.   And Coco; right?
21  A.   Yes.
22  Q.   And Beach Boy Nino; right?
23  A.   Yes.
24  Q.   And then also your cousin; your male cousin?
25  A.   Yes.

CROSS OF JONQUILLA DENISE SANDERS BY MR. RAEL    128

1   Q.   Now, on July 4th, do you recall having met with -- well,
2   let me ask it to you like this:  Your -- KennyMan -- you
3   didn't really know him until this transaction took place that
4   you are alleging happened; right?
5   A.   Yeah.  I didn't really know him like that.
6   Q.   No.  The only way you knew him was that he was at
7   parties that you were at?
8   A.   Yes.
9   Q.   And one of those parties on July 4th; right?
10  A.   Yeah.  One of them.
11  Q.   All right.  Now, on the party at July 4th, would you say
12  that you were having a good time and it's July 4th and it's a
13  lot of celebrations and you're going to do a little bit of
14  drinking and a little bit of doing some of that drug stuff?
15  A.   Yeah.  I was drinking and smoking weed.
16  Q.   Right.
17       Now, you indicated a few minutes ago that you were doing
18  some shake before you ever had an event where he was going to
19  be involved in picking up some drugs.  You said that; right?
20  A.   That I asked for a pill and he gave me some shake.
21  Q.   Yeah.  Shake.
22       So shake, now -- that's a lot of the leftover pills that
23  you get that are illegal pills; right?
24  A.   Yes.
25  Q.   Yeah.  Now, those are the MDMA.  Is that what those are?

CROSS OF JONQUILLA DENISE SANDERS BY MR. RAEL    129

1   A.   Supposed to be.

2   Q.   Sorry?

3   A.   It's supposed to be.

4   Q.   Supposed to be.

5   A.   Yeah.

6   Q.   Okay.  And when you get those shakes, it could be one

7   pill crushed up; it could be two pills crushed up; it could

8   be three pills crushed up.  It's shake; right?

9   A.   Right.

10  Q.   And just even one of those pills -- how long would you

11  say that that can keep you up?  For an hour, two, three, four

12  or five?

13  A.   It keeps me up long enough to drive there and back.

14  Q.   Okay.  So how many -- if you had two pills, how would

15  that affect you?

16  A.   I would be higher.

17  Q.   Much higher?

18  A.   Uh-huh.

19  Q.   Twice as high?

20  A.   Uh-huh.

21  Q.   How about if you had three?

22  A.   Triple.

23  Q.   Three times as high?

24  A.   Uh-huh.

25  Q.   So when you left to go to Charlotte, you were high as a

CROSS OF JONQUILLA DENISE SANDERS BY MR. RAEL     130

1  kite; right?

2  A.    I was high.

3  Q.    As a kite; right?

4  A.    I was high.  I don't know what you mean.

5  Q.    Okay.  So now you go and you hadn't met KennyMan before;

6  right?  You saw him at parties.

7  A.    I saw him at parties.

8  Q.    But there do you recall back in July when you had a

9  little conversation with KennyMan or not?

10  A.    No.

11  Q.    Can't recall?

12  A.    No.

13  Q.    And do you recall anything that -- did KennyMan ever

14  come over to you that you remember?

15  A.    No.  I don't know what you're talking about.

16  Q.    Well, the question is:  Do you remember, do you not,

17  that KennyMan, on that July 4th day, came over to you?  Yes

18  or no?

19  A.    No; I don't remember that.

20  Q.    You don't remember that.

21      Do you remember much about that July 4th party other

22  than you were there to party?

23  A.    Yeah.  I remember some stuff.

24  Q.    Do you remember -- do you remember whether or not any

25  other people besides KennyMan came over to you on that

CROSS OF JONQUILLA DENISE SANDERS BY MR. RAEL    131

1   July 4th party?
2   A.   No.  Something about -- I don't know what you're talking
3   about.
4   Q.   Don't know what I'm talking about.
5        Do you know whether or not other people other than
6   KennyMan came up to you because of the way you were acting on
7   that July 4th; yes or no?
8   A.   No.  I don't remember anybody coming up to me.
9   Q.   Nobody came up to you.  Just came on that day and had a
10  good time.  That was it; right?
11  A.   Yep.
12  Q.   Now, when you had gone to Atlanta one time before, you
13  went there for the purpose of getting some drugs; right?
14  A.   Yes.
15  Q.   And he told you, Ziggy, your boyfriend there, that it
16  could be as many as 10,000 pills; right?
17  A.   Yeah, but he wasn't my boyfriend.
18  Q.   Not your boyfriend?
19  A.   No.
20  Q.   Just your -- well, what is he to you?
21  A.   Just had sex with him a lot.
22  Q.   Just casually had some sex with him for -- and you
23  stayed with him for a period of time; right?
24  A.   What do you mean "stayed with him"?
25  Q.   Well, you slept over his house before; right?

CROSS OF JONQUILLA DENISE SANDERS BY MR. RAEL    132

1   A.   Yeah.

2   Q.   And you also, when you did this drug transaction, he

3   said "gotcha"; right?

4   A.   Uh-huh.

5   Q.   And when he said gotcha, he meant you-all were going to

6   have sex; right?

7   A.   Correct.

8   Q.   Okay.  And so when you did this and you met with him,

9   when you met with him, you met with a person named Armstrong;

10  right?

11  A.   Uh-huh.

12  Q.   And at that time that you were going to pick up these

13  10,000 pills -- 10,000 pills must make some people real high;

14  right?

15  A.   Yeah.  If they take 10,000 pills, I'm pretty sure they

16  would be high.

17  Q.   And Ziggy there was kind of worried, wasn't he, that

18  you, Ms. Sanders, might just take some of those pills; right?

19       MR. GUINN:  Objection, Your Honor.  Calls for

20  speculation.

21       THE COURT:  Sustained as to what Ziggy knew.  I'll

22  sustain the objection as to the form of the question.

23       MR. RAEL:  All right.

24  BY MR. RAEL:

25  Q.   Let's put it a different way.  Ziggy told you that he

1   was worried about going to Atlanta, you and he alone; right?
2   I mean, going into Atlanta alone -- that you really needed to
3   go with this Anderson; right?
4   A.    No.  He didn't tell me he was worried.
5   Q.    He wasn't worried.  So what was the -- so -- but the
6   purpose -- am I right, that going along with
7   Reginald Armstrong was because he really was worried that you
8   might be taking a lot of pills?
9   A.    No.  I assumed he just didn't trust me and thought I
10  wouldn't come back with the pills.
11  Q.    Pardon?
12  A.    I assumed that he didn't trust me to come back with his
13  pills.  So he sent someone along.
14  Q.    Oh, I see.
15        Now, when he didn't trust you to come back with the
16  pills, he trusted you to come with -- give him -- that you
17  were going to get money from him; right?
18  A.    When?
19  Q.    When.  Just before you were going to get these pills.
20  A.    No.  The $10,000 -- I mean, the 10,000 pills -- he
21  didn't send me any money the first time.
22  Q.    Oh, no money.  And isn't that because you never -- you
23  yourself were never going to get any money for doing any of
24  these transactions.  That's true, isn't it?
25  A.    No.  I never got paid for going.

CROSS OF JONQUILLA DENISE SANDERS BY MR. RAEL    134

1  Q.    No.  The reason that you weren't getting paid isn't just
2  because you were just sleeping with him; it was because you
3  really wanted to have him or KennyMan or maybe Pressure Gang
4  help you in your business ventures, in trying to get some
5  music going; right?
6  A.    Yeah.  I wanted to get signed.
7  Q.    Right.  And so the best way that you could get signed
8  would be to go ahead and do some of these transactions that
9  you wouldn't get paid on because maybe then it might help you
10 in your little music career; right?
11 A.    Yeah.  I figured doing whatever he wanted me to do would
12 help me get in better with him, yeah.
13 Q.    So whatever you could do, whether you have to sleep with
14 him, whether you had to go do some illegal stuff with him,
15 anything so that you could get your little music career
16 better; right?
17 A.    No.  I was sleeping with him because I wanted to.
18 Q.    Oh, I see.
19 A.    Yeah.
20 Q.    That was just the extra part of it?
21 A.    Yeah.
22 Q.    And so the part where you were going to get this career
23 better, you knew that KennyMan was doing rap in Atlanta;
24 right?
25 A.    I heard about him.

CROSS OF JONQUILLA DENISE SANDERS BY MR. RAEL    135

1   Q.   As a matter of fact you knew that he was at clubs and
2   performing, and was doing pretty good?
3   A.   I heard about him.
4   Q.   And you also heard, did you not, that he had a record
5   label; right?
6   A.   I didn't know too much about that.  I was trying to get
7   signed through Pressure Gang with Ziggy.
8   Q.   Now, the gang, this Pressure Gang -- they were a rough,
9   rough, rough lot; right?
10  A.   They were what?
11  Q.   Rough, rough, rough lot; right?
12  A.   Rough, rough, rough what?
13  Q.   Lot.
14  A.   Lot.
15  Q.   I mean, in other words, they were a bunch of bad
16  characters?
17            MR. GUINN:  Objection.
18            THE WITNESS:  Now that I know.  Yeah, I guess so.
19  BY MR. RAEL:
20  Q.   Now you guess so.
21  A.   I guess so.
22  Q.   Now, this incident where you're now saying that KennyMan
23  was right involved in this drug transaction, Ziggy gave you
24  some money.
25  A.   Uh-huh.

CROSS OF JONQUILLA DENISE SANDERS BY MR. RAEL    136

1   Q.   Was that 500?
2   A.   I don't know.  I didn't count the money.  I just put it
3   in my purse.
4   Q.   You just took whatever he gave you and you put it in
5   your purse?
6   A.   Yeah.  I did whatever he told me to do.
7   Q.   But he didn't really trust you?
8   A.   I don't think so.
9   Q.   Now, you took some money and put it in your purse.  Tell
10  the jury how much money you put in your purse.
11  A.   I don't know how much money I put in my purse.  It was
12  in rubber bands and I just put it in my purse.
13  Q.   When you did this drug transaction with KennyMan, as you
14  say, tell the jury how many pills did you receive when you
15  met with Ziggy?
16  A.   How many pills did I take?
17  Q.   Did you get when you met with Ziggy.
18  A.   I don't understand the question.
19  Q.   Okay.  You -- Ziggy -- you gave Ziggy, as I understand
20  it, you gave him some kind of a box; right?
21  A.   Yeah.
22  Q.   Okay.  So how many pills were in that box?
23  A.   I don't know if pills was in the box because I didn't
24  look in the box.
25  Q.   Oh.  You didn't look in the box.

CROSS OF JONQUILLA DENISE SANDERS BY MR. RAEL    137

1   A.   No.
2   Q.   But you figured that somehow this -- since he gave you
3   money, that this had to be pills?
4   A.   Yeah.  I assumed it was pills.
5   Q.   You assumed it?
6   A.   Uh-huh.
7   Q.   But in fact as an actual knowledge, you really just
8   don't know; right?
9   A.   Correct.
10  Q.   Now, when you got a box from him, and then he said
11  gotcha and you had sex, you never, never even one time opened
12  that box; right?
13  A.   No.
14  Q.   And you just don't know exactly and precisely what was
15  in that box; right?
16  A.   No, I don't.
17  Q.   Now -- just a minute, please.
18       We know that, as you said, you would like to get from
19  the judge -- he's the only one who could do it -- you'd like
20  to get some leniency; right?
21  A.   Correct.
22  Q.   And that as long as you came forward and told the jury
23  whatever you could tell them, that perhaps you might just get
24  that leniency; right?
25  A.   Uh-huh.

CROSS OF JONQUILLA DENISE SANDERS BY MR. RAEL    138

1   Q.    Now, you recall this indictment where you were charged
2   and pled guilty; right?
3   A.    Yes.
4   Q.    And do you remember that in that indictment you were
5   being charged with having 500 grams of a mixture and
6   substance containing a detectable amount of cocaine; right?
7   A.    Yeah; I remember that.
8   Q.    Do you remember also that they indicated to you that the
9   maximum amount that you could get for that would be a
10  million-dollar fine; right?
11  A.    Uh-huh.  I don't know.
12  Q.    You don't remember or you don't know?
13  A.    I don't remember.  I know I was facing 5 to 40 years.
14  Q.    I'm sorry?
15  A.    I know I was facing 5 to 40 years.
16  Q.    Five to 40 years?
17  A.    Yes.
18  Q.    Now, if on the other hand, as you sit here now, dressed
19  as you are, you gave some evidence like you just did, maybe,
20  instead of 5 to 40 years, it could be leniency?
21  A.    No.  I think it changed from 5 to 40 to zero to 20 once
22  they tested the drugs in the lab.
23  Q.    Just a minute, ma'am.
24        You -- I'm sorry.  I'm in kindergarten with this.
25        Now, you -- now, ma'am, you entered into a -- what they

CROSS OF JONQUILLA DENISE SANDERS BY MR. RAEL    139

1   call a factual basis; that is where they figure out how much
2   drugs you might have; right?
3   A.   Yes.
4   Q.   Now, in that factual basis -- I don't know, can you see
5   this screen?
6   A.   No.  Nothing's popped up.
7   Q.   All right.
8   A.   I can now.
9   Q.   You can?  Okay.
10       Let's look at that number, the very end, at Number 4.
11  Okay?
12  A.   Uh-huh.
13  Q.   That says that in this case you're going to not have
14  that cocaine you were charged with.  You were going to have
15  instead 2,000 grams of eutylone; right?
16  A.   Uh-huh.
17  Q.   Now, 2,000 grams.  Do you have any idea how many pills
18  that is?
19  A.   No, I don't.
20  Q.   No?  So when you had 10,000 that you did before you ever
21  met KennyMan, they just forgot about that and they just
22  forgot about the cocaine, and instead you ain't doing that
23  kind of time that you thought -- 5 to 40 years or whatever
24  you said; right?
25  A.   There was no cocaine.  When I was ready to sign the plea

CROSS OF JONQUILLA DENISE SANDERS BY MR. RAEL   140

1  for 5 to 40, I got an email saying that they thought it was

2  eutylone instead of cocaine.  So the plea changed.

3  Q.   Oh.  So that -- okay.  Now --

4        THE COURT:  Before you go on.  Let's give -- that

5  exhibit that you showed her -- let's give it an exhibit

6  number for the record.

7        MR. RAEL:  The exhibit I showed her, okay.  Sorry,

8  Your Honor.  That is the factual basis.  Came from the United

9  States attorney.

10       THE COURT:  No.  I don't care where it came from;

11  what it does.  Just give it an exhibit number.

12       MR. RAEL:  Oh.  How about D1.

13       THE COURT:  D1.  Thank you.

14  BY MR. RAEL:

15  Q.   Now, you see a document in front of you, as well?

16  A.   Yes.

17  Q.   And if you'll look at Number 2, it says:  Sentence.

18  That is the plea agreement sentence, okay?

19       THE COURT:  Go ahead and give that a number as

20  well.

21       MR. RAEL:  That would be D2.

22  BY MR. RAEL:

23  Q.   And looking at D2, looking at that Count 1, do you see

24  where it says that you could have, for this Count 1 that you

25  just pled guilty to, a term of 20 years imprisonment maximum;

CROSS OF JONQUILLA DENISE SANDERS BY MR. RAEL    141

1  right?

2  A.    Yes.

3  Q.    And it could be a million-dollar fine; right?

4  A.    Uh-huh.

5  Q.    Or both; right?

6  A.    Yes.

7  Q.    But that ain't going to happen to you; right?  As long

8  as you try to give what you are saying is the real truth and

9  nothing but the truth as it relates to KennyMan; right?

10 A.    As long as I'm completely honest.

11 Q.    Sure.  Say the truth and nothing but the truth.  All is

12 going to be good.

13 A.    Right.

14 Q.    Now, you indicated that he said, your friend who you

15 were sleeping with, that -- Ziggy -- that you were going to

16 do the same thing.

17 A.    Yeah.  That's what he said.  Same thing.

18 Q.    Right.

19     Now, the last time that you did the same thing, you

20 actually did that same thing with a guy who was a

21 light-skinned black man who was driving a red sport car;

22 right?

23 A.    Uh-huh.

24 Q.    And how many other times, if you know, did you also meet

25 with that guy?

 1   A.   I only went to pick something up for Ziggy twice.
 2   Q.   Twice?
 3   A.   Yeah.
 4   Q.   Okay.  And those times were this same guy, this guy who
 5   was in a sport car that was red, that was kind of tall,
 6   light-skinned black man; right?
 7   A.   That was the first time.
 8   Q.   Now, Ziggy.  You know, he's a man who, when you were
 9   hanging around with him, had a gun around; right?
10   A.   I seen him with a gun once before.
11   Q.   Yeah.  Saw him with a gun once before.
12        And did you find that either strange or unusual?
13   A.   No.
14   Q.   Did you find it to be strange or unusual that you would
15   do a transaction dealing with 10,000 pills, do it for
16   nothing, but what the heck?
17   A.   No.  I didn't find it strange or unusual.
18   Q.   All right.  This thing is kind of normal for you; right?
19   A.   It was the first time, so...
20   Q.   So now let's talk about a lady (sic) named Armstrong.
21   You know Ms. Armstrong?
22   A.   That's Reggie, right?
23   Q.   Okay.  Let's talk about for a minute -- but you know him
24   pretty well; right?
25   A.   No, I don't.

CROSS OF JONQUILLA DENISE SANDERS BY MR. RAEL    143

1    Q.    You don't know him?

2    A.    That's the guy that Ziggy sent with me to pick up the

3    pills.

4    Q.    Okay.  How about Ms. Anderson?  You know Ms. Anderson;

5    right?

6    A.    I know of her.

7    Q.    You know of her in one way because you two were over in

8    the Mecklenburg County jail and you were all together; right?

9    A.    Yeah.

10   Q.    And not only were you together with her, but there was

11   another one of your codefendants and you were all together as

12   well, three?

13   A.    Correct.

14   Q.    And you engaged in any number of conversations with her

15   and her with you because you-all were in this same

16   predicament.

17   A.    Uh-huh.

18   Q.    And were those conversations -- did they last hours?  Or

19   would they only last less than an hour?

20   A.    Less than an hour.

21   Q.    Okay.  And would you say that they were at least ten

22   conversations that you had with her?  Or would you say less

23   than ten?

24   A.    Less than ten.

25   Q.    Now, the -- later you went over where you are now, which

REDIRECT OF JONQUILLA DENISE SANDERS BY MR.    144
GUINN

1   is over in -- where is it?  Catawana (phonetic)?  Cabadaba

2   (phonetic)?

3   A.    Catawba.

4   Q.    Catawba.

5        And Catawba -- now, are you with her there?

6   A.    I was when I first got there but not anymore.

7   Q.    What was -- what did you say?

8   A.    We were together like the first week when we got there.

9   Q.    Right.

10  A.    But then they separated us.

11  Q.    Okay.  Because codefendants -- it would be better to

12  separate you-all so you-all just wouldn't conspire together

13  in a conspiracy together?

14            MR. GUINN:  Objection, Your Honor.

15            THE COURT:  Sustained.

16  BY MR. RAEL:

17  Q.    So now --

18            MR. RAEL:  I believe that's what I have.  Thank

19  you.

20            THE COURT:  Any redirect?

21            MR. GUINN:  Yes, sir.

22                    REDIRECT EXAMINATION

23  BY MR. GUINN:

24  Q.    Ms. Sanders, did you hear the part in the conversation,

25  I guess, that you just had with defense counsel where he

REDIRECT OF JONQUILLA DENISE SANDERS BY MR.     145
GUINN

1   asked you about taking some pills before meeting with
2   Mr. Watkins?
3   A.   Yes.
4   Q.   Okay.  Did you get into a car wreck or anything like
5   that on the way down from Charlotte, North Carolina, to
6   Atlanta?
7   A.   No.
8   Q.   Did you have any issue operating that motor vehicle?
9   A.   No.
10  Q.   Before that night had you ever been to Club Diamonds
11  before?
12  A.   I don't think so.
13  Q.   Okay.  Did you have any issue finding Club Diamonds
14  while operating the vehicle?
15  A.   No.
16  Q.   Did you have any issue remembering what happened on that
17  particular night?
18  A.   No.
19  Q.   Did you have any interest in getting signed with
20  Mr. Watkins' rap label?
21  A.   No.
22  Q.   Did you ever talk to Mr. Watkins about that?
23  A.   No.
24  Q.   What's the rap label that you wanted to be -- that you
25  wanted to join?

REDIRECT OF JONQUILLA DENISE SANDERS BY MR.      146
GUINN

1   A.   Pressure Gang.

2   Q.   There was some talk before about Pressure Gang parties

3   and individuals that were there.

4        Do you remember those questions?

5   A.   Yes.

6   Q.   Did you meet Mr. Watkins at one of those Pressure Gang

7   parties?

8   A.   I was introduced to him.

9   Q.   At one of those parties; is that correct?

10  A.   Uh-huh.

11  Q.   In Atlanta; is that correct?

12  A.   Yes.

13  Q.   Were there pills at that party?

14  A.   Not that I know of.

15  Q.   Did you ever do cocaine?

16  A.   No.  I don't do cocaine.

17  Q.   Did you ever pick up cocaine for Mr. Cloud?

18  A.   No.

19  Q.   What did you believe that was in the box that you gave

20  to Mr. Cloud?

21  A.   Pills.

22  Q.   I'm going to show you what I've got marked here as

23  Government's Exhibit Number 2.  If you can just bear with me

24  for one moment, please.

25       Ma'am, do you recognize this document?

1   A.   Yes.

2   Q.   I'm going to page down.  What is it?

3   A.   The plea agreement.

4   Q.   That you signed?

5   A.   Yes.

6   Q.   At the bottom of the page here, Page 7, whose signatures

7   are at the bottom of this document?

8   A.   Mine, my attorney's, and the United States attorney.

9   Q.   Have there been any changes to this document since when

10   you last saw it?

11   A.   No.

12          MR. GUINN:  Your Honor, at this time I'd like to

13   have Government's Exhibit Number 2 moved into evidence.

14          THE COURT:  Any objection?

15          MR. RAEL:  No.  I thought we did -- is it D2?

16   Yeah, that's fine.

17          THE COURT:  Admitted.

18          MR. GUINN:  And permission to publish that to the

19   jury?

20          THE COURT:  You may.

21          (Government's Exhibit Number 2 was received into

22   evidence.)

23   BY MR. GUINN:

24   Q.   Did you review this document with your lawyer?

25   A.   Yes.

REDIRECT OF JONQUILLA DENISE SANDERS BY MR.    148
GUINN

1  Q.   Did you run over all the provisions of this document

2  with your lawyer?

3  A.   Yes.

4  Q.   Okay.  I'm going to refer you to a specific subsection.

5  If you could, we are on Page 6 here.  But I'm going to go

6  back up to the section where it says:  Assistance to the

7  United States.  Starts with Paragraph Number 2.

8      Do you see that?

9  A.   Yes.

10  Q.   And beneath that do you see where there are particular

11  subsections a, b, c, d?

12  A.   Yes.

13  Q.   I'm going to page down to the next page where it says e.

14  I'm going to enlarge that for you.  Can you read that out

15  loud, please.

16  A.   "The defendant understands that the United States

17  desires only truthful and accurate information and testimony.

18  The defendant understands further that knowingly giving false

19  information or testimony may constitute a breach of the plea

20  agreement and/or could be prosecuted as an additional

21  criminal offense."

22  Q.   Since meeting with the police, I guess, initial --

23  during that initial debrief, have you given them any other

24  different story about what happened?

25  A.   No.

DIRECT OF MICHAEL SARDELIS BY MR. GUINN        149

1  Q.   Do you understand that there are potential consequences
2  if you're caught giving false information?
3  A.   Yes.
4          MR. GUINN:  I don't have any further questions,
5  Your Honor.
6          THE COURT:  Any recross?
7          MR. RAEL:  No.
8          THE COURT:  You may step down and be excused.
9          Call your next witness.
10          MR. GUINN:  At this time, Your Honor, the United
11  States calls Michael Sardelis to the stand.
12          THE CLERK:  Place your left hand on the Bible and
13  raise your right.
14                    MICHAEL SARDELIS
15  having been duly sworn was examined and testified as follows:
16                    DIRECT EXAMINATION
17  BY MR. GUINN:
18  Q.   Officer Sardelis, can you state your name and occupation
19  for the record, please.
20  A.   It's Michael Sardelis.  I'm a detective with the
21  Charlotte-Mecklenburg Police Department, currently assigned
22  to the FBI.
23  Q.   And how long have you been -- or what -- what's the
24  role?  What's your official title?
25  A.   Currently I'm a task force officer.

DIRECT OF MICHAEL SARDELIS BY MR. GUINN          150

1   Q.   Okay.  And how long have you been a task force officer
2   with the CMPD and FBI?
3   A.   Since 2010, about 12 years.
4   Q.   All right.  And before that what was kind of your
5   background in law enforcement?
6   A.   I was a patrol officer, community coordinator, worked
7   with the community, and that's pretty much what I did before
8   that.
9   Q.   Okay.  As a task force officer with the FBI, generally
10  what are your responsibilities?
11  A.   My job is to oversee cases, to work cases, to work our
12  cases kind of in conjunction with the Charlotte-Mecklenburg
13  Police Department and with the FBI.
14  Q.   All right.  Did you participate in the Pressure Gang
15  investigation?
16  A.   I did.
17  Q.   And as part of this case did you review wire calls as
18  part of this investigation?
19  A.   I did.
20  Q.   All right.  And as part of this case did you work in the
21  wire room in this case?
22  A.   I did.
23  Q.   Have you ever heard of something called a wire room
24  leader?
25  A.   I have.

DIRECT OF MICHAEL SARDELIS BY MR. GUINN        151

1   Q.   What is that?

2   A.   So that is the person -- your job is almost like a

3   supervisor.  Your job is to be in charge of the wire room.

4   So what you'll have is you'll have one, two, however many

5   monitors you have in a room.

6        Your job is to run those monitors in the room.  And the

7   monitors are the people that are listening to the calls as

8   they're coming in live.  And your job is also to coordinate

9   with any type of surveillance units you have out in the

10  field, along with if any traffic stops or interdictions need

11  to be made off of information you gather from the wire --

12  your job is to kind of put all that in place and do that.

13  Q.   Would it be fair to say that as the wire room leader, if

14  a pertinent or interesting call comes in, you're notified; is

15  that correct?

16  A.   Yes, sir.

17  Q.   In this particular case are there instances in which you

18  worked as the wire room leader?

19  A.   Yes, sir, there are.

20  Q.   Did you work in the wire room every single day?

21  A.   No, I did not.

22  Q.   On days that you didn't work in the wire room, would you

23  ever come back in and listen to calls that occurred while you

24  were off working on something else?

25  A.   Yes, sir.

DIRECT OF MICHAEL SARDELIS BY MR. GUINN        152

1   Q.   Do you believe that to be an important part of an

2   investigation such as this?

3   A.   It's very important.

4   Q.   Why did you believe it to be important?

5   A.   It helps you keep updated on the case and how the case

6   is going.  It helps you fill in the gaps because you can't be

7   in a wire room 24 hours a day, 7 days a week.

8        So you have to rely on the other team leaders to

9   communicate with each other.  But it's also better to listen

10  to the calls and understand what's going on, on what you

11  missed the days you were out.

12  Q.   As part of this investigation did you ever review calls

13  between Mr. Cloud, Ms. Sanders, and Mr. Watkins that occurred

14  on or about October the 16th, 2020, and October the 17th,

15  2020?

16  A.   I did.

17  Q.   And when you were reviewing these calls, what is the

18  phone number that you had for Mr. Steven Cloud?

19  A.   It is 980-777-0566.

20  Q.   Did you have phone numbers for Mr. Watkins?

21  A.   I did.

22  Q.   What were those phone numbers?

23  A.   May I review my notes?

24  Q.   If it would help refresh your recollection, please do.

25  A.   It would.

DIRECT OF MICHAEL SARDELIS BY MR. GUINN        153

1    One of the numbers we had was 678-558-8359.  And then
2    there was a second number of 470-389-2569.
3    Q.   Okay.  And then the last one -- what's the number that
4    you had for Jonquilla Sanders?
5    A.   May I review my notes, please.
6    Q.   If it would help refresh your recollection, please do.
7    A.   So for Ms. Sanders there was two phone numbers.  The
8    first phone number is 704-287-5769.  And then the second one
9    is 786-353-3542.
10   Q.   Have you ever heard of something called Google Voice?
11   A.   I have.
12   Q.   What is that?
13   A.   Google Voice is a system.  It's run by Google.  And it
14   allows you to pick a phone number or make up a phone number,
15   and then when people call that number, it sends that call
16   directly to your phone.
17   Q.   So would it be fair to say that sometimes a number may
18   appear differently?
19   A.   That is correct.
20   Q.   But would the same core number be identical?  Would it
21   be the same?
22   A.   That is correct.
23   Q.   Now, you mentioned earlier that you listened to the
24   calls that were going on, on October the 16th and 17th; is
25   that correct?

DIRECT OF MICHAEL SARDELIS BY MR. GUINN        154

1   A.    Yes, sir.

2   Q.    After you listened to those calls, what did you believe

3   was happening based upon what you heard in the phone calls?

4   A.    I believe there was a drug deal being set up.  That

5   Ms. Sanders was going to Atlanta to pick up drugs and bring

6   them back for Mr. Cloud.

7   Q.    Now, you mentioned coordinating surveillance.  You had

8   surveillance officers working with you-all at that time; is

9   that correct?

10  A.    That is correct.

11  Q.    How come you didn't intercept the drugs that you believe

12  Ms. Sanders had retrieved and was transporting back up to

13  Charlotte?

14  A.    I didn't have the assets in place at the time to be able

15  to make a traffic stop on the way back.

16  Q.    Okay.  Where would those assets have to have been in

17  place at?

18  A.    In Georgia.  In -- around the Atlanta area.

19  Q.    And again, about what time were these calls happening?

20  A.    They were late at night, into the morning hours.

21  Q.    Now, as part of this investigation do you listen to

22  calls in realtime?

23  A.    We do, yes, sir.

24  Q.    And as part of this investigation did you review what's

25  called open source social media material?

1  A.   We did.

2  Q.   What is that?

3  A.   So if you have a Facebook account or an Instagram

4  account and your account is not set to private, it's what we

5  call open source.  So we can -- anybody can look through your

6  account.

7      So we just use what's called open source to look through

8  other people's Facebook and social media accounts.

9  Q.   When you were listening to the calls between Watkins,

10 Cloud, and Sanders, did you hear any references to Club

11 Diamonds?

12 A.   I did.

13 Q.   Did you look at information, anything -- looking for

14 anything on social media associated with Club Diamonds?

15 A.   We did.

16         MR. GUINN:  Your Honor, I am showing the witness

17 what I've got marked here as Government's Exhibit Number 26.

18 BY MR. GUINN:

19 Q.   Government's Exhibit Number 26.  Do you recognize that?

20 A.   I do.

21 Q.   And what is that?

22 A.   It's a flier for a party at Club Diamonds.

23 Q.   Is that something that law enforcement officers came

24 across on social media?

25 A.   We did.  It's on Instagram.

DIRECT OF MICHAEL SARDELIS BY MR. GUINN        156

1   Q.   Okay.  And when you see that on social media, do you-all
2   do a screen capture of that?
3   A.   We do.
4   Q.   Is that similar to a photograph?
5   A.   Correct.
6   Q.   Once this screen was captured, have there been any
7   changes to it since you last saw it?
8   A.   No, sir.
9           MR. GUINN:  Your Honor, I'd like to have
10  Government's Exhibit Number 26 admitted into evidence and
11  published to the jury.
12          THE COURT:  Any objection?
13          MR. RAEL:  None.
14          THE COURT:  Let it be admitted and published.
15          (Government's Exhibit Number 26 was received into
16  evidence.)
17  BY MR. GUINN:
18  Q.   So you mentioned looking for materials associated with
19  Club Diamonds.  You came across this; is this correct?
20  A.   Yes, sir.
21  Q.   Okay.  I'm going to blow up different sections of this.
22       This flier here -- where is this event happening at?
23  A.   Diamond Club.
24  Q.   Okay.  And probably didn't do a good enough job there.
25       Where is that happening at?

1   A.   1715 Northside Drive, Atlanta, Georgia.

2   Q.   The event there -- when is it happening?

3   A.   Friday, October 16th.

4   Q.   And who was performing there that night?

5   A.   KennyMan.  Mr. Watkins.

6   Q.   And since this investigation started has you -- have you

7   become familiar with KennyMan and his appearance?

8   A.   I have.

9   Q.   Do you see KennyMan in the court today?

10  A.   I do.

11  Q.   Can you point him out and describe what he's wearing,

12  please.

13  A.   He's got glasses on, a beard, a white button-down shirt,

14  and a black vest.

15        MR. GUINN:  Your Honor, I'd ask that the record

16  reflect that the witness has identified Mr. Kenneth Watkins.

17        THE COURT:  It will.

18  BY MR. GUINN:

19  Q.   Officer Sardelis, so you mentioned earlier that

20  sometimes that you're -- you're able to listen to wire calls

21  in realtime; is that correct?

22  A.   Yes, sir.

23  Q.   Do you believe listening to those calls in realtime to

24  be an important part of an investigation?

25  A.   They are.

DIRECT OF MICHAEL SARDELIS BY MR. GUINN        158

1   Q.   Why do you believe that to be important?

2   A.   It helps us determine what's going on.  It helps us

3   determine if any enforcement action needs to be taken.  And

4   it just kind of gives us a big picture of what's going on at

5   the time when I'm in the room.

6   Q.   Okay.  You have mentioned a few times now hearing calls

7   between Watkins, Sanders, and Cloud; is that correct?

8   A.   Yes, sir.

9   Q.   At some point while working on this case did you hear

10  other calls that were similar in nature?

11  A.   I did.

12  Q.   When did those calls occur?

13  A.   After this call.

14  Q.   I'd like to direct your attention to October the 24th,

15  2020.  Were you working in the wire room on that day?

16  A.   I was.

17  Q.   Were you the wire room leader that day?

18  A.   I was.

19  Q.   And the calls that you heard that you believe to be

20  similar in nature -- who were those calls between?

21  A.   They were between Leticia Anderson and Steven Cloud.

22  Q.   Was there any other participant on those calls?

23  A.   There was.  There was several other participants.  One

24  of them was Kenneth Watkins.

25  Q.   What is the phone number that you had for

1   Leticia Anderson?

2   A.   May I review my notes?

3   Q.   If it would help refresh your recollection, please do.

4   A.   So Leticia Anderson's phone number is 678-208-8071.

5   Q.   So you hear these calls on the 24th.  What about the

6   nature of these calls made you believe that they were similar

7   in nature to the calls that you reviewed a week earlier on or

8   about October the 17th, 2020?

9   A.   They appeared similar.  The -- in the previous one on

10  the 16th, he had a female going to Atlanta to meet with

11  KennyMan.

12  Q.   Sorry, Officer Sardelis.  I'm going to slow you down for

13  one minute.  When you said "he," who was that?

14  A.   Steven Cloud had a female he was talking to.  And he was

15  directing her to go to Atlanta to meet with KennyMan.  And as

16  we started intercepting calls on the 24th, we heard the same

17  thing.

18  Q.   At some point did you have an opportunity to meet

19  Ms. Leticia Anderson?

20  A.   I did.

21  Q.   I'm showing you now what I've got marked here as

22  Government's Exhibit Number 24.  And what is that?

23       Do you see an image in front of you?

24  A.   Yes, sir.

25  Q.   What is that an image of?

DIRECT OF MICHAEL SARDELIS BY MR. GUINN       160

1    A.    It's Leticia Anderson.

2    Q.    Does this photograph fairly and accurately depict

3    Ms. Leticia Anderson's appearance?

4    A.    It does now.

5    Q.    And just to be clear, you've met Ms. Anderson in person;

6    is that correct?

7    A.    Yes, sir.

8              MR. GUINN:  Your Honor, at this time I'd like to

9    have Government's Exhibit Number 24 moved into evidence and

10   I'd like permission to publish this photograph to the jury.

11             THE COURT:  Any objection?

12             MR. RAEL:  None.

13             THE COURT:  Let it be admitted.  You may publish.

14             (Government's Exhibit Number 24 was received into

15   evidence.)

16   BY MR. GUINN:

17   Q.    And is that -- that's Ms. Leticia Anderson; is that

18   correct?

19   A.    Yes, sir.

20   Q.    So when you hear these calls happening in realtime, are

21   you doing anything as you're listening to the calls?

22   A.    Just listening to them and trying to figure out what's

23   going on.

24   Q.    Okay.  And just to be clear, you're in the wire room as

25   these are happening; is that correct?

1   A.   Yes, sir.  That is correct.

2   Q.   During the course of this investigation were you

3   familiar with Ms. -- or have you since become familiar with

4   Ms. Anderson's voice?

5   A.   I have.

6   Q.   Mr. Watkins' voice?

7   A.   I have.

8   Q.   And Mr. Cloud's voice?

9   A.   I have.

10         MR. GUINN:  Your Honor, at this time I'd like to

11  play what's been already admitted as Government's Exhibit

12  Number 1J.  I'd like permission to publish that to the jury.

13         THE COURT:  You may.

14         MR. GUINN:  Just one moment, please.

15         THE COURT:  Members of the jury, it's been a while

16  since you heard a recording and a transcript.  I'll remind

17  you that the recording is the evidence.  The transcript is an

18  aid to your listening to the evidence.  If you find that

19  there's any discrepancy between the transcript and the

20  recording, you should rely on the recording.

21         (Audio played in open court for the jury.)

22  BY MR. GUINN:

23  Q.   So, Officer Sardelis, this is admittedly a locker call.

24  So let's kind of take a moment and kind of break things down.

25       What's geolocation?

1   A.   Geolocation for phones is pretty much the phone will

2   tell you where you're at.  What the phone does is it hits off

3   of a tower, and then that cell tower gives you the location

4   of the phone.

5   Q.   Based on that, did you have a sense of where

6   Leticia Anderson's phone was when this call was being made?

7   A.   Not when that call was being made.

8   Q.   Later on at some point did you learn where that phone

9   was?  Ms. Anderson's phone?

10  A.   I did.

11  Q.   Okay.  And where was that?

12  A.   It was in the Atlanta, Georgia, area, around the

13  Covington Highway, the 4484 Covington Highway.

14  Q.   To be clear, you were in the wire room as it's

15  happening.  When this call's made, you're listening to it in

16  realtime; is that correct?

17  A.   That is correct.

18  Q.   About what time; do you remember?  Was it afternoon,

19  evening, when this call came in?

20  A.   It was morning time.

21  Q.   And the address there, the 4484 Covington Highway --

22  what location is that?

23  A.   That's the location for K3 Soundz studio.

24  Q.   Was that the same location -- you've reviewed

25  information associated with Ms. Sanders; is that correct?

1  A.    Yes, sir.

2  Q.    Is that the same location that she identified?

3  A.    That is correct.

4  Q.    And was -- did you believe that location to be

5  associated with Mr. Watkins?

6  A.    I did.

7  Q.    Why is that?

8  A.    It's a recording studio that he promotes out of and uses

9  to -- for music.

10  Q.    When you heard this call, what, if anything, did you

11  start doing?  Or what did you think was going on?

12  A.    I believed Ms. Anderson was on her way or was already in

13  Atlanta, Georgia, and was in the process of meeting with

14  Mr. Watkins in order to pick up narcotics.

15  Q.    Why did you believe that?

16  A.    From the previous calls we listened to with Ms. Sanders

17  and the fact that it was fairly identical to what was

18  happening before where Cloud was talking to a female, was

19  directing her to go meet with Mr. Watkins in order to get the

20  narcotics.

21  Q.    Okay.  After that call came in initially, did you

22  continue listening to calls between -- involving

23  Ms. Anderson, Mr. Watkins, and Mr. Cloud?

24  A.    We did.

25          MR. GUINN:  Your Honor, at this time I'd like to

DIRECT OF MICHAEL SARDELIS BY MR. GUINN        164

1   play what's been admitted as Government's Exhibit Number 1K.

2           THE COURT:  You may.

3           (Audio played in open court for the jury.)

4   BY MR. GUINN:

5   Q.    SC and KW, who are the participants of those -- of that

6   call?

7   A.    I'm sorry.  Say that again.

8   Q.    SW and KW.  Those were the initials on the screen; is

9   that correct?

10  A.    That is correct.

11  Q.    Who were the participants in that particular call?

12  A.    Steven Cloud and Kenneth Watkins.

13  Q.    And again, you're listening in realtime.  You heard that

14  call come in; correct?

15  A.    Yes, sir.

16  Q.    The part where Mr. Watkins says, "You can tell your

17  people to come on up there.  I'm about 10 minutes out."  Did

18  you hear that part?

19  A.    I did.

20  Q.    What did you think was happening at that time?

21  A.    I thought he was leaving from wherever he was to go meet

22  Ms. Anderson.

23  Q.    Okay.  So as you're standing in the wire room on October

24  the 24th, 2020, these first two calls come in.  What, if

25  anything, do you start doing?

1  A.    I have a -- I identified a law enforcement contact in
2  the Atlanta, Georgia, area.  I had immediately placed phone
3  calls to him once I determined -- or once I believed that
4  there was a drug deal that was getting ready to happen in
5  order for him to try to set up surveillance on the drug meet,
6  and then follow it away and do a traffic stop.
7  Q.    Was this an opportunity that you had -- that you
8  believed that you had back on October the 17th, 2020?
9  A.    I did not have the assets or the law enforcement in
10 place to help me with that time.
11 Q.    But at this point would it be fair to say that it looked
12 like that may happen; is that fair?
13 A.    Yes, sir.
14         MR. GUINN:  At this time, Your Honor, I'd like to
15 play what's already been admitted as Government's Exhibit
16 Number 1L.
17         THE COURT:  You may.
18         (Audio played in open court for the jury.)
19 BY MR. GUINN:
20 Q.    Again, you heard this call in realtime; correct?
21 A.    Yes, sir.
22 Q.    And based on this call, what did you think was happening
23 and what did you do in response?
24 A.    I thought Ms. Anderson was actually already at 4484
25 Covington Highway, the K3 Soundz studio, and that she was

1   waiting for Mr. Watkins to arrive.  And I -- like I said, I

2   made contact with law enforcement in Georgia, and I started

3   getting them to head towards that location.

4   Q.    The 4484 Covington?

5   A.    That is correct.

6   Q.    Why were you telling them to go there?

7   A.    I wanted them to try to do surveillance on the location

8   to try to identify who all was there and if they could

9   potentially see any items being transferred.

10  Q.    Were law enforcement officers -- did they make it out to

11  4484 Covington Highway in time?

12  A.    They did not.

13  Q.    And then finally I'm going to --

14        MR. GUINN:  Your Honor, I'd like permission to play

15  what's already been admitted as Government's Exhibit

16  Number 1M.

17        THE COURT:  You may.

18        (Audio played in open court for the jury.)

19  BY MR. GUINN:

20  Q.    And again, you heard this call in realtime on

21  October 24, 2020; is that correct?

22  A.    Yes, sir, it is.

23  Q.    About what time, do you remember, did that call occur?

24  Or the time of day, roughly?

25  A.    It was early afternoon.  It was after lunchtime.

1  Q.   The phrase, "You situated" that Steven Cloud said there,

2  is that Mr. Cloud's voice that you heard say that?

3  A.   Yes, sir, it is.

4  Q.   When you heard that, did that mean anything to you?

5  A.   It did.

6  Q.   What, if anything, did that mean?

7  A.   I believe that he was asking her if she had the drugs.

8  "Are you situated?"

9  Q.   Let me ask you a question:  Have you worked wire cases

10  before?

11  A.   I have.

12  Q.   Listened in on wire calls before?

13  A.   I have.

14  Q.   In your experience do people typically talk explicitly

15  about drugs or narcotics on wire calls?

16  A.   They do.

17  Q.   Is that always the case?

18  A.   Some of them are coded.  But they kind of tend to talk

19  and talk their way around stuff; that's correct.

20  Q.   So when you heard "situated," you thought perhaps that a

21  transaction had already occurred; is that correct?

22  A.   Correct.

23  Q.   Are you still in communication with law enforcement

24  officers in Georgia at this point?

25  A.   I was.

1  Q.   And what are you telling them at this point after you
2  heard that "Are you situated" call?
3  A.   I informed them that I believe the deal had already been
4  done and that she was most likely heading back to Charlotte.
5  And then I asked them if they could try to set up an
6  interdictor or do a traffic stop on her, on her way back to
7  Charlotte.
8       I also told them that towards the end he said I'll check
9  up on you in about an hour or so, so I told them that when I
10 get the next call in, and if she tells him where she's at,
11 I'll give them a little better direction.
12 Q.   Would it be fair to say that you gave them the
13 information generally that you had about Ms. Anderson -- did
14 you give them some information about the type of vehicle that
15 she was driving?
16 A.   I did.
17 Q.   As far as you knew were law enforcement officers in the
18 Georgia area able to locate that vehicle, Ms. Anderson's
19 vehicle?
20 A.   The vehicle that I had given them she was not driving at
21 the time.  But they did locate a vehicle that I was -- that I
22 believed she was using.
23 Q.   And were you notified that there was a traffic stop made
24 of that vehicle?
25 A.   I was.

DIRECT OF MICHAEL SARDELIS BY MR. GUINN        169

1   Q.   And were you notified that there was anything found

2   inside that vehicle?

3   A.   I was.

4   Q.   And when was that?  So you heard that call.  You told us

5   that it was -- that last call, that it was at this point

6   early afternoon; is that correct?

7   A.   Yes, sir.

8   Q.   Okay.  When did the traffic stop occur?  Do you recall?

9   A.   I believe it was sometime around 2 p.m.

10  Q.   On the same day, October the 24th, 2020?

11  A.   Yes, sir, this is correct.

12  Q.   At some point did you yourself with another case agent

13  travel down to the Georgia area to retrieve the items that

14  were discovered inside of Ms. Anderson's vehicle?

15  A.   I did.

16  Q.   And what items did you pick up when you went down to

17  Georgia?

18  A.   I picked up several packages of pills, about ten

19  packages of pills, and then a cellular telephone.

20  Q.   And were those -- where were those at?  Do you remember

21  the agency that they were with?

22  A.   It's the Georgia Bureau of Investigations.  It was at

23  one of their labs.

24  Q.   So you went there and did you sign it out from them?

25  A.   I did.

1  Q.   The pills specifically, and I guess the phone as well,

2  after you retrieved those items from Georgia -- what did you

3  do with them?

4  A.   Myself and another FBI agent drove directly back to

5  Charlotte, and I turned the evidence in to the Charlotte

6  FBI property control.

7  Q.   The pills -- do you know if those were eventually

8  transported to CMPD?

9  A.   Yes.  I -- myself and another agent checked those pills

10 out of FBI property, and we transferred them to CMPD where I

11 turned them in to property and requested lab work be done on

12 them.

13 Q.   When controlled substances go into Property CMPD, could

14 you describe briefly for the jury how that works?  Can anyone

15 walk in and out of the property room at CMPD?

16 A.   No.  It is a secure area inside of our building.  And

17 then there's a window and you can talk to the property clerk.

18 They take control of that evidence and then they lock it away

19 in another area in the building.

20 Q.   Okay.  And were those items, the pills specifically,

21 signed out of property control at CMPD before coming into

22 court today?

23 A.   Yes, they were.

24     MR. GUINN:  Your Honor, if I could -- if I could

25 approach defense counsel with what I've got marked here as

DIRECT OF MICHAEL SARDELIS BY MR. GUINN      171

1   Government's Exhibit Number 14.

2           THE COURT:  You may.

3           MR. GUINN:  And after that I'd like to approach the

4   witness, Your Honor.

5           THE COURT:  Take it one step at a time.

6           MR. GUINN:  Can I approach the witness, Your Honor.

7           THE COURT:  You may.

8   BY MR. GUINN:

9   Q.   Handing you here -- and please don't pull it all the out

10  of the bag quite yet -- Government's Exhibit Number 14.  Can

11  you look at that.  What is that?  To the best of your

12  ability.  I know it's kind of cumbersome.

13  A.   It's a large bag with multiple smaller bags inside of

14  it.

15  Q.   Sir, identification markings on that bag, is your name

16  on the bag anywhere?  Your initials on those bags anywhere?

17  A.   They are.

18  Q.   Okay.  And have there been any changes to, I guess, the

19  items inside the brown paper bag there since you last saw it?

20  A.   Oh.  I mean, they've been examined by the lab, but --

21  Q.   Other than that?

22  A.   No, sir.

23  Q.   Okay.  And your initials are on that; is that correct?

24  A.   Correct.

25           MR. GUINN:  Your Honor, at this time I'd like to

DIRECT OF MICHAEL SARDELIS BY MR. GUINN          172

1  have Government's Exhibit Number 14, which is, I guess, the

2  bag inside the brown paper bag, admitted into evidence, and

3  I'd like to publish that to the jury.

4          THE COURT:  Any objection?

5          MR. RAEL:  None.

6          THE COURT:  Let it be admitted.  You may publish.

7          (Government's Exhibit Number 14 was received into

8  evidence.)

9  BY MR. GUINN:

10  Q.   So, Officer Sardelis, if you could take it out of the

11  bag.  Hold it up so the jury can see, please.

12  A.   (Witness complied.)

13  Q.   Thank you.

14       Those items there -- that's what you picked from

15  Georgia; is that correct?

16  A.   Yes, sir, that's correct.

17  Q.   And that's what you turned in to the crime lab bag here

18  for -- or the crime lab for testing; is that correct?

19  A.   I turned it in to evidence.  Yes, sir, that's correct.

20  Q.   Thank you.

21       You mentioned obtaining a telephone from Georgia as

22  well; is that correct?

23  A.   Yes, sir, that is correct.

24  Q.   Did you conduct a search of the contents of that phone?

25  A.   I did.

DIRECT OF MICHAEL SARDELIS BY MR. GUINN       173

1  Q.   Basically, how did you do that?

2  A.   Wrote a search warrant for the item.  Once the search

3  warrant was approved and signed by the judge.  I then

4  connected the phone to a computer and it pretty much pulls a

5  forensic copy of the data off of that phone for me.

6  Q.   And did you review that forensic data before coming in

7  to court today?

8  A.   I did.

9  Q.   Were you able to -- so when you get inside the phone,

10 are you able to obtain a phone number for that particular

11 phone?

12 A.   I am.

13 Q.   And what was the phone number for that device?

14 A.   May I refer to my notes?

15 Q.   If it would help refresh your recollection, please do.

16 A.   The phone number for that phone is 704-449-7998.

17 Q.   Is that consistent with the phone number that you had

18 for Leticia Anderson?

19 A.   It is not.

20 Q.   Did you believe that to be Ms. Leticia Anderson's phone?

21 A.   I did.

22 Q.   Why did you believe that to be her phone?

23 A.   She was the only occupant in the vehicle, and it was the

24 only phone found in the vehicle.

25 Q.   Ms. Anderson's phone number -- did you take notes

DIRECT OF MICHAEL SARDELIS BY MR. GUINN        174

1   associated with that?  At some point did you write down her
2   phone number?
3   A.    I did.
4   Q.    Okay.  Do you know her phone number off the top of your
5   head?
6   A.    The one she spoke with on the calls?
7   Q.    Or just Ms. -- what you have for Ms. Anderson's phone
8   number.  What is that?
9   A.    I have to refer to my notes.
10  Q.    Okay.  If it would help refresh your recollection,
11  please refer to your notes.
12  A.    It's 678-208-8071.
13  Q.    Does she have another phone number that she used?
14  A.    That's the only number.
15  Q.    Okay.  You reviewed the contents of the cell phone;
16  correct?
17  A.    That is correct.
18  Q.    And did you find anything related to BankkRoll Ziggyroll
19  Ziggy or Ziggy?
20  A.    I did.
21  Q.    Do you know what Cloud, Steven Cloud's nicknames were?
22  A.    I did, or do.
23  Q.    Okay.  And what are Steven Cloud's nicknames?
24  A.    It's Ziggy or BankkRoll Ziggy.
25             MR. GUINN:  All right, Your Honor, if I could just

DIRECT OF MICHAEL SARDELIS BY MR. GUINN          175

1   have one moment.  I'm sorry.

2             THE COURT:  You may.

3   BY MR. GUINN:

4   Q.   Officer Sardelis, I'm showing you what I've got marked

5   here as Government's Exhibit Number 19.  And I think it's two

6   pages.

7        Do you see that?

8   A.   I do.

9   Q.   And what are those?

10  A.   It's text messages from Ms. Anderson's phone.

11  Q.   And I'm going to show you what's marked as Government's

12  Exhibit Number 20 as well.  What are those?

13  A.   Again, text messages from Ms. Anderson's phone.

14  Q.   And you reviewed those before coming in to court today;

15  is that correct?

16  A.   Yes, sir, that is correct.

17  Q.   When you reviewed those, did you take a screenshot of

18  those text messages?

19  A.   I did.

20  Q.   And you put those into a document?

21  A.   I did.

22  Q.   Have those text messages been changed in any way since

23  you last saw them and last reviewed them?

24  A.   They have not.

25  Q.   Okay.  Will having these text messages help illustrate

DIRECT OF MICHAEL SARDELIS BY MR. GUINN        176

1   your testimony to the jury?  Will they help you in your

2   testimony today?

3   A.   They will.

4        MR. GUINN:  Your Honor, I'd like to have

5   Government's Exhibits Number 19 and 20 admitted into

6   evidence.

7        THE COURT:  Any objection?

8        MR. RAEL:  No.

9        THE COURT:  Let them be admitted.

10       (Government Exhibits Numbers 19 and 20 were received

11         into evidence.)

12       MR. GUINN:  I'd like to publish those to the jury

13   at the appropriate time, Your Honor.

14       THE COURT:  You may.

15   BY MR. GUINN:

16   Q.   So now I'm going to show you Government's Exhibit

17   Number 19.  And this is kind of small text so I'm going to

18   take it -- the first three slides at the top, I'm going to

19   blow it up and if you could kind of read that.

20       But before we do that, the blue here, the blue on the

21   screen -- whose phone is that?  Or like, who is that?

22       And maybe it would help if I blew it up.

23   A.   The blue is going to be her phone.

24   Q.   Okay.  And the gray?

25   A.   Is going to be his.

1  Q.   And is that the person identified as Ziggy?

2  A.   Yes.

3  Q.   So the blue at the top -- if you could read that first.

4  Just read through the messages.  The blue and then gray and

5  then back and forth.

6  A.   It says "I need pills but I guess I'll get them

7  tomorrow."

8  Q.   What time was that message sent?

9  A.   10/20 at 10:07.

10  Q.   Okay.  Was that four days before the traffic stop that

11  you described earlier?

12  A.   Yes, it was.

13  Q.   Okay.  And then the gray.  What was the response in

14  gray?

15  A.   It says "When ... you didn't say anything.  BT it,

16  baby."

17  Q.   And then under that?

18  A.   "You didn't respond."

19  Q.   I'm going to blow up the next three messages.  If you

20  could start at the top with the gray.  Tell us who it is and

21  when that message was sent and what it says.

22  A.   It's from Ziggy, Steven Cloud.  It says "When?"

23       And then another message from him says, "I'm almost

24  ready again.  U gone take dat trip?"

25  Q.   And what's under that?

1  A.   The other one is from Ms. Anderson.  It says "I'm sure.
2  I'm the stepchild."
3  Q.   And then I'll blow up the last two messages on that
4  particular page.  At the top who sent it, and when it was
5  sent?
6  A.   It came from Ms. Anderson, and it was sent at 10/20/2020
7  at 10:49 p.m. and it says "When?"
8       Ziggy responds with "Idk yet."
9  Q.   Idk.  What -- have you seen that phrasing in text
10  messaging before?
11  A.   "I don't know."  Sorry.  That's what idk means.
12  Q.   Okay.  And then on the next page.  Who are those
13  messages from, when they were sent, and what they said?
14  A.   This is a message from Steven Cloud again.  It's sent on
15  10/20/2020 at 10:49 p.m. and it says "Got bt.  Got about
16  2,000 left."
17       And then another one is sent same date at 11:45 p.m.
18  from Steven Cloud and it says "Damn.  Okay."
19  Q.   And this was four days before the interaction with
20  Ms. Anderson; is that correct?
21  A.   That is correct.
22  Q.   All right.  I'm going to show you or publish to the jury
23  Government's Exhibit Number 20.  I think we're
24  chronologically going a little backwards here.  But I'm going
25  to blow up the first four messages.

DIRECT OF MICHAEL SARDELIS BY MR. GUINN       179

1      If you could start at the top, identify who was saying
2  it, and when it was said, and then read the contents, please.
3  A.   The first one is from Ms. Cloud -- I'm sorry.  From
4  Ms. Anderson to Steven Cloud.  It's on 10/18/2020 and it's at
5  3:49 p.m.  It says, "Do you have pills?"
6      And then Steven Cloud responds with "Yeah."  And then he
7  sends another one.
8  Q.   You don't -- please don't say the N word.  You can just
9  call it the N word and then kind of keep reading.
10 A.   It says "N word let someone steal my bag with 4,000 in
11 it last night."
12 Q.   And what does she respond?
13 A.   She says "Okay."
14 Q.   I'm going to blow up the next few messages.
15     And her response there?
16 A.   Again, this is from Ms. Anderson, 10/18/2020 at
17 4:16 p.m.  She says "Damn OMFG."
18 Q.   Is OMFG an expletive?
19 A.   It is.
20 Q.   And then his response under that?
21 A.   His response from Steven Cloud is "Yeah, man, S word got
22 me tight."
23 Q.   And then her response?
24 A.   She says "I'm sure.  That's crazy.  Damn."
25 Q.   And then the last one here.

1    A.   The last one is from Mr. Cloud again at 10/18/2020,
2    6:29 p.m.  It says "Wyd."
3    Q.   All right.  And so these are a few days before the
4    traffic stop; is that correct?
5    A.   Yes.
6    Q.   Okay.  And you reviewed these messages?
7    A.   I did.
8    Q.   Okay.  And the contents of these are associated, did you
9    believe, with pills?
10   A.   Yes, sir.
11   Q.   As part of this case we talked a little bit about
12   geolocation information, and you obtained geolocation
13   associated with the phone from Ms. Anderson; is that correct?
14   A.   That is correct.
15   Q.   What about Ms. Sanders?
16   A.   Yes, sir.
17   Q.   Mr. Watkins?
18   A.   Yes, sir.
19   Q.   And Mr. Cloud; is that correct?
20   A.   We already had the warrant, the information on him, so I
21   did not collect any of that.
22   Q.   How did you already have that information?
23   A.   So when we have the wire and the wire's up, part of the
24   wire affidavit is we get location data for that phone we're
25   listening to.

1    So we had realtime location data from Mr. Cloud coming
2    in as he was making phone calls.
3    Q.    Okay.  And basically what is, I guess, the basic
4    definition of phone location data?
5    A.    It pretty much gives you a general area where your phone
6    is.  Again, each phone hits off of a cell tower.  Cell tower
7    is divided into three to six sectors, kind of like a pie.
8    And then it will show you in the general area where the phone
9    is.
10    Q.    When you got this information as part of this case, did
11    you give it to anyone else at the FBI?
12    A.    I did.
13    Q.    Who did you give it to?
14    A.    Special Agent Jason Warren.
15    Q.    And just basically what does Jason Warren do at the FBI?
16    A.    Jason takes the cell site location data and he uses the
17    information to plot it on a map for us to show us where each
18    phone is.
19        MR. GUINN:  Your Honor, if I could have one moment,
20    please.
21        THE COURT:  You may.
22        MR. GUINN:  Your Honor, if we could, the
23    Government's Exhibit Number 14 is the bag of pills that was
24    published to the jury and he held it there.  Is he allowed to
25    walk and get closer to allow them to see it, or --

DIRECT OF MICHAEL SARDELIS BY MR. GUINN      182

 1          THE COURT:  Yes.  You may step down and do a brief
 2   parade before the jury of Government's Exhibit 14.  You can
 3   start at one end and walk across.  That's good.
 4          MR. GUINN:  At this time I have no further
 5   questions for Officer Sardelis.
 6          THE COURT:  Very well.
 7          Before you begin your cross, I'm going to offer to
 8   the jury the opportunity to stretch where you are, if you
 9   wish to.  I know the Court's going to do it.
10          MR. RAEL:  Your Honor, can I leave for just a
11   moment.
12          THE COURT:  Yes.  Just for a moment.
13          All right.  Let's do this.  Let's take a very brief
14   10-minute break.  See you at 5:30.
15          (Recess held.)
16          THE COURT:  Are we ready for the jury?  Call the
17   jury.
18          Everybody is free to sit down until the jury comes
19   in.  And here they are.
20        (The jury came back into the courtroom at 5:30 p.m.,
21          and the following proceedings were had in the
22          presence of the jury.)
23          THE COURT:  Be seated.
24          Mr. Rael, when you're ready, you may begin your
25   cross.

1          MR. RAEL:  Thank you.

2                    CROSS-EXAMINATION

3    BY MR. RAEL:

4    Q.   Hello, Agent, how are you?

5    A.   Well.  How are you?

6    Q.   Now?  I'm all right.  Thank you.

7          So, we hadn't met, and I appreciate you coming here.  It

8    sounded to me almost like you were apologetic that when

9    Sanders -- you wanted to stop her in the act.  You weren't

10   able to get that done; right?

11   A.   No, sir.

12   Q.   Not apologetic about it.  You just weren't able to get

13   that accomplished?

14   A.   Yeah.  Unfortunately I was not able to.

15   Q.   Right.  And had you been able, you'd be hopeful that it

16   would make life a lot easier for everybody; right?

17   A.   I'm not sure I understand.

18   Q.   Well, I mean, if you actually -- would it surprise you

19   to learn that she didn't even know what was in the box that

20   you're now thinking might be drugs?

21         Do you know that she said that?

22   A.   From which one?  Ms. Sanders?

23   Q.   Yeah.

24   A.   Yes.

25   Q.   And if you had been able to stop her, then clearly you'd

CROSS OF MICHAEL SARDELIS BY MR. RAEL          184

1  have been able to see really what was or wasn't in that box
2  had you been able to do that; right?
3  A.   That is correct.
4  Q.   Sure.
5       So when I said that it would make life a little easier
6  if that had happened, it just wasn't able.  It wasn't in the
7  stars; right?
8  A.   Yeah.  Sometimes we can do it, we can make a traffic
9  stop; sometimes we cannot.
10 Q.   Sure.
11      Now, you looked at a flier that had KennyMan's picture
12 in it, along with a couple of other folk.  And we had that
13 identified before the jury.  You remember seeing that; right?
14 A.   Yes, sir.
15 Q.   Now, do you have any idea what is the purpose of -- what
16 are the purpose of those fliers?
17 A.   It's a promotion.
18 Q.   Sure.
19      In other words, without promotion, ain't nobody coming;
20 right?
21 A.   Yes, sir.
22 Q.   And then you don't know if KennyMan was doing that
23 promotion or who was doing the promotion, but you do know
24 that it's important to have those fliers before you're going
25 to be able to have a show; right?

CROSS OF MICHAEL SARDELIS BY MR. RAEL          185

1   A.   Yes.

2   Q.   I mean, otherwise ain't nobody going to come; right?

3   A.   That's correct.

4   Q.   Now, the -- you indicated that -- you kept mentioning

5   and the U.S. attorney did -- you're situated.

6        You indicated a few minutes ago that to you, that meant

7   you're situated with the drugs, and that's got to be what it

8   means; right?

9   A.   Yeah.  In the context of the phone calls we intercepted

10  and everything that was going on, that is what I determined

11  it to be at that time.

12  Q.   Right.  It was the whole gestalt, the whole thing, so

13  you figured when somebody said "you're situated," that's what

14  it was about; right?

15  A.   In the context of that call, that is correct.

16  Q.   In that context.

17       And -- but it's not any kind of special code that you

18  know; you just felt like knowing everything else that was

19  going on, if she said "you situated," that meant what it

20  meant; right?

21  A.   Well, I mean, if he would have said, "Do you have the

22  drugs," then that would have been plain to understand.

23  Q.   Right.

24  A.   So "Are you situated" is a way of asking if you have the

25  drugs.

CROSS OF MICHAEL SARDELIS BY MR. RAEL          186

1   Q.   Yeah.  That's an implication.

2        How about "All good"?  Would that mean the same thing to

3   you?

4   A.   During that time frame, it could be, yes.

5   Q.   Could have been.  Just like "You're situated" could have

6   been; could not have.  Right?

7   A.   With the context of everything, it could mean that, yes.

8   Q.   Yes.  Could have.

9        "All well."  That could have meant the same thing, or it

10  could not have meant the same thing; right?

11  A.   With the context of the calls, if that would have been

12  said, I would have believed that she would have had the drugs

13  as well.

14  Q.   Now, when you had the -- you wouldn't -- but him saying

15  "You situated" -- that wouldn't be able to tell you whether

16  she was situated at 10 o'clock, 11 o'clock, 12 o'clock,

17  1 o'clock, 2 o'clock.  He just asked it at the time he asked

18  it; right?

19  A.   I'm not sure I understand your question.

20  Q.   Well, I mean, "You situated," even if that's what it

21  might have meant, could have meant I'm situated and I'm

22  situated at 10 o'clock.  I'm situated at 11 o'clock.

23       He just asked it at whatever time he asked it?

24  A.   According with the context of that call, the situated

25  meant that -- I believed that she had the drugs with her at

CROSS OF MICHAEL SARDELIS BY MR. RAEL         187

1   that time and she was heading home, especially with the fact
2   that he said:  I'll check on you in about an hour or so.
3   Q.    Okay.  Now, the information that you have before you of
4   all those drugs -- you got that from an officer over there,
5   either the FBI or the actual arresting officer from
6   Ms. Anderson; right?
7   A.    I got it from the evidence.
8   Q.    You got it from where?
9   A.    I got it from evidence.  I was not out at the traffic
10  stop.
11  Q.    Oh, you weren't at the traffic stop?
12  A.    No, sir.
13  Q.    So I mean, that looks to me like a pretty weighty amount
14  of stuff.  Did that -- do you have any idea whatsoever?
15  Could you tell the jury -- did it come in a box?  Did it come
16  in a tube?  Did it come in a case?  Do you know?  I mean, or
17  did it just come, somebody just dragging it in their hand?
18  A.    It was in a shoebox.
19  Q.    It was in a shoebox.
20        It was in a Versace shoebox; correct?
21  A.    I do not recall what kind of shoebox, but I know it was
22  in a shoebox.
23  Q.    Okay.  Now, tell us the size of that shoebox.  Like, do
24  you remember?
25  A.    I wasn't out there.  I don't know.  I just saw a picture

1  of it.

2  Q.   Oh, you saw a picture of it.  That's not a picture that

3  is currently in evidence as far as you know?

4  A.   The pictures are not in evidence.

5  Q.   Right.

6       The picture of the box is not in evidence; right?

7  A.   It's attached with the case files.

8  Q.   With the case file.  And who has the case file?

9  A.   Who has the case file?

10 Q.   Yeah.

11 A.   Everybody does.  The U.S. Attorney's Office does, and it

12 was handed over in discovery.

13 Q.   Oh.  So they have the actual photo of the box that this

14 was in; right?

15 A.   I would believe so, yes, sir.

16 Q.   Turned --

17 A.   I turned it over.  That is correct.

18 Q.   You turned over the box, too?

19 A.   Just the photo.

20 Q.   Just the photo, okay.

21      And you don't recall -- I don't remember what you said.

22 You don't recall if it was in a Versace box or any other kind

23 of box whatsoever; you don't know?

24 A.   It was in a shoebox.  I don't --

25 Q.   Shoebox.

1   A.    I don't know the difference.  Shoebox.  It was in a

2   shoebox.

3   Q.    Right.  Makes sense.

4      So sir, I appreciate the time.

5         MR. RAEL:  That's all I have.

6         THE COURT:  Any redirect?

7         MR. GUINN:  Just briefly, Your Honor.

8              REDIRECT EXAMINATION

9   BY MR. GUINN:

10  Q.    Officer Sardelis, a few minutes ago you were talking

11  about the phrase "situated," and you kept mentioning the

12  context of the call gave you some indication as to what that

13  was about.

14     Do you remember that?

15  A.    Yes.

16  Q.    What did you mean by context?  What context did you

17  believe that you had at the time?

18  A.    So we were listening to the calls.  Again, as we talked

19  about earlier, the week before, the same type of incident

20  happened where Mr. Cloud had directed a female to go to

21  Atlanta to meet with Mr. Watkins and come back and bring him

22  drugs.  And then the same context happened here, so that the

23  whole event seemed to play out the same way as the week

24  before.  The whole context of the calls.

25     The calls seemed to be fairly similar to the calls from

1  the previous week, along with the questions he asked her,

2  when he asked her if she was situated, and then "I'll check

3  on you again in an hour" led me to believe that she had

4  narcotics in her possession and was heading back to

5  Charlotte.

6  Q.   The text messages that we reviewed earlier -- did those

7  give you any additional context about the nature --

8          THE COURT:  Mr. Guinn, that's all been covered in

9  direct.  So if you have something new on cross?

10          MR. GUINN:  No, sir, that's it.  Last question.

11          THE COURT:  You may step down.

12          THE WITNESS:  Thank you, Your Honor.

13          THE COURT:  Do you have a short witness?

14          MR. GUINN:  I believe it will be short.  I would

15  like to call him if we have a minute.

16          At this time the Government calls Trooper Smith to

17  the stand.

18          THE CLERK:  Place your left hand on the Bible and

19  raise your right.

20                          EDDIE SMITH

21  having been duly sworn was examined and testified as follows:

22                      DIRECT EXAMINATION

23  BY MR. GUINN:

24  Q.   Trooper Smith, if you could, state your name for the

25  record and spell your last name, please.

1   A.   It's Trooper Eddie Smith.  My last name is S-M-I-T-H.

2   Q.   Okay.  And what do you do for a living, sir?

3   A.   I am currently assigned to the criminal interdiction

4   unit for the Georgia State Patrol.

5   Q.   You said the Georgia State Highway Patrol?

6   A.   Yes.

7   Q.   How long have you been with them?

8   A.   Since 2016.

9   Q.   Working the criminal interdiction unit with them,

10  basically what are your responsibilities?

11  A.   We assist local, state, and federal agencies with

12  interdiction on the state highways.

13  Q.   When you say interdiction, would it be fair to call that

14  also like a traffic stop?

15  A.   Yes.

16  Q.   I'd like to direct your attention to October the 24th,

17  2020.  Were you working on that particular day?

18  A.   Yes, sir, I was.

19  Q.   Okay.  And what were you doing?

20  A.   I was just routine patrol in the county of Franklin

21  County in Georgia.

22  Q.   Franklin County, Georgia?

23  A.   Yes.

24  Q.   Okay.  At some point were you in communication with

25  other law enforcement officers about a vehicle that may be

DIRECT OF EDDIE SMITH BY MR. GUINN          192

1   kind of passing through your patrol area?

2   A.   Yes, sir.

3   Q.   What information did you have at that time?  What was

4   communicated to you?

5   A.   That we had been requested -- our assistance had been

6   requested to conduct a traffic stop in reference to a drug

7   investigation.

8   Q.   And about what time was that?  Do you remember?

9   A.   I believe that afternoon.  Early that afternoon.

10  Q.   At some point while you were out there on patrol and

11  waiting, did you see a golden-colored Camry come through your

12  patrol area?

13  A.   Yes, I did.

14  Q.   And do you know if that vehicle was stopped, if a

15  traffic stop was conducted on the vehicle?

16  A.   Yes, there was.

17  Q.   Who conducted the traffic stop?

18  A.   Deputy Hayden Fray.  He's a deputy sheriff with the

19  Franklin County Sheriff's Office.

20  Q.   Where were you in relation to where the traffic stop

21  actually occurred?

22  A.   In the same general area.

23  Q.   Was there radio communication going on about this time?

24  A.   Yes, sir, there was.

25  Q.   Okay.  And at some point was it -- were you notified

1  that the traffic stop had occurred?

2  A.   Yes.

3  Q.   At some point did you yourself drive over to the traffic

4  stop location?

5  A.   Yes, sir, I did.

6  Q.   And how long did it take you to get there?

7  A.   I would say no more than two minutes.

8  Q.   And when you arrived what did you do?

9  A.   I parked behind Deputy Fray's patrol vehicle.  Once I

10 exited, I observed a female standing in the front of his

11 patrol car.  I walked up to his window.  He was actually

12 inside of his patrol car at the time.  I walked up and spoke

13 to him.  He stated that he had stopped a gold Toyota Camry

14 traveling northbound with a North Carolina license plate

15 displayed.  He stated that he stopped the vehicle for

16 speeding 83 in a 70 and expired tags.

17 Q.   The female that was stopped that was sitting outside of

18 the car -- did you get her name?

19 A.   Yes, sir, I did.

20 Q.   What's her name?

21 A.   Leticia Anderson.

22 Q.   Okay.  And at some point did you approach that

23 golden-colored Camry?

24 A.   Yes, sir, I did.

25 Q.   Did you conduct an investigation related to the

1   golden-colored Camry?

2   A.   I did.

3   Q.   Are you a K-9 officer -- or a K-9 officer?

4   A.   Yes.

5   Q.   And describe for the jury basically what that is.

6   A.   I handle a certified canine that is trained to detect

7   the odor of narcotics.

8   Q.   Did you deploy the canine around the vehicle?

9   A.   Yes, sir, I did.

10  Q.   How did you go about doing that?

11  A.   First I spoke with the driver.  I advised her who I was,

12  advised her that I was a K-9 handler, asked her if there was

13  anything illegal inside of the vehicle.  And during this

14  conversation, I noticed that she would keep eye contact with

15  me up until the point to where I asked the question if there

16  was anything illegal.  Once I asked that question, she

17  avoided eye contact with me.  Once we got past the question,

18  she regained eye contact with me.

19       So when I asked the question if there was anything

20  illegal, she said no.  That's at what point I deployed my

21  certified canine.

22  Q.   When you say "deployed," describe for the jury what that

23  is.  What's that look like?

24  A.   It's a deployment on the exterior of the vehicle.  I

25  begin at the front right passenger side headlight and I make

1  two complete passes around the vehicle.  After the second
2  complete pass, then the canine performance is done.
3  Q.    On this particular day with respect to that golden
4  Camry, did the canine alert on the vehicle?
5  A.    Yes, sir, it did.
6  Q.    When the canine alerts on a vehicle, what does it do?
7  A.    Well, it gives me probable cause to conduct a vehicle
8  search.
9  Q.    Well, just specifically, what does the dog do?
10  A.    Oh, its primary indication is to sit.
11  Q.    And what does that indicate when the canine sits after
12  being deployed on the vehicle?
13  A.    That he detects the odor of narcotics.
14  Q.    After the canine alerted, what did you do?
15  A.    I resecured him in my patrol car.  I went back to speak
16  with Ms. Anderson.  I advised her that I would be conducting
17  a probable cause search of her vehicle.
18       I asked again if there was anything illegal.  At this
19  point she said yes.  I said: What is it?  And she said:
20  Pills.  I asked her where the pills were at.  And she said:
21  In a box.  I asked where the box was at and she said the
22  front right passenger seat.  And that's where my canine
23  indicated at was the front right passenger door.
24  Q.    Did you search that car?
25  A.    I did.

DIRECT OF EDDIE SMITH BY MR. GUINN          196

1  Q.   What did you find inside the car?
2  A.   I found a large amount of pills in a box that was
3  located on the front right passenger seat and a large amount
4  of U.S. currency in the center.
5  Q.   Do you remember roughly how much U.S. currency?
6  A.   I want to say a couple thousand.
7  Q.   I'm going to show you what I've got marked here as
8  Government's Exhibit Number 13.  It should appear on the
9  screen in front of you in one moment.
10      This is Government's Exhibit Number 13.  Do you see that
11 in front of you?
12 A.   Yes, I do.
13 Q.   What's that a photograph of?
14 A.   That is suspected MDMA pills that were located inside
15 the vehicle.
16 Q.   And does this photograph fairly and accurately depict, I
17 guess, the scene as it was out on the side of the road on
18 that day October 2020?
19 A.   Yes, sir.
20 Q.   Will having this photograph help you in your testimony
21 to the jury today?
22 A.   Yes, sir.
23      MR. GUINN:  Your Honor, at this time I'd like to
24 have Government's Exhibit Number 13 moved into evidence and
25 ask permission to publish to it to the jury.

1    THE COURT:  Any objection?

2    MR. RAEL:  None.

3    THE COURT:  Let it be admitted and published.

4    (Government's Exhibit Number 13 was received into

5  evidence.)

6  BY MR. GUINN:

7  Q.    Let me make this a little bit bigger for you,

8  Trooper Smith.  And if you could just describe for the jury

9  kind of what we're looking at here.

10  A.    This is -- I would describe it as large Ziploc bags

11  containing multiple different color pills.  Obviously they're

12  separated by color, which is commonly seen when somebody's

13  transporting narcotics.

14  Q.    Thank you.

15    After these pills were recovered, did you-all turn those

16  into evidence down there in Georgia initially?

17  A.    Yes, sir.

18  Q.    Okay.  After those items were recovered, what did

19  you-all do with Ms. Anderson?

20  A.    She was placed under arrest and taken to the Franklin

21  County detention center.

22  Q.    And just for reference, how far is Franklin County?

23  Where is that in relation to South Carolina?

24  A.    From where we were actually at, probably 15 minutes.

25  Ten, 15 minutes.

1  Q.   From the South Carolina border?

2  A.   Yes, sir.

3           MR. GUINN:  Just one moment, Your Honor.

4  BY MR. GUINN:

5  Q.   And how far was that from Atlanta?

6  A.   I would say approximately an hour.  A little over an

7  hour.

8           MR. GUINN:  No further questions, Your Honor.

9           THE COURT:  Any cross?

10          MR. RAEL:  Yes, sir.

11                    CROSS-EXAMINATION

12 BY MR. RAEL:

13 Q.   I'm from Georgia, too.  So nice to see you.

14 A.   Yes, sir.

15 Q.   Took you some time to get here?

16 A.   Yes, sir, it did.

17 Q.   Traffic?

18 A.   Yes, sir.

19 Q.   So Officer -- or do you prefer deputy?

20 A.   Trooper Smith will be fine.

21 Q.   Okay.  Now, when you did this stop, you found not only

22 all of those pills, but there was a retriever of money as

23 well; right?

24 A.   Yes.

25 Q.   I see here in a report it says $4,638 was seized.  Would

CROSS OF EDDIE SMITH BY MR. RAEL                    199

1   that be about right?

2   A.   Yes.

3   Q.   Okay.

4             MR. RAEL:  That's all I have.  Thank you.

5             THE COURT:  Any redirect?

6             MR. GUINN:  No, sir.  Thank you.

7             THE COURT:  You may step down and be excused.

8             I am going to call it a night.

9             MR. GUINN:  We have run out of witnesses, Your

10  Honor.

11            THE COURT:  Members of the jury, if you don't tell

12  anybody, we're going to quit 10 minutes early today.  I thank

13  you for your attention all day long.

14            A couple of things as you go.  It's very important

15  to the integrity of this process to remember that you can't

16  talk about the case; you can't do any research.  You just

17  have to show up tomorrow morning.  You might have family or

18  friends interested in what you did in federal court today.

19  And you just can't tell them until your jury service is over.

20            The second thing is you've heard from a lot of

21  witnesses today, but there's still a ways to go.  And it's

22  important, again, for the integrity of what you're doing to

23  keep an open mind until you've heard all the evidence, you've

24  heard the arguments of the attorneys, and you have heard the

25  final instructions of the Court.

CROSS OF EDDIE SMITH BY MR. RAEL          200

1       And so with those two reminders not to talk about
2  the case and to keep an open mind, we'll see you at 9:30 in
3  the morning.  And we'll begin promptly at 9:30.  Thank you.
4          (The jury left the courtroom at 5:51 p.m., and the
5           following proceedings were had out of the presence of
6           the jury.)
7       THE COURT:  Be seated.  A couple of things before
8  we break for the night.  It's been a long day but I need to
9  ask the attorneys to stay for a short conference with our
10 clerk because I want to make sure that the evidence that we
11 have indicated as admitted -- that everybody's on the same
12 page with that.  And if not, then we'll clear it up before we
13 start evidence tomorrow morning.  So we will have a brief
14 run-through of the admitted evidence with the clerk.
15      And then the second thing is that I'm going to
16 distribute proposed jury instructions to each of you.  And
17 we'll have a charge conference here in this courtroom at 8:30
18 tomorrow morning.  It's not predicting anything about what I
19 might do with any motions at the end of the case.  It's just
20 utilizing the jury's time effectively.
21      And so we will have a charge conference at 8:30,
22 take up any legal issues at that time.  And I want to be
23 ready to go promptly at 9:30 when the jury comes back.
24      So anything else from either side at this point?
25      MR. GUINN:  Your Honor, if we could, Trooper Smith

CROSS OF EDDIE SMITH BY MR. RAEL                201

1   specifically is here under subpoena.  If there's not going to
2   be any need to recall him, I'd like to have him excused.
3           THE COURT:  Any objection to releasing Trooper
4   Smith from his subpoena requirement?
5           MR. RAEL:  No.
6           THE COURT:  Anything else?  All right.  So if
7   you-all would stay, Ms. Lynch will walk you through the
8   exhibits.  And I'll see all of you at 8:30 in the morning.
9           (Recess held at 5:53 p.m.)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

_____
                                        )
UNITED STATES OF AMERICA,               )
                                        )
                                        )      DOCKET NO. 3:20-CR-385
              vs.                       )
                                        )
KENNETH JEROME WATKINS,                 )
                                        )
              Defendant.                )
_____)


TRANSCRIPT OF JURY TRIAL DAY 2 OF 3
BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
UNITED STATES DISTRICT COURT JUDGE
TUESDAY, MARCH 7, 2022, AT 8:30 A.M.


APPEARANCES:

        On Behalf of the Government:
        LAMBERT F. GUINN, ASSISTANT U.S. ATTORNEY
        TIM SIELAFF, ASSISTANT U.S. ATTORNEY
        U.S. Attorney's Office
        227 W. Trade Street, Suite 1650
        Charlotte, North Carolina  28202

        On Behalf of the Defendant:
        C. SAMUEL RAEL, ESQ.
        1201 West Peachtree St. N.W
        Suite 2300
        Atlanta, Georgia 30309

                and

        DAVID L. HITCHENS, ESQ.
        212 N McDowell Street
        Charlotte, North Carolina  28204


KATHY CORTOPASSI, RDR, CRR, CRC
Official Court Reporter
United States District Court
Charlotte, North Carolina

```
                      I N D E X
```

GOVERNMENT'S CASE IN CHIEF-----------------------------

WITNESS:                                          Page

Andrew Oprysko

 Direct Examination by Mr. Sielaff               215

 Cross-Examination by Mr. Rael                   224

 Further Redirect Examination by Mr. Guinn       232

 Further Recross-Examination by Mr. Rael         235


Jason Warren

 Direct Examination by Mr. Guinn                 236

 Cross-Examination by Mr. Rael                   262


Michael Sardelis

 Rebuttal Direct Examination by Mr. Guinn        346

 Rebuttal Cross-Examination by Mr. Rael          348

                      EXHIBITS

GOVERNMENT EXHIBITS ----------------------------------

NO.    DESCRIPTION                          RECEIVED


18                                               242
28                                               347

I N D E X (Continued)

DEFENDANT'S CASE IN CHIEF ------------------------------

WITNESS                                         PAGE

Latisha Anderson

 Direct Examination by Mr. Rael                 276
 Cross-Examination by Mr. Sielaff              292


Lashanda Ayesha O'Neill

 Direct Examination by Mr. Rael                 311
 Cross-Examination by Mr. Guinn               317


Kizzy Childs

 Direct Examination by Mr. Rael                 323
 Cross-Examination by Mr. Sielaff              333
 Redirect Examination by Mr. Rael             339
 Recross-Examination by Mr. Sielaff           342

                    * * * * * * * * *


 Jury Instructions - Part 1                     353
 Government's Closing Argument                  360
 Defendant's Closing Argument                   373
 Government's Rebuttal Argument                 381
 Jury Instructions - Part 2                     385
 Jury Deliberations and Questions to the Court  397

205

1        (Whereupon, the following proceedings were held in

2   open court outside the presence and hearing of the jury:)

3        THE COURT:  Good morning, everyone.  So, we're here

4   for a charge conference.  And what I want to do is run

5   through the proposed instructions and see if there are any

6   additions, deletions, or other suggestions.

7        The way I do the jury instructions is that, again,

8   at the end of the case, I will give some general instructions

9   to the jury before y'all do your closing arguments.  And then

10  once you've done that, I'll come back and give the

11  substantive instructions afterwards before submitting the

12  case to the jury.

13       Some of these are -- all of these are pretty

14  standard jury instructions.  I just wanted to walk through

15  them page by page with you all; and if at any point we should

16  have a discussion or you have some suggested amendments or

17  deletions, let me know.

18       So, the general instructions begin on Page 1 with

19  introductory remarks on Page 1 and 2.  And that's all

20  boilerplate.  I don't think there's anything controversial

21  there.

22       Page 3 informs the jury that the indictment is only

23  a method of accusing Mr. Watkins of a crime; it's not

24  evidence and there's no presumption or inference of guilt

25  that flows from the indictment.

1    Page 4 discusses the fact that Mr. Watkins is only
2  on trial for the conduct charged in the indictment.
3    5, the presumption of innocence and reasonable
4  doubt.
5    6, defined the term reasonable doubt the way the
6  Fourth Circuit has approved it based upon reason and common
7  sense.
8    7, discussed direct and circumstantial evidence.
9    8, inferences from evidence.  I don't think we've
10 had any stipulations of fact yet, have we?
11    MR. GUINN:  We have not, Your Honor.
12    THE COURT:  And so I'll give or not give that
13 depending upon how the rest of the trial goes.
14    And then I've already given the instruction on the
15 recordings and the transcripts.  I would intend to give that
16 again unless both sides believe that I've already adequately
17 addressed it during the trial.  Does anybody want it out?
18 In/out?
19    MR. RAEL:  It's fine to keep it just as it sits,
20 that's fine.
21    THE COURT:  All right.  And I don't know that we've
22 had any testimony about any out-of-court statements by the
23 Defendant.
24    MR. GUINN:  I guess we've had the wire tap calls, I
25 suppose are out-of-court statements by the Defendant, and

1    things that, you know, were said.  Jonquilla Sanders, she
2    mentioned kind of briefly there.  So maybe.
3                THE COURT:  But the general instruction I give is
4    constructed around an interview or --
5                MR. GUINN:  No, we haven't had that.
6                THE COURT:  -- contact with law enforcement.  So
7    I'm going to take that out.  I don't know that I've excluded
8    any statements yet.  They'll stay in or out depending upon
9    the rest of the trial.
10               I've already instructed on the credibility of
11   witnesses.  I can do it again or not do it depending upon
12   lawyer preference.  Does anybody want it in or out?
13               MR. RAEL:  Yes.
14               THE COURT:  You want it in?
15               MR. RAEL:  Yes, sir.
16               THE COURT:  Uncontradicted testimony.
17               Impeachment by inconsistent statement or conduct.
18   Witnesses' use of addictive drugs.
19               I don't know that we've yet had any testimony from
20   a witness with a prior conviction.  Again, it's in or out
21   depending upon the rest of the trial.
22               Testimony of an accomplice.  Credibility.
23               Testimony of expert witnesses.  I don't know that
24   we've had that yet, but I know you've noticed an expert.
25               MR. GUINN:  It's forthcoming, Your Honor.

1           THE COURT:  All right.

2           Number of witnesses.

3           Failure to cross-examine.

4           Then, Mr. Rael, I don't know if you're in a

5  position to tell the Court -- and I'm not asking you to do it

6  if you're not in that position, but at some point I'd like to

7  examine Mr. Watkins on his -- on the record on his

8  understanding of his right to testify or not testify.

9           MR. RAEL:  Oh, sure.  I think that would be normal.

10          Also, as a rule --

11          THE COURT:  Go ahead and stand up.

12          MR. RAEL:  I'm sorry.  I apologize.

13          But, essentially, my preference is to have him not

14 testify.  However, it is his decision.  He seems to rule with

15 a lot of things, including this trial, as to what he wishes

16 to do or doesn't wish to do.

17          So, therefore, I'd like to try to control my

18 witnesses and clients if I can.  Sometimes you can't,

19 sometimes not exactly.  So I don't know.

20          THE COURT:  So at some point outside the presence

21 of the witness -- or outside the presence of the jury, unless

22 you object, I'll have that conversation with him on the

23 record.

24          MR. RAEL:  Yes, sir.

25          THE COURT:  And then we'll go one way or the other

209

1   on that instruction.

2          24 is in and out depending upon what happens.

3          And then from Page 25 to the end, I've done all

4   that before.  I can do it again if either side wants it.  My

5   preference is to say less, not more.  And so unless somebody

6   asks for any of the instructions from 25 to the end, like, my

7   inclination would be not to do it.

8          Does the Government have any preference on 25

9   through 28?

10          MR. GUINN:  Your Honor, with respect to 28, I'd

11   like 28, Your Honor.

12          THE COURT:  You want it?

13          MR. GUINN:  Yeah.  Punishment is the province of

14   the Court.

15          THE COURT:  All right.  Mr. Rael, do you have any

16   desire for the instructions on 25, 26, 27 to be given again?

17          MR. RAEL:  I don't care.

18          THE COURT:  And then we turn to the substantive

19   instructions, which, again, I will give after the lawyers

20   have made their closing arguments.

21          Page 1 and 2 I'll read the language of the

22   indictment.

23          And with respect to the substantive instructions,

24   the jury will have these back with them electronically.

25          So Page 1 and 2, I'll read the language of the

210

1    indictment.  I'll give a general instruction on "on or

2    about."

3         On 3, I'll read the statute that has been alleged

4    to have been violated.

5         On 4, I'll give an and/or instruction on 5.

6         And then 6 through 8, I'll instruct on the elements

7    of conspiracy.

8         On Page 9, I'll transition to definitions and I'll

9    define.

10        Distribute on 10.

11        Possession on 11, with intent to distribute on 12.

12        Then 13 transitions to the mental elements.

13        14 and 15, I'll give a co-conspirator act and

14   statements instruction.

15        And then I conclude with the boilerplate conclusion

16   language.

17        Any suggestions, additions, deletions on the

18   substantive instructions?

19        MR. GUINN:  Not at this time, Your Honor.

20        MR. RAEL:  No objection.

21        But, Your Honor, I know that my brother attorney

22   has a question.  I have a question on --

23        THE COURT:  All right.  Go ahead and stand up when

24   you're talking to me.

25        MR. RAEL:  Yes, sir.  My brother attorney has a

211

1    comment or two relative to this.

2              MR. HITCHENS:  I just had a question regarding the

3    recording and transcripts, regarding the unidentified parties

4    within the transcripts and the parties who are not

5    co-conspirators, that those statements are not presented for

6    the truth.

7              THE COURT:  I should add something to the effect

8    that if the jury finds that a party to the conversation is

9    not a co-conspirator, they can only consider their comments

10   for context for the others.

11             MR. HITCHENS:  Yes, Your Honor.

12             THE COURT:  I'll add something to that.

13             MR. HITCHENS:  Thank you.

14             THE COURT:  Thank you.

15             MR. RAEL:  May I address the Court?

16             The Court suggested any amendments to this.  I know

17   that every court does it differently, and this Court has had

18   its conference now.  I oftentimes get it later.  It is as the

19   Court wishes.  But usually at some point -- and that point

20   can be whatever point the Court instructs me -- I usually

21   have some requested charge of my own to present to the Court.

22             For instance, beyond a reasonable doubt.  I know

23   the Court said it in a fairly cryptic manner.  And that I

24   have some additional things for the Court to consider.

25             So as the Court indicated, it is sort of

212

1   boilerplate with some general instructions, and that I
2   understand.  I may have a few for the Court, so.
3          THE COURT:  That's why we had this conference, so
4   to consider those kinds of things.
5          MR. RAEL:  Right.  Except I had not had -- I
6   appreciate that.  I hadn't had an opportunity really to go
7   over that with my brother attorney.  And I will propose it,
8   but I can't propose it to this Court at this moment.  I could
9   propose it to the Court even as early as tomorrow if the
10  Court wishes.
11         THE COURT:  I don't know that this trial will last
12  into tomorrow.  That's why we're having this charge
13  conference today.  We'll have to see how long it does last.
14         But with respect to the specific instruction you
15  mentioned, I'll be glad to review any reasonable doubt
16  instruction you wish to submit.  But the one in these
17  proposed instructions is the one that has been affirmed by
18  the Fourth Circuit.  It is the one that I give in every
19  criminal case.  And so I'll consider anything you tender, but
20  I'm pretty inclined to go with what we've gone over.
21         MR. RAEL:  All right.
22         THE COURT:  Closing arguments, how long does each
23  side want for closing arguments?
24         MR. GUINN:  I think 30 minutes, Your Honor.
25         MR. RAEL:  An hour, Your Honor.

213

1          THE COURT:  An hour?

2          MR. RAEL:  I don't know that -- you know, being a

3    lawyer, I never stop talking.  I don't know if it will be

4    anything close to that.  They may tire of me after 10

5    minutes.

6          THE COURT:  This is a one-count case.  I think a

7    half hour is more than sufficient for each side.  So I'm

8    going to allow a half hour for closing argument for both of

9    you.  And the Government, having the burden of proof, would

10   go first and have the opportunity to do rebuttal.

11         Do you want any time warnings when you are arguing?

12         MR. GUINN:  Yes, sir, Your Honor.  I'd like 20 and

13   10.  And I'll have to let my co-counsel know, as well, Your

14   Honor.

15         THE COURT:  And how about you, Mr. Rael?  Do you

16   want any reminders from the Court when you're making your

17   argument about how much time you have left?

18         MR. RAEL:  It's not like marks where there's a

19   little --

20         THE COURT:  No.  Actually, with this setup, I think

21   I could tell you five minutes without interrupting you if you

22   want that.  But if you don't want that --

23         MR. RAEL:  Yes, that would be fine.

24         THE COURT:  All right.  Anything else from either

25   side?

214

1          MR. GUINN:  No, Your Honor, at this time.

2          THE COURT:  Are you ready to go with your

3  witnesses?

4          MR. GUINN:  At 9:30 we will be, yes, sir.

5          THE COURT:  Plan to start promptly at 9:30.  See

6  you all then.

7          BAILIFF:  All right.

8          CLERK:  The Court will stand in recess until 9:30.

9          (Recess held from 8:45 to 9:30 a.m.)

10          THE COURT:  Are we ready for the jury?

11          MR. GUINN:  The Government's ready, Your Honor.

12          THE COURT:  Call the jury.

13          MR. RAEL:  Your Honor, I know the rule has been

14  imposed.  Could the Court indicate that there's such a rule

15  on any witnesses?

16          THE COURT:  Yes, sir.  To both attorneys, any

17  witnesses you intend who you might call, you should have

18  those individuals leave the courtroom and be sequestered.

19          (The jury came back into the courtroom at

20          9:32 a.m., and the following proceedings were had

21          in the presence of the jury.)

22          THE COURT:  Be seated.

23          Call your next witness.

24          MR. SIELAFF:  The United States calls Andrew

25  Oprysko.

DIRECT OF ANDREW OPRYSKO BY MR. SIELAFF        215

1      THE CLERK:  Place your left hand on the Bible and
2  raise your right.
3      THE WITNESS:  (Complies.)
4                   ANDREW OPRYSKO
5  having been duly sworn was examined and testified as follows:
6                 DIRECT EXAMINATION
7  BY MR. SEILAFF:
8  Q.   Good morning, sir.  Would you please introduce yourself
9  to the jury?
10 A.   Good morning.  My name is Andrew Oprysko.
11 Q.   Would you mind spelling that last name for the Court?
12 A.   It's O-P-R-Y-S-K-O.
13 Q.   What is it you do for a living?
14 A.   I'm employed by the Charlotte Mecklenburg Police
15 Department Crime Laboratory.
16 Q.   What do you do in the crime lab?
17 A.   I work in the chemistry unit.  My main job duties are to
18 analyze submitted evidence to test for the presence of
19 controlled substances.
20 Q.   Can just anyone do that, or do you need some kind of
21 special training?
22 A.   I have a Bachelor of Science degree in forensic science
23 from the University of New Haven.  And then I underwent the
24 training programs in both my previous job and the current job
25 here before I was able to actually start doing this type of

DIRECT OF ANDREW OPRYSKO BY MR. SIELAFF       216

1   work.

2   Q.    You mentioned a previous work?

3   A.    Before I worked for the Charlotte Mecklenburg Police

4   Department, I worked for the New York City Police Department

5   Crime Lab from 2004 to 2011.

6   Q.    So, how long in total have you been in the field of

7   forensic chemistry?

8   A.    It's been around 18 years, I think.

9   Q.    And during that 18 years, did you have to do anything to

10  kind of maintain your employment in that specific field?

11  A.    Each year that I'm doing controlled substance analysis

12  work, I have to take a proficiency test.  The way we do it

13  here in Charlotte is there's an outside company that produces

14  these what we call blind proficiency tests.  They send us two

15  unknown samples, and then I take them in and I treat them as

16  if they were an actual case.  I do all my usual quality

17  checks, all my types of analysis, and then write up a report

18  saying what I think these are.

19        And that gets submitted to that company.  And then after

20  everyone who they're doing the tests for finish them, they'll

21  release their results and send that to our lab director to

22  show whether or not I got the answer right or not.

23  Q.    And throughout the 18 years that you've been in forensic

24  chemistry, have you satisfied the proficiency requirements?

25  A.    Yes, I have.

1  Q.   And as far as the actual techniques utilized by the

2  Charlotte Mecklenburg Police Department's laboratory, are

3  those accepted practices and the standard practice within the

4  field of forensic chemistry?

5  A.   Yes, they are.

6       MR. SIELAFF:  Your Honor, we would tender

7  Mr. Oprysko as an expert in the field of forensic chemistry.

8       THE COURT:  Any objection?

9       MR. RAEL:  No.  It sounds like he's an expert in

10 forensic chemistry.

11      THE COURT:  He'll be allowed to offer an opinion in

12 that area.

13 BY MR. SIELAFF:

14 Q.   In general terms, how do you begin testing a substance

15 to determine whether or not there's controlled substance in

16 it?

17 A.   So, the basic procedure we have is at the Crime

18 Laboratory, we'll receive our request for analysis.  Once I

19 have received that request and the case gets assigned to me,

20 I'll request that evidence from our property control area.

21 So all the evidence that comes in gets stored in the secure

22 property control section.  I don't have personal access to

23 that.  I have to request from somebody in property control to

24 get the evidence from the storage location wherever that is.

25 They will take into their custody and either bring it up to

DIRECT OF ANDREW OPRYSKO BY MR. SIELAFF     218

1  me in the Crime Lab or I'll go down and get it from them from
2  across kind of the counter and take into it my custody.
3      So once I have the evidence, I can bring it up to my
4  work space.  Each of us has our own kind of office space that
5  includes computer, workbench, and all the things we need to
6  kind of do our day-to-day work.
7      So I'll bring it into my office, verify all the
8  paperwork's correct, start my case notes, just basically when
9  I receive the item, basic description of the packaging,
10 things like that.
11     And then once I'm ready, I'll actually open up the
12 evidence, again to verify the contents matches the kind of
13 record we have for it.  And then, depending on what the
14 physical substance is or looks like, I'll kind of base my
15 analysis on that.
16     So in this case, there were a number of tablets or
17 pills.  So I started by kind of verifying the number of units
18 and then wrote down descriptions, counted all of them before
19 I could actually start doing my work.
20         MR. SIELAFF:  Your Honor, may I approach the
21 witness with physical evidence?
22         THE COURT:  You may.
23 BY MR. SIELAFF:
24 Q.  Mr. Oprysko, I'm going to place on your table what's
25 already been introduced as Government's Exhibit 14.  Would

1   you please take a look at Government's Exhibit 14 and tell me
2   if you've ever seen it before?
3   A.    Yes, I have.
4   Q.    And how do you know you've seen that exhibit before?
5   A.    The complaint number, which is the case number on the
6   sticker, matches what I have in my paperwork, and also my
7   initials appear on the seal of the bag and on the kind of
8   packaging inside.
9   Q.    And when you first received that item, did it look
10  exactly like it looks today?
11  A.    No.  This outer bag I added after my analysis to be able
12  to kind of place everything into, seal to keep contained.
13  Inside it was in a number of different kind of plastic
14  security bags.
15  Q.    When you first received the pills that are Government's
16  Exhibit 14, was it in a sealed condition?
17  A.    Yes, it was.
18  Q.    And was it appropriately marked and labeled to ensure
19  that all the protocols of your laboratory had been followed
20  up to that point?
21  A.    Yes.
22  Q.    So, you said that the first thing you did with
23  Government's 14 was count the units?
24  A.    Yeah.  I'd opened up the -- again, all the outer
25  packaging.  I laid it out.  I took a picture just to have a

DIRECT OF ANDREW OPRYSKO BY MR. SIELAFF        220

1    record.  And then for each of the bags that were present, I

2    counted the number of pills that were present in each of the

3    bags along with the description of basically what they looked

4    like.

5    Q.    Okay.  So, visually, how many different types of pills

6    are there visually?

7    A.    I'd have to refer to my notes briefly.

8    Q.    If you could do that to refresh your recollection,

9    please.

10   A.    I'm just looking at what I labeled as page 1 of my

11   handwritten notes packet.

12        There were 11 different bags.  Some of them had the same

13   kind of color and shapes in them.  There were a total of, I

14   think, about seven different shape/color combinations.

15   Q.    And all in total, how many pills did you count?

16   A.    I counted 8,909 pills.

17   Q.    8,909?

18   A.    Yeah, that was split across 11 Ziploc bags.

19   Q.    So, once you've counted them, what's your next step in

20   the analyzation process?

21   A.    Based on the evidence type, how they were packaged and

22   then the different shapes and colors, I took one of each kind

23   of shape/color for the bags that were present, so I tested a

24   total of 11 pills.

25        I first did what's called a presumptive screening test,

1   which is a color test, and that's just kind of a general
2   screening test I do to see what it could be to help me figure
3   out later how I want to prepare those for my more confirming
4   analysis.
5   Q.   So, the color test, first of all, what was it and kind
6   of how did it guide your next step?
7   A.   So I did what's called the marquis color test.  And
8   that's kind of a general purpose color test reagent.  It'll
9   react to a large number of different controlled substances.
10  And basically what I'm looking for there is just a color
11  change.
12      So I'll take a kind of plastic little spot plate, which
13  is kind of a little plastic plate with little wells or dips
14  in it and I'll place a drop of the color test reagent and
15  then I'll add a small portion of one of the tablets that I've
16  crushed up.  And again, I'm looking to see if there's any
17  kind of color change.  And that can tell me, can give me a
18  general idea of what might be present.
19      In this case, I believe I got a yellow color reaction
20  for -- yeah, a slight yellow color reaction is what I put for
21  all the pills I tested.
22      Based on that, I then went on to perform more confirming
23  analysis, which is gas chromatography mass spectroscopy, or
24  GCMS for short, and that's an instrumental technique that
25  allows me to take an unknown sample, I dissolve it in a

DIRECT OF ANDREW OPRYSKO BY MR. SIELAFF    222

1   solvent and I can run it on an instrument.  And that tells me
2   what things are present in a particular substance or sample.
3        Based on those results, I can then confirm what those
4   are by comparing it to a known standard.  We purchase unknown
5   standards from outside certified chemical companies.  So if
6   you're a Crime Lab, you can buy things like cocaine, heroin
7   as reference standards so we could use those to compare to an
8   unknown.
9   Q.   Now, the steps you just kind of outlined for the jury,
10  first a, kind of a guiding color test, gas chromatography
11  mass spectrometry, and comparing to known standards, is that
12  all accepted practice in the field of forensic chemistry for
13  identifying a substance?
14  A.   Yes, it is.
15  Q.   Did you get different results with the different 11
16  pills, or were they all the same?
17  A.   They all gave me what I list as a slight yellow color.
18  Q.   And then as far as the gas chromatography and the mass
19  spectrometry, did they give you the same or different
20  results?
21  A.   I got the same results for all the 11 pills I tested.
22  Q.   What can you tell us about what each of those 11 pills
23  is?
24  A.   I got a result of a compound called Eutylone.  And
25  Eutylone is part of a class of chemicals called substituted

DIRECT OF ANDREW OPRYSKO BY MR. SIELAFF        223

1   cathinones.  They're based on kind of a base molecule of a

2   drug called cathine, which is a naturally-occurring compound

3   in some plants that are found, I believe, in like Africa and

4   those areas.

5        So they're able to take that starting compound of

6   cathine and using chemistry processes convert it into a whole

7   bunch of different forms.  Each of those forms have different

8   things added to them in different places kind of on the

9   molecule itself.

10       In this case, the compound that was present again was

11  one that's called Eutylone.  It's kind of lumped in also, if

12  you've ever heard the term on the news as bath salts, it's

13  kind of that class of compounds, but that's kind of just a

14  slang term.

15  Q.   Just so we have our record clear, could you spell

16  Eutylone for us?

17  A.   E-U-T-Y-L-O-N-E.

18  Q.   And you said it's part of the cathinone family.  How do

19  you spell cathinone?

20  A.   C-A-T-H-A-N-O-N-E [sic].

21  Q.   And based on your comparison, or your testing of all 11

22  kinds of visually different pills, did you draw any

23  conclusions about the 8,909 pills that were all a part of

24  Government's Exhibit 14?

25  A.   I'm just able to say for certain that the 11 I tested

1  contained cathinone; that the rest of the pills were visually
2  consistent with those 11 that I tested.
3           MR. SEILAFF:  Thank you.  No further questions.
4           THE COURT:  Any Cross?
5           MR. RAEL:  Yes, thank you.
6                          CROSS-EXAMINATION
7  BY MR. RAEL:
8  Q.   Good morning, sir.
9  A.   Good morning.
10 Q.   We haven't met, but you, as I understand it, you've been
11 up in New York and been doing this for some time in New York?
12 A.   I was in New York for seven years.
13 Q.   Okay.  And then you were in New Haven, you said, as
14 well?
15 A.   For college, yes.
16 Q.   Oh.  Yale's in New Haven.  Is that where you went?
17 A.   No, it was the University of New Haven.  It's in, I
18 think, the neighboring town of West Haven, technically.
19 Q.   Okay.  So, you have to buy things to compare different
20 kinds of stuff in cocaine.  If you go out and you buy that
21 and then you can use that as a way to deal with it and have a
22 standard; right?
23 A.   Yes.  The laboratory purchases them.
24 Q.   What about this Eutylone?  You go out and buy that?
25 A.   Yes.  We were able to purchase a Eutylone standard from

1    a chemical supplier.

2    Q.    Am I right or am I wrong that Eutylone, if you know, was

3    at one point legal?

4    A.    At one point, yes.

5    Q.    And then somehow everything is legal and then it became

6    illegal.  About how long ago?

7    A.    I'm not sure on the federal level when they changed that

8    particular rule.  It's been different in North Carolina for

9    several years, as well.

10   Q.    So, for a while it was not considered a dangerous drug;

11   right?

12           MR. SIELAFF:  Objection, relevance.

13           THE COURT:  Sustained.

14   BY MR. RAEL:

15   Q.    And when you say that you bought things to compare, at

16   some point this drug was legal so you didn't need to go have

17   anybody buy it; right?

18   A.    I'm not sure when we purchased the standard for this

19   specifically.  I'd have to look in my notes for reference,

20   but.

21   Q.    Why don't you do just that, if you don't mind, if it

22   tells you.

23   A.    Looks like we made up the standard in January of 2021.

24   So I'm not sure exactly when we purchased it, but it would

25   have been within probably about a six-month period before

CROSS OF ANDREW OPRYSKO BY MR. RAEL          226

1  that that we would have had it in storage until we needed it.
2  Q.    So that would have been in January of 2021.  And when
3  would you make this examination of this Eutylone?
4  A.    It was January of 2021.
5  Q.    Was that before or was that after these known standards
6  that you are talking about?
7  A.    We purchase the standard and then when we actually need
8  it for a case, we'll kind of prepare it and then run it along
9  with the case contemporaneously.
10 Q.    Can you tell the jury when it was that you actually
11 examined these 8,909 pills?
12 A.    It was between January 13th and January 20th.
13 Q.    And what is the date, if you are aware, that you dealt
14 with this known standard?
15 A.    The standard I ran on, it looks like January 19th.
16 Q.    All right.  Now, this Eutylone, do you know, being an
17 expert in this area, why it would be made illegal by the
18 Federal Government?
19        MR. SIELAFF:  Objection, relevance.
20        THE COURT:  Sustained.
21 BY MR. RAEL:
22 Q.    Are you aware about -- just a moment.
23        All right, sir.  Now, this Eutylone that's now illegal,
24 it came to you, my understanding.  You put it in this extra
25 container and within that container contained what was in it;

CROSS OF ANDREW OPRYSKO BY MR. RAEL                227

1   correct?
2   A.   Yes.
3   Q.   All right.  What about a box?  Was there a box?
4   A.   I just received it like this.  It was in plastic --
5   heat-sealed plastic bags when I got it.
6   Q.   Well, do you know that it even came in a box?
7   A.   Not to my knowledge, no.  I only know from when I
8   received it what condition it's in.
9   Q.   Do you know where -- who gave you the box?  If I told --
10  you don't even know if it was a box or you wouldn't know if
11  it was a Versace box; right?
12  A.   I only know how I received it.
13  Q.   Right.  And so, who gave you the information that you
14  now have before you?  Where did that come from?  Did it come
15  from a detective?  Did it come from a police officer?  How
16  did you get it?
17            MR. SIELAFF:  Objection.
18            THE COURT:  Overruled.
19            THE WITNESS:  What information?
20  BY MR. RAEL:
21  Q.   The information of this 8,909 pills.  Where did you --
22  how did you get it?  Did you get it out of a lockbox?  Where
23  did you find it?  How did you first open it?
24  A.   Again, when I receive a request to work on the case,
25  it's in our electronic computer system.  It's called the LIMs

CROSS OF ANDREW OPRYSKO BY MR. RAEL          228

1    system, which is Lab Information Management.  And that not
2    only is useful for writing our reports and things of that
3    nature, but it also is for the property section to be able to
4    track and store evidence.
5         So when I request the evidence, I go electronically
6    using the case number, choose the item I want delivered,
7    submit that electronically, and then they bring it to me.
8    And then on that system, there is kind of a heading for the
9    item with a brief description.  I'm not sure who specifically
10   entered that in this case.  It's usually the officer who's
11   submitting it to the property section will kind of fill in
12   those forms.  So when I receive it, it already has a property
13   evidence sticker on it with a brief description of what
14   should be in the packaging.
15   Q.   Who was the officer, if you know, that dropped it off?
16   A.   I don't know off the top of my head.
17   Q.   Would you be able to tell if you looked at your notes?
18   Could that help you?
19   A.   It should be on the chain of custody form.
20   Q.   And do you have such a form?
21   A.   Yes.
22   Q.   Could you mind looking and let the jury know who did
23   that?
24   A.   It looks like the first entry on this is for CMPD
25   personnel Michael Sardelis.

1  Q.   Okay.  And was that the only entry, or is there more?

2  A.   I mean, there's multiple entries.  Each time somebody

3  kind of takes possession of this evidence, so the officer

4  will have it in his custody, it will be under his name.  And

5  then when they transfer it to Property, it gets transferred

6  to the Property, usually a cart or a shelf initially.  And it

7  shows the name of the person who makes that entry.

8       The chain of custody record I have here has five or six

9  different names of Property people or officers.  Myself is on

10 there since I had custody of the evidence.  I'm just showing

11 each step in the process of where it went from who to who and

12 place to place.

13 Q.   So for each step, who had step number 1?  You said it

14 was whom?

15 A.   It was the -- it looks like Officer Michael Sardelis.

16 Q.   Who had step number 2?

17 A.   I believe it was one of the Property technicians.  It's

18 listed as Erin Reynolds transferred it from Michael to the

19 Property cart, which is just a cart, so they could bring it

20 and then put it on a shelf location.

21 Q.   And all the other people who had it were already with

22 the -- you're with the GBR?  Who are you with?

23 A.   CMPD.

24 Q.   Okay.  All the other people were with that organization?

25 A.   Yes.  They're all Charlotte police employees.

1  Q.   Except for the very first one?

2  A.   No, he was a CMP officer, I believe.

3  Q.   Okay.  Now, did you conduct any of the forensic tests on

4  the packaging itself?

5  A.   No, I did not.

6  Q.   Did you -- did you make any kind of fingerprint analysis

7  at all?

8  A.   No.

9  Q.   Since you didn't have the box, you didn't make any -- it

10  seems to me, therefore, you didn't make any analysis on the

11  box that it came in that now is contained before you?

12  A.   I only tested the drug evidence in this case.

13  Q.   Were you able to determine the origin of the pills?

14  A.   No.

15  Q.   Now, I'm right, I presume, that you don't know -- you're

16  an expert and a person who -- you're almost like -- you're

17  like a scientist, right?

18  A.   Yes, I am a scientist.

19  Q.   So, sir, therefore, you don't know -- all you're doing

20  is analyzing.  You don't know any of the facts of who gave

21  who the pills or who paid for the pills, where they got it,

22  none of that; you're just analyzing things, right?

23  A.   Yes, that's correct.

24  Q.   And do you have any idea, if you know, how many of --

25  how many pills that can -- do you know, being a scientist,

1  will one pill get you high?

2  A.   I don't know specifically about this drug.

3  Q.   Have you ever examined that particular drug before?

4  A.   Yes.

5  Q.   And am I right that that drug is sort of like MDMA, but

6  it's just a little bit different?  Help the jury understand

7  and help me understand.

8  A.   Chemically, they're different substances.  But my

9  understanding, just from kind of reading literature on it, is

10  that it is kind of supposed to have the same effect on the

11  person taking it.  But, again, I'm not any kind of medical

12  expert to say for certain.  It's just kind of reading from

13  anecdotal evidence and different research studies.

14  Q.   Do you know how it's made?  I mean, it's not from

15  Pfizer, I guess.  How do people make that?

16              MR. SIELAFF:  Objection, relevance.

17              THE COURT:  Sustained.

18  BY MR. RAEL:

19  Q.   And so, did you say that this originally came -- this is

20  sort of like a substitute of caffeine?

21  A.   Not caffeine, cathine.  It's, again, based upon the Khat

22  plant, K-H-A-T, which contains that drug I spoke of earlier,

23  cathine, C-A-T-H-I-N-E.  It's not the same as in coffee or

24  tea.  It's in a different class of drugs.

25  Q.   Good, because I had some this morning.  Thank you.

FURTHER REDIRECT OF MICHAEL SARDELIS BY MR.     232
GUINN

1    So, this -- is that the portion of the drug that makes

2  things illegal?

3  A.   Yes.

4  Q.   Do you have any idea, if you would know, how much money

5  it costs to get this quantity of drugs?

6          MR. SIELAFF:  Objection.  Lack of foundation.

7          THE COURT:  Sustained.

8          MR. RAEL:  All right.  Thank you, sir.

9          THE COURT:  Any Redirect?

10         MR. SIELAFF:  No, Your Honor.  Thank you.

11         THE COURT:  You may step down.  Call your next

12  witness.

13         MR. GUINN:  Your Honor, at this time the Government

14  would like to recall Officer Sardelis.

15         THE COURT:  I remind you you are still under oath.

16         THE WITNESS:  Yes, sir, Your Honor.

17              FURTHER REDIRECT EXAMINATION

18  BY MR. GUINN:

19  Q.   Officer Sardelis, you testified about several telephone

20  numbers.  Do you recall that testimony?

21  A.   I do.

22  Q.   And you talked yesterday about seizing a telephone as

23  part of this investigation?

24  A.   That is correct.

25  Q.   Again, whose phone was that?

FURTHER REDIRECT OF MICHAEL SARDELIS BY MR.      233
GUINN

1  A.   It was Latisha Anderson's phone.

2  Q.   Okay.  Do you remember the number for that phone?

3  A.   May I review my notes?

4  Q.   If it would help refresh your recollection.

5  A.   The phone number on the phone I seized was 704-449-7998.

6  Q.   Okay.  Did you have a different number for Latisha

7  Anderson?

8  A.   I did.

9  Q.   What is that number?

10  A.   Can I review my notes again, please?

11  Q.   If it will help refresh your recollection, please do.

12  A.   Sorry.  The phone number is 678-208-8071.

13  Q.   Did you take any kind of analysis to kind of confirm

14  those two numbers?

15  A.   I did.

16  Q.   What did you do?

17  A.   What I did was after I got the download from

18  Ms. Anderson's phone, I reviewed that.  And you saw the text

19  messages we had yesterday between her and Mr. Cloud.  What I

20  did was I looked for phone calls, as well, during the time

21  frame of the 24th.  And I compared those calls on that phone

22  with the calls we intercepted on the wire.  And those calls

23  from the phone matched up with the calls we intercepted from

24  the wire, leading me to believe that the phone that

25  Ms. Anderson had, although the number was different, was the

1  same phone that was used to communicate with Mr. Cloud.

2  Q.   This 678 number that you provided to the jury, what kind

3  of number is that?  Or what kind of number do you believe

4  that to be?

5  A.   I believe it's like a -- it's a Google -- it's a Google

6  number.  So what I did was I requested information on the

7  number.  The number comes back to a company called Bandwidth.

8          MR. RAEL:  Objection, Your Honor.  I don't think

9  that he could testify about that.

10          THE COURT:  Overruled.

11          THE WITNESS:  So, that phone number comes back to a

12  company called Bandwidth.  And then I requested the owner, or

13  who that number is then leased out to, and Bandwidth came

14  back with Google.

15          MR. RAEL:  Objection, Your Honor.  That would be

16  hearsay.

17          THE COURT:  Overruled.

18  BY MR. GUINN:

19  Q.   Did you give all this information to Agent Jason Warren

20  with the FBI?

21  A.   I did.

22          MR. GUINN:  Thank you.  I don't have any further

23  questions at this time.

24          THE COURT:  Any Cross?

25          MR. RAEL:  Thank you, Your Honor.

FURTHER RECROSS-EXAMINATION

BY MR. RAEL:

Q.   Good morning, sir.

A.   How are you?

Q.   Fine, thank you.

     Who's the gentleman right over there to your right?

A.   Detective Parker.

Q.   Did you and Detective Parker have any conversations about this case when it concluded yesterday?

A.   I mean, we worked the case together, so we had many conversations about this case during the case.

Q.   I see.  What did you all discuss about the stuff that came into this case yesterday?

A.   Are you talking about trial?

Q.   Yes.

A.   Oh, we didn't discuss the trial.

Q.   Oh, nothing at all?

A.   No.

Q.   Okay.  I appreciate that.  Thank you.

          MR. GUINN:  No Redirect, Your Honor.

          THE COURT:  You may step down.

          THE WITNESS:  Thank you, Your Honor.

          MR. GUINN:  Your Honor, at this time, the United States calls Agent Jason Warren to the stand.

          THE CLERK:  Place your left hand on the Bible and

DIRECT OF JASON WARREN BY MR. GUINN                236

1   raise your right.

2                          JASON WARREN

3   and having been duly sworn was examined and testified as

4   follows:

5                       DIRECT EXAMINATION

6   BY MR. GUINN:

7   Q.   Agent Warren, if you could state your name and

8   occupation for the record, please.

9   A.   My name is Jason Warren, W-A-R-R-E-N.  I'm a special

10  agent with the Federal Bureau of Investigation.

11  Q.   Agent Warren, what do you do for the FBI?

12  A.   I'm presently assigned as a national asset of the

13  Cellular Analysis Survey Team, which is a collection of

14  individuals that work cell phones and location-based

15  technology throughout the country.

16  Q.   Okay.  And then what are your responsibilities in that

17  role?

18  A.   In that role, again, I'm -- we have a couple of

19  different categories.  We have what's known as a field asset.

20  So that field asset belongs to a specific division of the

21  FBI.  For instance, if we have an asset in Albany, the field

22  asset would report to that SIC in Albany, that local

23  Supervisor In Charge.  I am a national asset, so my

24  management and my chain of command is run out of

25  FBI headquarters.

1    So as a member of whether it's a national asset or a

2    field asset of the Cellular Analysis Survey Team -- you'll

3    hear me refer to it as CAST.  As a member of CAST, my job is

4    to analyze call detail records, so call detail records from

5    cell phones, and then really to any location-based

6    information from any type of electronic communication service

7    provider, I take that data; and as it relates to mostly

8    fugitives, missing persons, violent crimes, any type of that

9    data that is derived or comes from an investigation, I take

10   that data and I conduct an analysis of that data.  And

11   oftentimes, you know, trying to find, you know, again, that

12   missing person, that kidnap victim.  Or to determine if a

13   phone was in the vicinity of a particular crime scene, I take

14   that data from the phone company or the provider, I put it on

15   a map, and make pictures.

16   Q.   You talked about your current role at the FBI.  Just

17   very generally, briefly, what is your background with the

18   FBI?

19   A.   My background, initially I started out in the Washington

20   field office where I worked counter-terrorism matters.  I was

21   on an overseas counter-terrorism squad for a number of years.

22       In 2009 I transferred to Charlotte, North Carolina.  And

23   again, I should also mention as a national asset, I live and

24   work in Charlotte, North Carolina.  So while I'm not

25   reporting to the chain of command within Charlotte, I still

1  report to this office and work out of this office here in
2  North Carolina.
3      But since I've been in Charlotte in 2009, I've worked
4  various types of violations.  I've worked missing persons,
5  bank robberies, Hobbs Act robberies, which are just robberies
6  of commercial institutions.  I've worked a little bit of
7  drugs.  I've worked pills, and innocent images in the sense
8  that like crimes against children, those type matters.
9      So, really, every investigative program at some point in
10  my 19 years I've touched in some way.  And all of our
11  investigations today really involve a technology piece,
12  right.  There's technology in everything we do.
13      I'd probably venture to say that everybody here has a
14  cell phone.  Some of us have two.  But, again, that
15  technology really comes into our lives on a daily basis.
16  Q.   Have you received some sort of specialized training in
17  cellular phone technology, getting analysis of historical
18  cellular call detail records?
19  A.   I have.
20      So, all the members -- so right now, approximately, we
21  have 83 task force officers and special agents in the FBI
22  that are certified members of CAST.  So certified in the
23  sense that we go through rigorous training to prepare us to
24  conduct this analysis of these records and to understand the
25  nuances from all the different phone companies.

1    So we receive training in various disciplines, so radio

2  frequency technology being one of them, mapping foundations

3  and fundamentals.  We also meet with the phone companies on

4  an annual basis to kind of figure out where they are today

5  and then where they're going, you know, next year.  I think

6  we've all seen the 5G towers that are popping up all over

7  town.

8    So, again, we stay in touch and in tune with the phone

9  company because it has a very direct effect on what we do,

10 you know, conducting that analysis.

11    And then some of the other items, again, I mentioned the

12 mapping foundations, but also taking the data from the phone

13 companies is -- comes in like a Microsoft Excel.  So it's

14 just all ones and zeroes and understanding how to take that

15 data and put that on a map.

16 Q.   Have you ever instructed others in this field or given

17 instruction, I guess, to other colleagues?

18 A.   I have.  So the Cellular Analysis Survey Team, so CAST,

19 we also train our state and local partners and prosecutors, a

20 lot of times, in the basic cellular analysis so they have an

21 understanding themselves of how to analyze records at a basic

22 level.  In fact, we just taught a class, it's been about a

23 month ago now, out in Raleigh, North Carolina, where we had a

24 lot of our state and local partners come out.  And I was the

25 lead instructor for that.

DIRECT OF JASON WARREN BY MR. GUINN          240

1   But, again, it's a very regular thing we do.  And just
2   trying to get that message out so that everybody has an
3   understanding and we're all doing it the correct way.
4   Q.   Have you ever testified as an expert in court in this
5   area before?
6   A.   I have.
7   Q.   How many times, approximately?
8   A.   Approximately 22 times.
9   Q.   And just roughly, if you could, to best of your ability,
10  how many hours of training do you have in this particular
11  area?
12  A.   So today over 800 hours of training.  And, again, that
13  annual recertification we go through, as well.  And then
14  meeting with the phone company.
15       MR. GUINN:  Your Honor, at this time I'd like to
16  tender Agent Warren as an expert in cellular phone
17  technology, cell towers, and analysis of historical cellular
18  call detail records.
19       THE COURT:  Any objection?
20       MR. RAEL:  No.  It sounds like he's an expert in
21  all of those areas.
22       THE COURT:  He will be allowed to offer opinions in
23  those areas.
24  BY MR. GUINN:
25  Q.   Agent Warren, at some point did you receive cellular --

1   I'm sorry -- call detail his -- historical call detail

2   records from Agent Sardelis related to the Pressure Gang

3   criminal investigation?

4   A.   I did.

5   Q.   Outside of participating in that, in the review of these

6   materials, did you have anything to do with the Pressure Gang

7   investigation, the underlying investigation itself?

8   A.   I did not.

9   Q.   As part of your review of those materials, did you form

10  some opinions and conclusions as to that information?

11  A.   I did.

12  Q.   And did you prepare a report of your findings with

13  respect to that?

14  A.   Yes, I did.

15  Q.   I'm going to show you what I've got marked here as

16  Government's Exhibit Number 18, if you could just bear with

17  me for one moment.  Do you recognize this document?

18  A.   I do.

19  Q.   What is this?

20  A.   So this is the report of my analysis.

21       So, again, I've taken those call detail records that

22  came in originally, and this is the report or the findings

23  that I've prepared, basically give it demonstrative exhibit

24  of the analysis.

25       So this is the pictures behind the ones and zeroes and

DIRECT OF JASON WARREN BY MR. GUINN          242

1  letters and numbers.

2  Q.    Okay.  Have there been any changes to this document

3  since you last saw it?

4  A.    No.

5  Q.    Will having this document help you in your testimony

6  today in discussing these issues with the jury this morning?

7  A.    It will.

8          MR. GUINN:  Your Honor, at this time I'd like to

9  offer Government's Exhibit Number 18 in evidence and publish

10  it to the jury.

11          THE COURT:  Any objection?

12          MR. RAEL:  None.

13          THE COURT:  Let it be admitted and published.

14          (Government's Exhibit Number 18 was received into

15          evidence.)

16  BY MR. GUINN:

17  Q.    All right.  So, Agent Warren, if we could kind of start

18  at the first page here.  I see a list of phone numbers here.

19  Could you kind of explain to the jury, just kind of starting

20  there, what we're looking at and what's going on?

21  A.    Yes.  So I was requested to conduct an analysis of four

22  specific devices.  So the first telephone number being

23  470-389-2569.  You'll notice here that it's in red.  So any

24  time we see this number throughout the report or we see red,

25  that's going to be that Verizon Wireless phone.  So red being

1  Verizon Wireless.

2      The second number is 704-287-5769.  That's a T-Mobile

3  number.  And again that's going to be green.

4      And then we have the following number, 704-449-7998,

5  which is also a T-Mobile number.

6      And then the last number is 678-558-8359, so we'll see

7  that in blue in the following slides.  And that is also a

8  T-Mobile number, as well.

9  Q.   So, Agent Warren, kind of starting the big picture, we

10  have pictures of cell phone towers that you kind of put in

11  your report here.  Talk to us about those.  What are cell

12  phone towers and generally how do they work?  What do they do

13  in what you --

14  A.   So cell phone towers, we've all seen -- the picture on

15  the left here is an example of a traditional macro cell phone

16  tower.  So a macro site being a large site.  You'll see the

17  triangle-shaped antenna at the top.  That provides coverage

18  to three specific sectors.

19      So if you think of a cell phone tower as a pizza, so the

20  phone company takes this pizza and they cut it into three

21  distinct 120-degree slices.  Those are going to be what I

22  refer to later as the sectors.

23      And when the phone company gives me the data or gives

24  the agent the data, they provide the azimuth, or the center

25  beam, of that sector.  So they might come and in their data

1   say that it's a 60-degree center beam, so the 60 degrees is
2   going to, again, be that center.
3        To the right here in this picture, in this example, I
4   think we've all been around 485 a time or two and we've seen
5   that tree that's 25 feet taller than every other tree, so
6   spoiler alert.  It's a cell phone tower.  They -- basically
7   the phone company has figured out ways to hide the antennas
8   because we don't like looking at the towers on the left;
9   right?  We like looking at the things on the right, you know,
10  a flagpole that is three times the diameter of a regular
11  flagpole.  What they do is they hide the antennas inside the
12  flagpole because, again, a flagpole is easier on the eyes
13  than the antenna on the left.
14  Q.   Okay.  Sectors and orientation and then kind of sector
15  illustration, you mentioned that earlier.  I guess the pizza
16  example that you gave, is this -- that image kind of
17  represent that?
18  A.   It is.  So this is, again, that breakdown of the three
19  sectors.  So we'll see in this example here, we have
20  Sector 1.  Let's just take Sector 1, for example.  So the
21  phone company will give you the date and time and then cell
22  ID, so the identifier of the cell tower.  And it will tell
23  you, in this case, a zero degree azimuth.
24       So that zero degrees, again, that's the center of the
25  energy coming off the tower.  And I know, based on my

1  knowledge, training, experience, I'm going to go 60 degrees

2  to the left, 60 degrees to the right.  And that's how you see

3  that shape.  So that red shape, that red-shaded area is the

4  direction the energy is traveling off for Sector 1.

5      So this is going to be an illustration here.  So Slide 4

6  is an illustration of what that looks like drawn on a map.

7  Or this is what it looks like so when you see this shape,

8  this green shape here is an illustration of how a sector is

9  drawn out.

10      The shaded area at the base is not a coverage area.

11  It's not saying that the phone has to be in that little

12  shaded area.  Again, that's just directional.  So that's the

13  direction the energy is traveling off of that tower.

14  Q.   It may be a little bit confusing now, but this image

15  here, this kind of green line with the shaded center, that's

16  going to be on later images in slides; is that correct?

17  A.   Correct.

18  Q.   These images here, the network interaction dialogue box,

19  are these in later slides, as well?

20  A.   They are.

21      And, again, this is just an explanation of what we're

22  going to see.  And I'm going to have different ones for the

23  different phones.  But all the dialogue boxes are going to be

24  the same.  You'll have various colors.

25      So, again, same content in those dialogue boxes.  We

DIRECT OF JASON WARREN BY MR. GUINN          246

1   see -- again, just to briefly kind of touch it, so we see the
2   direction of the interaction or the transaction.  We see
3   transaction type, which could be voice, SMS, or data.
4        And then, again, I mentioned the phone company gives us
5   that azimuth.  In the lower right there, we see -- in this
6   example, we see 240.  So that's a 240-degree azimuth.
7        And at the top here we see T-Mobile.  So eNodeB, so
8   evolved node B, so that is a 4G tower.  So that eNodeB, and
9   then it's going to have a unique cell site number.  In this
10  case I just did 123456789 to not call out any specific
11  towers.  But there will be a tower number provided by the
12  phone company that is unique in that network.
13  Q.   So you did this for T-Mobile.  Looks like you did this
14  for -- is this an example of Verizon?
15  A.   It is.  Again, just using your mind to trigger on the
16  red.  So we see that red, that red header bar there is going
17  to trigger to us, that's going to be a Verizon phone.
18  Q.   So let me stop you for a moment on Verizon specifically.
19  So here direction of -- direction or outgoing call.  What
20  does that mean?
21  A.   So what that means, that's what took place as far as
22  direction, whether it was incoming to the phone or outgoing
23  to the phone -- or outgoing from the phone.  So that's me
24  taking my phone out and dialing a number and hitting the
25  green button to dial.  Otherwise, it's me swiping, you know,

1    if I want to talk to the person or not talk to the person,
2    swiping left or right to activate that phone call, right, to
3    basically receive the call.  That would be an incoming call.
4    Q.    So if a -- I guess in terms -- if I'm hitting accept a
5    call or reject a call or hanging up with a call, do all of
6    those have actions when I'm on my phone, have some sort of
7    interaction with the cell phone tower?
8    A.    They do.
9          So unless the phone is physically powered off, if your
10   phone rings, there is a tower and sector plotted as soon as
11   your phone rings.
12         If you make a call, there is a tower and sector plotted
13   in the records automatically.
14         Again, these are business records kept within the phone
15   company.  So I myself have very -- I have no sway over what
16   goes in and out of the records.  If I leave my phone on and
17   my phone is just hanging out, it's connected to the cellular
18   network.
19   Q.    Okay.  And with respect to Verizon specifically, I guess
20   back in 2020, was there some issue with Verizon in terms of
21   whether the information here was reflected correctly about
22   outgoing calls versus incoming calls?
23   A.    Yes.  So, Verizon had a period on their 4G VoLTE
24   records, they had a period to where they couldn't tell you
25   for sure if it was the originating tower or the terminating

1  tower.

2      And just to kind of break that down.  If I take my phone

3  out right now and I have a Verizon phone and I hit dial, so

4  that's going to be an originating call from my phone.  So the

5  tower plotted is going to be the originating tower.

6      If I stay right here in this chair and sit on the phone

7  for 5 minutes and I hit end, the originating tower and the

8  terminating tower are going to be exactly the same because I

9  haven't gone anywhere.  I've sat in the chair the whole time.

10     So for a period of time, Verizon could not clearly

11 identify whether it was an originating tower or a terminating

12 tower, but it doesn't change the fact that the phone's still

13 connected to that tower and to that sector at a given time

14 within that call.

15     Verizon did the math and over 90% of data during this

16 time, over 90% of transactions on their network, so we can

17 think of the millions of transactions on their network, over

18 90% of them utilized the same originating and terminating

19 sector.

20 Q.  Would any of that affect your analysis in this

21 particular case?

22 A.  It would not.

23 Q.  This is a sector-mapping illustration that you're going

24 to, again, I guess, explain a little bit later on in the

25 slides?

DIRECT OF JASON WARREN BY MR. GUINN          249

1  A.   It is.

2       So this is -- we kind of stair step through it a little

3  bit.  So we looked at the clock with the drawing and then we

4  look at how the sector would be reflected.  This, in Slide 7

5  is what that sector is going to look like on a map.  So at

6  the base there, we see a little green dot, so that little

7  green dot is a T-Mobile tower.  And then we'll see that shape

8  drawn.  That is a zero degree cell site cell sector on a

9  T-Mobile tower.

10 Q.   All right.  So with respect to this case, would it be

11 fair to say that you were given several numbers to analyze;

12 is that correct?

13 A.   Correct.

14 Q.   And those were the numbers when you and I started

15 talking?

16 A.   Correct.

17 Q.   You were given particular dates to look for, as well; is

18 that correct?

19 A.   I was.

20 Q.   What dates were those specifically?

21 A.   So, I was requested to conduct an analysis of records as

22 it specifically relates to times on October 16th, 2020,

23 October 17th, 2020, and October 24th of 2020.

24 Q.   And we've talked about cell phone technology.  Cell site

25 and cell sectors we've reviewed.  And so it's kind of a first

1   substantive map here.  Explain to the jury what they're
2   looking at here, please.
3   A.   What we're looking at on Slide 11, so every green dot
4   represented on the map here is a T-Mobile cell phone tower.
5   So we'll see, as you get further east out in like Fairview,
6   Midland, we'll see that the dots kind of start to spread out
7   and get further apart.  And then as you get to downtown
8   Charlotte, we see what the dots do; right?  It's just a big
9   pile of green dots.  So every one of those represents a
10  specific T-Mobile tower.
11       And then I was provided -- as part of my request, I was
12  provided the address of 2512 Finchley Drive in Charlotte,
13  North Carolina.  And so any time we see this little icon,
14  you'll notice it's a little orange house icon.  Any time we
15  see that icon, that's going to refer to that Finchley Drive
16  address.
17  Q.   Atlanta, Georgia, is that what's depicted here?
18  A.   It is.
19       So since this request really kind of spanned two cities,
20  so we had Charlotte, North Carolina, and Atlanta, Georgia,
21  covering the two cities, this map on Slide 12 is a
22  representation of -- everywhere we see a red dot is going to
23  be a Verizon Wireless cell phone tower.  And, again, we see
24  the green dots being the T-Mobiles.
25       And then I was given two special addresses in the

DIRECT OF JASON WARREN BY MR. GUINN          251

1   Atlanta area, so the first one being the Diamond Club at
2   1715 Northside Drive, Northwest.
3   Q.   Is that where my cursor is, that kind of blue square
4   area?
5   A.   That's correct.
6        So, again, that blue icon with the Delta Charlie, or the
7   DC, in it.
8        And then I was given a separate address.  So any time we
9   see that red icon with a K3, like K3 Soundz, and that's 4484
10  Covington Highway in Decatur, Georgia.
11  Q.   Okay.  So would it be fair to say that what you're doing
12  as you're looking at this information is trying to determine
13  what cell phones interacted with particular towers in the
14  vicinity of these locations?
15  A.   So what I'm doing as it relates to specific call detail
16  records, specific call detail records of this case, is I'm
17  trying to determine were the records provided to me in the
18  vicinity or in the area of any of these addresses that were
19  provided to me?  So the specific addresses given to me by the
20  case agent were the phones in those areas at any times of
21  particular interest on those dates in question.
22  Q.   So, the first date that you were given or that you
23  looked at, was that October the 16th, 2020?
24  A.   It was.
25  Q.   And the time frame that you were looking at

DIRECT OF JASON WARREN BY MR. GUINN          252

1   specifically?

2   A.   So I began my analysis around 7:49 at night on

3   October 16th.  And what we're looking at here on Slide 13 is

4   telephone number 704-287-5769.  And you'll notice the phone

5   at 7:49 and 7:53 utilized two different towers.  And again,

6   those towers pointing back towards that Finchley Drive

7   address.  So, again, in my opinion, the phone was in the

8   vicinity -- at these times, the phone was in the vicinity of

9   2512 Finchley Drive.

10  Q.   Slide 14, explain to the jury what you're looking at

11  specifically.  And if you could start with the time and how

12  that's changed from the last slide.

13  A.   Okay.  So we'll notice here, so Slide 14, you'll notice

14  the times are now 11:36 p.m. on the 16th to 1:31 a.m. on the

15  17th.  So we've gone past that midnight time to where now

16  we're in a different day.

17       But what Slide 14 is depicting is large kind of, this is

18  kind of the 30,000-foot view of travel; right?  So the phone

19  has now left Charlotte.

20       So if you remember back to the previous slide, the phone

21  was in and around that Finchley Drive address.  In my opinion

22  now, the phone is now traveling southeast.  And again, I

23  can't say exactly what road it's on.  But in my opinion,

24  based upon what I've seen in the past with phones traveling

25  south and east, so the phone utilized towers with a

DIRECT OF JASON WARREN BY MR. GUINN         253

1  consistent being on Interstate 85.  But again, more of that
2  south -- actually I'm sorry, not southeast -- southwest.  So
3  again, that southwest travel.  And that's what you're seeing
4  by the black lines.  So the black lines are just depicting
5  that travel.
6      And you'll notice in the upper right, we have that
7  little bitty, it might be hard to see, but you see a small
8  green wedge in the upper right that said 11:36 p.m. phone
9  call on Tower 136937, Sector 22.
10     And then in the far lower left again, that southwest
11 movement, the far lower left, we have 1:31 a.m. the phone
12 utilized, again the phone being 704-287-5769, that tower
13 sector was Tower 74281, Sector 2.
14     So, again, we're just kind of showing that large kind of
15 movement.
16 Q.   Is this consistent with the phone traveling down 85
17 between these two time frames?
18 A.   It is.
19 Q.   So, what are we looking at here in Slide Number 15?  And
20 if you could again start with the date and time frame,
21 please.
22 A.   All right.  Slide 15 we'll notice that the phones have
23 changed; right.  So these are two new phones that we've not
24 seen up until this point.  But this is October 17th of 2020
25 from 12:20 a.m. to 12:23 a.m.

DIRECT OF JASON WARREN BY MR. GUINN          254

1    You'll see -- keep in mind, we're dealing with a Verizon

2    phone and a T-Mobile phone.  So you'll see them using towers

3    from their respective carriers.  You'll notice the dot at the

4    base of the red sector, that's also a T-Mobile tower.  So

5    sometimes the phone companies will partner up and lease space

6    to each other where they don't have to go do a whole site

7    survey and build new towers.  Sometimes they won't, right,

8    because it's competition.  And if they get there first, you

9    know, they can keep the other guy out.  That's going to make

10   their customer base a little stronger.

11       But in this case, you'll notice the Verizon tower and

12   the T-Mobile tower, they're collocated.  Those are different,

13   basically different carriers, different phone carriers on the

14   same tower.

15       But in this case, the Verizon phone utilized

16   Tower 173064, Sector 26, for an outgoing call at 12:23 a.m.

17   and that's going to be that 120-degree red sector there.  And

18   at 12:20 a.m. the T-Mobile phone 678-558-8359 had an incoming

19   call, and that's on that 40-degree sector.

20       And in my opinion, both of those sectors would be

21   sectors that would provide coverage or would put the phones

22   in the vicinity of the K3 Soundz.

23   Q.   Now, the other phone that we looked at earlier, and I'll

24   go back up to Slide 14, we'll call it the green phone for

25   right now, that was on its way to Charlotte.  At this time

1  frame, had it arrived in Atlanta?

2  A.    No, it had not.

3  Q.    At some point do you see that green phone make its way

4  down to the vicinity of Atlanta, Georgia?

5  A.    You do.

6  Q.    All right.  On Slide 16, if you could kind of describe

7  what we're seeing with the jury, please.

8  A.    So Slide 16 is exactly that.  So the phone 704-287-5769

9  has now arrived in the area of the Diamond Club or -- and it

10  is utilizing -- again, you'll see two sectors.  All that

11  means is the phone company has put multiple antennas facing

12  the same direction.  So that's probably a really busy tower

13  for them.  So they've stacked antennas.  But again, that same

14  azimuth, so that 40-degree azimuth.

15       And you'll see that that Tower 69199, 704-287-5769 has

16  now gotten to or arrived in that area.  And you'll also note

17  the Verizon phone, the 470-389-2569, is also in the area of

18  the Diamond Club and is utilizing that 75-degree azimuth.

19  And again, that being the Verizon portion of that tower.

20  Q.    Is this data consistent with both phones being in the

21  vicinity of the Diamond Club in and around this time frame?

22  A.    It is.

23       And, sorry, just before we move on.  And you'll notice,

24  too, so the Verizon phone is in that area a little bit of

25  ahead of time, so 1:43 a.m.  But you'll notice at 3:02 a.m.,

DIRECT OF JASON WARREN BY MR. GUINN          256

1   that last outgoing call there at the bottom, the 3:02:56, the

2   other phone, so the green phone, the 5769, is also in that

3   area at 3:03.  So in my opinion, around 3:02, 3:03, those

4   phones were in the same general vicinity or the same

5   location, being that Diamond Club.

6   Q.    And then on Page 17, Slide 17, what are we seeing here?

7   A.    Slide 17 we've noticed that the 704-287-5769 has now

8   moved over to -- again, we saw the K3 Soundz a couple slides

9   back.  So now the green phone, or the 5769 phone, has now

10  moved over to that K3 Soundz.  So you'll notice that it's

11  150489, Sector 11 was utilized, and that's that 40-degree

12  azimuth.  And that is the tower that is in the vicinity or

13  provides coverage to that K3 Soundz.

14  Q.    Now, just to be clear, when you're, I guess, riding

15  around with a phone in your car, are the cell towers

16  constantly tracking your phone?  What is this telling us?

17  A.    So this is phone usage.  So what we're looking at here

18  is somebody actually having to use the phone.

19        So, the question is, you know, the phone company keeping

20  tabs, kind of all your tower sector usage, as you move

21  through the network.

22        The short answer is yes and no.  So, there are datasets

23  at Verizon Wireless, but they only keep the data for about

24  seven days.  So if you're running Facebook on your phone or

25  some sort of app, WhatsApp, all these different apps, and the

1  phone is connecting to those towers to utilize the data side
2  of things, then the phone company would keep that.
3       But what we're looking at here is simply voice and
4  SMS usage, so we're not looking at data transactions.
5  Q.   Okay.  So notice here on this slide, Slide 17, that the
6  red phone from the previous slide is not on Slide 17.  Does
7  that mean the phone was gone?  Or not being used?  Or what
8  can we determine?
9  A.   So I had no location data for that red phone during this
10 given time, so the phone was not being used.
11 Q.   After this slide here, after the phone's down, the green
12 phone is down in Atlanta, Georgia, do you know -- do you have
13 any sense of where it headed back after that?
14 A.   Yes, so after these slides here, the phone then traveled
15 from the Atlanta area back to Charlotte, North Carolina.
16 Q.   Do you have any indication that the red phone also
17 traveled back up to Charlotte, North Carolina at that point?
18 A.   It did not.
19 Q.   Did you review another date that provided similar
20 information with respect to this case?
21 A.   I did.
22 Q.   So I'm going to take you to October the 24th, 2020, and
23 the time frame there between 7:06 and 9:31 a.m.  Please
24 explain to the jury kind of what we're looking at here.
25 A.   Okay.  So our phone number -- so the green phone has now

1  changed.  So we're looking at a different phone number, so

2  this time on the 24th, the green phone is going to

3  specifically relate to 704-449-7998.  Again, another T-Mobile

4  phone.

5        But on the 24th, we see a similar pattern to that other

6  T-Mobile phone.  The phone is leaving Charlotte,

7  North Carolina, traveling southwest towards Atlanta, Georgia.

8  And what I've captured for you here is at 7:06 a.m., the

9  phone utilized Tower 61502, Sector 24.  And that was at

10  7:06 a.m.  The phone travels southwest and I grab the last

11  tower here on this map is going to be, I think that's near

12  Carnesville.  And that is going to be Tower 73339, Sector 3,

13  and that was about 9:31 a.m.

14        And, again, those black arrows just showing that

15  direction of travel.

16  Q.    Okay.  I guess, is this 85 that is tends to see kind of

17  appearing to go along?

18  A.    Again, still traveling that pattern.  Traveling down

19  Interstate 85.

20  Q.    Slide 2, what are we looking at here?

21  A.    So Slide 19 is a continuation of the Slide 18.  I just

22  couldn't fit it all on one slide and still make sense of it.

23  So Slide 19 is, again, that continual southwest travel, the

24  phone is continuing to travel down.  And you'll notice -- so

25  picking up at 9:31, that's the tower from the previous slide

1  there in Carnesville.  That's at 73339, Sector 3.  And then
2  the last tower all the way at the bottom of the map here is
3  going to be Tower 62216, Sector 3.  And, again, this is at
4  704-449-7998, and that's going to be the tower at 10:22 a.m.
5  So, almost an hour has gone by there where the phone is
6  basically finishing up in the bottom of the left map.
7  Q.   This now new green phone, the 7998 phone, that's
8  headed -- where does it eventually wind up?
9  A.   So it eventually winds up in that area of Atlanta,
10  Georgia.
11  Q.   Okay.  And is this what's depicted here on Slide 20?
12  A.   It is.
13  Q.   Okay.  And if you could start at the top, kind of date,
14  time, and kind of just walk us through what we're looking at
15  here.
16  A.   So now we've zoomed down a little bit because we're
17  getting away from like that zoomed-out travel.  We zoomed
18  down a little bit.  We'll notice in the upper left, the phone
19  at 10:29:18 utilized Tower 152680, Sector 12, and then the
20  phone travels down and you'll notice it gets in the vicinity
21  of the K3 Soundz and in my opinion gets in the vicinity and
22  starts to leave and then comes back.  So that's why you see
23  like those differences in times.
24       In that lower left, we see the 67517 tower.  You'll
25  notice some of them start out at like 10:31 a.m. and you'll

1  notice the bottom is 10:27 a.m.  I don't necessarily think

2  that the phone sat there the entire time.  So the phone

3  basically tripped out and started to head back northbound and

4  then came back into that area.

5      And, again, we see those two, basically one, two, three,

6  four, five different T-Mobile sectors all kind of pointing to

7  like the area of K3 Soundz, but spending -- the green phone

8  spends quite a bit of time there.

9      If we move further over to the east, we'll notice the

10  phone -- again, going back to that Verizon, the red phone and

11  then the blue phone being that T-Mobile phone, we'll notice

12  that is utilizing towers off to the west.  And that's from

13  11:05 until 11:38 a.m. collectively for both of those phones.

14      So, the phone for -- those two phones stayed off to the

15  west at the time that the K3 Soundz -- or the green phone was

16  over in the vicinity of K3 Soundz.

17  Q.   What are we looking at here in Slide 21?

18  A.   So as I mentioned, I think the phone, that green phone I

19  think left and came back.  So some of the activity we're

20  noticing off to the left now is going to be on that return

21  visit.  So now we have at 11:50 -- actually 11:38 a.m. is

22  kind of our begin time.  Again, the red phone at 11:38 is

23  still off to the west.  And you'll notice from 11:38 to 11:54

24  the phone stays off to the west.

25      In my opinion, you know, the phone's going to be

1  somewhere.  You'll notice that red phone utilizes both those

2  towers and kind of overlapping amounts of time.  So that

3  phone is going to be generally stationary somewhere off to

4  the west in between those two towers.

5       So maybe if you'll come on down 1:24 and off to the left

6  a little bit right there, to our left, there you go.  So up.

7  The phone's going to be, for the Verizon phone, somewhere in

8  that space between those two towers.

9       But you'll notice at 12:14, the phone begins to move in

10 a westward fashion.  So at 12:14 the phone is utilizing

11 Tower 473564.  So the phone has now left those original

12 towers and started to move to the west.

13      And we'll notice this whole time, so the green phone

14 stays consistently in the area or in the vicinity of that

15 K3 Soundz.

16 Q.   Okay.  And then what are we looking at in this slide

17 here?

18 A.   Slide 22.  So the phone, the green phone, so that

19 704-449-7998 has departed that K3 Soundz and kind of that

20 Atlanta area and started headed back towards Charlotte or up

21 Interstate 85, so northbound Interstate 85.  And that's going

22 to be from your times -- again, our first tower here in the

23 lower left is going to be 12:42 p.m., and you'll see that it

24 stops just kind of southwest of Lavonia.  And that's going to

25 be at the 2:09, the phone utilized Tower 73687, Sector 3.

1  Q.   Do you know if this phone ever made its way back up to

2  Charlotte on 10/24/2020?

3  A.   On the 24th, it did not.

4  Q.   Do you know whereabouts it stopped at?

5  A.   It stopped in this general vicinity, in this area was as

6  far north it made it that day.

7  Q.   We don't have, I guess, the overview map.  But do you

8  know kind of where we are at this point?  Are we still in

9  Georgia, or close to South Carolina?  Where are we?

10 A.   I think we're still in Georgia almost to the

11 South Carolina line.

12 Q.   Okay.  And at that point that's where it stops hitting

13 on cell towers; is that correct?

14 A.   Correct.

15        MR. GUINN:  Just one moment, Your Honor.

16        No further questions, Your Honor.

17        THE COURT:  Any Cross?

18        MR. RAEL:  Yes, thanks.

19                   CROSS-EXAMINATION

20 BY MR. RAEL:

21 Q.   Good morning, sir.

22 A.   Good morning, sir.

23 Q.   Thank you for your service.

24 A.   Yes, sir.

25 Q.   So you're a Special Agent with the FBI.  And it sounded

CROSS OF JASON WARREN BY MR. RAEL          263

1  to me like you are really helping the public.  I mean, you're

2  helping kidnap victims and violent crimes and fugitives;

3  that's what you do?

4  A.    Yes, sir.

5  Q.    And then also understood that you have been involved in

6  counter-terrorism.  What did you do there?

7  A.    So, I investigated crimes against Americans committed

8  overseas.  So specifically if an American citizen traveled

9  abroad and was attacked, murdered, you think of it, I would

10 investigate that crime committed by somebody overseas.

11      And then to follow onto that, I also -- I investigated

12 foreign terrorist organizations that were plotting or

13 attacking or fighting the U.S. as they operated overseas.

14 Q.    So, when I get my GPS to go back this evening wherever

15 I'm headed, it will get me to precisely and exactly where I

16 have to go; right?

17 A.    So is your question if you're utilizing like your Google

18 Maps?

19 Q.    No, if I'm on a GPS and I want to go from wherever I am

20 to this courthouse, then I can get there exactly almost to

21 the precise area that I have to go to.

22 A.    So, working with location-based information as long as I

23 have, I don't -- I hesitate to use the words exactly.

24 Because even at the courthouse this morning as I drove in --

25 and I've been to the courthouse a thousand times -- I put it

CROSS OF JASON WARREN BY MR. RAEL                    264

1   in my Google Maps.  It gets me in the area.  I still need to
2   know where I'm going.  It got me within a block; right?  So.
3   Q.    I've only been here since yesterday.
4   A.    So, yeah.  So you got it.  So you know what the building
5   looks like now.  So hopefully -- you hear stories all the
6   time of people driving off in the woods because they say
7   their GPS told them to go there.
8        GPS is good.  If you're wearing an ankle bracelet, for
9   instance, and the company is coming back and telling you that
10  it is this latitude/longitude within 1 meter, it's good.
11       But this is not what we're talking about here.  Again,
12  we're talking about call detail records with cell site
13  information.  We're talking about cell sites.
14  Q.    I see.  So, in other words, with what you're showing,
15  it's got kind of like a range.  At one of them, it's been
16  like within of range of 10 percent, 20 percent, 40 percent.
17  It just depends; right?
18  A.    So, no, it doesn't.  So there's no -- so there's no
19  number that I put on it.  There's no 10, 20, 30, 40 percent.
20  You'll notice, again, if we refer back to the dots on a map;
21  right?  So the phone company is very deliberate as they
22  design and build their network.  So the RF propagation or the
23  way that the RF moves through the network has to be taken
24  into account, and that oftentimes dictates where they put
25  towers.

1     And the towers are built in a manner as to where I can
2  start on this tower -- so say, let's go for lunch.  So we're
3  going to go to lunch today.  I start a call as soon as I get
4  outside the courtroom and I walk over to Pot Belly Sandwich
5  to get a sandwich.
6     So, the phone company needs to know -- so your phone
7  needs to know what your adjacent towers are because I have to
8  keep that call from when I leave the courthouse all the way
9  until I get in line.  I am going to be a good customer, and I
10 am going to stop the call when I get up front and not be on
11 the phone while I'm trying to order food.  But I'm going to
12 tuck the phone away.  So that might be different towers.  So
13 the phone has to understand your serving cell, so the cell
14 tower right now that my phone is connected to.
15    It also understands all the adjacent towers.  Because --
16 so that's going to be called the neighbor list.  So the phone
17 needs to know the neighboring cell sites so that as I move
18 through the network, it can cleanly hand me off to those
19 different towers.
20 Q.   Excuse me, sir.  I didn't know if it was 10 percent,
21 20 percent.  I don't know everything as you do.  But I do
22 know that there is, isn't there, some kind of a range.  You
23 can't pinpoint precisely and exactly where somebody is;
24 right?
25 A.   So, with call detail records with cell site, again, we

1    drew those shapes and those wedges, I can't say specifically

2    that the phone was on Third Street versus Fourth Street

3    versus Fifth Street.  So, again, that's showing that the

4    phone was in the vicinity or in the area of.  And then I can,

5    based on my knowledge, training, and experience, figure out

6    that it would be -- the cell site cell sector would be

7    consistent with the tower sector that would provide service

8    to an address.

9         So if I looked at the towers for the courthouse, I can

10   figure out by looking at the towers and the usage, like what

11   towers would provide coverage to the courthouse.  It's not

12   going to be the towers facing the opposite direction.  It's

13   not going to be a tower in Gastonia, North Carolina, because

14   of all the towers downtown are busy.  Like, I can tell based

15   on the azimuths and the way it's drawn out what I believe

16   would be the serving cell for a particular address or

17   location.

18   Q.   Could you look at your Number 20 slide?

19   A.   Okay.  Yeah, if you can put it on the screen or somebody

20   can put it on the screen, I will.  I have nothing on my

21   screen right now.

22        MR. GUINN:  Just one moment, Your Honor.  I'll pull

23   it up.

24        MR. RAEL:  Could you do that for me?  Thank you,

25   sir.

CROSS OF JASON WARREN BY MR. RAEL                267

1           THE WITNESS:  You said Slide 20?
2    BY MR. RAEL
3    Q.    Yes.
4    A.    Okay.
5    Q.    I'm in kindergarten with this.
6    A.    It's okay.  No worries.  We'll wait on the technology.
7    Seems like we're all the time waiting on technology one way
8    or another.  And it's the computer and it knows we're waiting
9    on it, so it's going to take its time.
10          All right.  I see Slide 20.
11   Q.    Okay.  And on the very top of it, it says that someone
12   was there at 10:29.  And then they got to the location at
13   11:38; right?
14   A.    So, what it says -- again, it says that the phone was
15   traveling into the Atlanta area.  So at 10:29 the phone
16   utilized Tower 152680, Sector 12, and you'll notice at 10:31,
17   so you're talking almost, what?  Two minutes later, the phone
18   was utilizing the 0-degree azimuth.  And you'll notice at
19   10:35 it was utilizing the 120-degree azimuth.  So it got
20   into that area, I would estimate, around 10:35 p.m.
21   Q.    So, how long does it take to drive from this time of
22   10:29 till somebody gets to the location at 11:38?  How long?
23   Is it 10 miles, 5 miles, 50 miles?  Do you have any idea?
24   A.    So, I mean, if you're looking at the specific cell
25   sectors here, so Tower 152680, Sector 12, to the tower at,

CROSS OF JASON WARREN BY MR. RAEL            268

1   say, 67517 just below it, you'll notice in the bottom right
2   we have a scale.  So we're only talking, what?  You know,
3   without getting the piece of paper out and drawing
4   specifically, you're talking a couple miles.
5   Q.   Oh, a couple miles.
6   A.   But I also -- I also say that question, too.  It also
7   depends who's driving; right?  If it's my mother-in-law, then
8   that's going to take her 15 minutes.  If it's me, then I
9   could probably do it in a couple minutes.  But it also
10  depends on traffic.  Anybody who's been to Atlanta knows, you
11  know, that Atlanta's notorious for bad traffic, as well.
12       So the short answer is it depends.  But, again, what
13  you're looking at on this map is the phone at 10:29 utilized
14  that Tower 152680.  It traveled, you know, basically 10:29 to
15  10:31.  At 10:31 it picks up that 0-degree azimuth.
16       So, again, remember, as the phone moves through the
17  network, right, it's going to reselect the strongest,
18  cleanest signal.
19       So, in my opinion, at 10:31 the phone is reselected now
20  to Tower 67517.  The phone continues to travel down south.
21  And then you'll notice at 10:35 is when we see that sector
22  off to the east, that 120-degree azimuth is utilized at
23  10:35.
24       And as I mentioned earlier, like, the phone travels
25  around the area a little bit before it decides to travel back

1  out of town and come back again.  I'm not exactly sure what

2  all that in-and-out was, but the phone bumps around and kind

3  of hangs out in that area, and then travels out and then

4  travels back in what we see in the next slide.

5  Q.   So if I understand -- and you could tell the jury

6  this -- it takes, depending upon how fast you drive, just a

7  couple of miles to go, to get to the final location.  Someone

8  left, whoever it might have been, at 10:29 and then got to

9  the actual location, which would have been this K3, that's

10 the final location, that's the studio, at 11:38; right?

11 A.   No.

12      So, what we're looking at, here again, is that inbound

13 travel at 10:29.  You see the tower off to the top left.  At

14 10:31, the phone has changed towers.  The phone now is

15 utilizing Tower 67517.  And then you'll see that it continues

16 to travel.

17      So at 10:49 it is utilizing Tower 150489.  That's going

18 to be the tower that is shaded kind of that K3 Soundz.  So

19 that's 10:49 to 11:25.

20      I believe you'll notice at 11:27 it utilizes that

21 120-degree sector again for 67517, and again that's at 11:27.

22 So that's going to be probably back on the outbound side.

23 Q.   Okay.  So the gap between 10:29 till 11:38, I'm not a

24 math wizard, that's how long, sir?

25 A.   So you're talking 59 minutes.

1  Q.   59 minutes.  All right.

2  A.   But, again, understand that we're looking at two

3  different phones.  The usage for the 11:38 calls were on the

4  Verizon phone in the upper right.  So, what we're looking at

5  kind of end of record or end of time for the 7998 number is

6  11:27 a.m.

7  Q.   All right.  Thank you, sir.

8  A.   Okay.

9       THE COURT:  Any Redirect?

10      MR. GUINN:  No, Your Honor.

11      THE COURT:  You may step down.

12      THE WITNESS:  Thank you, Your Honor.

13      THE COURT:  Call your next witness.

14      MR. GUINN:  Your Honor, at this time the United

15 States rests.

16      THE COURT:  Very well.  Members of the Jury, we're

17 going to take our morning break at this time.  Don't talk

18 about the case.  Keep an open mind.  And we'll see you in

19 15 minutes.

20      (The jury left the courtroom at 10:49 a.m., and the

21       following proceedings were had out of the presence of

22       the jury.)

23      THE COURT:  Be seated.

24      Mr. Rael, are there any motions at this time?

25      MR. RAEL:  Yes, I'm going to make a motion to

CROSS OF JASON WARREN BY MR. RAEL                271

1  dismiss.  But I think I'm going to be very quick.  I do that

2  because in case there's an appeal, do that.  But I have no

3  argument to give to the Court relative to that.  The Court

4  will make its own decision as to whether it's appropriate or

5  inappropriate.

6          THE COURT:  All right.  In analyzing that motion, I

7  have to take the evidence in the light most favorable to the

8  Government; and when I do that, I find that there's

9  sufficient information to go to the jury.

10          Do you intend to put on evidence at this time?

11          MR. RAEL:  Yes.

12          THE COURT:  Very well.  I would like to make an

13  inquiry on the record with Mr. Watkins to make sure that --

14  to satisfy the Court that Mr. Watkins understands his rights

15  in this area.

16          Mr. Watkins, would you please stand?

17          THE WITNESS:  (Complies.)

18          THE COURT:  And so I think you heard me tell the

19  jury at the beginning of the case during jury selection that

20  you had a constitutional right not to testify; that there's a

21  presumption of innocence in every criminal case.  And so you

22  do not have any burden to either put on evidence or to

23  testify.  That's your constitutional right.

24          But you also have a right to testify if you wish to

25  testify.  And I know that's a topic that you have discussed

1   with your attorney.  But I want to make sure on the record

2   that you understand your rights in this matter to testify or

3   not to testify.

4          If you chose not to testify, I would again instruct

5   the jury that that's your constitutional right and they can't

6   hold it against you.

7          DEFENDANT:  Yes, sir.

8          THE COURT:  So, having said all that, have you made

9   a decision whether to testify or not in this case?

10         DEFENDANT:  No, sir.  I'm going to get with my

11  lawyer to see their decision.

12         THE COURT:  Do you understand your rights that you

13  have a choice to testify or not --

14         DEFENDANT:  Yes, sir.

15         THE COURT:  -- testify?

16         Thank you.

17         Mr. Rael, can you give me, for scheduling purposes,

18  just a proffer of your evidence, the nature of it?

19         MR. RAEL:  Yes.

20         THE COURT:  The number.

21         MR. RAEL:  If I may, the Court should anticipate

22  that there are going to be about a baker's dozen witnesses.

23  Those witnesses are dealing in two areas.  Area one is about

24  the situation with Ms. Anderson and what they know about what

25  Ms. Anderson had said in my opening about -- what she said

1  that Mr. Watkins had nothing to do with the drug transaction.

2  She said it.

3        And by the way, it will be more than a baker's

4  dozen should Ms. Anderson come to court to testify.

5        I would have hoped while under subpoena that she

6  would.  There has been some conversation apparently with the

7  U.S. Attorney when they went to see her that she don't want

8  to deal with defense attorneys.  I could understand that.  I

9  don't know what that will or will not occur.

10        The second area is going to be about the other

11  person who has pointed the finger at -- Ms. -- my client,

12  that is Ms. Sanders.  We have evidence as to what Ms. Sanders

13  did both on July 4th as well as what we know about the box

14  that she never opened, that she didn't look at, and what was

15  in that box, and that none of that which was in the box

16  whatsoever is illegal drug despite her saying such.

17        Those witnesses can do that.

18        Further, there is the situation as to the shooting

19  that occurred where Mr. Watkins was shot.  That happened

20  apparently, according to what the evidence is showing,

21  literally hours before what was a supposed drug transaction

22  with Ms. Anderson.  And we will have evidence that can relate

23  to all of that.  That is in its essence what it will be.

24        Since there are about a dozen witnesses, and since

25  our time is about 11 o'clock, my expectation, especially if

CROSS OF JASON WARREN BY MR. RAEL                274

1    Ms. Anderson decides to take the stand and then gets

2    cross-examined by the United States Attorney or attorneys, I

3    can't envision that the case would be concluded today.

4           But, you know, that's a guess, and I'm asking the

5    Court only to give me a guess.

6           THE COURT:  Yeah, and that's what I was requesting

7    of you.

8           So I understand that the nature of your defense

9    presentation will be a factual one?

10          MR. RAEL:  Oh, yeah, definitely.

11          THE COURT:  All right.  Thank you.

12          So we'll take a 10-minute break at this time.

13   We'll take a 15-minute break and be ready to go at 11:15.

14          MR. SIELAFF:  Your Honor, if I may, just -- I do

15   not have a motion prepared.  I didn't think one would be

16   necessary.  But if I heard the defense forecast, I believe

17   the quote was a baker's dozen to testify about what Latisha

18   Anderson said, more if Latisha Anderson testifies.

19          I don't know how we're going to hear 13 witnesses

20   testify about what a non-testifying co-defendant has said

21   about the events.  I expect that what is being forecasted is

22   entirely hearsay.

23          The second category was evidence about Jonquilla

24   Sanders' behavior on July 4th.  That sounds to me like

25   improper character evidence.

1          So, basically, I have concerns that most of what
2     I've heard being forecasted by the defense is simply improper
3     evidence.
4          THE COURT:  So, what I hear you articulating is a
5     motion in limine to prohibit hearsay and improper character,
6     witness character evidence.
7          I'd be glad to hear your response to that motion,
8     Mr. Rael.
9          MR. RAEL:  Well, I think he's right.  I think that
10    hearsay is not appropriate and is not the right thing to do.
11         Relative to July 4th, that is not a character
12    matter, sir, because there was a confrontation in the
13    evidence as to what occurred on July 4th with Mr. -- with my
14    client.  So, I would say when that comes up, we can argue.
15    That will take it to just one more day.  But whatever it is,
16    that's my response.
17         THE COURT:  So, I'll take up those objections when
18    they're ripe.
19         MR. SIELAFF:  Yes, sir.  Thank you for hearing me.
20         THE COURT:  Thank you.
21         (Recess held from 10:59 to 11:14 a.m.)
22         THE COURT:  Are we ready for the jury?  Call the
23    jury.
24         (The jury came back into the courtroom at 11:16 a.m.,
25         and the following proceedings were had in the

DIRECT OF LATISHA ANDERSON BY MR. RAEL          276

1        presence of the jury.)
2            THE COURT:  Be seated.  Members of the Jury, when
3    we broke for our recess, the Government had rested its case.
4    It is now the Defendant's opportunity to put on evidence if
5    he chooses to do so.
6            Mr. Rael, do you intend to put on evidence at this
7    time?
8            MR. RAEL:  Thank you, Your Honor.  I would like to.
9            THE COURT:  Call your first witness.
10           MR. RAEL:  Thank you.  Your Honor, this is
11   Ms. Latisha Anderson, and I'm going to call her first.
12           THE CLERK:  Ms. Anderson, if you could please
13   stand?  Place your left hand on the Bible and raise your
14   right.
15           THE WITNESS:  (Complies.)
16                       LATISHA ANDERSON
17   and having been duly sworn was examined and testified as
18   follows:
19                       DIRECT EXAMINATION
20   BY MR. RAEL:
21   Q.   Good morning, Ms. Anderson.
22   A.   Good morning.
23   Q.   You understand that you're here under my subpoena?
24   A.   Correct.
25   Q.   And I understood that you were not real interested in

DIRECT OF LATISHA ANDERSON BY MR. RAEL          277

1  talking to defense lawyers, and I can understand that.  But
2  you are here before this jury today.  And you did put your
3  hand on this Bible; right?
4  A.    Correct.
5  Q.    And that's to tell the truth?
6  A.    Yes, sir.
7  Q.    The whole truth?
8  A.    Yes, sir.
9  Q.    And nothing but the truth?
10 A.    Yes, sir.
11 Q.    Will you do that today, whether it's for me or for these
12 U.S. Attorneys here?
13 A.    Yes, sir.
14 Q.    Do you have any kind of background that would help the
15 jury understand that when you place your hand on this Bible
16 today you are really telling the truth?  Do you believe in
17 any of that?
18 A.    Yes, sir.
19 Q.    What do you believe?
20 A.    I believe that the truth --
21        MR. SIELAFF:  Objection, relevance.
22        THE COURT:  Sustained.  Let's get to the substance,
23 Mr. Rael.
24        MR. RAEL:  All right.
25

DIRECT OF LATISHA ANDERSON BY MR. RAEL        278

1   BY MR. RAEL:

2   Q.   All right.  Are you currently now in jail?

3   A.   I am.

4   Q.   Why are you in jail?

5   A.   I was caught with drugs on the 24th of October, and it

6   may have been, like, two years -- almost two years now, if

7   I'm not mistaken.

8   Q.   All right.  Is that -- if it were about 5.3 pounds of

9   drugs, would that be about right?

10  A.   I mean, I don't know exactly how much it weighed, so I

11  don't recall the actual weight.

12  Q.   All right.  Were those drugs that were found in your

13  car?

14  A.   You say was there drugs?

15  Q.   Were there drugs in your car?

16  A.   Yes.

17  Q.   That was the drugs that were over when you got stopped?

18  A.   Yes.

19        MR. SIELAFF:  Objection, leading.

20        THE COURT:  Overruled.

21  BY MR. RAEL:

22  Q.   When you got stopped, can you tell us what happened when

23  you got stopped?

24  A.   Well, when I got pulled over on October 24th, the

25  officer came to the car.  He was like:  Oh, do you know why I

DIRECT OF LATISHA ANDERSON BY MR. RAEL     279

1  pulled you over?  I was like:  No.  Why?  He was like:  Oh,
2  you were speeding.  And, of course, we went back and forth on
3  the speeding thing because I wasn't speeding.  But, okay.
4  Let's go with it.
5       Then he was like:  Well, your sticker is out on the back
6  of your car.  Do you mind stepping out of the car, you know,
7  just so I could show you the sticker being out on the back of
8  your car.  So before I get out, I asked him, I said:  Did you
9  pull me over for speeding or did you pull me over for the
10 sticker?  He's like:  Well, we're just going to show you the
11 sticker on the back of the car.
12      So I get out of the car.  I walk to the back.  And, of
13 course, the sticker was out.  I didn't know the sticker was
14 out because the car did not belong to me.  So I was like,
15 okay, it's out.
16      So as I went to walk back towards the car, he was like:
17 Well, don't go get back in the car.  Just stand right here
18 for a minute.  I was like:  Okay, cool.  So I stood back
19 there at the car.
20      And he was like:  Do you mind if I search the car?  I
21 was like:  Of course I mind, because you pulled me over for a
22 traffic stop, not nothing that as you say, anyway.
23      So he was like:  Well, just stay here and I'm going to
24 wait for backup.
25      Didn't know what he was calling backup for because, as I

1   stated, he pulled me over for speeding.  So why did you want
2   to search the car?  But, later I found out that he pulled me
3   over because he was instructed to pull me over.
4   Q.   I see.  Now, ma'am, have you ever anywhere been
5   convicted before this of any kind of felony at all?
6   A.   No, sir.
7   Q.   And this event, this problem that you had where you are
8   now in jail, is that because you -- this was the first time
9   that you've ever been convicted of any kind of drug situation
10  or even any other kind of felony at all?
11  A.   Correct.
12  Q.   So, after the officer took you to -- did he search your
13  car?
14  A.   Well, after he called backup or whatever, and I never --
15  I still to this day don't understand why it was maybe like
16  13, 14 police cars out there.  But he was like:  Oh, we were
17  like we're going to search your car.
18  Q.   Let me just stop you there.  You said there were 13 or
19  14 cars?
20  A.   Correct.
21  Q.   Who did that?
22  A.   I mean, I guess whoever authorized them to pull me over,
23  because like I say, I was not speeding, so.
24  Q.   Were they other -- were they folks with the sirens
25  going, the police and stuff like that?

DIRECT OF LATISHA ANDERSON BY MR. RAEL          281

1    A.    Well, they didn't have any sirens at all.  It was, a
2    couple of them had their blue lights on and a couple of the
3    cars were just out there, I guess, for more support, maybe.
4    I don't know.
5    Q.    Well, you had other people in the car, too?
6    A.    No, it was just me.
7    Q.    Okay.  So, after you -- did they take you to jail?
8    A.    Well, yeah, after they called the dogs and whatever and
9    searched the car, well, and had the dog walking around the
10   car like maybe two or three times, they told me, they was
11   like:  Well, we got a hit on the driver's side.  I was like:
12   What?  He's like:  Yeah, the dog hit on the driver's side.  I
13   was like:  It's not possible.  He was like:  Well, we're
14   going to search the car.
15        So they searched the car, find the drugs or whatever.
16        And he was like -- they read me my Miranda rights and
17   put me in the back of the police car and took me to Franklin
18   County Detention Center.
19   Q.    Might I ask, you live in Charlotte?
20   A.    Yeah, I live in Charlotte.
21   Q.    For a while?
22   A.    Yeah, I was born and raised here.
23   Q.    Let's see.  Where is that?
24   A.    Probably about -- I grew up on the west side of
25   Charlotte, so it's probably about 10 minutes away from this

1    actual court.

2    Q.    All right.  Are you familiar -- now, also when -- after

3    they took you to jail, where was that?

4    A.    In Franklin County.

5    Q.    Okay.  From Franklin County, did they then transport you

6    anywhere else; and if so, where?

7    A.    No.  From Franklin County, I was denied bond when I got

8    there.  But I think maybe, I want to say between 10, 15 days

9    later, I went to court, got a bond and bonded out.

10   Q.    I see.  Were you ever in Mecklenburg jail?

11   A.    Yes.  I was sent to Mecklenburg September the 1st of

12   last year.

13   Q.    Are you familiar with a woman named Sanders?

14   A.    I am.

15   Q.    If I told you that you'd spoke with Ms. Sanders for one

16   week since you got arrested, would that be accurate?

17   A.    No.

18   Q.    What would be accurate?

19   A.    It would be accurate that I was in there for -- I was

20   in -- the pod that we was in is a program pod, so I was in

21   that pod with her for maybe --

22   Q.    May I interrupt you.  What's a program pod?

23   A.    Different kind of programs.  It's like drug classes,

24   GED.  Just -- they have other classes, but them is like the

25   main two classes that you go in there for.  But they have

1   other classes.  But like I said, the GED and the substance
2   abuse class are the main two classes.
3         So, I was in there for maybe two months and a half
4   until -- I left that pod exactly -- December the 3rd is when
5   I left.
6         But we talked every day.  Like when I first get there,
7   she was like, she was like:  Are you Latisha?  And I was
8   like:  Yeah.  Because the way her approach was, you know, and
9   I was like yeah.  She was like:  Oh, we're on the same case.
10  I was like:  But I don't know you.  She was like:  I don't
11  know you, either.  And so I came to understand that that's
12  part of the indictment.  Everybody don't know everybody.
13        So, she was like --
14              MR. SIELAFF:  At this point I'm going to object to
15  the narrative of the conversation.
16              THE COURT:  Sustained.
17              So, Ms. Anderson, listen to the question and answer
18  it and then wait for the next question.
19              THE WITNESS:  Okay.
20  BY MR. RAEL:
21  Q.   So, now, when you met -- did you meet with members of
22  the United States Attorney's office on or around the 1st of
23  June?
24  A.   I did.
25  Q.   Okay.  About how long was that meeting?

1  A.   About 15, 20 minutes, I'm not sure.  I didn't have a

2  watch, so I can't tell you the exact amount of time that I

3  was in there.

4  Q.   I guess they don't give that to you in jail?

5  A.   Of course not.

6  Q.   Just time.

7  A.   Uh-huh.

8  Q.   So, ma'am, did they tell you that -- what did they tell

9  you about what could happen to you good if you were to

10  testify for them?

11  A.   Well, they actually didn't tell me anything.  I spoke

12  with my attorney, and he gave me the info, I guess what they

13  gave him.

14  Q.   Let's not talk about what the attorney and you talked

15  about.  That would be something you can't really get into.

16  But what did you believe could happen to you if you testified

17  for the Government?

18  A.   Well, maybe I could get a downward departure or I could

19  get a lower sentence or something like that.

20  Q.   But, I don't know if you know, but they've rested.  They

21  didn't do anything.  They didn't call you.

22          THE COURT:  Mr. Rael, you're supposed to ask the

23  witnesses questions, not tell her about legal proceedings.

24          MR. RAEL:  Judge, I'm sorry.

25          THE COURT:  Ask the next question.

1          MR. RAEL:  No problem.

2    BY MR. RAEL:

3    Q.    So, did you know that you could get a downward departure

4    if you testified?

5    A.    I mean, I know that they offer stuff like that, but.

6    Q.    Who offered that?

7    A.    I know that the U.S. Attorney offers things like that.

8    Q.    I see.  But did they tell you that?

9    A.    Well, in the beginning, like when I first spoke with

10   them they did.  But they didn't say nothing like that on June

11   the 1st, no.

12   Q.    You first spoke with them when?

13   A.    I don't want to quote myself, but I think it was around

14   May when I was released from jail, on 24 hours house

15   confinement.

16   Q.    What did they tell you then?

17   A.    They told me if I told the truth and I agreed to testify

18   that I would -- maybe I could get -- they could talk to a

19   judge, recommend that, you know, the judge give me a lesser

20   sentence.  But they couldn't promise anything.

21   Q.    Okay.  Did they talk to you about my client over here,

22   Mr. Kenny Watkins?

23   A.    Well, that conversation didn't go long, either, because

24   they just showed me a picture of him.

25   Q.    Wait a minute.  They showed you a picture of KennyMan?

DIRECT OF LATISHA ANDERSON BY MR. RAEL          286

1   A.    Yes.

2   Q.    And after they showed you that picture, what did you

3   say?

4   A.    I don't know him, which I don't know him.  So they was

5   like --

6   Q.    Excuse me.  So way back then they showed you a

7   photograph?

8   A.    Correct.

9   Q.    And you said you didn't know him?

10  A.    Right, because I don't know him.

11  Q.    Well, wait a minute now.  Okay.  You don't know him.

12  How many times have you all met him?

13  A.    Well, this is only my second time seeing him besides the

14  two times I saw him on the computer, the picture that they

15  showed me.  But this is only my second time seeing him in

16  person.

17  Q.    Well, he was the one that you met with and he gave you

18  all that 5.3 pounds of drugs?

19  A.    He didn't.

20  Q.    Did they tell you that?  The Government told you that?

21  A.    No.  They was just like:  Do you know him?  And I was

22  like:  No.  And he was like:  Well, you met him before.  And

23  I was like:  That don't mean that I know him just because I

24  met him before, and I wouldn't even call that like a meet and

25  greet.  You know, it was just a transaction.  And it wasn't

DIRECT OF LATISHA ANDERSON BY MR. RAEL        287

1    an illegal transaction.  But it was just one transaction that

2    me and him had, and it didn't even last two minutes.  So I

3    wouldn't say that, no, I don't know him.  Have I seen him?

4    Yes.  Do I know him?  No.

5    Q.   You're obviously not good friends, obviously.  You've

6    never even so much as known him.  So I'm trying to figure,

7    why is he here?

8              MR. SIELAFF:  Objection.

9              THE COURT:  That's not for you to figure, Mr. Rael.

10             MR. RAEL:  All right.

11             THE COURT:  It's your role to ask this witness

12   factual questions, and if you will stick to that.

13             MR. RAEL:  All right, Your Honor, I will.

14   BY MR. RAEL:

15   Q.   So you had -- did you have any funds in addition to all

16   of this amount of drugs, you don't know how much, but it

17   turned out to be 5.3 pounds?  Did you have any money?

18   A.   I did.

19   Q.   When you left Charlotte, did you have any money?

20   A.   I did, but I didn't have $4,500 when I left Charlotte.

21   I had maybe about $200 when I left Charlotte.

22   Q.   What was the point of having $200?

23   A.   Gas money, food, cigarettes, and just in case like I saw

24   something I wanted.

25   Q.   When you left Charlotte, did you leave in your car?

1    A.    No.

2    Q.    What car did you leave in?

3    A.    I drove my brother's car.

4    Q.    Okay.  What kind of car is that?

5    A.    It's a gold Toyota Camry.

6    Q.    Gold?

7    A.    Yeah.

8    Q.    And when you left, what was the purpose of leaving?

9    A.    Well, I was doing a friend a favor at the time.  Like I

10   said before, I didn't know that he was having me to pick up

11   drugs.  But curiosity killed the cat.  I didn't actually know

12   what was in the box until I started driving down the highway

13   and I wanted to look in it, so I opened it.

14   Q.    I see.  Now, if you came over -- if you came only with

15   you said $200, but there were -- when you got stopped there

16   was a considerable amount of money, how did you get that

17   money?

18   A.    Well, I got $4,500 from your client.

19   Q.    For drugs?

20   A.    No.

21   Q.    For what?

22   A.    Well, from my understanding, the money was from -- he do

23   music.  So the money was from a feature or something that him

24   and another gentleman had done.

25   Q.    Who was the other gentleman?

1  A.   Mr. Cloud.

2  Q.   Okay.  Do you call him Mr. Cloud?

3  A.   No.  We call him Ziggy.

4  Q.   Ziggy.  Okay.  Do you know specifically what it was for?

5  A.   I don't.  I just know that he said it was for some

6  music, like I guess he feature on a song or something that

7  they had done together, so I'm assuming that's what it was

8  for.  I mean, we didn't get into details.  He just asked if I

9  could grab that from him while I was up there, and I did.

10 Q.   All right.  So -- I guess this doesn't move, all right.

11      So, what was your reaction when the U.S. Attorneys came

12 to you and you indicated, as you did, that he was not the

13 right man?

14 A.   I mean, I was just telling them that they got the wrong

15 guy.

16 Q.   Well, what was your reaction to that?

17 A.   I was just like, wow, you know.

18 Q.   Did you expect that he would be charged, if you know, of

19 this drug conspiracy?

20           MR. SIELAFF:  Objection to --

21           THE COURT:  Sustained.

22           MR. SIELAFF:  -- her expectations.

23           THE COURT:  Sustained.

24 BY MR. RAEL:

25 Q.   So at some point, ma'am, you say that you met this

1  Ms. Sanders for a period of time; is that right?

2  A.   Correct.

3  Q.   And that you had any number of conversations -- did you

4  have conversations with Ms. Sanders?

5  A.   Yeah, we had a lot of conversations.

6  Q.   Did any of those conversations involve my client?

7  A.   Maybe a couple.

8  Q.   Of those couple of conversations, do you recall what she

9  might have said about the case?

10 A.   Well, I recall one where she said that --

11            MR. SIELAFF:  Objection.

12            THE COURT:  Overruled.

13 BY MR. RAEL:

14 Q.   That means you can respond.

15 A.   Oh.  Well, I recall one where she was like they were at

16 a party and he had said something to her out of the way or

17 something, had caught an attitude with her or something

18 because she was drunk or something.  And she was like that

19 she don't, she's not too fond of him.  She don't like him.

20 Q.   May I just stop you.  She said she was not too fond of

21 him.

22 A.   Yeah.

23 Q.   Is that the exact words she said?

24 A.   Yeah.

25 Q.   Can you tell us why?

1   A.   She said they had an altercation at a party or something
2   that they was at.  I don't know nothing about these parties.
3   I never been to any of their parties.
4   Q.   All right.  Now, did she tell you anything about the
5   sentence that she might get?
6   A.   Well, yeah.  She said that she was getting a 5K and --
7   Q.   Let me stop you.  Do you have any idea what that is?
8   A.   I mean, I don't know what it consists of.  But when
9   you're locked up, like, everybody in jail talks about a 5K.
10  I guess it's like a new pair of Jordans, everybody wanted it.
11  Q.   All right.  Go right ahead.
12  A.   So she was like that she's been in the 5K.  She's not --
13  she's not going to sit in jail for nobody.  She's going to do
14  whatever she got to do to make sure that she get home to her
15  son.  And I was looking at her and I was like:  What do you
16  mean by that?  She was like:  You could just tell them
17  anything.  She was like:  It's not like they're going to know
18  or whatever.  And I was like:  What?  And she was like:  You
19  stupid, because you not getting it.  I said:  Do you know
20  that you could ruin somebody's life?  She's like, her exact
21  words were, excuse my language:  I don't give a fuck as long
22  as I don't have to sit in jail.  I was like:  Wow.  That's
23  how you feel?  She was like:  It's life.  It is what it is.
24  Just like, okay, cool.
25  Q.   When she said such a thing, how did you feel?

1   A.   I was baffled.  I was like, wow, because like I say, you

2   could ruin, like you could really ruin somebody's life like

3   that.  And she was like:  I don't give a fuck.  I'm not going

4   to be here.  And she was like:  Well, you know, I only got a

5   year, anyway, so I'll be out December 3rd while you're still

6   sitting in jail.  And I'm like:  I'm not going to -- my life

7   is already ruined.  I'm not going to damage nobody else.

8   Q.   I see.  You'll notice if you look at the fellow you

9   hadn't met before, he has looks like some sort of religious

10  thing.  Did she say anything about any of that?

11  A.   Well, she was like:  Oh, he a Muslim.  He don't -- she

12  call him a 5 percenter.  Like, I don't know what that is.

13  I'm Baptist.  So she was like:  Oh, he's a 5 percenter.  He

14  don't know what he want to be, this, that, and a third.  He

15  wear that cap for show.  And I mean, she was just going on

16  and on.  I guess the little altercation that they had at that

17  party didn't go good.  I don't know.  But she's not fond of

18  him at all.

19              MR. RAEL:  Your witness.

20              THE COURT:  Any Cross?

21              MR. SIELAFF:  Please, Your Honor, thanks.

22              MR. RAEL:  Just a moment.

23              THE COURT:  Mr. Sielaff, you can begin your cross.

24                         CROSS-EXAMINATION

25

CROSS OF LATISHA ANDERSON BY MR. SIELAFF      293

1   BY MR. SIELAFF:

2   Q.   Ms. Anderson, can you hear me okay?

3   A.   I can.

4   Q.   I was actually at the meeting June 1st that you referred

5   to with the defense counsel; is that right?

6   A.   Yes.

7   Q.   And your testimony today is that all the pills,

8   Government's 14, some 9,000 pills, those did come out of your

9   car; right?

10  A.   Correct.

11  Q.   And you said that you had them because you were doing a

12  favor for a friend?

13  A.   Correct.

14  Q.   Who is that friend?

15  A.   Like I told you in the meeting that we had on the 1st, I

16  won't mention this friend because he's unknown.  He's not a

17  part of this case, so I won't mention that person.

18  Q.   Okay.  So, you told us clearly you weren't going to say

19  nothing about where the pills came from; right?

20  A.   I told you I wasn't going to mention the name.  It was

21  an unknown person.  Yes, I did tell you that.

22  Q.   And then again, you talked to the defense counsel about

23  a meeting that took place before that with law enforcement;

24  right?

25  A.   Correct.

1   Q.   And in that meeting, you unequivocally stated you don't
2   know Kenny Watkins when they showed you a picture and said:
3   Who's this?
4   A.   I did.
5   Q.   You said:  I don't know?
6   A.   I did.
7   Q.   So you see a picture, your answer, "I don't know?"
8   A.   Exactly.
9   Q.   Okay.  But you do know Steven Cloud; right?
10  A.   I do.
11  Q.   In fact, y'all were in a dating relationship?
12  A.   I mean, we ain't going to say that, but.
13  Q.   Well, what would you say?
14  A.   I mean, he was -- if I had an itch, he was the one that
15  scratched it.
16  Q.   After your arrest, you actually called him several times
17  from the Georgia jail; right?
18  A.   I ain't going to say several, but, yeah, I called him.
19  Q.   And at the end of each call, he'd say "I love you" and
20  you'd tell him, "I love you more"; right?
21  A.   I don't recall, but probably.
22  Q.   So you two would tell each other frequently you loved
23  each other?
24  A.   Probably so, yes.
25  Q.   And he posted your bail; right?

1   A.   Wrong.

2   Q.   Okay.  He didn't provide you any money to post your

3   bail?

4   A.   He probably gave me some, but he didn't give me what my

5   bail was.

6   Q.   Who did?

7   A.   My mother and my sister.

8   Q.   Okay.  And when you were arrested with the pills, they

9   also took your iPhone; right?

10  A.   Correct.

11  Q.   And the phone number for that iPhone was 704-449-7998;

12  correct?

13  A.   Correct.

14  Q.   But you also used Google Voice; right?  You also had

15  another Internet number that people could dial and it would

16  ring on that same phone, 678-208-8071?

17  A.   Wrong.  I don't know who that number is.

18  Q.   So how many times do you remember talking to Steven

19  Cloud during your trip to Georgia?

20  A.   Talking to him while driving there?

21  Q.   Yes, ma'am.

22  A.   None, not one.

23  Q.   Not one?

24  A.   Zero.

25  Q.   Okay.  You don't remember talking to him a single bit?

1   A.    Not driving there.  You asked me do I remember talking

2   to him while driving to Georgia.

3   Q.    Yes.

4   A.    I did not talk to him at all driving to Georgia.

5   Q.    It wasn't until you got to Georgia?

6   A.    It wasn't until probably I had been there maybe two and

7   a half hours, maybe, an hour, two hours.

8   Q.    And Steven Cloud was a drug dealer; right?

9   A.    You could say that.

10  Q.    I mean, and you knew that at the time?

11  A.    Yeah.

12  Q.    He dealt pills?

13  A.    I don't know what he dealt with, but.

14  Q.    Well, you all exchanged phone calls and texts about how

15  to sell pills and how to sell meth; right?

16  A.    Oh, we didn't exchange phone calls about how to sell

17  meth.  I actually initiated that conversation about the meth

18  because I received the mail from a junky, which is a

19  crackhead, y'all call him whatever you want to call him.  And

20  I don't know anything about meth, so I asked him about it.

21  Q.    Because he would know?

22  A.    I figured maybe.  I'm not going to sit here and say he

23  would know, because everybody -- just because you're a drug

24  dealer don't mean that you know how to sell everything, every

25  drug that you get, no.

CROSS OF LATISHA ANDERSON BY MR. SIELAFF     297

1  Q.   So, Saturday, October 24th, 2020, you remember that date
2  pretty good, I see?
3  A.   Uh-huh.
4  Q.   You started the day here in Charlotte?
5  A.   Correct.
6  Q.   And you left fairly early in the morning to head to
7  Georgia?
8  A.   Correct.
9  Q.   Specifically you went to Decatur; right?
10  A.   I'm not sure what part of Georgia I went to.
11  Q.   Atlanta area?
12  A.   Yeah.
13  Q.   And when you left Charlotte, you didn't have 9,000 and
14  some pills in your car, did you?
15  A.   I did not.
16  Q.   And you spoke to Steven Cloud after you got there?
17  A.   Correct.
18  Q.   In fact, you'd been trying to call him a lot and text
19  him.  He wasn't answering his phone.  And the texts were
20  either bouncing or he wasn't reading them; right?
21  A.   Correct.
22  Q.   Because you were supposed to have a meeting around
23  10-ish.  And you weren't able to meet anybody at 10-ish;
24  right?
25  A.   I didn't meet anybody until like 10:30 or 11 o'clock.

1  Q.   And you were getting frustrated that Steven Cloud wasn't
2  answering his phone?
3  A.   Right.  Because he asked me to pick up something for him
4  and he wasn't answering, so it was kind of making me upset.
5  Q.   And he wanted you to pick up something from Kenny
6  Watkins?
7  A.   Correct.
8  Q.   KennyMan?
9  A.   Correct.
10 Q.   And so even though you left early in the morning, you
11 got to the Atlanta area about 10-ish, maybe 10:30; right?
12 A.   I was there before then.  I got there --
13 Q.   Even before then?
14 A.   Yeah.
15 Q.   And on behalf of Steven Cloud, you were trying to meet
16 with KennyMan, the Defendant?
17 A.   Right.
18 Q.   And you didn't actually get a chance to meet with him
19 until about 12:30?
20 A.   I don't know the exact time, but maybe.  Between 12:30,
21 1:00, I'm not sure.
22 Q.   You're not sure of the exact time?
23 A.   Right.
24 Q.   Does 12:30 sound about right?
25 A.   I mean 12:30, 1 o'clock.

1   Q.   12:30 or even maybe 1 o'clock?

2   A.   Right.

3   Q.   It wasn't before 12:30, if anything it was closer to

4   1:00?

5   A.   I'm not sure.

6   Q.   Okay.  Was it before noon?

7   A.   That I met with KennyMan, was it before noon?

8   Q.   Yes.  It was afternoon; right?

9   A.   I'm assuming that it might maybe was.

10  Q.   And, in fact, you got so frustrated you were going to

11  leave without meeting him; right?

12  A.   Correct.

13  Q.   And then you got on a three-way call with Ziggy or,

14  Mr. Cloud, and the defendant where he said:  I'll meet you at

15  the spot in 10 minutes; right?

16  A.   Right.

17  Q.   And you went back and you met with him.

18  A.   Not -- no.  It wasn't anything happen like that.  It

19  wasn't in 10 minutes.

20  Q.   It took longer, in fact?

21  A.   Maybe like --

22  Q.   But he's -- I'm sorry.  I didn't mean to interrupt.  Go

23  ahead.

24  A.   Maybe like 30 minutes maybe.

25  Q.   But the defendant said he'd meet you in 10 minutes.  You

1   went to the spot and then you had to wait for like a half

2   hour?

3   A.    Yeah.

4   Q.    But finally he met with you?

5   A.    Yeah.

6   Q.    And then finally, because you'd been there all day, as

7   soon as you were done meeting with him, you started driving

8   back to Charlotte?

9   A.    Correct.

10  Q.    But you never got back to Charlotte; right?

11  A.    Correct.

12  Q.    Because after spending all day in Georgia, you now had

13  9,000 and some pills sitting on your front passenger seat in

14  a shoebox?

15  A.    Correct.

16  Q.    Now, you actually -- you're waiting sentencing; right?

17  A.    Correct.

18  Q.    Because a while back you were actually in front of a

19  judge.  You were sworn in just like you were sworn in today;

20  right?

21  A.    Uh-huh.

22  Q.    In a courtroom?

23  A.    Uh-huh.

24  Q.    And you told that judge that you were guilty of

25  conspiring to distribute narcotics.

1   A.    Right.  And in my indictment it says the known and the
2   unknown.
3   Q.    Uh-huh.
4   A.    So, yes.  But like I said, I didn't know that it was
5   drugs until I opened the box.
6   Q.    And your testimony today is you opened that box in the
7   car?
8   A.    Yes.
9   Q.    Okay.  But you'd picked up the box, according to what
10  you're saying, without having any idea what it was?
11  A.    What you mean pick it up, like, with my hands?  I mean,
12  yes --
13  Q.    Go ahead, tell --
14  A.    -- I received it.
15  Q.    I'm sorry.  Tell the jury, how'd the box get in the car?
16  A.    I received it from a gentleman.  I rolled the window
17  down and he placed the box in the passenger seat.  That's how
18  I received the box.
19  Q.    And there it stayed while you drove around town?
20  A.    Correct.
21  Q.    Okay.  And you did that as a favor for a friend, but
22  you're not -- it wasn't -- you're telling this jury it wasn't
23  Steven Cloud?
24  A.    I'm telling you it was not Steven Cloud.  The only thing
25  me and Steven Cloud agreed on that day was to get money from

1   Mr. Watkins.  That was it.  We didn't agree on no drugs or
2   nothing like that.
3   Q.   Okay.  And I want to be clear.  Your testimony to this
4   jury is you did not agree with Steven Cloud to go on a run to
5   pick up pills?
6   A.   Correct.
7   Q.   Thank you.  All right.  But you did plead guilty to
8   conspiring with several people to distribute pills.
9   A.   I'm not going to say several people.  Like I said, the
10  known and the unknown.
11  Q.   All right.  That's the mystery person that you're not
12  willing to say who it was?
13  A.   Yes, sir.
14  Q.   Okay.  All right.  Now, you talked about the traffic
15  stop.  And initially that's what it started out as far as you
16  knew is a speeding stop?
17  A.   Yes.
18  Q.   Okay.  And then eventually you were placed under arrest
19  and then you went to jail and they seized the pills and they
20  seized your phone, they seized your cash; right?
21  A.   Correct.
22  Q.   Okay.  You drove down to Georgia that day; correct?
23  A.   Correct.
24  Q.   October 24th, it was a Saturday.  Does that sound right?
25  A.   Yeah.

CROSS OF LATISHA ANDERSON BY MR. SIELAFF          303

1   Q.   Okay.  And when you were pulled over and the trooper
2   said -- pulled you over for speeding -- "where are you
3   going?", you told him you'd been in Atlanta since Thursday.
4   That's what you told him; right?
5   A.   I don't recall that.
6   Q.   Ah.  Okay.  Would that surprise you that you told the
7   trooper that you'd been in Atlanta since Thursday?
8   A.   It probably wouldn't, but I don't recall that.
9   Q.   If you had an opportunity to review the audio of that
10  traffic stop, would that refresh your recollection?
11  A.   I mean, if I hear it, then yeah.  But I mean, if I told
12  him that, I told him that.  But like I said, just because I'm
13  hearing it don't -- it's not going to make me remember that I
14  told him that.  It's just going to be evidence that I said
15  it.
16  Q.   Ah.  Okay.  And do you remember telling him that you
17  were in Atlanta since Thursday because you were visiting your
18  auntie?
19  A.   I do remember telling him that.
20  Q.   And you said my auntie's sick.
21  A.   I do remember telling him that.
22  Q.   You said she's dying of cancer.
23  A.   I don't remember telling him that, but I probably did.
24  Q.   You said she's got kids and I was there to take care of
25  her and her kids.

CROSS OF LATISHA ANDERSON BY MR. SIELAFF        304

1   A.    I probably said it.  I don't know.

2   Q.    And you told him:  I don't have anything illegal in this

3   car?  You told him that; right?

4   A.    I probably -- I don't know if I told him that, but I

5   probably did.

6   Q.    Okay.  So you definitely remember telling him you had a

7   sick auntie dying of cancer in Atlanta and you were taking

8   care of her?

9   A.    See, I remember telling him that.

10  Q.    And you definitely remember telling him there's nothing

11  illegal in this car?

12  A.    I don't remember telling him that.  I don't even

13  remember him asking me right then, that conversation, was

14  there anything in the car.

15  Q.    Then they brought the dog.

16  A.    Right.

17  Q.    I believe your testimony to Mr. Rael is you told him

18  when they said:  Hey, the dog hit the car, you told them:

19  That ain't possible?

20  A.    Yes.

21  Q.    But you knew at that time --

22  A.    I knew that.

23  Q.    -- you had a whole shoebox of pills sitting in the car.

24  A.    Right.  But I knew where him saying that that dog hit on

25  the driver's side, I knew that was absolutely 100 percent a

1   lie, because they didn't find anything on the driver's side.
2   Everything that they found was on the passenger side in the
3   front seat.
4   Q.   Now, to go back to something you said early, early,
5   early on.  You said you'd never been convicted of anything
6   before.  You're not saying you've never been involved in the
7   drug trade before your arrest; are you?
8   A.   I'm not saying that I never been in any trouble.  But
9   what's on my background, no, I have never been convicted of
10  that.
11  Q.   So this is the first time you got caught?
12  A.   Right.
13  Q.   All right.  So, once they get the shoebox full of pills
14  out of your car, they tell you:  Hey, you're under arrest.
15  A.   Correct.
16  Q.   They told you all about that.
17       And after you were arrested, you told them you got these
18  pills on Friday, the day before the traffic stop.  Do you
19  remember telling them that?
20  A.   No, I don't.
21  Q.   Uh-huh.  Do you remember telling them you were going to
22  deliver the pills to somebody in Greenville?
23  A.   I don't.
24  Q.   Do you remember --
25  A.   I remember -- I don't remember saying Greenville.  But I

CROSS OF LATISHA ANDERSON BY MR. SIELAFF     306

1  do -- I thought I told him that I was meeting somebody at a
2  gas station is what I thought I told him, but if you say
3  Greenville, I don't.
4  Q.   And you also told him at some point:  "Look, I just
5  picked up the box.  I never looked in it.  Until you took it
6  out of my car, I had no idea there were pills in the box."
7  Do you remember telling them that when you were arrested that
8  until they opened it up, you were shocked there were pills in
9  that box?
10 A.   I wasn't shocked.  Like I said, I opened the box.  I
11 knew what was in the box.  But no, I don't remember telling
12 him that.
13 Q.   You don't remember telling him that you were surprised
14 because you didn't know there were pills in the box?
15 A.   No.
16 Q.   All right.  Your testimony, or actually they also seized
17 a whole big wad of cash from the center console; right?
18 A.   Correct.
19 Q.   And you told them, "yep, it's something like $3,500
20 because that's my rent money."
21 A.   Don't remember telling them exact amount.
22 Q.   Do you remember telling them all that cash in the center
23 console was your rent money?
24 A.   No, I don't.
25           MR. SEILAFF:  If I could have just a moment, Your

CROSS OF LATISHA ANDERSON BY MR. SIELAFF       307

1   Honor.
2            MR. GUINN:  Just one moment, Your Honor.
3            (Brief pause.)
4   BY MR. SIELAFF:
5   Q.   All right.  Ms. Anderson, at the moment you should have
6   in front of your screen a video.  It's going to be played
7   without sound, which is Government's Exhibit 25.  Let me know
8   when you've had a chance to view it.
9            MR. SEILAFF:  And for the record, that's actually
10  25D.
11  BY MR. SEILAFF:
12  Q.   Ms. Anderson, were you able to view 25D?
13  A.   Yeah.
14  Q.   Did that appear to be a fair and accurate video of the
15  traffic stop of you on October 24th, 2020?
16  A.   Yes.
17  Q.   All right.  I'm also going to have you look at --
18  A.   I'm not saying that's accurate, because I don't see all
19  the police cars.  It was way more cars than that.
20  Q.   Okay.
21  A.   But, yes, that is me in the back of that police car.
22  Q.   All right.  So you're saying you see yourself in a
23  police car in a video, and the whole video looks accurate
24  except all the police cars that you testified about aren't in
25  the video?

JA329

1   A.    Correct.

2   Q.    Okay.  If you'd look at Exhibit 25 C, as in cat, please.

3   A.    (Watching video.)

4   Q.    All right.  Did you have a chance to see 25C?

5   A.    Right.

6   Q.    All right.  And that's you on the video; right?  And it

7   appears to be you at the traffic stop October 24th of 2020?

8         MR. RAEL:  Object for counsel to be saying that if

9   it's not in evidence.

10        THE COURT:  Overruled.

11  BY MR. SIELAFF:

12  Q.    That appears to be you; correct?

13  A.    Correct.

14  Q.    It appears to be completely and fairly accurate of you

15  as you appeared on that day talking to troopers?

16  A.    Right.

17  Q.    All right.  But, again, everything's accurate except for

18  those several, several police cars that you were talking --

19  A.    Right.  It was a whole lot of police cars out there.

20  Q.    So everything's accurate except all those cars aren't

21  there?

22  A.    Right.  That's me.

23  Q.    Let's look at 25B.

24  A.    (Watching video.)

25  Q.    And 25A.

1   A.   (Watching video.)

2   Q.   All right.  So as to 25A and B both, is that from the

3   traffic stop?

4   A.   Yes.

5   Q.   All right.  And at that point is when you're sitting in

6   the car and most of the video is actually just kind of the

7   passenger-side window of your car; right?

8   A.   Right.

9   Q.   At some point you can see the shoebox, though, sitting

10  there right next to you?

11  A.   Right.

12  Q.   And does that all appear to be fair and accurate?

13  A.   I guess so.

14  Q.   Would you need to be able to hear the audio to be able

15  to verify that this is, in fact, the video of your traffic

16  stop and your interaction with the troopers?

17  A.   No, because I know that was me.

18  Q.   You know -- even without hearing it, you know it's all

19  accurate?

20  A.   Right.

21          MR. SEILAFF:  Thank you, ma'am.

22          THE COURT:  Any Redirect?

23          MR. RAEL:  Your Honor, if I may, the Court likes to

24  move these cases along.

25          THE COURT:  I'm just asking if you have any

CROSS OF LATISHA ANDERSON BY MR. SIELAFF      310

1   Redirect.

2          MR. RAEL:  I do.  What I'd like to tell the Court

3   is that my brother attorney knows this law here in

4   North Carolina better than I, and he wants to have a chat

5   with me before I do that, so I would like to have that little

6   bit of time if the Court would permit me.

7          THE COURT:  No, your opportunity to do Redirect is

8   right now.

9          MR. RAEL:  All right, sir.  Can I have a moment?

10          THE COURT:  You could have a moment.

11          MR. RAEL:  Thank you.  Your Honor, I actually would

12   appreciate it, but we do not have any further Redirect.

13          THE COURT:  Very well.  You may step down.

14          Call your next witness.

15          MR. RAEL:  Your Honor, I'll call Ayesha O'Neill if

16   the Court could sound for him -- her.

17          (Witness enters the courtroom and takes the witness

18   seat.)

19          THE CLERK:  Place your left hand on the Bible and

20   raise your right --

21          THE WITNESS:  Right?

22          THE CLERK:  Other way.

23          THE WITNESS:  (Complies.)

24                  LASHANDA AYESHA O'NEILL

25   and having been duly sworn was examined and testified as

DIRECT OF LASHANDA AYESHA O'NEILL BY MR. RAEL    311

1  follows:

2                    DIRECT EXAMINATION

3  BY MR. RAEL:

4  Q.    Good afternoon, ma'am.

5  A.    Good afternoon.

6  Q.    Could you tell us what your name is and what you do with

7  yourself?

8  A.    Yes.  My name is Lashanda O'Neill.  I go by Ayesha,

9  which is my middle name.  I do hair.  I'm a stylist.  I own

10  two locations.  I currently live in Florida right now, which

11  is my main location.  My second location is in Atlanta,

12  Georgia.

13  Q.    What exactly is it that you do when you do whatever you

14  do?

15  A.    I do several different hairstyles.  I braid.  I also

16  apply wigs and natural styles.  I also twist locks or

17  dreadlocks of that nature.  Natural hair.  Anything dealing

18  with hair, I'm with it.

19  Q.    All right.  Can I ask you, do you know this fellow over

20  here, the defendant in this case; and if so, how?

21  A.    Yes, I do know him.  I know Kenny.  I know Kenny

22  through, he -- they let me -- you rent a booth at K3 Soundz.

23  I also know him through -- he's just a great person.  Most

24  importantly, he helped me build both of my businesses as far

25  as fundraisers --

DIRECT OF LASHANDA AYESHA O'NEILL BY MR. RAEL    312

1          MR. GUINN:  Objection, Your Honor.

2          THE COURT:  Sustained.

3    BY MR. RAEL:

4    Q.   Which means --

5          THE COURT:  Ms. O'Neill, try to listen to the

6    question and answer that question and then wait for the next

7    question.

8          THE WITNESS:  No problem.

9    BY MR. RAEL:

10   Q.   So, you've known him doing hair.  Do you know him in any

11   other way?

12   A.   Yes.  Through the family.  Also, was referred to him to

13   do stylists, to do the stylists' hair through his videos.  So

14   I style the models through the family.  That's how I know.

15   Through the family, cookouts.  Just family now.

16   Q.   Do you know a fellow named Ziggy; and if so, how?

17   A.   I do not know Ziggy.  I don't know Ziggy.

18   Q.   Okay.  And the time that you have known -- how long have

19   you known the defendant over here?

20   A.   I would say for about five or six years.

21   Q.   Okay.  Do you know whether or not he's engaged in music?

22   A.   Yes, I do.  He's a great artist.  He's a great

23   performer.

24   Q.   When you say performer, what do you mean?

25   A.   Well, I attended most of his shows.  So he's great with

DIRECT OF LASHANDA AYESHA O'NEILL BY MR. RAEL    313

1  engaging with the crowd as far as performing songs, creating
2  different cinemas as far as videos, and just getting through
3  interviews.
4  Q.    Do you know whether or not he also promotes them?
5  A.    Yes, he does.  He promotes them through, of course,
6  social networks, flyers, radio blasts as far as promos on the
7  radio.  Those are the marketings that I'm aware of.
8  Q.    Do you happen to know whether or not he was involved in
9  promoting any shows in October?
10  A.    Of course, yes.
11  Q.    What?
12  A.    One show in particular, different club, like strip clubs
13  or different venues in Atlanta.
14  Q.    Is that -- are you familiar with a Club Diamond?
15  A.    I am, yes.
16  Q.    Is that a strip club that you're talking about?
17  A.    Yes, it is.
18  Q.    Is that a small club or a large club, what is it?
19  A.    It's quite small.  It's not very big.
20  Q.    How many people would you say would come to something
21  like that?
22  A.    We would pack it out.  I'm not sure.  Maybe, you know,
23  at the minimum of 30 to 50, 60 people.
24  Q.    All right.  Do you know whether or not he would receive
25  any money at the door or not?  How would he be paid?

DIRECT OF LASHANDA AYESHA O'NEILL BY MR. RAEL    314

1    A.    I'm not sure.  I'm not aware of how he was getting paid.

2    I'm not sure.

3    Q.    Okay.  Now, let me turn your attention to a woman.  Did

4    you see a woman here before who was dressed in -- who looked

5    like she was just coming from a jail?  Did you see any of

6    that?

7    A.    I did not.

8    Q.    Okay.

9              MR. RAEL:  Just a moment, please.

10             MR. SIELAFF:  What do you need?

11             MR. RAEL:  Could you possibly help me pull up a

12   picture of Ms. Anderson.  I know it's an exhibit.  But I

13   don't know which one.

14             MR. GUINN:  Just one moment, Your Honor.

15             MR. RAEL:  Appreciate it.

16             MR. GUINN:  Mr. Rael, is this the one?

17             MR. RAEL:  Yes.

18             MR. GUINN:  This is Government Exhibit 24 already

19   admitted into evidence.

20   BY MR. RAEL:

21   Q.    I think what you have before you is in evidence,

22   Exhibit 24.  Have you seen that person before?

23   A.    I have seen her before, but maybe smaller, like thinner.

24   But that's definitely her.

25   Q.    Okay.  You mean thinner, she lost some weight?

DIRECT OF LASHANDA AYESHA O'NEILL BY MR. RAEL    315

1    A.    Looks like she's gained a little weight.

2    Q.    Gained, okay.

3    A.    Uh-huh.

4          MR. RAEL:  Could you also, Counsel, pull up

5    Number 25A?

6          MR. GUINN:  It's up, sir.

7          MR. RAEL:  I spoke earlier to the clerk.  Would you

8    know the number for a box that was introduced?

9          MR. GUINN:  Showing the witness right now, I'm

10   going to show you -- is this the one you're talking about,

11   Mr. Rael?

12         MR. RAEL:  Yes.

13         MR. GUINN:  Your Honor, this is Government's

14   Exhibit Number 13.  My notes indicate that it's been admitted

15   into evidence.

16         THE COURT:  Thank you.

17   BY MR. RAEL:

18   Q.    Ms. O'Neill -- I am right, it is Ms. O'Neill?

19   A.    Yes.

20   Q.    All right.  If you would look at the exhibit before you,

21   which is Government's Exhibit Number 13.  You see a box

22   there?

23   A.    I do see a box.

24   Q.    Did you ever see that box before?

25   A.    I have seen this box before.

DIRECT OF LASHANDA AYESHA O'NEILL BY MR. RAEL    316

1   Q.   Okay.  Could you tell the jury where you saw that box
2   before?
3   A.   I've seen this box actually at a Chevron gas station.
4   The previous picture that you seen -- that you showed me
5   before, the young lady, she actually received this box at the
6   Chevron from a guy.
7   Q.   Oh, you mean she received it from a guy.  She received
8   it from him?
9   A.   No, sir (pointing to defendant).
10  Q.   All right.  Could you describe who that -- have you ever
11  met that guy before?
12  A.   No, I never met the guy.  The guy was just -- he was
13  like a fair-skinned, light-skinned guy, kind of tall.
14  Q.   Okay.  Can you tell me if you know what was he driving
15  or not?
16  A.   A red sports car.
17  Q.   And can you tell me, if you would, what she was driving
18  or not?
19  A.   A brown, a brown car.  As to what type, I'm not sure.
20  Q.   And these two cars, were they near each other at that
21  Chevron?
22  A.   Yes.  They were quite close, yes.
23  Q.   And who had, if anyone, that Versace box?
24  A.   Who had the box?
25  Q.   Yeah.  Who first had the box?

1  A.    The guy had the box and the girl received the box.

2  Q.    And when she -- well, first of all, what are you doing

3  there?

4  A.    I was getting some snacks for my workday, to start my

5  day off with because I'm usually on my feet for about 8 to 10

6  hours a day.

7  Q.    All right.  And is there any question of any kind

8  whatsoever that that was something that she got from that

9  person?

10  A.    Say it again?

11  Q.    She definitely got that box from that person?

12  A.    She did, yes.

13  Q.    And do you know of your own knowledge where KennyMan was

14  at that time?

15  A.    No, I have no knowledge of where he was.

16  Q.    Okay.  Now --

17          MR. RAEL:  Thank you.

18          THE WITNESS:  You're welcome.

19          THE COURT:  Any Cross?

20          MR. GUINN:  Yes, sir.

21                  CROSS-EXAMINATION

22  BY MR. GUINN:

23  Q.    Ms. O'Neill, you know Mr. Watkins; correct?

24  A.    I do.

25  Q.    And you actually do some work down in Atlanta, Georgia,

CROSS OF LASHANDA AYESHA O'NEILL BY MR. GUINN    318

1  you said?

2  A.    I do.

3  Q.    It would be fair to say that you have a financial

4  relationship; is that correct?

5  A.    I pay my booth rent.

6  Q.    Your booth rent at K3 Soundz studio; correct?

7  A.    Correct.

8  Q.    You pay that rent to Mr. Watkins; is that right?

9  A.    To mostly I pay Kizzy.

10 Q.    Say it again?

11 A.    I pay Kizzy is who I pay, yes.

12 Q.    Okay.  But Mr. Watkins works at K3 Soundz studio;

13 correct?

14 A.    Yes.

15 Q.    Mr. Watkins had you do some work on some of his videos

16 before coming into court today; is that right?

17 A.    Yes, in passing.

18 Q.    Stylist work?

19 A.    Yes.

20 Q.    And you're compensated for that work, you receive money

21 for that; is that correct?

22 A.    I do.

23 Q.    Club Diamonds is a club down there; is that correct?

24 A.    It is.

25 Q.    And KennyMan, or Mr. Watkins, frequents Club Diamonds

CROSS OF LASHANDA AYESHA O'NEILL BY MR. GUINN    319

1  performing as KennyMan; is that right?
2  A.    Yeah.
3  Q.    So in October of 2020, it would make sense that he's
4  been to Club Diamonds; correct?
5  A.    Yes.
6  Q.    Performing at Club Diamonds; correct?
7  A.    Correct.
8  Q.    The person that they showed you, Government Exhibit
9  Number 24, I'm going to pull that back up for you.  You said
10 that you saw her at a Chevron gas station; is that right?
11 A.    That's correct.
12 Q.    Before that Chevron gas station, had you ever seen that
13 woman before?
14 A.    I had not.
15 Q.    How long did you see her at the Chevron gas station?
16 A.    I was there for not -- not long.  Maybe five or ten
17 minutes I was there.
18 Q.    Five or ten minutes, and what did you see happen?
19 A.    I just seen her receive a box and I just remember her
20 hair.
21 Q.    Okay.  So that five-minute interaction was so impactful
22 upon you that you remember someone bringing a box over and
23 putting it in the car?
24 A.    Yeah.  The reason why I remember is because I stated
25 there was no need for her -- you know, she needed to get her

1   hair done.  Instead of getting those shoes, you need to be in
2   my chair.
3   Q.   Sure.  What day was that?
4   A.   It was October 20th [sic].
5   Q.   Say it again?
6   A.   October the 24th.
7   Q.   October the 24th?
8   A.   Uh-huh.
9   Q.   What time were you at the Chevron gas station?
10  A.   Between -- I'm not sure.  It had to be between 9:50 and
11  10:15, around that time.
12  Q.   9:50 and 10:15?
13       So this Chevron gas station you're at, in proximity, how
14  close is that to K3 Soundz studio?
15  A.   It's pretty close.
16  Q.   Outside of that interaction, you've never seen that
17  woman before in your life; is that correct?
18  A.   I have not.
19  Q.   The individual that you say put the box in the vehicle,
20  you've never seen that person before?
21  A.   No, sir.
22  Q.   Do you know if Ms. Anderson went later on to meet with
23  Mr. Watkins?
24  A.   I did see her.
25  Q.   See her where?

CROSS OF LASHANDA AYESHA O'NEILL BY MR. GUINN    321

1   A.    She pulled into the studio parking lot.

2   Q.    So she did go to the studio parking lot?

3   A.    I did see her eventually, yes.

4   Q.    Okay.  It was after the meeting at the gas station?

5   A.    It was after.

6   Q.    Before coming into court today, defense counsel, the

7   gentleman that was asking you questions a little while ago,

8   you met with him; is that correct?

9   A.    Yes.

10  Q.    And talked to him about your testimony today; is that

11  correct?

12  A.    Not correct.  No, that's not correct.  May I explain?

13  Q.    Sure.

14  A.    No.  I just spoke with him previously to see what dates

15  I would be in town because I reside in Florida.  So to

16  basically, you know, to be here today.

17  Q.    But before that, you didn't talk to him about the

18  substance of the case?

19  A.    No, sir.

20  Q.    Did you talk to police about the substance of the case?

21  A.    No.

22  Q.    But you know KennyMan has been charged for quite some

23  time; is that correct?

24  A.    Not quite some time.  I recently found out.

25  Q.    When did you find out?

JA343

CROSS OF LASHANDA AYESHA O'NEILL BY MR. GUINN    322

1  A.    A couple of weeks --

2  Q.    Okay.

3  A.    -- ago.

4           MR. GUINN:  Just one moment.

5           No further questions.

6           THE COURT:  Any Redirect?

7           MR. RAEL:  No, Your Honor.

8           THE COURT:  You may step down.  Call your next

9  witness.

10          MR. RAEL:  Your Honor, I will call Kizzy Childs.

11          Should the Court direct or can I make sure that

12 they know not to talk to each other?

13          THE COURT:  Yeah, you should do that.

14          MR. RAEL:  May I just do that?

15          THE COURT:  Yes.

16          MR. RAEL:  Thank you.

17          THE CLERK:  Ma'am, would you like to swear on the

18 Bible or to be affirmed?

19          THE WITNESS:  Affirmed.

20                        KIZZY CHILDS

21 having been duly affirmed, was examined and testified as

22 follows:

23          THE WITNESS:  Yes.

24          THE CLERK:  Thank you, have a seat, please.

25          THE WITNESS:  Right here?

1                       DIRECT EXAMINATION

2    BY MR. RAEL:

3    Q.   Good morning, ma'am.  I'm right here.

4    A.   Hi, how are you?

5    Q.   Hello.  Could you tell the jury and this Court who you

6    are and where you live?

7    A.   My name is Kizzy Childs.  I'm from -- I'm originally

8    from Omaha, Nebraska, but I reside in Laconia, Georgia.  I've

9    been in Georgia since 2011.  I am the mother of Kenneth --

10   I'm the mother of Kenneth's children, which he has two

11   children, and he also has a stepson.  I am his Islamic wife.

12   We have been married since 2013.

13        And if you don't know about Islam, Islam is -- there's

14   two types.  We practice underneath the Sunna.  And our

15   relationship is based off of, you know, our culture and our

16   beliefs.  We have a contract within each other.  And we have

17   sworn on our behalf of, what you call an oath, and we took a

18   testimony within each other with our Imam, which people would

19   consider Imam like a preacher or something of that nature.

20        Kenneth is a very, very good father when --

21             THE COURT:  Well, I'm going to interrupt you,

22   Ms. Childs.  I ask you to listen to the question and answer

23   it and wait for the next question.  The question was:  Who

24   you are and where do you live.

25             THE WITNESS:  Okay.

DIRECT OF KIZZY CHILDS BY MR. RAEL          324

1          THE COURT:  Now that you've answered that, listen
2     to the next question.
3          THE WITNESS:  Yes, sir.
4     BY MR. RAEL:
5     Q.   Are you a little nervous, ma'am?
6     A.   No.
7     Q.   Okay.  Very good.
8          Have you ever appeared in court before like this before
9     a jury in a Federal Court, things like that?
10    A.   No, sir.
11    Q.   Okay.  Well, then, you're not as nervous as I am.
12         So, ma'am, if you would, do you know -- well, you know
13    him as some kind of Islamic wife; is that what you were
14    saying?
15    A.   Yes.  I'm married to Kenneth through Islam.  I am his
16    Islamic wife.
17         And Islam is basically a form of a religion, like
18    Baptist or Catholics and things of that.  That's where Islam
19    comes in play.  So I practice Islam.
20    Q.   Do you live together all the time?
21    A.   No.  Kenneth actually has his own place and I actually
22    have my own place with his children.
23    Q.   What kind of children?
24    A.   Well, Kenneth has actually two biological children and
25    he also has a stepson.  One is -- his biological son is 18.

DIRECT OF KIZZY CHILDS BY MR. RAEL          325

1    His two children are two years old and eight months old that

2    belongs specifically to him is the two-year-old and the

3    eight-month-old.

4    Q.   If you know, do you know where he lives?

5              MR. SIELAFF:  Objection, relevance.

6              THE COURT:  Overruled.

7    BY MR. RAEL:

8    Q.   If you know.  I was asking you do you know where he

9    lives?

10   A.   Yes, I do know where he lives.  He has his own condo

11   down in the Buckhead area, which is the downtown Atlanta

12   area.  That's where he resides.  And I -- that's where he

13   resides and he sees his children there.

14   Q.   All right.  If I can, please, let me turn your attention

15   to an exhibit.

16             MR. RAEL:  And it's the same exhibit that we

17   showed, that box, if you could pull it up, Counsel, please?

18   You're better than I am.

19             MR. GUINN:  This is Government's Exhibit Number 13,

20   for the record, Your Honor.

21   BY MR. RAEL:

22   Q.   I'm showing you, ma'am, Government's Exhibit Number 13.

23   I'm going to ask if you've ever seen that box before?

24   A.   Yes.  Yes, I have seen that box.

25   Q.   May I ask you where you've seen such a box before?

DIRECT OF KIZZY CHILDS BY MR. RAEL          326

1   A.   On October 24th of '20, I was actually getting my hair

2   done and I happened to be going to go get something to eat,

3   and I happened to be at a gas station and I seen a young lady

4   who was standing with a light-skinned guy and she was

5   handing -- he was handing her this box.

6   Q.   Okay.  Let me just interrupt you for a minute.

7        MR. RAEL:  Counsel, would you help me and pull up

8   the picture of the young lady?

9        MR. GUINN:  You mean Government's Exhibit

10  Number 24?

11       MR. RAEL:  Yes, I think so.  Thank you.

12  BY MR. RAEL:

13  Q.   I'm showing you Government's Exhibit Number 24.  Is this

14  the lady you were talking about?

15  A.   Yes.  That's the young lady that was with the

16  light-skinned guy, yes.

17  Q.   Okay.  She was with someone, you said, a

18  light-skinned --

19  A.   It was a light-skinned male that she was with, standing

20  in the parking lot of a gas station, which was a Chevron.

21  She was standing next to him.  And she -- he had gave her a

22  box.  And me and my cousin were going to the store.  And we

23  laughed because we was like, damn, she must be, excuse my

24  French, be doing something special because that's a

25  nice-ass box.  So.

DIRECT OF KIZZY CHILDS BY MR. RAEL          327

1    Q.   Why is that box nice?

2    A.   It was a Versace box.

3    Q.   And Versace is -- what is Versace?  I wish I knew

4    exactly.  That's a high-end box?

5    A.   It's a very nice, high-end box.  Like, it's nothing too

6    cheap.  You're not going to find anything -- like with a

7    Versace shoebox like that, you're not going to -- that type

8    of box, it wasn't small.  It was a nice-size box.  That's

9    about a five -- it's expensive.

10             MR. RAEL:  And did we just put up that box a moment

11   ago?  Could we put up the, that box?

12   BY MR. RAEL:

13   Q.   Looking at Government's Exhibit Number 13, that is the

14   box that you're discussing?

15   A.   Yes.

16   Q.   That is the box that this gentleman came up and met this

17   other lady that you saw just a minute ago?

18   A.   Yes.

19   Q.   Can you tell us what happened at that time?

20   A.   Well, like I was stating, I had went to the Waffle

21   House.  I was actually getting something to eat and the gas

22   station is right next door --

23   Q.   May I just interrupt.  Waffle House, what is that?

24   A.   It's an eating restaurant.  People know Waffle House as

25   maybe like a breakfast place, more or less.  They serve like

DIRECT OF KIZZY CHILDS BY MR. RAEL          328

1   food to go.  You can sit down.  It's a little diner.  You can
2   get like hash browns and waffles.
3   Q.    I don't know if they have that -- they may have that in
4   North Carolina, too.  You're from Georgia; right?
5   A.    Correct.
6   Q.    So, tell us what next occurred.
7   A.    When I was in the parking lot going into the store, that
8   is when I had seen the young lady that you guys had brought
9   up on the screen with the light-skinned guy and they were
10  standing next to a car.  It was two cars.  I remember because
11  it was, like, kind of flashy, which was a red sports, like a
12  sports car.  And she was in a brown car, brownish, gold,
13  however you want to say it.

14       So, when she was standing outside and I had seen her, he
15  was handing her a box.  And at that present time, I had seen
16  her get the box and the individual, Ayesha, me and her was
17  going into the store because we were going to go get some
18  drinks because she was going to do my hair and she didn't
19  have anything in the salon.

20       So when we walk in, she said:  Dang, instead of her
21  getting a box, she need to get her hair done.  I was like:
22  Uh-huh.  And I said:  Well, she needs to be slayed by Ayesha.
23  It was kind of a joke with us.

24       And at that present time, we had went and got our food
25  and walked back.  And that's when I had seen her for the

1    first time.

2    Q.   All right.  Now, are you familiar with a person named

3    Ziggy; and if so, how?

4    A.   Yes, I am familiar with the guy named Ziggy.  And how I

5    do know him is because him and Kenneth does music together

6    and --

7    Q.   May I just interrupt you and ask you what kind of music

8    are you talking about?

9    A.   Hip-hop, like rap music.  That's the type of music they

10   do.  Basically, like performing and things of that nature,

11   like going to clubs, promoting, videos, and a lot.  They just

12   do a lot of stuff within the music industry.

13   Q.   They sell drugs together?

14   A.   No.  I said music.  They don't sell drugs together.

15   I've never seen that.  I've only known him to do a feature.

16   That's how I actually know of Ziggy is because when he met

17   Kenneth, it was actually based upon he was actually doing a

18   feature with a song with Kenneth.  And then they have

19   developed a relationship as far as the music world.

20        And when you say music world meaning, you know, they

21   were both -- they're both what you call independent artists.

22   And so, therefore, they were meshing well together because

23   his platform for Ziggy was actually here in South Carolina.

24   But Ziggy would always come down to Atlanta, Georgia, and

25   promote.

1      And Kenny, since Kenneth is actually from Atlanta and is

2  very known, you know, as far as local, like a local person,

3  he was just trying to help him in the avenues of, you know,

4  getting him publicity and like how you can, you know, as far

5  as go and going like what we call like -- there's like

6  this -- I can't think of the name right now, but it's like --

7  it's called Off the Porch.  And this is like a site that

8  people go on, a lot of upcoming and some regular artists,

9  that's where they go and they get publicity and things of

10  that nature so that you can know them.  It's kind of like an

11  introduction, but it's kind of like to let you know who they

12  are.  And so you can get kind of an eye for it.  It shows you

13  on all types of websites and things of that nature.

14  Q.   So, does it work the other way around?  Does Kenny go,

15  if you know, up to North Carolina just like Ziggy comes down

16  to Atlanta, or no?

17  A.   No.  Kenneth has not been to North Carolina.  It's

18  always Ziggy has always came to Atlanta, Georgia, and done

19  things.  Everything that we have as far as doing music,

20  everything from the first time we have met him has always

21  been done in Atlanta, Georgia.  Nothing outside of Atlanta,

22  Georgia, as far as Ziggy coming.

23  Q.   Do you know why?

24          MR. SIELAFF:  Objection.  Calls for speculation.

25          THE COURT:  Overruled.

DIRECT OF KIZZY CHILDS BY MR. RAEL          331

1  BY MR. RAEL:
2  Q.   Did you understand -- do you know why it's a one-way
3  trip, not the other way around?
4  A.    I know -- it's never -- I guess, the market as far as
5  him being in Georgia, I mean coming up here, which is
6  North Carolina, it just never has actually crossed paths to
7  even come up here.  Not saying that he wouldn't, but we have
8  never came up here.
9  Q.   What, if you know -- you've been with KennyMan for a
10 long time.  You've had, I guess you said you had children
11 together; right?
12 A.    Yes.
13 Q.   So, does Kenny do -- what's Kenny's drug of choice?
14 A.    Kenneth doesn't do drugs.
15 Q.   I mean, doesn't -- any reason why?  No?
16 A.    No, he doesn't do drugs.  I mean, there's no choice for
17 him to have to do drugs, because it's nothing -- that's not
18 in his character to do drugs.  Like, he's into his religion.
19 He's into his religion and he's into his family and he's
20 into, he's into his work ethic.  He has a strong work ethic.
21 And that's what he's into.  He's into making sure that he
22 builds generational wealth for his children.  And he strives
23 in doing that.  And that's why he has basically like three
24 jobs.  He's a very busy man.
25      And when I say he has three jobs, he records.  That's a

1  hobby.  He does it.  He's good at it.  I believe he's good at

2  it.  And he also owns K3 Soundz, which that is a studio that

3  he developed after his first child.  He named it after his

4  first child.  Then we also have a trucking company, which is

5  called KJR & Sons Trucking.  And the reason why it was called

6  KJR & Sons Trucking is because it was also started as of last

7  year --

8  Q.   Black -- what did you say?

9  A.   KJR & Sons Trucking Service.

10  Q.   You said "black sheer"?

11       THE COURT:  Last year.

12       THE WITNESS:  Last year.  He started as of last

13  year.

14  BY MR. RAEL:

15  Q.   Sorry.

16  A.   Sorry.  He started the business as of last year because

17  he now has a second-born child.  And he wanted to incorporate

18  him, which is his son name is Kayoni (phonetic) into the

19  business.  So he named the business KJR & Sons because KJR is

20  Kenneth Junior and then you have Kenneth Junior, the Third,

21  and then you also have his stepson.  So he wanted to make it

22  like it's his kids.  Like it's something that he wants to

23  leave and build for his children.

24       THE COURT:  All right.  Wait for another question.

25  I don't think the question was about drug usage and so

CROSS OF KIZZY CHILDS BY MR. SIELAFF          333

1  let's -- ask the next question.
2        MR. RAEL:  Maybe just concentrate.
3        Well, your witness.
4        THE COURT:  Any Cross?
5        MR. SIELAFF:  Yes, Your Honor.
6                      CROSS-EXAMINATION
7  BY MR. SIELAFF:
8  Q.   Ma'am, can you hear me okay?
9  A.   Yes, I can.
10  Q.   Again, how long have you and the Defendant been married?
11  A.   Since 2013.
12  Q.   All right.  And when did you find out that he had been
13  charged in this case?
14  A.   It was in October.
15  Q.   October?
16  A.   Of last year.
17  Q.   Of '21?
18  A.   No.  Yes.  '21.  This is '22, that's correct.
19  Q.   October of 2021.  So, like six, seven months ago, sound
20  about right?
21  A.   Correct.
22  Q.   And you were shown Exhibit 24, a picture of Latisha
23  Anderson.  How do you know her?
24  A.   Because I had seen her -- actually I had seen her at the
25  gas station when I was going to go get something to eat,

CROSS OF KIZZY CHILDS BY MR. SIELAFF          334

1   which was at the Waffle House, which is right next door to
2   the gas station, and I was actually going to the gas station
3   to get something to drink.
4   Q.   Okay.  So you recognize her from that single meeting;
5   correct?
6   A.   I recognize her from that single meeting.  And I
7   actually recognize her because later on while -- excuse me.
8   Later on that day, a little while after we had got back to
9   the studio, which is K3 Soundz, we have a hair salon in
10  there, and I was getting my hair done.  And I actually seen
11  that individual there at the studio.
12  Q.   Ah, so she was also at K3 Soundz.  You're certain of
13  that?
14  A.   Yes.
15  Q.   Okay.  Now, you said that the box, the Versace box,
16  sticks in your mind because it's really distinctive and
17  it's -- anything in that box is going to be expensive; right?
18  A.   Yes, I would assume that anything in that box would be
19  expensive because it was a nice-sized box.
20  Q.   Nice-sized box and it's got "Versace" on it; right?
21  A.   Right.
22  Q.   Your husband has several such boxes; right?
23  A.   Has what?
24  Q.   Several such boxes.  Versace, Jimmy Choo, high-end Louis
25  Vuitton, high-end boxes, merchandise that he's gotten as

CROSS OF KIZZY CHILDS BY MR. SIELAFF          335

1   gifts or bought himself; correct?

2   A.   Yes.

3   Q.   Okay.  So, high-end boxes like that Versace box, he's

4   got in his own home; right?

5   A.   Yes.

6   Q.   And you wanted to talk to Mr. Rael -- actually, you

7   answered several questions.  He asked you about the kinds of

8   performances the Defendant does with Ziggy and the kind of

9   music he performs; correct?

10  A.   Correct.

11  Q.   And, in fact, most people call that gangster rap;

12  wouldn't they?

13  A.   No.  I just know it as rap.

14  Q.   Do you go to your husband's performances?

15  A.   Yes, I've been.

16  Q.   Okay.  Do you watch the videos he posts online, either

17  by himself or with Steven Cloud?

18  A.   Yes.

19  Q.   Do they rap about doing drugs?

20       MR. RAEL:  Excuse me.  I think the witness was

21  trying to say something.

22       THE COURT:  Oh, okay.  Were you interrupted?

23       THE WITNESS:  Yeah, I was just going to say that,

24  yes, I have been to, around, because I'm actually the

25  secretary of state on the business when it comes to K3 Soundz

1  studio and I actually am on the trucking company, so I have

2  hands-on.  I'm actually like the secretary of the business.

3  So, yes, I am hands on.

4  BY MR. SIELAFF:

5  Q.    So it's not just that you all are tied in a marriage

6  relationship; all of your businesses, both the studio, the

7  performances, and the distribution of goods throughout the

8  country, y'all are tied together; right?

9  A.    What do you mean by distribution of goods?

10 Q.    That's what you use your trucking company for; correct?

11 A.    Yes.

12 Q.    To move goods?

13 A.    Correct.

14 Q.    State to state, around Georgia, Georgia, North Carolina,

15 things like that; right?

16 A.    Correct.

17 Q.    Okay.  And so you're familiar with your husband and

18 Steven Cloud's performance in a song that they've

19 collaborated on called "Don't Do It"; right?

20 A.    Yes.

21 Q.    And in that, they sing or rap, perform about, "They've

22 got more money than all them.  We got more guns than all of

23 them," right?  That's a line from the performance?

24 A.    Correct.

25 Q.    And Steven Cloud, while standing next to your husband,

1  says, "Done time for murder one.  Bitch, try me.  I'll murder

2  another one"?

3           MR. RAEL:  Objection, Your Honor, relevance.

4           THE COURT:  Sustained.

5  BY MR. SEILAFF:

6  Q.   Your husband in a performance of "2 da Door."  And

7  that's number 2, D-A, D-O-O-R.  Are you familiar with that

8  song?

9  A.   Yes.

10  Q.   And in that song, does he hold himself --

11           MR. RAEL:  Your Honor, again, I object.

12           THE COURT:  Let me see the lawyers at sidebar.

13           (A bench conference was held on the record but out

14            of the hearing of the jury as detailed below

15            beginning at 12:43 p.m.)

16           THE COURT:  Your objection?

17           MR. RAEL:  I just don't see the relevance of all of

18  that.

19           THE COURT:  What's the relevance?

20           MR. GUINN:  Well, Your Honor, this has already been

21  entered into in Direct.  First was inquiry into the types of

22  performances and type of music the Defendant does and the

23  types of collaborations he does with Steven Cloud.  Those are

24  both inquired into on Direct.

25           Additionally, Mr. Rael elicited character evidence

CROSS OF KIZZY CHILDS BY MR. SIELAFF          338

1   about his client from his wife; that he's a good Muslim and
2   anything like this is out of character.
3           THE COURT:  Normally I would prohibit this kind of
4   cross on lyrics, but I do think the door was open wide on
5   character evidence on Direct with respect to character traits
6   of the defendant.  So I think this is responsive to it and
7   covered by the Rules 404 and 405.  And so any objection I'll
8   deny, but I will say that it'll get cumulative soon.
9           MR. SIELAFF:  Yes, Your Honor.
10          MR. RAEL:  And, Your Honor, if I may, I understand
11  the Court's ruling.  I just wonder are they going to -- if we
12  start -- of course, I guess to counsel, but we're going to
13  bring in the videos?
14          THE COURT:  No, we're not going do that.  I just
15  mentioned my concern with the cumulative nature.  It wouldn't
16  even come in had you not gone in the character direction with
17  this fact witness, and so the door's open.  It's open
18  briefly.  So let's go.
19          MR. SIELAFF:  Yes, Your Honor.
20          (The bench conference concluded at 12:45 p .m., and
21          proceedings resumed within the hearing of the
22          jury.)
23  BY MR. SIELAFF:
24  Q.   Ma'am, I'll start with a new question.  Are you familiar
25  with your husband's song "You Know It"?

1    A.    Yes.

2    Q.    And in that song, he says, "I'm a doper, for real";

3    correct?

4    A.    Yes.

5          MR. SIELAFF:  No further questions.

6          THE COURT:  Any Redirect?

7          MR. RAEL:  Hang on.  Yes, thank you.

8                       REDIRECT EXAMINATION

9    BY MR. RAEL:

10   Q.    I believe you mentioned when the United States Attorney

11   examined you that later in the day you had seen Ms. Anderson;

12   is that what you said?  You saw her over at K3 Soundz?

13   A.    Yes, I did say that.

14   Q.    Do you know what occurred at K3 Soundz?

15   A.    Yes.  At that time I was actually getting my hair done,

16   and which I was getting my hair done by Ayesha in the suite.

17   And that's when I had actually seen San -- I mean, I had

18   actually seen the young lady, she had came to the studio.

19         And at that time, that's when the guy Nova, he cleans

20   up, and he said that there was a car.  And they were saying

21   that they were there for Kenny.  And I was like:  Well, who

22   is that there for Kenny?

23         MR. SIELAFF:  Your Honor, at this point I'm going

24   to object to the narrative.

25         THE COURT:  So ask your next question.

REDIRECT OF KIZZY CHILDS BY MR. RAEL          340

1      MR. RAEL:  All right.

2  BY MR. RAEL:

3  Q.   What the judge is asking you to do is to try to get to

4  the point of my question, which was:  Do you know what

5  occurred between KennyMan there and that lady at K3 Soundz?

6  A.   Yes.  As I was stating, a few minutes had went by, about

7  20 minutes went by and Kenneth end up pulling down to the

8  back of the studio.  And that's when -- I was actually

9  concerned about him, because I hadn't heard from him the

10  night before because he had been shot at for breaking up a

11  fight.

12      MR. SIELAFF:  Objection.  We're well outside the

13  scope of Cross.

14      THE WITNESS:  So she was in the -- she was actually

15  in the parking lot, the young lady was.  And Kenny had got

16  out of the car and I was standing right there and she end up

17  walking up.  Kenneth had handed her $4,500 because that was

18  money that --

19      MR. SIELAFF:  Objection.

20      THE COURT:  Overruled.

21  BY MR. RAEL:

22  Q.   That means you can keep talking.

23  A.   Oh, I'm sorry.  Never done this.

24      THE COURT:  Just tell the jury what you saw.

25      THE WITNESS:  I saw Kenneth give her $4,500 in her

1  hand.  And she was in that same brown car that I had seen her

2  earlier that day before I got to the shop to get my hair

3  done.  That was the same gold car, the same girl that I

4  happened to make a -- we happened to be talking about,

5  Ayesha.  And he gave her the money and --

6  BY MR. RAEL:

7  Q.   Let me just interrupt you and ask you.  And if you could

8  just directly -- well, anyway.

9       Do you know of your own knowledge why she got this

10 $4,500?

11 A.   Yes.  Because Ziggy and Kenneth had just shot, did a

12 video.  And it was for Truckload.  And he had paid for the

13 video.  So therefore, he had had -- I guess Ziggy had her

14 come down to pick up the money.  And that's the reason why

15 Kenneth gave her the $4,500 because he also had told me at

16 that time when she walked away, he said:  Make sure you take

17 this off the books, because I have now paid Ziggy for the

18 video that was shot.

19 Q.   What's -- you said Truckload?

20 A.   Yes.

21 Q.   What is that?

22 A.   It's actually a -- it's actually a video that Kenneth

23 and Ziggy had shot and who is the first time that Kenny had

24 actually dressed up and they had like wigs.  It was more like

25 a comedy video song.  So I wouldn't -- it was like they were

1  dressed up.  He was looking like if you ever known -- some

2  people may not know the Tyler Perry A Madea.  He was kind of

3  had the wig and they had canes and they were protecting it.

4  It was girls in the video.

5          THE COURT:  Way outside the scope at this point.

6          MR. RAEL:  Ma'am, thank you.

7          I have nothing further, Judge.

8                      RECROSS-EXAMINATION

9  BY MR. SIELAFF:

10 Q.   Ma'am, Truckloads is also a song about dealing drugs;

11 right?

12 A.   I wouldn't say that it's just about dealing drugs.

13 Q.   The lyric is, "I've got truckloads and bales, don't even

14 put it on a scale"?

15         MR. RAEL:  Your Honor, I'll object on the grounds

16 of relevance.

17         THE COURT:  Overruled.

18         MR. RAEL:  All right.

19 BY MR. SIELAFF:

20 Q.   Right?

21 A.   Can you repeat the question?

22 Q.   One of the lyrics is "got truckloads and bales, no need

23 to put it on a scale"; right?

24 A.   Yes.  That is the lyric.

25         MR. SIELAFF:  Thank you.

RECROSS OF KIZZY CHILDS BY MR. SIELAFF          343

1          THE COURT:  All right.  That's it.  You may step

2     down.

3          Call your next witness.

4          MR. RAEL:  I wanted to have --

5          THE COURT:  You had Direct and Redirect.  And now

6     it's time to call another witness.

7          MR. RAEL:  Yes, Your Honor.

8          THE COURT:  Actually, I think this is a good time

9     to break for our lunch break.

10         Members of the Jury, thank you for your attention

11    this morning.  We'll take an hour break for lunch.  Over

12    lunch, don't talk about the case.  Keep an open mind.  And we

13    will see you back in court at 1:55.

14         (The jury left the courtroom at 12:52 p.m.)

15         (Court recessed from 12:53 to 1:55 p.m.)

16         (Open court at 1:55 p.m.)

17         (Whereupon, the following proceedings were held in

18    open court outside the presence and hearing of the jury:)

19         THE COURT:  Are we ready for the jury?

20         MR. RAEL:  No, Your Honor.  I have something to

21    tell the Court.

22         THE COURT:  All right.

23         MR. RAEL:  Two things.  Number 1, we rest.  There

24    are going to be no further witnesses.  This is going to be

25    the case.

1        Number two, Mr.  Watkins and I have had a long

2   conversation.  If the Court wants to ask him any further,

3   Mr. Watkins has unequivocally decided not to testify.  Those

4   are, I think, important things to tell the Court.

5        And then I don't know if there's anything else that

6   I can think of.

7        Oh, yes.  I gave to your clerk one jury

8   instruction.

9        THE COURT:  I see.  I'll review it and we'll talk

10  before I talk to the jury.

11        MR. RAEL:  Okay.  And then there we are.

12        THE COURT:  Would you mind, do I have permission to

13  talk with your client about his choice?

14        MR. RAEL:  Oh, absolutely.

15        THE COURT:  So, Mr. Watkins, I want to go back to

16  the conversation we had where you indicated you were aware of

17  your choice between testifying and not testifying.  And you

18  weren't ready to make that decision then.  Have you made that

19  decision now?

20        DEFENDANT:  Yes, sir.

21        THE COURT:  And what is that?

22        DEFENDANT:  I'm not testifying.

23        THE COURT:  All right.  Thank you.

24        Is the Government going to put any rebuttal

25  evidence on?

1          MR. GUINN:  Just one, Your Honor.

2          THE COURT:  Well, let's bring the jury back in at

3  this time and I'll let you rest in front of the jury and then

4  we'll go back to you.

5          MR. RAEL:  So if they're bringing in another

6  witness, then I can get involved with that, obviously.

7          THE COURT:  You can -- any witness.  They just

8  indicated they have a one-witness rebuttal.

9          All right.  Let's call the jury.

10          Has the Government gotten a copy of the proposed

11  instruction?  Let me tender it to you for review.

12          MR. GUINN:  Yes, sir.

13          (The jury came back into the courtroom at 2 p.m.,

14          and the following proceedings were had in the

15          presence of the jury.)

16          THE COURT:  Welcome back, Members of the Jury.

17          All right.  The case is with the defense.

18  Mr. Rael?

19          MR. RAEL:  Thank you, Your Honor.  Your Honor, we

20  rest.

21          THE COURT:  All right.  Members of the Jury, you've

22  heard the Government's case and the Defendant's case.

23          Does the Government have any rebuttal testimony?

24          MR. GUINN:  Just one, Your Honor.  One moment.

25          THE COURT:  Call your witness.

DIRECT OF MICHAEL SARDELIS BY MR. GUINN        346

1          MR. GUINN:  At this time the Government calls
2    Michael Sardelis to the stand.
3          Just one moment, Your Honor.
4                    DIRECT EXAMINATION
5    BY MR. GUINN:
6    Q.   Agent Sardelis, as part of your testimony earlier, you
7    mentioned looking at a cell phone with Ms. Anderson; is that
8    correct?
9    A.   Yes, sir.
10   Q.   I want to show you what I've got marked here as
11   Government's Exhibit Number 28.  I'll blow it up for you.
12        Do you recognize this message?
13   A.   I can't see.  Now I've got it.
14   Q.   Do you recognize this message?
15   A.   Yes.
16   Q.   Is this one of the messages that you reviewed when you
17   were looking at Ms. Anderson's phone earlier?
18   A.   It is.
19   Q.   And have there been any changes since you last captured
20   this image and before coming into court today?
21   A.   No, sir.
22   Q.   Will having this help you in your testimony to the jury?
23   A.   I'm sorry?
24   Q.   Will having this exhibit help your testimony to the jury
25   today?

DIRECT OF MICHAEL SARDELIS BY MR. GUINN          347

1  A.    Yes, sir.
2           MR. GUINN:  Your Honor, at this time I'd like to
3  move Government's Exhibit Number 28 into evidence.
4           THE COURT:  Any objection?
5           MR. RAEL:  None.
6           THE COURT:  Let it be admitted.
7           MR. GUINN:  Ask permission to publish it to the
8  jury.
9           THE COURT:  You may.
10           (Government's Exhibit Number 28 was received into
11           evidence.)
12  BY MR. GUINN:
13  Q.    This text message in blue here, that's one that you
14  recovered from Ms. Anderson's phone; is that correct?
15  A.    Yes, sir, that is correct.
16  Q.    When was this message sent?
17  A.    It was sent on 10/24/2020 at 10:49 a.m.
18  Q.    And do you remember who this message was sent to?
19  A.    It was sent to Steven Cloud.
20  Q.    Is that the Ziggy number that you mentioned earlier?
21  A.    Yes, sir, that is correct.
22  Q.    Can you read the contents of the message, please?
23  A.    It says, "Bout to leave.  I will bring your money when I
24  get back to the city."
25           MR. GUINN:  No further questions, Your Honor.

CROSS OF MICHAEL SARDELIS BY MR. RAEL          348

1          THE COURT:  Any Cross?

2          MR. RAEL:  Yes.

3                    CROSS-EXAMINATION

4     BY MR. RAEL:

5     Q.   So, Anderson, if I understood, Anderson tells Ziggy,

6     "I'll bring your money when I get back to the city;" right?

7     A.   Yes, sir.

8     Q.   So, money for what?

9               MR. GUINN:  Objection, Your Honor.

10              THE COURT:  Sustained.

11    BY MR. RAEL:

12    Q.   Do you know of your own knowledge what it was that she

13    was to bring back money for, yes or no?

14    A.   I'm sorry?

15    Q.   Do you of your own knowledge know whether or not you

16    know what she was to bring back her money for?

17    A.   No.

18    Q.   So, you wouldn't know if she was to bring back money

19    because Mr. Kenny Watkins gave her money to deal with

20    something that they had to do with music; do you?

21    A.   I know that the text message was sent prior to her

22    meeting with Mr. Watkins.

23    Q.   Message was sent when?

24    A.   I would say like 10:49 a.m. or so.

25    Q.   Okay.  And that's all we know; right?

1    A.    We know that they weren't scheduled to meet up until

2    later.

3              MR. RAEL:  Uh-huh.  All right.  Thank you.  That's

4    all.

5              THE COURT:  Any Redirect?

6              MR. GUINN:  No, sir.  Thank you.

7              THE COURT:  You may step down.

8              Any further evidence?

9              MR. GUINN:  No, sir.

10             THE COURT:  All right.  Members of the Jury, you

11   can swivel and face me or you can watch this on the monitor.

12   Again, neither one of those are good choices.  But I do want

13   to talk to you now that you've heard the evidence -- oh,

14   yeah, let me take care of one legal matter before we -- well,

15   no, let me give you instructions at this point, then we'll

16   take care of the legal matter.

17             But I want to give you general instructions on the

18   law that applies to the case, then the attorneys are going to

19   make their closing arguments.  And once they have done that,

20   I will come back and talk to you specifically about the count

21   charge in the indictment.

22             As I told you in the preliminary instructions, it

23   is your duty and your responsibility in this trial to find

24   the facts.  You can find those facts only from the evidence

25   which has been presented during the trial.  And the evidence

1  consisted of the testimony of the various witnesses, the

2  exhibits which have been admitted into evidence by the Court,

3  and any stipulation of fact made by the parties.

4       In reaching your decision as to the facts, it is

5  your sworn duty to follow the law as the Court instructs you.

6  You will apply the law given to you by the Court to the facts

7  which you find from the evidence to reach a verdict.

8       Now, Counsel may refer to some of the governing

9  rules of law in their arguments.  If, however, any difference

10  appears to you between the law as stated by counsel and that

11  stated by the Court in these instructions, you are to be

12  governed by these instructions.  You're not to single out one

13  instruction alone as stating the law but must consider all

14  the instructions as a whole.  You may not substitute or

15  follow any personal or private notion or opinion as to what

16  the law is or ought to be.

17       You are required to perform these duties without

18  bias, prejudice, or sympathy for any party.  The law does not

19  permit jurors to decide cases on the basis of bias,

20  prejudice, sympathy, or on any basis other than solely upon

21  the facts and the law arising in the particular case.

22       This case involves one charge brought against the

23  Defendant, Kenneth Jerome Watkins.  And you are instructed

24  again that an indictment is but a formal method of accusing

25  the defendant of a crime.  Its purpose is to inform the

351

1    defendant of the charge against him and bring him to trial.
2    It is not evidence of any kind against the defendant, nor
3    does it permit any presumption or inference of guilt.
4        In other words, an indictment is not consistent
5    either with guilt or lack of guilt.  It simply puts that
6    question at issue in your decision.  It is up to you, the
7    jury, to decide whether the Government has proved each
8    element of the crime alleged in the Bill of Indictment beyond
9    a reasonable doubt.
10       You are here to decide whether the Government has
11   proved beyond a reasonable doubt that the defendant is guilty
12   of the crime charged.  The defendant is not on trial for any
13   conduct or offense not alleged in the indictment.  Neither
14   are you concerned with the guilt of any other person or
15   persons not on trial as a defendant in this case.
16       So I will take a break here in my instructions with
17   you and meet with the lawyers at a sidebar before I go any
18   further.
19           (A bench conference was held on the record but out
20           of the hearing of the jury as detailed below
21           beginning at 2:08.m.)
22       THE COURT:  So I'm glad to hear from you again on
23   your reasonable doubt proposed instruction if you have
24   anything more to add other than what's on the paper.
25       MR. RAEL:  More?  Only that the Court has said and

352

1  the Fourth Circuit says that what the Court had indicated

2  would be sufficient.  But we're also dealing with a matter of

3  a man's life and justice.  And I think that what I've given

4  the Court is a further edification of that which is very

5  important.  And I can see no reason unless that instruction I

6  give is improper, which it isn't, why the Court would not

7  provide such an instruction to the jury.

8          THE COURT:  What says the Government?

9          MR. GUINN:  We don't -- I mean, I think the

10  instruction as it is now is sufficient.  I think the language

11  in that document could potentially be confusing.  But if the

12  Court's inclined to give the instruction submitted by

13  Mr. Rael, we can make do with that.

14          THE COURT:  So I'm going to deny your proposal.

15  I'm going to give the instruction that I give in every case.

16  It's time tested.  It's simple.  I think it's accurate and

17  has been reviewed by the Fourth Circuit.  And so I'm going to

18  give that version of reasonable doubt and I note your

19  objection.  I wanted to have this conversation before I got

20  into that.

21          MR. RAEL:  Thank you.  Then I do object and it's

22  noted.  Thank you.

23          THE COURT:  You're welcome.

24          Anything else?

25          MR. GUINN:  No, sir.

353

1      THE COURT:  Let's go back.

2          (The bench conference concluded at 2:10 p .m., and

3          proceedings resumed within the hearing of the

4          jury.)

5      THE COURT:  All right.  Back on the record.

6          Every defendant in a criminal case is presumed to

7   be innocent.  And this presumption continues throughout the

8   course of the trial.  The presumption will end only if you

9   reach the jury room and arrive unanimously at the conclusion,

10  if you do, that the Government has shown to your satisfaction

11  that the defendant is guilty beyond a reasonable doubt.

12         This burden on the Government does not change at

13  any time during the course of the trial.  The presumption of

14  innocence in favor of a defendant is not a mere formality to

15  be disregarded by the jury at its pleasure; it is a

16  substantive part of our criminal law.

17         Accordingly, the Government must prove each of the

18  elements of the crime charged in this indictment beyond a

19  reasonable doubt before there can be a conviction.

20         Now, the term "reasonable doubt" means just what it

21  says.  It is a doubt based upon reason and common sense.  Its

22  meaning is no doubt self-evident and understood by you, and

23  the Court will not attempt to define the term further.

24         Now, there are two types of evidence which a jury

25  may properly assess in determining whether the Government has

354

1    met its burden of proof as to any offense.  One is direct
2    evidence, such as the testimony of an eyewitness.  The other
3    is circumstantial evidence, which is evidence of facts or
4    circumstances from which the existence or nonexistence of
5    other facts in controversy may be inferred.
6          As a general rule, the law makes no distinction
7    between direct and circumstantial evidence; it simply
8    requires that before convicting a defendant, the jury must be
9    satisfied of the guilt of such defendant beyond a reasonable
10   doubt from all the evidence in the case.
11         Now, while you should only consider evidence
12   presented during the trial of this case, you are permitted to
13   draw such reasonable inferences from the testimony and
14   exhibits as you feel are justified in the light of common
15   experience.  In other words, you may make deductions and
16   reach conclusions which reason and common sense lead you to
17   draw from the facts which have been established by the
18   testimony and evidence in the case.
19         Now, we've talked about this once before, but let
20   me say again that there were certain exhibits, Government
21   Exhibits, which were transcripts of certain recordings
22   admitted into evidence.  Transcripts represent themselves as
23   a record of what was said.  Specifically, they were intended
24   as an aid to identify who was speaking and what was said.
25   You are specifically instructed that whether the transcripts

355

1    correctly or incorrectly reflect the content of the

2    conversation or the identity of the speakers is entirely for

3    you to determine.  You should make this determination without

4    prejudice or bias based on the testimony regarding

5    preparation of the transcripts, your own comparison of the

6    transcript to what you have heard on the recordings, and any

7    other relevant evidence or testimony.

8            Should you determine that the transcripts are

9    incorrect or inaccurate in any respect, you should disregard

10   it to that extent.

11           If you find that a person speaking in a recording

12   was a conspirator and the statements were during and in

13   furtherance of the alleged offense, you may consider those

14   statements for the truth of what was said.

15           If you find that a person speaking is not a

16   conspirator, then you may not consider those statements for

17   the truth but rather for the context of the conversation.

18           Again, I instructed you on the credibility of

19   witnesses.  And I'll remind you that you are the sole judges

20   of the credibility of the witnesses and the weight their

21   testimony deserves.  And while there is no absolute or

22   arbitrary guide or measure by which you determine the

23   truthfulness or untruthfulness of a witness, the Court will

24   point out to you certain principles which may assist you in

25   the determination of the credibility of the witnesses.

356

1          And these general principles include:  Whether the

2    witness has any motive or reason for being truthful or

3    untruthful; the witness' interest, if any, in the outcome of

4    the case; whether there has appeared from the witness'

5    attitude or conduct any bias, prejudice, or feeling which may

6    cause that person's testimony to be influenced; whether the

7    testimony bears the earmarks of truthfulness; and to what

8    extent, if any, it is corroborated or confirmed by other

9    testimony which is not questioned or to what extent, if any,

10   it is corroborated or confirmed by known or admitted facts.

11   You may also consider the intelligence and the mental

12   capacity of a witness, and the witness' opportunity to have

13   accurate knowledge of the matters to which the person

14   testifies.

15          I instruct you that you may believe all that a

16   witness says or none or believe part and disbelieve part.

17   You're not required to accept testimony even though the

18   testimony is uncontradicted, the witness is not impeached.

19   You may decide, because of the witness' bearing and demeanor

20   or because of the inherent improbability of his or her

21   testimony or for other reasons sufficient to you that such

22   testimony is not worthy of belief.

23          The testimony of a witness may be discredited or

24   impeached by showing that he or she previously made oral or

25   written statements which are inconsistent with his or her

357

1   present testimony.  The earlier contradictory statements are

2   admissible only to impeach the credibility of the witness,

3   not to establish the truth of those statements.

4        It is the province of the jury to determine the

5   credibility, if any, to be given the testimony of a witness

6   who has been impeached.  If a witness is shown knowingly to

7   have testified falsely concerning any material matter, you

8   have a right to distrust such witness' testimony in other

9   particulars.  You may reject all the testimony of that

10  witness or give it such credibility as you may think it

11  deserves.

12       The testimony of someone who has shown to have used

13  addictive drugs during the period of time about which the

14  witness testified must always be examined and weighed by the

15  jury with greater care and caution than the testimony of

16  ordinary witnesses.  You should never convict any defendant

17  upon the unsupported testimony of such a witness unless you

18  believe that testimony beyond a reasonable doubt.

19       Now, an accomplice is one who united with another

20  person in the commission of a crime voluntarily and with

21  common intent.  An accomplice does not become incompetent as

22  a witness because of participation in the crime charged; on

23  the contrary, the testimony of one who assents that he or she

24  is an accomplice may be received in evidence and considered

25  by the jury even though not corroborated by other evidence

358

1   and given such weight as the jury feels it should have.

2         The jury, however, should keep in mind that such

3   testimony is always to be received with caution and

4   considered with great care.  You should never convict a

5   defendant upon the unsupported testimony of alleged

6   accomplices unless you believe that testimony beyond a

7   reasonable doubt.  The fact that alleged accomplices have

8   been convicted of the offense is not evidence in and of

9   itself of the guilt of any other person.

10        Now, during the trial, you heard testimony from

11  witnesses who were allowed to give opinion testimony in

12  certain fields.  These witnesses were permitted to testify

13  even though they may not have actually witnessed any of the

14  events involved in the trial.  A person's training and

15  experience may give him or her specialized knowledge in a

16  technical field.  The law allows that person to state an

17  opinion here about matters in that particular field.

18        Merely because the witness has expressed an opinion

19  does not mean, however, that you must accept this opinion.

20  The same as with any other witness, it is up to you to decide

21  whether you believe his or her testimony and choose to rely

22  upon it.  Part of that decision will depend on your judgment

23  about whether the witness's background, training, and

24  experience is sufficient to give the opinion that you heard.

25  You must also decide whether the opinions were based on sound

1    reason, judgment, and information.

2    Your decision on the facts of this case should not
3    be determined by the number of witnesses testifying for or
4    against a party.  You should consider all the facts and
5    circumstances in evidence to determine which of the witnesses
6    you choose to believe or not believe.

7    Now, Mr. Watkins has elected not to testify in this
8    case.  The Court instructs you that he has a constitutional
9    right not to take the stand and testify and not to speak at
10   all or offer any evidence.  The burden of proof being
11   entirely upon the Government, you must draw no adverse
12   inference of any kind from his exercise of his privilege not
13   to testify.  This right is a fundamental one in America's
14   criminal law and one which cannot be disregarded by the jury
15   at its pleasure.

16   And, again, the punishment provided by law for the
17   offense charged in the indictment, should there be a verdict
18   of guilty on the offense, is a matter exclusively within the
19   province of the Court, should never be considered by the jury
20   in any way in arriving at an impartial verdict as to the
21   guilt or lack of guilt of the accused.

22   Those are the general instructions I wanted to give
23   you before you heard from the attorneys in closing argument.
24   Once they have made their closing argument to you, I'll come
25   back and give you specific instructions on the count charged

360

1  in the indictment.  So if you would turn your attention to

2  the attorneys at this time.

3          Mr. Guinn, are you ready to proceed?

4          MR. GUINN:  Yes, Your Honor.  Just one moment to

5  move the podium if that's all right?

6          THE COURT:  Yes.

7          MR. GUINN:  The Government's ready, Your Honor.

8                  GOVERNMENT'S CLOSING ARGUMENT

9          In the beginning of this trial I came up here and I

10  talked to you all and gave my opening statement and asked

11  that you all think about three things as we're moving through

12  the trial and we're putting on evidence.  And so I'm going to

13  run back through those three items, but I'm going to kind of

14  do it backwards.  And so kind of bear with me, if you would.

15          The last thing that I asked you to do as you're

16  kind of listening to this trial is to think about Kenneth

17  Watkins in the context of this conspiracy.  This was a

18  nine-person conspiracy.  This investigation was going on for

19  a long time.  There are certain witnesses that you've heard

20  from in court today, some of which you didn't.  But today is

21  a day that we're asking you to focus on the role that

22  Mr. Watkins played in this particular case and exactly what

23  he did.  It's not about who you like or who you didn't like

24  or who should be here or who shouldn't be here.  "What did

25  Mr. Watkins do?" is the question before you all today.

1      The second thing I asked you all to do is to think
2  about what Mr. Watkins was charged with in this case.  And so
3  what he's charged with is conspiracy.

4      Now, the judge is going to give you additional
5  instructions after we've had an opportunity to talk to you
6  all.  If anything that I say is different than what the judge
7  says, then you need to do what the judge says.

8      But here's conspiracy:  A conspiracy is an
9  agreement between two or more persons to join together to
10 accomplish some unlawful purpose.  It's a kind of partnership
11 in crime in which each member becomes the agent of every
12 other member.

13     Listen to what it says there.  It's an agreement
14 between two or more persons.  It's not about who was holding
15 Eutylone at a particular time.  It's not about who's a good
16 guy or bad guy.  Did this person participate in an agreement
17 to do an unlawful thing?

18     It's the agreement that is illegal.  It's the
19 agreement that you're thinking about.

20     The law also says that the Government need not
21 prove that the alleged conspirators entered into any formal
22 agreement, nor -- or that they direct -- or that they
23 directly stated between themselves all the details of the
24 scheme.  Similarly, the Government need not prove that all
25 the details of the scheme alleged in the indictment were

1    actually agreed upon or carried out.

2         So, it's not that -- when you're looking at a -- at

3    an agreement between individuals of a narcotics conspiracy,

4    you're not going to have a formal declaration of what people

5    are going to do.

6         So in the situation of which people go into a room

7    and they sit down and:  "We're going to get together and

8    we're going to distribute Eutylone.  We're all in agreement.

9    Let's all sign this document and we'll file it somewhere so

10   that we're all on the same page."  That's not how

11   conspiracies work.

12        Conspiracies are modern, they're fluid.  They

13   happen on phones.  And that's what a lot of the testimony

14   that you've heard here today.  And so investigators have to

15   use different tools to capture that material, to figure out

16   what's going on.  They have to use wire taps.  They have to

17   do phone location information.  They have to put those

18   sequence of events together to figure out what happened.  And

19   all the information has to be considered to get a full

20   picture of what was going on.

21        And that was the first thing that I asked you all

22   to do in this particular trial.  And I think that's going to

23   be the most important thing, the thing that I'm going to ask

24   you all to do when you go back in that jury room and you talk

25   amongst yourself.  Lay out the sequence of events, what

1    occurred on October the 17th, 2020, and what occurred on
2    October the 20th, 2020, and compare them to each other.  Take
3    all the information from those two days, lay them out next to
4    each other and walk through the sequence of events.  But I'm
5    going to kind of do some of that for you right now.
6              So, let's talk about the late-night hours of
7    October the 16th, 2020.  You had an opportunity to hear from
8    Ms. Jonquilla Sanders.  She got on the stand and explained to
9    you exactly what was going on:  "I knew Steven Cloud as
10   Ziggy.  I went over to his residence.  We had a relationship.
11   I went to that house on Finchley Drive and I met with him.
12   And he called me over there.  That's how I got to go over
13   there."
14             Do you know how you know that was true, what she
15   said?  Because you heard the phone calls that she made
16   herself.  She didn't know she was being wire tapped at that
17   time.  She had no way of knowing that.  She heard -- you
18   heard the phone calls that she made with Mr. Cloud summoning
19   her over to Finchley Drive.  And what he said is:  "I need
20   you to take that trip for me.  Same thing.  Same thing."
21             So we asked her:  What does "same thing" mean to
22   you?  How do you know what that means?  She says, "I knew
23   what Mr. Cloud was about.  I had made a similar run for him
24   before where I got pills.  When I went over there, I thought
25   in my head I was going to go meet with him and go down to

364

1  Atlanta and get pills."

2          We also know that she went to Finchley Drive that
3  time because she didn't know that there was a camera outside
4  of her residence -- outside of that residence taking pictures
5  of everyone that was coming there and everyone that was
6  leaving.  And lo and behold on the evening hours of the 16th,
7  October the 16th, 2020, she's on that camera captured walking
8  into Finchley Drive just like she said she did.

9          When she gets there, she meets with Mr. Cloud.  He
10  sends her down to Atlanta, Georgia, with a person by the name
11  of Reggie Armstrong.  And so, the question may be in your
12  mind, well, how do we know she actually went down to Atlanta,
13  Georgia?  How do we know that happened?  Again, law
14  enforcement officers are tracking her movements.  They're
15  tracking the movements of the phone.  You heard from Jason
16  Warren, he got on the stand and explained to you the green
17  phone that was Ms. Sanders' phone initially, that green
18  phone, we saw the map travel down to Atlanta, Georgia.

19          She says that, "I went to Club Diamonds first."
20  You heard that on the phone call where Mr. Watkins says, "I'm
21  going to be at Club Diamonds."  And Mr. Cloud says, "Okay,
22  I'll send her to Club Diamonds."

23          She goes to Club Diamonds.  When you look at the
24  map, the phone has her going to Club Diamonds.  She can't
25  alter phone records.  She can't make that stuff up.  It's all

1  right there on the map.  Pay attention to the sequence of

2  events.

3          She says, "I get down to Club Diamonds but he's not

4  going to have the stuff there with him."  We hear him say

5  that on the phone, "I'm going to be at Club Diamonds but I'm

6  not going to have it with me."  You're going to have those

7  calls back in that room.  Listen to those calls again.  Play

8  it through.  He says, "I'm not going to have it there with

9  me."

10          She says okay.  She leaves Club Diamonds.  She goes

11  to the studio.  We know that studio on 4484 Covington

12  Highway, that's the studio associated with Mr. Cloud.

13  Everyone -- his own witnesses got up here and said K3 Soundz

14  studio, that's where he does work.  That's where he goes.

15  She leaves the club, goes to K3 Soundz studio.

16          The phone information corroborates that, as well.

17  Look at the phones.  The green phone and the red phone are

18  together.  They head over to the area K3 Soundz studio.

19          She says, "When I get to K3 Soundz studio, I have

20  to wait for a while.  Nothing happens there and I leave K3

21  Soundz studio and I go to another location."  Again, look at

22  the maps of the phones.  Her phone leaves there and goes to

23  another location.

24          All the information that she provided to you,

25  everything that was given to her -- everything that was given

366

to you by her was supported by the information by law
enforcement officers.

So, she gets this box from Mr. Watkins.  And she
was very clear, "That is the person that I met with.  I had
seen him before.  I had met him before.  I was involved in
this Pressure Gang stuff.  I had seen him at parties from
before.  There's not a doubt in my mind, that's the person
that I met with."  And she -- he gives her a box.  And she
goes back and she takes that box back to Mr. Cloud.  She
delivers the box to him and he walks away.  And you see that
on the pole cams, as well.

Now, it -- it's kind of interesting.  Ms. Sanders
says, "I never looked inside the box."  And so in your head,
you may be, well, how do you know what's inside the box?
Ms. Sanders knew what was inside the box and she was
convinced enough to plead guilty to conspiring to commit a
narcotics transaction.

If someone sends me to a pizza restaurant to go
pick something up and I go there and I pick up a pizza box
and I walk out and I take that pizza box back to another
location and I get there and it's like, well, I didn't know
what was in the box.  You know, I didn't open it.  Maybe it
was pizza, maybe it was not.  That's a little bit silly.

Ms. Sanders was not being silly.  She understood
that she joined in the agreement to commit a criminal

367

1    offense.  She knew that she was going to get narcotics.  She
2    agreed with others to go get narcotics even though she didn't
3    state it explicitly.  She went to go retrieve an item that
4    she believed to be narcotics and deliver it back.
5            What she felt she was responsible for and what she
6    pled guilty to is the agreement.  Okay?
7            So, that's the transaction that occurred on October
8    the 16th and 17th.
9            And also I want you to think about just the nature
10   and circumstances of that agreement.  When she gets that
11   initial call, it's late on the 16th.  She goes down
12   immediately to Atlanta, Georgia; turns right around and comes
13   back and gets to Charlotte in the early morning hours.
14   That's the narcotics transaction.  It has to happen right
15   then.
16           That occurred on the 17th.  There were text
17   messages, Government's Exhibits Number 20 -- I'm sorry, 19.
18   That should be on the screen in front of you in one second.
19   Go back and take a look at those text messages.  And so the
20   blue text messages are Ms. Anderson, right.
21           So now we're switching.  Now we're switching over
22   and these are on the 18th.  I'm sorry.
23           Can you pull up Government Exhibit Number 20.
24   Perfect.
25           So these are the text messages that occurred on the

1    18th.  And so at this point the transaction involving

2    Ms. Sanders has already occurred, right?  And so you hear

3    Ms. Anderson ask on the 18th about pills.  And in that text

4    message, in the gray text messages, he says something -- he

5    says, "Someone steal my bag with 4,000 in it last night."  So

6    she comes down, Ms. Sanders comes down and delivers pills.

7    On the 18th he says, Someone stole my bag of pills.  Someone

8    stole my bag of pills.  He's telling Ms. Anderson this when

9    she's asking about the pills.  So that was --

10                   Go to Government's Exhibit Number 19.

11                   On the 19th -- on the 20th, there's another text

12    message exchange about pills.  And the -- you can read those

13    text messages.  They will be in the back room with you.

14                   But the one that I want you to focus on is about

15    five messages down where the cursor is right now where Ziggy

16    says, "I'm almost ready again.  You going to take that trip?"

17    That's four days before Ms. Anderson gets in her vehicle on

18    the 24th and rides down to Atlanta, Georgia, from the

19    Finchley Drive address to go again down to Atlanta, Georgia.

20                   What Ms. Sanders says -- and I know it's kind of

21    tough, and so I'm getting confused with names a little bit

22    myself.  But what Ms. Sanders says is corroborated by

23    interactions that Mr. Cloud had with Ms. Anderson.  And

24    that's why it's important to lay out this sequence of events.

25                   There's a delivery of pills that occurs.  There's a

1    pill theft, and so now he's got to get more pills.  He's got
2    to get someone to make another trip for him.  And he asks her
3    four days, Ms. Anderson, four days before the 24th, "Are you
4    ready to take another trip for me?"  What trip do you think
5    Mr. Cloud is talking about?  He's talking about the drug
6    trip.
7         So, on the 24th, law enforcement officers again are
8    tracking a phone.  This time it's Ms. Anderson's phone and
9    they're listening to phone calls.  Now, given the
10   circumstances, they weren't able to act fast enough to snatch
11   up the narcotics that occurred on the 16th and the 17th.
12   They didn't know it was going to happen, so they couldn't
13   predict what to do and how to address it.  But they're
14   listening for this on the 24th.
15        So, what they hear is, again, Mr. Cloud sending
16   another female down to the Atlanta, Georgia, area.  And the
17   person that he's talking to on the other end is Mr. Watkins.
18   He's guiding them together.  He's making sure that there's
19   some sort of meeting that's going to occur.
20        Where are you?
21        She's about 10 minutes out.
22        How far are you away?
23        And lay the phones out again.  You will have that
24   CAST report that Jason Warren had for you.  The red phone and
25   the blue phone are Mr. Watkins'.  The green phone at this

1    point is now Ms. Anderson's.  And we're on the 24th.  You'll
2    see that green phone start heading towards K3 Soundz studio.
3    You'll see the red and blue phones that belong to Mr. Watkins
4    start heading towards K3 Soundz studio, all on the 24th.

5            We know that Ms. Anderson travels down to Atlanta,
6    Georgia, because she stopped in Atlanta, Georgia.  We know
7    what she had in that box because that box was seized and
8    those items were found and they're tested.  And then we do --
9    and they were able to determine that that substance was
10   Eutylone.

11           Ms. Anderson came in here and she admitted, "I went
12   down to Atlanta, Georgia, and I did meet with Mr. Watkins."

13           Where she draws the line, though, is at an
14   interesting place.  She says, yes, I left Charlotte,
15   North Carolina, to go down to Atlanta, Georgia.  And, yes, I
16   was talking to Mr. Cloud.  And, yes, I was talking to
17   Mr. Watkins.  But I wasn't going to do a drug deal for
18   Mr. Cloud.  That wasn't what I was going to do.

19           Well, who were you going to do a drug deal for?
20           I'd really rather not say.

21           We know that she's not being honest about that
22   because we have those text messages from her phone that was
23   seized.  She was talking to Mr. Cloud four days earlier about
24   getting pills.  We know what she's down there for.  We know
25   what she was going to go there for.

371

1          We have the meeting between Ms. Watkins -- between
2    Ms. Anderson and Mr. Watkins.  And she says, "Well, I met
3    with Mr. Watkins and he gave me cash and I was going to take
4    that cash back up."
5          Did he give you pills?
6          No.
7          Who did you get the pills from in Atlanta, Georgia?
8          I don't know.  I'd rather not say.  I can't say.
9          Then get to Government's Exhibit Number 24.  Sorry,
10   let me -- just one moment.  28.  And if you -- could you blow
11   that up?  Thank you.
12         Ms. Anderson sends a text message from her phone to
13   Mr. Cloud, to Ziggy, and says, "I'm about to leave.  I'll
14   bring your money when I get back to the city."
15         Go back and listen to those calls again where she
16   says -- where she's waiting on KennyMan, waiting on
17   Mr. Watkins to get to K3 Soundz studio.  There's back and
18   forth.  They're talking back and forth.  He's not there.
19         Look at the CAST report that was given to you by
20   Jason Warren where you see that green phone get down to K3
21   Soundz studio in the morning around this time and then start
22   heading back out.
23         The text message that she sends to Cloud at this
24   time is, "Look, I came down to K3 Soundz studio 4484
25   Covington.  Your guy that was supposed to give me the stuff,

372

1    the pills is not here.  I'm headed back up there to bring you

2    your money.  I guess it's not going to happen."

3              This text message that occurred at 10:50 was before

4    everyone says that she had that second meeting with

5    Mr. Watkins.  This was in the morning.  There was no money

6    that she was supposed to have at this point because she

7    had -- she -- she's saying that she hadn't met with

8    Mr. Watkins yet.

9              This text message pushes back against that notion.

10   It indicates, again, that Ms. Anderson is not being

11   completely truthful with you all about everything that

12   happened.

13             "About to leave.  I'll bring your money back to the

14   city" is her saying I wasn't able to see this guy; I'm going

15   bring your money back up.

16             Then you see that phone head back down toward K3

17   Soundz studio.  She was able to meet with Mr. Watkins there

18   and then start heading back up the road.

19             This case is about the sequence of events.  It's

20   about everything that happened.  You have to go back there

21   and lay everything out.  And the question that you have to

22   ask yourself is:  Did Mr. Watkins participate?  Did he join

23   in the agreement with other people to make sure that

24   narcotics got from Atlanta, Georgia, to Charlotte,

25   North Carolina.  That's it.

1          Is this an unfortunate series of events in which

2     there's some sort of confusion and he's got the wrong guy?

3     Or did all those phone calls at 2 a.m. in the morning, making

4     sure that they caught up with Ms. Sanders, did all those

5     messages saying that "I'm headed there to meet with

6     Mr. Watkins right now," after we know she's going down there

7     to get pills, after we know that she just met with another

8     pill dealer in Charlotte, were all of those completely

9     unrelated to Mr. Watkins?

10         You don't need to leave your common sense at the

11    front door when you come in to a jury trial.  You can use

12    your common sense.  You can use the information that you

13    have.  And you can put that all together.  And I think if you

14    do that, you're going to see beyond a reasonable doubt that

15    Mr. Watkins joined in the agreement to get pills from one

16    location to another.

17         That's all you have to find.  That's supported by

18    the evidence in this case.  And I'm going ask that you return

19    a verdict of guilty.

20              THE COURT:  Mr. Rael?

21                   DEFENDANT'S CLOSING ARGUMENT

22              MR. RAEL:  Good morning, or afternoon.  There's

23    only one thing about this case that's a case.  That is that

24    Ms. Sanders came there high, doing shake, and had a box of

25    which she doesn't know what it is.

DEFENDANT'S CLOSING ARGUMENT                374

1          And then we have United States Attorney having the
2    audacity to tell us that we must know what's in a pizza box,
3    right?  What else could it be?  It couldn't be a sandwich.
4    It couldn't be a calzone.  It couldn't be anything but pizza.
5    Right?
6          And then they present to you a box that you can
7    hardly see that somebody has and he has a box with him, and
8    that's the case.
9          Except they say that it's also with Ms. Anderson
10   because, after all, they try to put two and two together.
11   And at some point they met him and at some point she had
12   drugs.
13         But yet Ms. Anderson testified to you and
14   testified -- and has no reason of any kind whatsoever to come
15   to the court -- in fact, she didn't want to come to this
16   court.  She didn't want to come to have me ask her any
17   questions.  But when she came to this court, she said this.
18   She said that she told the FBI not once but twice that she
19   had the wrong man.  And yet they've brought this case.
20         And what shall we feel about Mr. KennyMan?  A man
21   who has never been to Atlanta -- been to Charlotte ever
22   before.  A man who they have no evidence of any kind
23   whatsoever that he's ever, ever even done one drug.  He's a
24   Muslim.  Whatever one feels about a Muslim, he's a man of
25   religion, and that means a lot.  A person of religion is

1  going to do the right thing.

2          And when she, Ms. Anderson, came up there and took

3  the stand, she was a person, she said she was a Baptist.  I

4  don't care if you're a Baptist, I don't care who you are.

5  But she told what she knew and that was the case.

6          When you, as jurors, have to sit on a case -- how

7  many times have you all as jurors ever had to sit and

8  determine American justice?  Which is exactly what this is.

9  You, as jurors, not only have a responsibility, but you are

10  really the heroes here.  The Court does not.  Only you, a

11  collective number of people who I've never met and may never

12  again will have to make judgments on a case.  And that is

13  democracy in action.  That is exactly why you're here.  That

14  is exactly why you are trying to make decisions about what

15  the truth is and what the lie is.

16          And what is the truth about Ms. Sanders?  Really?

17  You heard her.  Now he's sitting there vouching for that

18  lady?  Who just wants to get a deal?  Just wants to be able

19  to make life easier for her?  Who, after she has

20  conversations with Ms. Anderson, tells you:  He's a so forth

21  and so on and I could give a damn, basically.  He doesn't

22  care about her -- him worth a smit.  Not a smit.

23          Yet this is his life.  This is his children's

24  lives.  This is his person that he decided to have a

25  relationship with as a wife's lives.  She could care less.

DEFENDANT'S CLOSING ARGUMENT                     376

1  Not even a single solitary bit.

2          So, when she has these conversations with
3  Ms. Anderson, Ms. Anderson doesn't know her from smit,
4  listens, doesn't like it a bit.  She's there to lie to you --
5  and she did.  She lied to you.  Right in front of your face.
6  Lied to a jury.  Lied to a judge in a Federal Court.  How
7  dare she do such a thing.

8          And then Ms. Anderson, what did she do?  She
9  subjected herself, even though she didn't want to be here, to
10 a cross-examination by the United States Attorney.  And she
11 answered her questions -- his questions.  And those questions
12 were what?  Tell me how all of a sudden what she said is
13 untrue.  What did come out that is untrue?  I heard nothing.
14 I saw nothing.

15         What happened here is pretty understandable.  They
16 say that what happened to Ms. Sanders, and they're so sure
17 that she's involved, is linked in some manner to
18 Ms. Anderson.  So they believe that.  They guess that.

19         We don't guess.  We only work with what we do.  We
20 have said he stands there not guilty.  We didn't bring in any
21 other reason or any little this and that because they didn't
22 tell us the rights or we didn't do this or we didn't do that.
23 He's coming to you because he tells you he's not guilty
24 beyond a reasonable doubt.

25         And beyond a reasonable doubt is very important.

DEFENDANT'S CLOSING ARGUMENT                              377

1  Why even have a reasonable doubt?

2            Why did they also say, our founders of our

3  democracy, why did they say that he doesn't even have to

4  testify?  Well, wouldn't you want to?  Wouldn't you want to

5  come and tell the jurors and tell the judge your side of the

6  story?  Yeah.  And then what happens?  You can't win.  You

7  tell the story, but something they don't like, somebody

8  doesn't care, or more important, much more important than

9  that, you have a very skilled prosecutor here, two

10  prosecutors, very capable, and they start to ask you

11  questions.

12            And you, who are you?  Are you a man who has a

13  college education and an MBA and FBI and deal with

14  terrorists?  No.  You're nothing like that.  You are an

15  American.  That's all you are.  And now you have to stand

16  there and withstand the criticism and the questions of the

17  United States Attorneys.  Well, you can.  But when you do,

18  who's bigger than you are?  That's why, as Americans, our

19  founders have said you do not have to testify.  That's why

20  the judge said you will not -- cannot hold it against him.

21            And then again, why would he?  What kind of weak,

22  miserable case is there that they've made here?  Where is the

23  proof?  Tell you what they could do.  You have the entire

24  Federal Bureau of Investigation that brings people in.  They

25  have endless amounts of money, guarantee you, that they've

DEFENDANT'S CLOSING ARGUMENT                378

1  spent on this case.  But they don't do what they should do to

2  you, to you to feel comfortable about coming up beyond a

3  reasonable doubt that someone is guilty.

4          They could, but they don't.  They think they have

5  that whole case.  But you know there's not enough now.

6          So, they can tap his phone.  They tapped everybody

7  else's.  They go back to the court and they say:  We think we

8  got him, but we want to be sure.  No.  They were too fast.

9  Because as soon as they heard that Ms. Anderson had drugs,

10  that was it.  They didn't need to do another thing.  Didn't

11  do all the things that they could have done, should have

12  done, and never did do.

13          Did they bring in a confidential informant,

14  perhaps?  Wouldn't this help you know exactly?  Would you

15  have to guess like they did or would you now know?

16          They're following people for years.  They are

17  looking at somebody's camera.  They are following those

18  people.  They are looking at the garbage.  How much more

19  would it take for them to feel and how much more would it

20  take for you as jurors to feel comfortable that they've got

21  their man 100?  All they have to do, as the FBI does, is take

22  a few minutes and do just that.  And they do none of it.

23  They feel that their case is there open and shut.

24          This case is not a case that someone should be

25  guilty of beyond a reasonable doubt.  With all of the

1  evidence that they have, with all of the time that they have
2  to get into a case, what, in fact, do they have?
3          Please, I beg you, look at all of these little
4  stuff that was taken down because the Court said you can go
5  ahead and we're looking for Pressure Gang or we're looking
6  for Ziggy and we're going to catch a web.  And so we're going
7  to catch him in a web.  And now they're going to get him
8  good.  They're going to get him tight.  They're going to get
9  him and send him down the road.
10          But the truth is that none of it, when you look at
11  every single solitary cell phone, you never hear him talking
12  about anything that is incriminating or bad.  Not once.  Not
13  anything.
14          They are trying to put this web together; but just
15  like a puzzle, they have to put it together where it all
16  comes together.  If they leave out just one piece of the
17  puzzle, then it's not a completed puzzle.  And they have done
18  exactly that.
19          This is not a case of beyond a reasonable doubt.
20  You, as jurors, that reasonable doubt isn't just because the
21  founders of our country gave a defendant a beyond a
22  reasonable doubt.  No.  It's for you.  You should be able
23  to -- be able to come back home tonight, or tomorrow, or
24  whenever it takes the time for you to decide to do what you
25  do and know, without a doubt, you have done the right thing.

1   You have put a man who is guilty and you have done justice.
2   But if you have a doubt, a doubt, even one doubt with a
3   reason, then you can feel yourselves that this is not only
4   for him, but it's for you.
5           And are there any doubts here?
6           Reasonable doubt number one, you have a woman who
7   has no good reason, doesn't want to be here, and tells the
8   FBI on two occasions that when they put a picture in front of
9   him, it's not the guy.  It's someone else.
10          Doesn't that make sense?  She's really reluctant to
11  say who it is.  Well, when you look at the indictment, if you
12  get the indictment, it will say it's a conspiracy known to
13  what was unknown.  And unknown, there's someone there.  A
14  deal was done.  That's reasonable doubt number one.
15          Reasonable doubt number two, her own credibility.
16  Was it something that you could not believe a single word out
17  of her mouth like I can't believe, and nor should you, a
18  single word of out of Ms. Sanders' mouth as only looking to
19  get some better situation?  Could care less about a person.
20  Is this right?  Is this righteous?  I don't think so.
21          This is horrible.  He got caught in a web the last
22  minute of the last moment when they caught a lot of bad guys.
23  I can understand why the FBI gets involved and does all those
24  things.  Because they did get some bad guys.  They got that
25  Ziggy; no good.  They got the people in the Pressure Gang; no

GOVERNMENT'S REBUTTAL ARGUMENT                381

1   good.  Is this man the no good bastard?

2            MR. SIELAFF:  Objection, Your Honor.

3            THE COURT:  Sustained.

4            MR. RAEL:  No.  This man is a man of faith.

5            MR. GUINN:  Objection.

6            MR. RAEL:  Of children.  A man who the evidence

7   shows exactly who he is.

8            Jurors, you decide.  Bring back a verdict of not

9   guilty.  Thank you.

10            THE COURT:  Mr. Guinn, 13 minutes.

11            MR. GUINN:  Yes, sir.

12                  GOVERNMENT'S REBUTTAL ARGUMENT

13            Mr. Rael came up here and said a few moments ago

14   that this case is like a puzzle and if you take out one piece

15   of the puzzle, then the whole thing falls apart.

16            That's not what a conspiracy is.  Go back, look at

17   the -- look at the instructions that the judge is going to

18   give you.  Listen to those instructions that he's going to

19   give you.

20            The issue is not whether or not or how this puzzle

21   fits together definitively.  The issue is whether or not

22   Mr. Watkins fits inside the puzzle box.  Whether he's a piece

23   that belongs in a puzzle box.  Whether he was a member of

24   this conspiracy or not.  And he was.  And that's established

25   by the evidence.

1    Mr. Rael spent a lot of time talking about

2    Ms. Anderson and Ms. Sanders.  Ms. Sanders was not caught in

3    a lie in this courtroom.  Ms. Anderson came in and said

4    something else, said this woman said something else.  The

5    person that was caught in the lie in this courtroom is

6    Ms. Anderson.  She's the liar.  She's the person that was not

7    being truthful.  When we asked her, Who did you leave -- who

8    did you meet with in Charlotte?  Who were you going down to

9    get pills for?

10    I don't know.  I'm not going to say.  I'm going

11    keep protecting this person.  I'm not going to say anything

12    about that.

13    Fine.

14    Who are you meeting down in Atlanta to get the

15    pills for?  Give me a name.  Let's run that person down.

16    No, I'm not going to tell you that, either.  I'm

17    not going to say that, either.  Even now in court, I met with

18    law enforcement officers twice.  I had two opportunities to

19    tell them who it was, to give them the right person.  I'm not

20    going to do it.

21    When she's sitting here in front of you all, she

22    had the opportunity to tell you who it is.

23    "I'm not going to do that."

24    When she was -- when we asked her who she was going

25    down for, we didn't show her those text messages because we

1  didn't want -- she had already sent them.  But look at those

2  text messages.  She doesn't know exactly what's on her phone.

3  She lied to you all right there on the stand.

4           Who are you leaving to get pills for?

5           She says she don't know.  She says that it's not

6  Mr. Cloud.  She's talking to Ziggy four days earlier about

7  traveling down to Atlanta to get pills.  She sat here and she

8  lied to you.  That is her.  She's lying to you.

9           When you compare her story to what the law

10  enforcement officers found, it doesn't match up.  It doesn't

11  make sense.

12          When you look at Ms. Sanders, if Ms. Sanders wanted

13  to lie, if she wanted to tell you a story and give you

14  something that was not true, why not just say, "I opened the

15  box and there was a bunch of pills."  Right?  That's what you

16  all want.  "I flipped the box open.  It was a bunch of pills.

17  I got it from Mr. Watkins.  I know it was pills.  Here you

18  go."  Right?  If she wanted to lie, she would go all the way.

19          She's not lying.  She said, "I got a box from him.

20  I'm being honest.  I don't know what was in the box.  I

21  figured it was pills in the box.  I know the agreement that I

22  signed up for.  That's what I did.  But I didn't flip that

23  box open."

24          She was being honest with you.  She wasn't caught

25  in a lie.

1        What she said to Ms. Anderson makes a lot of sense.
2   She said, "I'm not going to do someone else's time.  I don't
3   know him.  I'm not going to do his time."  She came in here.
4   She gave her story about what was going on.  She told you the
5   truth.  She was not caught in any lie.  Ms. Sanders is being
6   honest with you.  She gave you a story, the sequence of
7   events.
8        Again, I'm going to go back to that about what
9   happened on the 16th and on the 17th.  It all matches up with
10  the phone calls that we're listening to.  It all matches up
11  with the phone location information that you all reviewed, as
12  well.  Ms. Sanders was being honest with you about what's
13  going on.
14       He spent a lot of time talking about the Government
15  bullying Mr. Watkins and trying to, you know, put pressure on
16  him.  Here's what they did.
17       They reviewed information.  They had a snapshot of
18  what was going on in a particular time in Charlotte,
19  North Carolina, and Atlanta, Georgia.
20       What they were trying to figure out is whether this
21  person joined in agreement with these other individuals, with
22  Cloud, who we know is a drug dealer, with Ms. Anderson, who
23  we know was caught with narcotics, with Ms. Sanders, who
24  admitted going down and participating in the agreement to go
25  retrieve this box at 2 a.m. that she believed to contain

1    narcotics and bring it back up.  Whether Mr. Watkins was a

2    member of that conspiracy.

3            They listened to phone calls.  They tracked the

4    phone records.  They talked to the individuals that were

5    involved.  And they came to the only clear conclusion that's

6    supported by the law.  The only clear conclusion that's

7    supported by beyond a reasonable doubt that Mr. Watkins was a

8    participant in this conspiracy.  That he was a piece of the

9    puzzle that fits inside the puzzle box.

10           And because of that, Mr. Watkins is guilty, and

11   we're going to ask that you return a verdict of guilty when

12   you go back into that jury room.  Thank you.

13           THE COURT:  I will now read Count One in the Bill

14   of Indictment.  I will then read the statute that the

15   defendant is charged with violating.  Finally, I will tell

16   you the essential elements of the offense.  And you should

17   keep in mind as I do this that you will have a copy of these

18   instructions with you when you go into the jury room to

19   decide this case.  So it will not be necessary for you to try

20   to memorize the charge.

21           I remind you that the Bill of Indictment is not

22   evidence.  Count One reads:  From in or about 2019, the exact

23   date being unknown to the Grand Jury, through in or about

24   December of 2020, in Mecklenburg County, within the Western

25   District of North Carolina, and elsewhere, the defendants,

1  steven Lamar Cloud, Laquail Wallace, Akeem Olajuwan Davis,

2  Jeremy Thomas Latham, Melissa Renee Eagly, Maenard Burgess,

3  Latisha Anderson, Jonquilla Sanders, and Kenneth Jerome

4  Watkins did knowingly and intentionally combine, conspire,

5  confederate, and agree with each other, and with others known

6  and unknown to the Grand Jury, to distribute and possess with

7  the intent to distribute controlled substances, that is, a

8  mixture and substance containing a detectable amount of

9  cocaine, a mixture and substance containing a detectable

10 amount of cocaine base, also known as crack cocaine, and

11 methamphetamine (actual), Schedule II controlled substances,

12 and a mixture and substance containing a detectable amount of

13 Eutylone, a Schedule I controlled substance in violation of

14 Title 21, United States Code, Section 841(a)(1).

15          You will note that the Bill of Indictment charges

16 that the offense was committed in or about a certain date or

17 dates.  The proof need not establish with certainty the exact

18 date of the alleged offense.  It is sufficient the evidence

19 in the case establishes beyond a reasonable doubt that the

20 offense in question was committed on a date reasonably near

21 the date or dates alleged.

22          Title 21, United States Code Section 846 reads in

23 pertinent part as follows:  Any person who conspires to

24 commit any offense defined in this subchapter commits an

25 offense.

1    One of the offenses referenced in Section 846 is
2   Section 841, which reads in pertinent part as follows:  It
3   shall be unlawful for any person knowingly or intentionally
4   to distribute or possess with intent to distribute a
5   controlled substance.
6    Now, where a statute specifies several alternative
7   ways in which an offense can be committed in the disjunctive
8   or using the word "or," the indictment may allege the
9   different ways in conjunctive or using the word "and."
10    You may find the defendant guilty of the offense if
11   you find beyond a reasonable doubt that he committed one or
12   more of the means of violating the statute; thus, where the
13   indictment uses the term "and," you may consider it as "or"
14   unless I specifically instruct you differently.
15    A conspiracy is an agreement between two or more
16   persons to join together to accomplish some unlawful purpose.
17   It is a kind of partnership in crime in which each member
18   becomes the agent of every other member.  A co-conspirator
19   may be a person not on trial in this case or not named in the
20   indictment; however, a person cannot conspire with a
21   Government agent or informant.
22    For you to find the defendant guilty of this crime,
23   you must be convinced that the Government has proved each of
24   the following beyond a reasonable doubt:
25    That on or about the date alleged in the indictment

1  in the Western District of North Carolina that, one, two or

2  more persons directly or indirectly reached an agreement to

3  distribute or possess with intent to distribute a controlled

4  substance.  I instruct you that cocaine, cocaine base,

5  methamphetamine, and Eutylone are controlled substances

6  within the meaning of this law.

7          Two, the defendant knew of the unlawful purpose of

8  the agreement.

9          And, three, the defendant joined in the agreement

10  knowingly and voluntarily; that is, with the intent to

11  further its unlawful purpose.

12          One may become a member of a conspiracy without

13  knowing all the details of the unlawful scheme or the

14  identities of all the other alleged conspirators.  If the

15  defendant understands the unlawful nature of a plan or scheme

16  and knowingly and intentionally joins in that plan or scheme

17  on one occasion, that is sufficient to convict him for

18  conspiracy even though the defendant had not participated

19  before and even though the defendant played only a minor

20  part.

21          The Government need not prove that the alleged

22  conspirators entered into any formal agreement, nor that they

23  directly stated between themselves all the details of the

24  scheme.

25          Similarly, the Government need not prove that all

1   of the details of the scheme alleged in the indictment were

2   actually agreed upon or carried out.  Nor must it prove that

3   all of the persons alleged to have been members of the

4   conspiracy were such or that the alleged conspirators

5   actually succeeded in accomplishing their unlawful

6   objectives.  Merely associating with others and discussing

7   common goals, mere similarity of conduct between or among

8   such persons, merely being present at the place where a crime

9   takes place or is discussed, or even knowing about criminal

10  conduct does not of itself make someone a member of the

11  conspiracy nor a conspirator.

12          You may not infer that the defendant is a member of

13  a conspiracy merely from the fact that he was present at the

14  time and place when the conspiracy was being carried on and

15  had knowledge that it was being carried on.

16          I shall define certain terms used in the essential

17  elements, and you are to apply these definitions as you

18  consider the evidence.  If I do not define certain words, you

19  will assign to them their ordinary, everyday meaning.

20          To distribute means to deliver or transfer

21  possession of a controlled substance to another person with

22  or without any financial interest through a transaction.

23          Possession, as that term is used in these

24  instructions, may be one of two kinds:  Actual possession or

25  constructive possession.

1    A person who knowingly has direct physical control
2    over a thing at a given time is in actual possession of it.

3    A person who, although not in actual possession,
4    knowingly has both the power and the intention at a given
5    time to exercise dominion or control over a thing, either
6    directly or through another person or persons, is in
7    constructive possession of it.

8    Possession may be sole or joint.  If one person
9    alone has actual or constructive possession of a thing,
10   possession is sole.  If two or more persons share actual or
11   constructive possession of a thing, possession is joint.

12   You may find that the element of possession is
13   present if you find beyond a reasonable doubt that the
14   defendant had actual or constructive possession either alone
15   or jointly with others.

16   The phrase "with intent to distribute" means to
17   have in mind or to plan in some way to deliver or transfer
18   possession or control over a thing to someone else.

19   In attempting to determine the intent of any such
20   person, you may take into consideration all of the facts and
21   circumstances shown by the evidence received in the case
22   concerning that person.

23   In determining a person's intent to distribute
24   controlled substances, you may consider, among other things,
25   the quantity of the controlled substance, the presence or

1    absence of equipment used in the processing or sale of

2    controlled substances, and the presence or absence of large

3    amounts of cash or weapons.

4            You may not infer an intent to distribute from

5    possession of a small quantity of drugs by itself.

6            For you to find the defendant guilty of the charge

7    in Count One of the indictment, the Government must prove

8    beyond a reasonable doubt that the object of the conspiracy

9    was to possess with the intent to distribute a controlled

10   substance as alleged in the indictment.

11           The Government must show beyond a reasonable doubt

12   that the defendant and a co-conspirator knowingly and

13   voluntarily agreed to possess with intent to distribute one

14   or more of the alleged controlled substances.

15           The word knowingly means that the act was done

16   voluntarily and intentionally, not because of mistake or

17   accident.

18           Next, I want to explain something about proving a

19   defendant's state of mind.  Ordinarily, there's no way that a

20   defendant's state of mind could be proved directly because no

21   one can read another person's mind and tell what that person

22   is thinking.

23           But a defendant's state of mind can be proved

24   indirectly from the surrounding circumstances.  This includes

25   things like what the defendant said, did, how he acted, and

1  any other facts or circumstances in evidence that show what
2  was in the defendant's mind.  You may also consider the
3  natural and probable results of any acts that the defendant
4  knowingly did and whether it is reasonable to conclude that
5  the defendant intended those results.  This is all for you to
6  decide.

7          Evidence has been received in this case through a
8  certain person or persons who are alleged to have been
9  co-conspirators with the defendant, have done or said things
10 during the existence or life of the alleged conspiracy in
11 order to further or advance its goals.  Such acts and
12 statements of alleged co-conspirators may be considered by
13 you in determining whether or not the Government has proved
14 the charge in Count One of the indictment against the
15 defendant.  Since these acts may have been performed or these
16 statements may have been made outside the presence of the
17 defendant, and even done or said without his knowledge, these
18 acts or statements should be examined by you with particular
19 care before considering whether they may be used against the
20 defendant.

21         If you find that the acts or statements were in
22 furtherance of the goals of the conspiracy and you find that
23 the defendant was or became a member of that conspiracy, you
24 may consider those acts or statements as evidence against the
25 defendant.  Acts done or statements made before the alleged

1    conspiracy began or after it ended may only be considered

2    against the person who performed the act or made the

3    statement.  Acts done or statements made by an alleged

4    co-conspirator before the defendant joined an existing

5    conspiracy may be considered by you in determining whether

6    the Government has sustained its burden of proof on Count

7    One.

8           Now, Members of the Jury, you have heard the

9    evidence, the arguments of counsel for the Government and for

10   the defendant.  It is your duty to remember the evidence,

11   whether it has been called to your attention or not.  And if

12   your recollection of the evidence differs from that of the

13   attorneys, you are to rely solely upon your recollection of

14   the evidence in your deliberations.

15          You, as jurors, must decide this case based solely

16   on the evidence presented here within the four walls of this

17   courtroom.  This means that during your deliberations, you

18   must not conduct any independent research about the case, the

19   matters in the case, the individuals or groups involved in

20   the case, or legal concepts.  Your duty to follow this

21   instruction is a serious responsibility.  The failure to

22   follow it may result in being found in contempt of court.

23          During your deliberations, you must not communicate

24   with or provide any information to anyone by any means about

25   this case.  You may not use any electronic device or media

1  such as a telephone, cell phone, smartphone, iPhone,

2  Blackberry or computer, the Internet, any Internet service or

3  any text or instant messaging service or any Internet

4  chatroom, blog, or website such as Facebook, Myspace,

5  LinkedIn, YouTube or Twitter to communicate to anyone any

6  information about the case or to conduct any research about

7  the case while serving as jurors.

8        I have not reviewed the contentions of the parties,

9  but it is your duty not only to consider all the evidence but

10  also to consider all the arguments, the contentions, and

11  positions urged by the attorneys and any other contention

12  that arises from the evidence and to weigh them all in the

13  light of your common sense and as best you can determine the

14  truth of this matter.

15        The laws, indeed it should, requires the presiding

16  judge to be impartial; therefore, do not assume from anything

17  I may have done or said during the trial that I have any

18  opinion concerning any of the issues in the case.

19        I instruct you that a verdict is not a verdict

20  until all 12 jurors agree unanimously as to what your

21  decision shall be.  You may not render a verdict by a

22  majority vote or any other voting mechanism aside from a

23  unanimous verdict of 12.

24        The Court suggests that as soon as you reach the

25  jury room, before beginning deliberations, you select one of

1  your members to serve as foreperson.  This individual has the
2  same vote as the rest of the jurors but simply serves to
3  preside over the discussions.
4          Once you begin deliberating, if you need to
5  communicate with me, the foreperson will send a written
6  message to me by knocking on the door and handing it to the
7  marshal.  However, you are not to tell me how you stand
8  numerically as to your verdict.
9          For instance, should you be split in your voting at
10  any particular time, you would not tell me the specific
11  number of division in your note.
12          We use a verdict sheet, which is simply the written
13  notice of the decision that you reach in this case.  As soon
14  as you have reached a verdict as to the count alleged in the
15  Bill of Indictment, you will return to the courtroom and your
16  foreperson will, on request, hand the verdict sheet to the
17  clerk.  And there are places on the verdict sheet for the
18  foreperson to enter the verdict, sign it, and date it.
19          During the trial, several items were received into
20  evidence as exhibits.  And we have a computer system in the
21  deliberation room that enables you to view the exhibits
22  electronically.  And you will receive further instructions on
23  how to use that system.
24          If you need a break during deliberations, you may
25  do so in the jury room.  Or if you need a break outside the

1  jury room, a marshal will escort you.  But you must not

2  deliberate during a break unless all 12 of you are together.

3  And if you are not together, then do not talk about the case

4  until all of you are back together.

5          Does either side request a sidebar concerning the

6  instructions?

7          MR. GUINN:  No, sir.

8          MR. RAEL:  No, Your Honor.

9          THE COURT:  Members of the Jury, you have been on

10 the Court's schedule since the beginning of this trial.  The

11 case is about to be handed to you for deliberation.  And from

12 that point forward, we will be on your schedule.  And so you

13 will let us know how late you wish to stay in your

14 deliberations or whether you want to come back in the

15 morning.  We're on your schedule and you dictate it and you

16 let us know.

17         (To Alternate Juror:)  I don't know if you have

18 anything in the deliberation room, any personal effects?  But

19 if you do, if you would retrieve those personal effects and

20 then come back into the courtroom.

21         The remaining jurors, I'm going to ask you to take

22 the case and decide it at this time.

23         (Whereupon, the jury retired to deliberate.)

24         (The jury left the courtroom at 3:20 p.m., and the

25         following proceedings were had out of the presence

JURY DELIBERATIONS AND QUESTIONS TO THE COURT   397

1              of the jury.)

2         (The verdict sheets were delivered to the jury for

3         commencement of their deliberations at 3:21 p.m.)

4         THE COURT:  Go ahead and be seated.  Any objection

5    to the transcripts of the recordings going back with the

6    recordings, recorded exhibits?

7         MR. RAEL:  I don't think -- thank you, Your Honor.

8    I don't think that's necessary.  I think they can judge that

9    from the evidence itself, the evidence which was in which are

10   the actual.

11        THE COURT:  Does the Government have sanitized

12   copies of the recordings without the transcripts?

13        MR. GUINN:  I believe so, yes.  There should be in

14   the exhibits that were provided.  If not, we will make sure

15   to give to it the clerk.

16        THE COURT:  Okay.  I am going to direct that the

17   transcripts not go back and that the recordings go back by

18   themselves.

19        MR. GUINN:  I'll check with Ms. Lynch to make sure

20   she has them.

21        THE COURT:  Yes.

22        We're waiting for the alternate to come back, I'll

23   excuse her and then we'll stand in recess.

24              (Alternate Juror entered the courtroom.)

25              (Juror's name sealed per order of the Court.)

JURY DELIBERATIONS AND QUESTIONS TO THE COURT   398

1          Miss, you can sit right in that first seat if you
2     want.  I just want to thank you for your participation as an
3     alternate.
4          JUROR:  You bet.
5          THE COURT:  I don't know if you realized that
6     that's what you were doing.
7          JUROR:  Yeah, they kind of told me.  Well, some of
8     the people.
9          THE COURT:  And the number 13 might have been
10    obvious to you.
11         JUROR:  Kind of a giveaway.  But that's good.
12         THE COURT:  I know it might be frustrating to have
13    sat in on a whole trial and then not engage in the
14    deliberations.
15         JUROR:  That's okay.
16         THE COURT:  But I want to let you know that your --
17         JUROR:  And can I sit back here and see what
18    happens?
19         THE COURT:  You can do whatever you want.  But I
20    want to thank you for your service.  If for some reason one
21    of your fellow jurors could not continue for any reason, we
22    knew that you were there to fill that slot and we could keep
23    going rather than to start again.  So your willingness to
24    serve as a juror provided a valuable service for our court.
25         JUROR:  Well, thank you for a good experience.

JURY DELIBERATIONS AND QUESTIONS TO THE COURT    399

1    THE COURT:  You're free to stay or you're free to
2  go.
3    JUROR:  I'd like to sit.
4    THE COURT:  And we will stand in recess now.  But
5  if the lawyers would go through the last series of exhibits
6  with the clerk to make sure we're all on the same page.
7    (Recess held.)
8    (Open court 4:55 p.m.)
9    THE COURT:  So the jury has two questions that
10  they've submitted.  The first one reads as follows:
11    All jurors heard that the conspirators in this case
12  (9) are at a point in their respective legal process.  There
13  is confusion about what that status is among the jurors;
14  e.g., most jurors heard that all participants other than
15  Sanders and Watkins had been charged or had pled guilty in
16  this case and been sentenced.
17    And so the question following that is:  Can the
18  jury have clarification about the status of these individuals
19  in the conspiracy?  Specifically Steven Cloud.
20    My inclination in response to that question is to
21  remind the jurors that Mr. Watkins is on trial in this case
22  and they're not to be concerned about any other individuals.
23    Any objection to that response?
24    MR. GUINN:  No objection, Your Honor.
25    MR. RAEL:  No, Your Honor.

JURY DELIBERATIONS AND QUESTIONS TO THE COURT    400

1        THE COURT:  And then the second question is:

2        The jury needs clarification around the testimony

3   of Anderson, specifically her testimony on knowing,

4   underlined, versus meeting Watkins.  Some jurors heard that

5   she did not know Watkins but that she had met him.  The

6   interpretation is that she was being literal, knowing versus

7   meeting.  Are we able to read or hear Anderson's testimony?

8        My inclination in response to that question is to

9   tell the jurors that they have to rely upon their own

10  individual memory of the testimony and leave it at that.

11       Any objection?

12       MR. GUINN:  No, sir.

13       THE COURT:  And then the other thing is:  My

14  inclination is to just write those responses on the notes and

15  return the notes to them.

16       The other option would be to bring them in and tell

17  them that here.  Any objection to my just writing those

18  responses?

19       MR. RAEL:  No, sir.

20       MR. GUINN:  No, sir.

21       THE COURT:  So I'll do that and read to you what

22  I've written before I send it back.

23    So the question:  Can the jury have clarification of the

24  status of the individuals and the conspiracy, specifically

25  Steven Cloud?

1    My response is:  You are not to be concerned about the

2    status or guilt of any other person not on trial as a

3    defendant in this case.

4        Then the second question:  Are we able to read or hear

5    Anderson's testimony?

6        My response is:  No.  You must all rely on your own

7    individual memory of the testimony.

8            MR. GUINN:  No objection to either written

9    response, Your Honor.

10           THE COURT:  So we'll send these back and be in

11   recess until further notice.

12           (Recess held.)

13           (Open court at 6:17 p.m.)

14           THE COURT:  The jury has indicated they want to go

15   home and come back tomorrow morning at 8:30.  Everybody be

16   back at 8:30.

17           (Recess held.)

18

19

20

21

22

23

24

25

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

_____
                                 )
UNITED STATES OF AMERICA,        )
                                 )
                                 )   DOCKET NO. 3:20-CR-385
          vs.                    )
                                 )
KENNETH JEROME WATKINS,          )
                                 )
          Defendant.             )
_____)


TRANSCRIPT OF JURY TRIAL DAY 3 OF 3
BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
UNITED STATES DISTRICT COURT JUDGE
WEDNESDAY, MARCH 8, 2022, AT 8:30 A.M.


APPEARANCES:

          On Behalf of the Government:
          LAMBERT F. GUINN, ASSISTANT U.S. ATTORNEY
          TIM SIELAFF, ASSISTANT U.S. ATTORNEY
          U.S. Attorney's Office
          227 W. Trade Street, Suite 1650
          Charlotte, North Carolina  28202

          On Behalf of the Defendant:
          C. SAMUEL RAEL, ESQ.
          1201 West Peachtree St. N.W
          Suite 2300
          Atlanta, Georgia 30309

               and

          DAVID L. HITCHENS, ESQ.
          212 N McDowell Street
          Charlotte, North Carolina  28204


               KATHY CORTOPASSI, RDR, CRR, CRC
                    Official Court Reporter
                 United States District Court
                  Charlotte, North Carolina

```
1                        I N D E X
2   VERDICT ANNOUNCED                    Page 407
3
4   JURY DISMISSED                            408
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                (Jury in deliberations from 8:30 a.m. to 10 a.m.)
 2                (Open court at 10:04 a.m.)
 3                THE COURT:  Be seated.
 4                All right, the jury has a question and it reads as
 5     follows:  1:  C = call reference.  We would like phone
 6     numbers of the people on the call and the identities of the
 7     people on the call.
 8                And my inclination and response to this is to say
 9     there was testimony -- during the trial, there was testimony
10     concerning the phone numbers and the identities of the people
11     on the call, and you will have to rely on your memory of that
12     testimony in considering this issue.
13                Any objection?
14                MR. RAEL:  No.  Precisely, Judge.
15                MR. GUINN:  No objection.
16                THE COURT:  Then the second part of this note is:
17     Status update.  The jury is not in agreement on the verdict.
18                And my suggestion is to answer the first question
19     and only that.  There doesn't seem to be a question related
20     to the second part of this.
21                And so what I think I'm going to do is answer the
22     first question and ask them to continue to deliberate.
23                Any objection?
24                MR. GUINN:  No, sir.
25                MR. RAEL:  No, Your Honor.
```

```
 1          THE COURT:  So the note back is:  During trial, you
 2   heard testimony about the phone numbers and the identities of
 3   the people on the call.  You must rely on your memory
 4   concerning that testimony.  Please continue your
 5   deliberations.
 6          Any objection?
 7          MR. GUINN:  No, sir.
 8          MR. RAEL:  No, Your Honor.
 9          THE COURT:  All right.  That's what we'll do, and
10   we'll stand in recess until further notice.
11          (Recess held at 10:08 a.m.)
12          (Jury deliberations continued to 2 p.m.)
13           (Open court at 2:04 p.m.)
14          THE COURT:  The jury has indicated that they have
15   reached a verdict.  And so I will call them for the reading
16   of the verdict.
17          I do want to say, before we do that, that
18   witnessing the reading of a verdict can be a difficult thing,
19   and it has -- the effect is different from person to person.
20   And so I would want to say to everybody that if there's going
21   to be a difficulty handling your emotions, that this -- now
22   would be a good time to leave.  The Court will not tolerate
23   any emotional verbal reaction to the reading of the verdict
24   either from the lawyers, Mr. Watkins, or anyone else.  And so
25   I just wanted to say that now in case anybody feels like this
```

1    would be so difficult emotionally that you would not want to
2    be present during it.
3         The second thing I would say before the reading of
4    the verdict is that after the reading of the verdict, I'll
5    dismiss the jurors.  And then I'll dismiss everyone from the
6    courtroom after the jurors have left the building.
7         With that, I'll ask to call the jury in.
8         (The jury came back into the courtroom at 2:07 p.m.,
9         and the following proceedings were had in the
10        presence of the jury.)
11        THE COURT:  Members of the Jury, have you selected
12    a foreperson?
13        JURORS:  Yes.
14        (Juror's name to be sealed per Court order.)
15        THE COURT:  Is that you?
16        FOREPERSON:  Yes.
17        THE COURT:  Has the jury reached a verdict?
18        FOREPERSON:  Yes.
19        THE COURT:  And have you recorded that verdict on
20    the verdict form?
21        FOREPERSON:  Yes.
22        THE COURT:  At this time, if you would tender that
23    to the deputy clerk.
24        (Verdict passed to deputy clerk.)
25        THE COURT:  Madame Clerk, would you publish the

1  verdict in open court.

2           THE CLERK:  Yes, sir.

3           In Case Number 3:20-CR-385, United States of

4  America versus Kenneth Jerome Watkins, as to Count One,

5  charging the defendant with a violation of 21 U.S.C. 846, we

6  the Jury unanimously find the defendant guilty.

7           (Outbursts from audience.)

8           UNIDENTIFIED MALE:  No.

9           UNIDENTIFIED FEMALE:  What?

10          UNIDENTIFIED MALE:  No.

11          UNIDENTIFIED MALE:  Y'all got it wrong.

12          Don't put your hands on me.  I'm going.  I'm

13  leaving.  Don't put your hands on me.  I'm leaving.

14          UNIDENTIFIED MALE:  Have a seat.  Have a seat.

15          (Disturbance in the hallway.)

16          THE COURT:  Does either side wish to have the Jury

17  polled?

18          MR. GUINN:  No, sir.

19          THE COURT:  Members of the Jury, I want to thank

20  you for your service.  I will have to ask you to call back in

21  on -- oh, I've just been informed that as a result of recent

22  developments, you do not have to call back in.

23          I do want to express the thanks of the Court to

24  you.  When you came in and out of the courtroom, we all stood

25  out of respect for your role in this proceeding as the judges

1  of the facts.  It is a very small token of respect that we

2  convey to you as citizens.  Being willing to serve on the

3  jury is a contribution of great value to our justice system.

4  We couldn't do it without you.

5         I noticed during the trial your conscientious

6  attention to the evidence and, of course, the length of your

7  deliberation indicated that that carried through there, as

8  well.  I want to thank you for your service and dismiss you

9  at this time.  Thank you.

10         (The jury left the courtroom at 2:10 p.m., and the

11         following proceedings were had out of the presence of

12         the jury.)

13         THE COURT:  Be seated.

14         Mr. Watkins, in light of the verdict, I want to

15  tell you what to expect from this point forward.

16         The case will be referred to the probation office

17  and a presentence report will be prepared.  And once that is

18  done and you will be interviewed -- you will have an

19  opportunity to be interviewed as part of that process, and

20  you have a right to have your attorney present.

21         Once the presentence report is prepared, they will

22  be sent to the parties for their review and any objections

23  they wish to make to the report.  The final report will then

24  be sent to me, and I will calendar a hearing to conduct the

25  sentencing.

1              DEFENDANT:  Okay.

2              THE COURT:  So that's what you can expect from this

3      point forward.

4              DEFENDANT:  Okay.

5              THE COURT:  What's the Government's position with

6      respect to bond?

7              MR. GUINN:  Your Honor, it's my understanding under

8      the Bail Reform Act, based upon what Mr. Watkins is being

9      convicted of, I believe the language in the statute is "shall

10     detain" unless there were exceptional circumstances as to why

11     he should remain out.  I don't know what those exceptional

12     circumstances are.  I'm not aware of any issues that he's had

13     while being out on bond, but the statute is the statute and

14     the standard is the standard.  And that's my understanding,

15     Your Honor.

16             THE COURT:  What says the Defendant?

17             MR. RAEL:  Well, Your Honor, number one, as the

18     Court may or may not be aware, he has not only faithfully

19     shown up in court today, but he's been on an ankle monitor.

20     Every time he's been on that monitor, he's always had no

21     problems of any kind with the Probation Department or

22     anywhere else.  If we are talking about extraordinary, well,

23     on the one hand, it's not extraordinary.  There are people

24     who have children and family; but in this case, his children,

25     I will tell the Court, I don't know if it ever came out, I

1  saw it myself, he has just a little toddler who it's going to

2  take a period of time, some period of time, at least until

3  the sentencing hearing is established, as the Court directed

4  it would, where, at the end of the day, he's going to have to

5  figure out how to make all those type of arrangements for not

6  just that child but others.

7        And then, as in every case, while he has to put his

8  affairs in order, not knowing that -- not having, as all the

9  other defendants have had some opportunity to determine what

10  they are going to do with their lives, I think it's important

11  for the Court to recognize that he's going nowhere.  Just

12  look at the people that were there just a minute ago; maybe a

13  courtroom more full of people than the courts have seen

14  before.  And there's a great support system.  Even to the

15  point where they were just, unfortunately to the Court,

16  disrupting the courtroom.  But there's a great sense of

17  camaraderie with everyone.

18        And it seems to me that those are circumstances

19  that should permit the Court to allow him to do what he did

20  when he came all the way from -- to Charlotte from Atlanta.

21  He's come.  He'll be there.  And I think that's an important

22  consideration for a court.

23        THE COURT:  Thank you.

24        I did -- I did witness the amount of support that

25  Mr. Watkins has throughout the trial.  I did witness the

1    disruption at the end of the trial despite the Court's

2    admonitions.  That disruption is unacceptable.

3         Notwithstanding that, I certainly wouldn't hold any

4    of that against Mr. Watkins.  Mr. Watkins showed respect to

5    the Court throughout these proceedings.  I want to recognize

6    the outburst as something unprecedented in the Court's

7    experience of 17 years on the bench.  Totally intolerable.

8         But having done that, I want to inform Mr. Watkins

9    that in no way does the Court hold that against him.

10        However, it appears to the Court that 18 United

11   States Code Section 3143 provides that upon a conviction such

12   as this, the Court shall order the defendant remanded unless

13   there are exceptional circumstances that would indicate a

14   different result.  I do not find any exceptional

15   circumstances.  I remand Mr. Watkins at this time.

16        MR. HITCHENS:  If I may, he was whispering to me

17   when Mr. Rael was up there.  He does own two businesses in

18   which he employs several employees, and those businesses

19   would immediately be disrupted, along with the lives of those

20   employees.  He just would like time to wind down and put some

21   kind of structure in place to keep the people employed, just

22   a short amount of time.  I don't think he's asking for a date

23   until the sentencing, but possibly a report date, Your Honor.

24        THE COURT:  Mr. Hitchens, I acknowledge both your

25   remarks and the testimony that I heard during the trial, but

1    I had that in mind as I made my decision.  So the decision is
2    not affected by that argument.  Mr. Watkins will be remanded
3    at this time.
4            DEFENDANT:  Can I go to my family?  Can I give my
5    wife?  Tell them I love them.
6            UNIDENTIFIED FEMALE:  Daddy.
7            DEFENDANT:  I love you, Baby.  Where Kizzy at?  Can
8    I tell her I love her?
9            (Defendant exited the courtroom at 2:18 p.m.)
10            THE COURT:  Mr. Rael, you can advise anybody that's
11    here with you that they're free to go at this time.
12            Mr. Rael, Mr. Hitchens, Counsel for the Government,
13    you're free to go.
14            (Court adjourned at 2:20 p.m.)
15
16
17
18
19
20
21
22
23
24
25

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA

CERTIFICATE OF OFFICIAL REPORTER

I, Kathy Cortopassi, RDR, CRR, CRC, Federal Official Court Reporter, in and for the United States District Court for the Western District of North Carolina, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this the 7th day of September 2022.


/s/ Kathy Cortopassi
Kathy Cortopassi, RDR, CRR, CRC
U.S. Official Court Reporter

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

-----------------------------------------------------------  )
**UNITED STATES OF AMERICA,**                                )          **DOCKET NO. 3:20-CR-0385**
                                                             )
**-vs-**                                                     )
                                                             )          **DEFENDANT'S**
**KENNETH WATKINS,**                                         )          **MOTION FOR ACQUITTAL**
**Defendant.**                                               )
----------------------------------------------------------- )

Defendant Kenneth Watkins, by and through counsel, respectfully moves the Court for an

order granting acquittal following a jury verdict pursuant to Fed. R. Crim. P. 29. The grounds for

this motion are set forth in a forthcoming memorandum of law. Watkins respectfully requests that

this motion be heard at a hearing to be set at a later date.

Dated: June 23, 2022

Respectfully submitted,


/s/  C. Samuel Rael
2221 Peachtree Road, N.E.                    C. Samuel Rael
Suite D-114                                  Attorney for Defendant
Atlanta, Georgia 30309                       Georgia Bar No. 591750
(404) 522-2555
Email: samuelrael@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the within and foregoing **MOTION FOR**

**ACQUITTAL** on all parties of record in this action by electronic delivery:

Lambert Guinn
United States Attorney's Office 227
West Trade Street, Suite 1650
Charlotte, NC 28202
704-344-6222
Email: lambert.guinn@usdoj.gov

This 23rd day of June, 2022.

Respectfully submitted,

/s/ C. Samuel Rael
C. Samuel Rael Attorney
for Defendant Georgia Bar
No. 591750

2221 Peachtree Road, N.E.
Suite D-114
Atlanta, Georgia 30309
(404) 522-2555
Email: samuelrael@gmail.com

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

```
------------------------------------------------------------ )
UNITED STATES OF AMERICA,              )          DOCKET NO. 3:20-CR-0385
                                       )
-vs-                                   )
                                       )          DEFENDANT'S
KENNETH WATKINS,                       )          MOTION FOR NEW TRIAL
Defendant.                             )
------------------------------------------------------------ )
```

Defendant Kenneth Watkins, by and through counsel, respectfully moves the Court for an order granting a new trial pursuant to Fed. R. Crim. P. 33. The grounds for this motion are set forth in a forthcoming memorandum of law. Watkins respectfully requests that this motion be heard at a hearing to be set at a later date.

Dated: June 23, 2022

Respectfully submitted,

/s/  C. Samuel Rael

2221 Peachtree Road, N.E.                 C. Samuel Rael
Suite D-114                               Attorney for Defendant
Atlanta, Georgia 30309                    Georgia Bar No. 591750
(404) 522-2555
Email: samuelrael@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the within and foregoing **MOTION FOR**

**NEW TRIAL** on all parties of record in this action by electronic delivery:

Lambert Guinn
United States Attorney's Office 227
West Trade Street, Suite 1650
Charlotte, NC  28202
704-344-6222
Email:  lambert.guinn@usdoj.gov

This 23rd day of June, 2022.

Respectfully submitted,

/s/  C. Samuel Rael
C. Samuel Rael Attorney
for Defendant Georgia Bar
No. 591750

2221 Peachtree Road, N.E.
Suite D-114
Atlanta, Georgia 30309
(404) 522-2555
Email: samuelrael@gmail.com

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

---------------------------------------------------------- )
**UNITED STATES OF AMERICA,**      )      **DOCKET NO. 3:20-CR-0385**
     )
**-vs-**      )
     )      **DEFENDANT'S MEMORANDUM**
**KENNETH WATKINS,**      )      **IN SUPPORT OF MOTION**
**Defendant.**      )      **FOR ACQUITTAL AND**
---------------------------------------------------------- )      **NEW TRIAL**

Defendant Kenneth Watkins, by and through counsel, submits this Memorandum of Law in Support of his Motion for Acquittal and New Trial.

## BACKGROUND

The Government initially indicted Steven Cloud and Akeem Davis on November 17, 2020, for their role in a Charlotte area drug conspiracy. (DCD #3.) On January 20, 2021, the Government obtained a Second Superseding Indictment, which added four more defendants. Finally, on June 15, 2021, the Government indicted Kenneth Watkins, adding him as the seventh defendant on its Third and Superseding Indictment. All other defendants pled guilty. Watkins proceeded to trial, which was held before a jury beginning June 6, 2022.

## PRELIMINARY STATEMENT

Watkins is a musician/rapper who lives in the Atlanta, Georgia area. The allegations against Watkins in the final Indictment are that he was involved in the Charlotte conspiracy to distribute cocaine or Eutylone. At trial, the Government provided one witness who testified that Watkins gave her a box, which she claimed contained Eutylone pills, but which she testified to not looking inside of.

Latisha Anderson, a witness who pled guilty and who had intricate knowledge of the conspiracy, also testified and informed the jury that Watkins was not involved in the conspiracy in any way, even telling the FBI and the Government that she did not obtain any drugs from Watkins.

The jury deliberated for nearly 24 hours, asking several questions about Anderson's

testimony, whether Cloud had been found guilty or sentenced. The jury expressed confusion about certain facts, evidence, and witnesses, and requested to hear Anderson's testimony again. This Court denied that request.

Despite the jury's verdict, this Court continues to play a vital role in ensuring that there was legally sufficient evidence for the jury not only to conclude that Watkins was possibly—or even probably—guilty of the crime charged, but that he was in fact guilty *beyond a reasonable doubt*. Without the testimony of a witness who struck a deal with the Government to reduce her sentence in exchange for that testimony, the conspiracy case against Watkins fails on every level. To prove a conspiracy under 21 U.S.C. § 846, the Government must prove that a defendant joined with two or more persons to accomplish an unlawful purpose. Specifically, the jury must find that the Government proved each of the following beyond a reasonable doubt: First, that there was an agreement between two or more persons to possess and distribute the drug; Second, that the defendant knew of this agreement, or conspiracy; and Third, that the defendant knowingly and voluntarily participated in or became a part of this agreement or conspiracy.

Aside from two separate deliveries of a box and cash (to Anderson), no evidence or testimony showed Watkins' agreed with anyone else to possess or distribute Eutylone, that he was aware of a drug conspiracy in Charlotte, North Carolina, or that he knowingly and voluntarily participated in any conspiracy. This absence of evidence compels a judgment of acquittal on Count One, the only count against Watkins.

When the evidence viewed in the light most favorable to the prosecution calls for speculation—*i.e.*, if it gives equal or nearly equal circumstantial support to a theory of guilt as it does to a theory of innocence—then a reasonable jury must *necessarily* entertain a reasonable doubt. Even drawing all inferences in the Government's favor, no reasonable jury could have found Watkins guilty beyond a reasonable doubt.

For all of these reasons, the Court should grant the Defendant's motion for judgment of acquittal. Alternatively and at a minimum, the Court should grant a new trial pursuant to Federal

Rule of Criminal Procedure 33. This relief is mandated by the fact that the trial evidence was so heavily weighted against the verdict, as well as other prejudicial errors at trial—such as (i) the failure to include a more detailed and descriptive charge regarding reasonable doubt, and (ii) the failure of the jury to stay awake and observe the trial. Whether this Court grants acquittal under Rule 29, or merely a new trial under Rule 33, the jury's verdict cannot stand.

There exists a very substantial issue with respect to the sufficiency of the evidence as to many of the elements of the sole count levied against Watkins. The case against Watkins required the jury to take a leap and believe drugs were inside of a box based on the testimony of a witness who did not herself look inside the box.

**ARGUMENT**

## I.    THE COURT SHOULD GRANT JUDGMENT OF ACQUITTAL UNDER RULE 29

### A.    Legal Standard

The U.S. Constitution "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970); *see Sullivan v. Louisiana*, 508 U.S. 275, 278 (1993) (Constitution "require[s] . . . a jury verdict of guilty beyond a reasonable doubt"). This standard exists because it would be unconstitutional "to have a jury determine that the defendant is *probably* guilty." *Id.*; *see, e.g., United States v. Ray*, 61 F. App'x 37, 50 (4th Cir. 2003) ("[T]he fact that the evidence would permit a jury to find that [the defendant] *might* have participated in the shooting with the intent to further the drug conspiracy, or even that he *probably* did so, is not adequate to sustain his conviction.").

Rule 29 provides "an important safeguard to the defendant," in that "[i]t tests the sufficiency of the evidence against him, and avoids the risk that a jury may capriciously find him guilty though there is no legally sufficient evidence of his guilt." *United States v. Nukida*, 8 F.3d 665, 670 (9th

Cir. 1993) (quoting 2 Charles A. Wright, Federal Practice and Procedure § 461, at 637-38 (2d ed. 1982)). A court "must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). Faced with a Rule 29 motion, a court should consider "whether there is substantial evidence (direct or circumstantial) which, taken in the light most favorable to the prosecution, would warrant a jury finding that the defendant was guilty beyond a reasonable doubt." *United States v. MacCloskey*, 682 F.2d 468, 473 (4th Cir. 1982); *see United States v. Alerre*, 430 F.3d 681, 693 (4th Cir. 2005) (citation omitted) (defining "substantial evidence" as "evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt"). Although the standard requires inferences to be drawn in favor of the Government, it "not so strict that the defendant's evidence must be disregarded." *United States v. Beck*, 615 F.2d 441, 448 (7th Cir. 1980). Instead, "[i]n considering the motion, the Court should examine the evidence as a whole including that offered by the defendant." *Id.*; *see* 2A Fed. Prac. & Proc. Crim. § 467 (4th ed.) ("The court must look to all of the evidence."); *cf. Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (noting, in Rule 50 civil context, that court should consider "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses").

A Rule 29 motion for acquittal should be granted where the government has failed to offer "more than mere speculation and conjecture" to support a given charge. *United States v. Gengler*, No. 1:08 Cr. 12, 2009 WL 5549225, at *8 (E.D. Va. Oct. 23, 2009) (Trenga, J.). "[C]ircumstantial evidence is equally available with direct evidence to prove the conspiracy, but suspicion or conjecture cannot take the place of evidence." *Harms v. United States*, 272 F.2d 478, 483 (4th Cir. 1959); *see Evans-Smith v. Taylor*, 19 F.3d 899, 908 n.22 (4th Cir. 1994) ("While all inferences must be made in favor of the prosecution, leaps of logic should not be."). In cases where the evidence, though viewed deferentially, still gives "equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable

doubt," and the court should enter a judgment of acquittal. *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002) (citation and internal quotation marks omitted). Though "the government's proof need not be so certain as to exclude all inferences of innocence, in a case where the government's overall evidence of guilt is so thin, the alternate hypotheses consistent with innocence become sufficiently strong that they must be deemed to instill a reasonable doubt in our hypothetical reasonable juror." *Ray*, 61 F. App'x at 49 (citation omitted); *see, e.g.*, *Glenn*, 312 F.3d at 64 (reversing and remanding for entry of judgment of acquittal despite circumstantial evidence showing that defendant had "motive and opportunity to commit the crime," that he "possessed a handgun, departed the general area of [the victim's] death, and reacted casually when informed of the shooting," and later "made false statements to the police about his activities around the time of the murder").

For example, the Fourth Circuit reversed a denial of a motion for judgment of acquittal (and remanded for *vacatur*) despite a defendant's extrajudicial confession to ATF agents, where there was insufficient record evidence to corroborate that confession. *See United States v. Stephens*, 482 F.3d 669, 673 (4th Cir. 2007). It has also affirmed a judgment of acquittal where the government's case rested on "missing, flawed, or contradictory facts" that led to the conclusion that no reasonable trier of fact could hold the defendant guilty beyond a reasonable doubt. *United States v. Bonner*, 648 F.3d 209, 213 (4th Cir. 2011). This court, too, has granted a judgment of acquittal on a conspiracy count where there was "no evidence from which any inference of such an agreement [to violate the law] could be reasonably drawn." *Gengler*, 2009 WL 5549225, at *9. Moreover, on multiple occasions, courts in this district have granted judgments of acquittal in Section 951 cases specifically, notwithstanding grave underlying allegations of espionage-related conduct.[3]

### B. The Government Failed To Introduce Substantial Evidence to Support Guilt Beyond A Reasonable Doubt Against Watkins

The government's failure of proof becomes clear when considering each element of a drug conspiracy under 21 U.S.C. § 846. If the Court concludes that there is a lack of substantial evidence with respect to even one element of either count, it "*must* enter a judgment of acquittal" for that

count. Fed. R. Crim. P. 29(a) (emphasis added).

In order to prove the drug conspiracy case against Watkins, the Government was required to prove that Watkins joined with one or more people to possess and distribute drugs. Specifically, the Government had to prove, *beyond a reasonable doubt*, that: There was an agreement between two or more persons to possess and distribute the drug; That Watkins knew of this agreement, or conspiracy; and that Watkins knowingly and voluntarily participated in or became a part of this agreement or conspiracy. The government failed to proffer substantial evidence of two of those elements.

First, the government failed to establish that Watkins was aware of an agreement or conspiracy to possess or distribute a controlled substance. Next, there was no evidence that Watkins knowingly or voluntarily joined in the conspiracy. Because these elements fail, Watkins is entitled to acquittal. *See, e.g.*, *United States v. Blue*, 808 F.3d 226 (4th Cir. 2015) (acquittal appropriate in drug conspiracy where government failed to proffer substantial evidence that defendant knew drug was there).

Anderson testified that Watkins delivered money to her for repayment of a loan made by Cloud to Watkins – all legal acts. The government did not proffer substantial evidence that Watkins *knew* he was engaged in conduct other than a legal transaction. That uncontradicted testimony in this case is totally inconsistent with the government's allegation that Watkins *knew* he was in violation of 21 U.S.C. §§ 841, 846.

## II.    THE COURT SHOULD GRANT A NEW TRIAL UNDER RULE 33

As discussed above, the government has failed to proffer substantial evidence sufficient to find Watkins guilty beyond a reasonable doubt, and a judgment of acquittal under Rule 29 is the appropriate outcome. "If the court enters a judgment of acquittal after a guilty verdict, the court must also conditionally determine whether any motion for a new trial should be granted if the judgment

of acquittal is later vacated or reversed," and in doing so "must specify the reasons for that determination." Fed. R. Crim. P. 29(d)(1). Regardless of whether it grants a judgment of acquittal, the Court should grant Watkins a new trial under Rule 33, which permits the court to "vacate any judgment and grant a new trial if the interest of justice so requires." Fed.R. Crim. P. 33(a).

Here, the interest of justice requires a new trial for five reasons: (A) the jury's verdict was against the weight of the evidence, and (B) certain aspects of the final jury instructions failed to fully state the applicable law.

### A.    The Evidence Weighed Strongly Against The Jury's Verdict

For all of the reasons discussed above in connection with Watkins' motion for judgment of acquittal, the Government's failure to offer substantial evidence supporting a guilty verdict also warrants a finding that the verdict was against the weight of the evidence. Regardless of whether the Court grants a judgment of acquittal, at a minimum it should grant a new trial under the court's "much broader" Rule 33 authority. *See United States v. Campbell*, 977 F.2d 854, 860 (4th Cir. 1992) ("When the motion [for a new trial under Rule 33] attacks the weight of the evidence, the court's authority is much broader than when it is deciding a motion to acquit on the ground of insufficient evidence."). Moreover, "[i]n deciding a motion for a new trial, the district court is not constrained by the requirement that it view the evidence in the light most favorable to the government." *Id.* Thus, unlike Rule 29, "the trial court may grant relief if it determines that the evidence—even if legally sufficient to convict—weighs so heavily against the verdict that it would be unjust to enter judgment." *United States v. Souder*, 436 F. App'x 280, 289 (4th Cir. 2011); *see, e.g.*, *id.* (reversing trial court's grant of judgment of acquittal while upholding conditional grant of new trial as against the weight of the evidence).

The lack of proof beyond a reasonable doubt compels a finding that the jury's verdict was against the weight of the evidence with respect to the sole count levied against Watkins. The absence of any evidence that Watkins *knew* of a conspiracy or *knowingly* participated in that conspiracy,

demonstrates that the verdict was against the weight of evidence.

Accordingly, regardless of whether this Court grants the Rule 29 motion, it should find that the government did not make a preponderance showing. Because the evidence weighs so heavily against the verdict of guilt beyond a reasonable doubt, a new trial should be granted.

### B.    A New Trial is Warranted to Correct Erroneous Jury Instructions Regarding Reasonable Doubt

The Court should also order a new trial to correct an error in the final jury instructions. To receive a new trial based on erroneous jury instructions, a defendant must show "both that the instructions did not adequately state the law and that the error was prejudicial to him because the jury was likely to be confused or misled." *United States v. White*, 443 F.3d 582, 587 (7th Cir. 2006) (alteration omitted). Here, the jury instructions were erroneous because they failed to provide an accurate definition of "reasonable doubt." Such error was prejudicial.

The sole count against Watkins required the government to prove that Watkins knowingly conspired to violate federal drug laws. 21 U.S.C. § 846. With respect to reasonable doubt, Watkins requested the Court to charge this extremely important information as follows:

> The government has the burden of proving the defendant guilty beyond a reasonable doubt. The law does not require a defendant to prove his innocence or produce any evidence at all. The government has the burden of proving the defendant guilty beyond a reasonable doubt, and if it fails to do so, you must find the defendant not guilty.

> Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. It is only required that the government's proof exclude any "reasonable doubt" concerning the defendant's guilt. A reasonable doubt is a doubt based on reason and common sense after careful and impartial consideration of all the evidence in the case. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty.

> Authority: 1.05 PATTERN CRIMINAL JURY INSTRUCTIONS

The Court gave a cursory charge, simply referring to the need to find guilt beyond a

reasonable doubt, and did not fully define or describe the term[1]. The instruction from the Court failed to give sufficient guidance to the jury and on an issue as important as the standard for proof of guilt. While Watkins acknowledges that a further definition is not required by the Supreme Court or Fourth Circuit precedent, Watkins submits that failure to more fully define reasonable doubt in this case was erroneous and should be corrected.

## CONCLUSION

Based on the foregoing reasons Watkins submits that he is entitled to an order of this Court granting his Motion for acquittal and for new trial.

Dated: June 23, 2022

Respectfully submitted,

/s/  C. Samuel Rael

2221 Peachtree Road, N.E.
Suite D-114
Atlanta, Georgia 30309
(404) 522-2555
Email: samuelrael@gmail.com

C. Samuel Rael
Attorney for Defendant
Georgia Bar No. 591750

---

[1] The exact charge is unknown, however the Court used a very limited charge.

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the within and foregoing **MEMORANDUM**

**IN SUPPORT OF MOTION FOR ACQUITTAL AND NEW TRIAL** on all parties of record in this

action by electronic delivery:

Lambert Guinn
United States Attorney's Office 227
West Trade Street, Suite 1650
Charlotte, NC  28202
704-344-6222
Email:  lambert.guinn@usdoj.gov

This 23rd day of June, 2022.

Respectfully submitted,


/s/  C. Samuel Rael
C. Samuel Rael Attorney
for Defendant Georgia Bar
No. 591750

2221 Peachtree Road, N.E.
Suite D-114
Atlanta, Georgia 30309
(404) 522-2555
Email: samuelrael@gmail.com

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | DOCKET NO. 3:20-CR-385 |
| | ) | |
| v. | ) | |
| | ) | **GOVERNMENT'S RESPONSE TO** |
| | ) | **DEFENDANT'S MOTION FOR A** |
| KENNETH JEROME WATKINS | ) | **NEW TRIAL AND ACQUITTAL** |
| | ) | |

NOW COMES the United States of America, by and through Dena J. King, United States Attorney for the Western District of North Carolina, and respectfully submits the following response to the defendant's motion for a New Trial and Acquittal.

## BACKGROUND

On or about June 15, 2021, the defendant, Kenneth Jerome WATKINS was indicted for a single count of conspiring with others to distribute controlled substances within the Western District of North Carolina. **[Doc. 93]** The defendant was arrested and made his initial appearance in the Northern District of Georgia on or about October 26, 2021. The defendant made his initial appearance in the Western District of North Carolina on or about December 6, 2021 and was arraigned on the same day. After several continuances, the defendant's trial was set for June 6, 2022. Following a two-day trial, the jury returned a verdict convicting the defendant of a single count Conspiracy to Distribute and Possess with the Intent to Distribute Controlled Substances within the Western District of North Carolina. On June 23,

1

2020, the defendant filed motions seeking a New Trial and Acquittal. **[Docs. 265, 266]**

## ARGUMENT

There was substantial evidence of the defendant's participation in a narcotics distribution conspiracy and the defendant's motion for this court to set aside the guilty verdict in this matter and enter an acquittal should be denied. Following a guilty verdict at the conclusion of a trial, a court "may set aside the verdict and enter an acquittal." *Fed. R. Crim. P. 29(c)(2)*. "A defendant challenging the sufficiency of the evidence to support his conviction bears a heavy burden." *United States v. Beidler*, 110 F.3d 1064, 1067 (4th Cir. 1997) (quotations omitted). "Reversal for insufficient evidence is reserved for the rare case where the prosecution's failure is clear." *Id*. This Court "must affirm a conviction when substantial evidence viewed in the light most favorable to the prosecution supports the verdict." *United States v. Moody*, 2 F.4th 180, 189 (4th Cir. 2021) (quotations omitted). Substantial evidence is present "if any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." *United States v. Penniegraft*, 641 F.3d 566, 571-72 (4th Cir. 2011). "[T]his court cannot make its own credibility determinations but must assume that the jury resolved all contradictions in testimony in favor of the Government." *Id*. at 572.

In this case there was substantial evidence from which the jury could conclude that the essential elements of a narcotics conspiracy had been proven beyond a reasonable doubt. During the trial law enforcement officers testified that as part of

2

a narcotics investigation they utilized wiretaps to monitor phone calls between Stephen CLOUD, Jonquilla SANDERS, and the defendant. SANDERS testified at trial and described two occasions in which CLOUD directed her to travel to the Atlanta, Georgia area to retrieve narcotics and return them to Charlotte, North Carolina. SANDERS told jurors that in the summer of 2020 she first traveled to Atlanta and retrieved pills for CLOUD.

In October 2020, CLOUD contacted SANDERS and told her that he needed her to take a trip for him and do the "same thing." SANDERS would later explain that she understood "same thing" to mean that she was to travel to Atlanta to meet with someone to retrieve pills and return those pills to CLOUD. Her belief was based on her prior interaction with CLOUD. At the trial in this case, SANDERS described leaving Charlotte late on October 16, 2020, and traveling almost non-stop to Atlanta. SANDERS explained that she arrived in Atlanta during the early morning hours of October 17, 2020, met with the defendant to retrieve a box, and immediately drove back to Charlotte to give that box to CLOUD. SANDERS testified that though she never looked inside the box, she believed the box to contain narcotics based on her prior experience with CLOUD in the summer of 2020.

Telephone call recordings played at trial corroborated that SANDERS had contact with CLOUD and that she traveled to the Atlanta area to meet with the defendant. Additionally, phone location information indicated that a telephone associated with the defendant came into close proximity to a phone associated with

3

SANDERS.  The phone location evidence presented at trial supported SANDERS' assertion that she met with the defendant.

Law enforcement officers testifying at trial explained that based on the calls made between CLOUD, SANDERS and the defendant, investigators believed that SANDERS had gone to Atlanta on October 16, 2020, to retrieve narcotics.  After reviewing the calls from October 16, 2020, and October 17, 2020.  Law enforcement officers monitoring the wiretap of CLOUD's phone, were carefully listening for future occasions in which CLOUD appeared to be directing another person in Charlotte to travel to Atlanta to retrieve narcotics.

On October 24, 2020, investigators monitoring calls on CLOUD's phone intercepted a series of calls between CLOUD, Latisha ANDERSON, and the defendant.  Based on the calls it appeared that CLOUD was directing ANDERSON to meet with the defendant in Atlanta.  Like the sequence of events involving SANDERS, it appeared that ANDERSON was traveling to Atlanta at the behest of CLOUD to meet with the defendant.  ANDERSON would remain in Atlanta briefly and immediately began traveling back to Charlotte after her meeting with the defendant.  Law enforcement officers in Charlotte, North Carolina were able to coordinate with local investigators in Georgia and engage in a traffic stop of ANDERSON's vehicle as it traveled back toward Charlotte.  During the traffic stop officers searched ANDERSON's vehicle and located Eutylone pills, a Schedule I controlled substance.  ANDERSON testified at trial and described meeting the

4

defendant on October 24, 2020 but explained that the meeting was not to retrieve narcotics from the defendant.

A reasonable juror listening to the testimony presented at trial could conclude that ANDERSON met with the defendant and retrieved Eutylone from the defendant. Shortly after the meeting with the defendant ANDERSON was stopped with narcotics. The intercepted phone calls and phone location information do not indicate that ANDERSON met with anyone else before the traffic stop and the discovery of the pills. Text messages between ANDERSON and CLOUD several days before October 24, 2020 also indicate that CLOUD was sending ANDERSON to Atlanta to specifically get pills. Moreover, based on the similarities in the testimony of SANDERS to the events leading up to ANDERSON's traffic stop a reasonable juror could conclude that there were also Eutylone pills in the box that was retrieved by SANDERS a week earlier. It is clear that the there was an agreement between the parties to engage in the distribution of narcotics and the defendant was a participant in that agreement. While it is true that SANDERS offered a different explanation of her meeting with WATKINS, these credibility disputes have to be viewed in a light most favorable to the Government. The defendant's request for this Court to set aside the guilty verdict and enter an acquittal should be denied.

The defendant also seeks a new trial arguing again that there was insufficient evidence of guilt and that the Court provided an erroneous definition of reasonable doubt to the jury. The defendant's request for a new trial on these grounds should be denied. Federal Rule of Criminal Procedure provides that a Court "may vacate any

5

judgment and grant a new trial if the interest of justice so requires." *Fed. R. Crim. P. 33(a)*. However, "under the applicable legal principles, a trial court should exercise its discretion to award a new trial sparingly, and a jury verdict is not to be overturned except in the rare circumstance when the evidence weighs heavily against it." *United States v. Smith*, 451 F.3d 209, 216 -217 (4th Cir. 2006) (quotations omitted). As discussed in the response to the defendant's request for an acquittal pursuant to *Fed. R. Crim. P. 29*, there was sufficient evidence that a jury considered to determine that the defendant was responsible for conspiring with other to distribute narcotics within the Western District of North Carolina. The jury considered the evidence presented by the parties, the credibility of the witness, and apparently resolved those issues in favor of the Government. A new trial based on insufficient evidence presented at trial should be reserved for very rare cases in which the evidence was so lacking that allowing a guilty verdict to stand would be a miscarriage of justice. That is not the case here. Though circumstantial, there was clear and substantial evidence of the defendant's guilt presented at trial and the defendant's request for a new trial based on insufficient evidence should be denied.

Finally, the defendant contends that the trial court failed to adequately define reasonable doubt for the jury and a new trial is appropriate. "The proper inquiry in reviewing a reasonable doubt instruction is whether there is a reasonable likelihood that the jury applied the reasonable doubt standard in an unconstitutional manner." *United States v. Williams*, 152 F.3d 294, 298 (4th Cir. 1998). "The trial court is not required to define reasonable doubt as a matter of course so long as the jury is

6

instructed that a defendant's guilt must be proven beyond a reasonable doubt; the Constitution does not obligate a court to further define the standard." *Id.* "[A]t some point a reasonable doubt definition may be so incomprehensible or potentially prejudicial to require reversal." *United States v. Moss*, 756 F.2d 329, 333 (4th Cir. 1985). In this case when instructing the jury as to the reasonable doubt standard the Court provided that: "the term "reasonable doubt" means just what it says. It is a doubt based upon reason and common sense. Its meaning is no doubt self - evident and understood by you, and the Court will not attempt to define the term further." The definition provided by the Court in this case was clear, concise and appropriately left it to each juror to apply their common sense meaning of the term. Most importantly, the Court explained throughout the instructions that the burden was on the Government to prove its case beyond a reasonable doubt, and nothing in the definition could reasonably be interpreted as shifting a burden to the defendant. The Court was under no obligation to further define reasonable doubt, and the defendant's motion for a new trial on these grounds should be denied.

Wherefore, the Government that the defendant's motions for a new trial and acquittal be denied.

RESPECTFULLY SUBMITTED, this 7th day of July 2020.

DENA J. KING
UNITED STATES ATTORNEY

**s/ Lambert Guinn**
Assistant United States Attorney

7

NC Bar Number: 39714
United States Attorney's Office
227 West Trade Street, Suite 1700
Charlotte, North Carolina 28202
Telephone: 704.338.3114
E-mail: Lambert.Guinn@usdoj.gov

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | **DOCKET NO. 3:20-CR-0385** |
| | ) | |
| -vs- | ) | |
| | ) | **DEFENDANT'S REPLY** |
| **KENNETH WATKINS,** | ) | **TO GOVERNMENT'S** |
| **Defendant.** | ) | **RESPONSE** |
| _____ | ) | |

Defendant Kenneth Watkins, by and through counsel, respectfully submits his Reply to the Government's Response to his Motion For a New Trial and Acquittal.

**REPLY**

The Government responded to Defendant's Motion for New Trial and Acquittal by stating that it had presented substantial evidence of Watkins' participation in a conspiracy to distribute narcotics. The support for the response did not reveal "substantial evidence" and instead revealed how little evidence it had to implicate Watkins in a conspiracy with Stephen Cloud. Based on the Government's own filing, this Court should grant Watkins' Motion.

As the Government pointed out in its Response, Jonquilla Sanders, a co-conspirator of Cloud's, testified that she was told to travel to meet with Watkins in the Atlanta, Georgia area to do the "same thing" as she had done before. Sanders stated that she understood the "same thing" to mean that she was to pick up narcotics. Sanders testified that she retrieved a box from Watkins, but admitted she did not look inside the box and could only guess that it contained narcotics. Sanders offered no testimony about what Watkins knew about the contents of the box, how Watkins obtained the box, or his knowledge of Sanders' or Cloud's conspiracy to distribute narcotics.

Another Cloud co-conspirator, Latisha Anderson, testified that she traveled to the Atlanta area to retrieve something from Watkins, but that she did not receive narcotics. The Government submitted testimony that Anderson was stopped by police on her way back to Charlotte, and a police search of her vehicle revealed Eutylone pills in her vehicle. There was no testimony about when the

pills were placed in Anderson's vehicle, whether before or after her meeting with Watkins. Like Sanders, Anderson offered no testimony about Watkins' knowledge of Cloud's activity.

None of this evidence, either in the Response or presented at trial, shows that Watkins was in an agreement to possess and distribute narcotics; that Watkins knew of any agreement, or conspiracy existing between Cloud or anyone; or that Watkins knowingly and voluntarily participated in or became a part of such an agreement or conspiracy. Based on the evidence presented at trial, no reasonable juror could find that Watkins conspired with anyone to possess and distribute narcotics.

The only way that a jury could reach the verdict that it did in this case is to make logical leaps that are improper for a jury[1]. Motions for new trial and acquittal exist so that courts can correct these type of erroneous verdicts. For the reasons set forth above, Defendant respectfully requests that the Court grant his Motion.

Dated: July 18, 2022

Respectfully submitted,

2221 Peachtree Road, N.E.
Suite D-114
Atlanta, Georgia 30309
(404) 522-2555
Email: samuelrael@gmail.com

/s/  C. Samuel Rael
C. Samuel Rael
Attorney for Defendant
Georgia Bar No. 591750

---

[1] These types of leaps are the result of a jury that, during deliberation, is unsure of certain information about evidence, such as who is speaking in a recording or on a written transcript.

## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the within and foregoing **Reply to the Government's Response** on all parties of record in this action by electronic delivery:

Lambert Guinn
United States Attorney's Office 227
West Trade Street, Suite 1650
Charlotte, NC  28202
704-344-6222
Email:  lambert.guinn@usdoj.gov

This 18th day of July, 2022.

Respectfully submitted,

/s/  C. Samuel Rael
C. Samuel Rael Attorney
for Defendant Georgia Bar
No. 591750

2221 Peachtree Road, N.E.
Suite D-114
Atlanta, Georgia 30309
(404) 522-2555
Email: samuelrael@gmail.com

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:20-CR-00385-RJC-DCK

| | | |
|---|---|---|
| USA | ) | |
| | ) | |
| v. | ) | ORDER |
| | ) | |
| KENNETH JEROME WATKINS (9) | ) | |
| | ) | |

**THIS MATTER** is before the Court upon the defendant's post-verdict

Motions for a Judgment of Acquittal or for a New Trial, (Doc. Nos. 265, 266), the

government's response, (Doc. No. 270), and related pleadings.

I.      BACKGROUND

The defendant proceeded to jury trial on a charge of conspiracy to distribute a

mixture and substance containing Eutylone, a Schedule I controlled substance, in

violation of 21 U.S.C. § 846. (Doc. No. 93: Indictment at 1-2). At the close of the

government's proof, the Court denied the defendant's motion for judgment of

acquittal under Rule 29(a) of the Federal Rules of Criminal Procedure. The

defendant elected to present evidence and the government called one witness in

rebuttal. The jury found the defendant guilty. (Doc. No. 260: Verdict).

II.     DISCUSSION

The instant motions seek judgment of acquittal under Rule 29(c), or, in the

alternative, new trial under Rule 33. Under Rule 29, a guilty verdict must be

sustained "if, viewing the evidence in the light most favorable to the prosecution,

the verdict is supported by substantial evidence," that is, evidence which a

reasonable finder of fact could accept as adequate to support the defendant's guilt

beyond a reasonable doubt. <u>United States v. Burfoot</u>, 899 F.3d 326, 334 (4th Cir. 2018).  Under Rule 33, a new trial can be ordered if required in the interest of justice, but "a jury verdict is not to be overturned except in the rare circumstance where the evidence weighs heavily against it." <u>Id.</u> at 340 (internal quotation marks omitted).

A.     Sufficiency of the Evidence

The defendant argues that the government failed to establish that he was aware of and joined the alleged conspiracy. (Doc. No. 267: Memorandum at 6).  The government counters that co-conspirator testimony, intercepted phone calls, and cell phone location data support the jury's verdict. (Doc. No. 270: Response at 2-5).

The evidence presented at trial centered around two trips by drug couriers to Atlanta.  Jonquilla Sanders testified that co-conspirator Steven Cloud sent her from Charlotte to meet with the defendant in Atlanta on or about October 16, 2020.  The defendant gave her a box which she delivered to Cloud.  She believed pills were in the box because Cloud sent her to get pills from another person in Atlanta in the summer of 2020, and he told her this trip would be "the same thing."

Other evidence corroborated her testimony.  Intercepted phone calls connected Cloud, Sanders, and the defendant before and during the trip, with Cloud directing her not to deal with anyone but the defendant and the defendant directing her to a secondary location because he didn't have "it" at the club where they first met.  Cell phone location data recorded the proximity of her phone and the defendant's at the time she said they were meeting for the exchange.  Additionally,

2

Cloud sent "Reggie" to travel with Sanders because, according to her own admission, she could not be trusted with pills.

Letisha Anderson testified during the defendant's case. She admitted being sent by Cloud from Charlotte to meet with the defendant on or about October 24, 2020, at his music studio in Atlanta and being found with a box of pills[1] during the return trip. However, she explained that she had only obtained cash from the defendant and that another person had given her the box of pills. The defendant's wife and a woman who worked for him each testified during his case that they saw Anderson receive a box from a man at a gas station near the defendant's music studio. The jury may have chosen to believe Anderson in part and disbelieve in part, along with disbelieving the other defense witnesses, considering text messages among Cloud, Anderson, and the defendant indicate she was being sent to retrieve pills. Accordingly, in light most favorable to the government, the Court finds that substantial evidence was presented at the trial from which a reasonable juror could find the defendant guilty of the charged conspiracy beyond a reasonable doubt and that the evidence does not weigh heavily against the verdict.

B.    Jury Instruction

The defendant argues that the Court erroneously failed to define fully the term "reasonable doubt." (Doc. No. 267: Memorandum at 8-9). During the trial, the defendant requested the following instruction:[2]

---

[1] The nearly 9,000 pills were tested and found to contain Eutylone.
[2] The defendant cited 1.05 Pattern Criminal Jury Instructions, but did not specify which Circuit or author published the proposed instruction.

3

REASONABLE DOUBT

The government has the burden of proving the defendant guilty beyond a reasonable doubt. The law does not require a defendant to prove his innocence or produce any evidence at all. The government has the burden of proving the defendant guilty beyond a reasonable doubt, and if it fails to do so, you must find the defendant not guilty.

Proof beyond a reasonable doubt is proof that leaves you firmly convinced of the defendant's guilt. There are few things in this world that we know with absolute certainty, and in criminal cases the law does not require proof that overcomes every possible doubt. It is only required that the government's proof exclude any "reasonable doubt" concerning the defendant's guilt. A reasonable doubt is a doubt based on reason and common sense after careful and impartial consideration of all the evidence in the case. If, based on your consideration of the evidence, you are firmly convinced that the defendant is guilty of the crime charged, you must find him guilty. If on the other hand, you think there is a real possibility that he is not guilty, you must give him the benefit of the doubt and find him not guilty.

(Doc. No. 259).  The Court denied the request and instructed the jury:

PRESUMPTION OF INNOCENCE AND REASONABLE DOUBT

Every defendant in a criminal case is presumed to be innocent, and this presumption continues throughout the course of the trial. This presumption will end only if you reach the jury room and arrive unanimously at the conclusion, if you do, that the government has shown to your satisfaction that the defendant is guilty beyond a reasonable doubt.  This burden on the government does not change at any time during the course of the trial.  The presumption of innocence in favor of a defendant is not a mere formality to be disregarded by the jury at its pleasure.  It is a substantive part of our criminal law. Accordingly, the government must prove each of the elements of the crime charged in this indictment beyond a reasonable doubt before there can be a conviction.

REASONABLE DOUBT

The term "reasonable doubt" means just what it says.  It is a doubt based upon reason and common sense.  Its meaning is no doubt self-evident and understood by you, and the Court will not attempt to define the term further.

4

The Fourth Circuit has repeatedly admonished trial courts not to define reasonable doubt. <u>United States v. Williams</u>, 152 F.3d 294, 298 (4th Cir. 1998). This Court's instructions were substantially similar to those approved in <u>Williams</u>. Therefore, this issue is without merit and a new trial is not required in the interest of justice.

III.    CONCLUSION

Having considered the defendant's motions for judgment of acquittal or new trial under Rules 29 and 33 of the Federal Rules of Criminal Procedure, the Court finds that substantial evidence supports the conviction and that a new trial is not in the interest of justice.

**IT IS, THEREFORE, ORDERED** that the defendant's Motions, (Doc. Nos. 265, 266), are **DENIED**.

Signed: November 15, 2022

Robert J. Conrad, Jr.
United States District Judge

5

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

_____
                                )
UNITED STATES OF AMERICA,       )
                                )
                                )   DOCKET NO. 3:20-CR-385-9
            vs.                 )
                                )
KENNETH JEROME WATKINS,         )
                                )
            Defendant.          )
_____)


TRANSCRIPT OF SENTENCING HEARING
BEFORE THE HONORABLE ROBERT J. CONRAD, JR.
UNITED STATES DISTRICT COURT JUDGE
MONDAY, FEBRUARY 13, 2023, AT 9:31 A.M.

APPEARANCES:

        On Behalf of the Government:
        LAMBERT F. GUINN, ASSISTANT U.S. ATTORNEY
        TIMOTHY SIELAFF, ESQ., DOJ-USAO
        U.S. Attorney's Office
        227 W. Trade Street, Suite 1650
        Charlotte, North Carolina  28202

        On Behalf of the Defendant:
        PAUL KISH, ESQ.
        229 Peachtree St. N.E
        Suite 2505, International Tower
        Atlanta, Georgia 30303

               and

        ANTHONY G. SCHEER, ESQ.
        RAWLS, SCHEER, FOSTER, MINGO & CULP, PLLC
        1011 East Morehead Street
        Charlotte, North Carolina  28204


        KATHY CORTOPASSI, RDR, CRR, CRC
        Official Court Reporter
        United States District Court
        Charlotte, North Carolina

2

1        THE COURT:  Good morning, everyone.  We're here in

2    the matter of United States versus Kenneth Jerome Watkins for

3    sentencing.  Are the parties ready to proceed?

4        MR. KISH:  We're ready on behalf of the defendant.

5    My name is Paul Kish.  And I'm here with local counsel, Tony

6    Scheer.

7        MR. SCHEER:  Good morning.

8        THE COURT:  Good morning to both of you.

9        MR. SIELAFF:  The United States is ready, being

10   Your Honor.

11       THE COURT:  Before we begin this hearing, I would

12   just say to everyone here is that sentencing hearings can be

13   emotional matters.  And if there's anyone in the courtroom

14   who believes that it will be difficult for you to control

15   your emotions at any time during the hearing, you should

16   leave now, that the Court is not going to tolerate any

17   outbursts or disturbance in the courtroom at any time by any

18   individual.  And so if it's going to be difficult for you to

19   sit here while this hearing goes forward, I would advise that

20   you leave now.

21       And I do love children, but I can't have any noise

22   from any children, so if that's going to be a problem, then

23   if you would kindly take care of it now.

24       All right.  Mr. Watkins was found guilty by a jury

25   on June 8th of last year.

3

1          And, Mr. Watkins, after the jury verdict, your case
2  was referred to the Federal Probation Department for the
3  purpose of preparing a presentence report.  And I want to ask
4  you a few questions about that report, so if you would please
5  stand.
6          Have you had a chance to read the presentence
7  report?
8          DEFENDANT:  Yes, sir.
9          THE COURT:  Do you believe you understand it?
10         DEFENDANT:  Yes, sir.
11         THE COURT:  And have you had enough time to go over
12  your attorney's -- go over the presentence report with your
13  attorneys?
14         DEFENDANT:  Yes, sir.
15         THE COURT:  Very well.  You may sit down at this
16  time.
17         Mr. Kish, I'll be glad to hear from you on any
18  objections to the presentence report.
19         MR. KISH:  Yes, sir.  We laid those out both in our
20  objections to the initial report as well as in our sentencing
21  memorandum.
22         The first set of objections deal with the fact that
23  the controlled substance in this case is a relatively unusual
24  substance called Eutylone, E-U-T-Y-L-O-N-E for the court
25  reporter.  And as we know, it's not one of the controlled

4

1  substances that is listed in one of the big tables that comes
2  after Section 2D1.1 of the guidelines.

3          Instead, a sentencing court, just as you have to do
4  today, in sentencing a case involving something like
5  Eutylone, has to determine what other portions of the
6  guidelines provide the method by which the base offense level
7  is selected.

8          The probation officer went to what is called the
9  drug conversion table.  Based upon trial testimony from a
10 chemist that Eutylone is what is called a synthetic
11 cathinone, C-A-T-H-I-N-O-N-E, based on that testimony, the
12 probation office determined that synthetic cathinone, under
13 the drug conversion table, had the rate of 1:380, meaning for
14 every gram of a synthetic cathinone, the drug conversion
15 table says the court should consider 380 grams of a separate
16 calculation called converted drug weight.

17         And that's what the probation office did.  They
18 said that there were, according to the testimony of the
19 chemist, there were 4,391 grams of Eutylone in the bag that
20 was being carried by -- or in a vehicle that was being
21 carried by Ms. Anderson.

22         So 2,391 grams of Eutylone.  And the probation
23 officer said take that times 380.

24         Next, the Government estimated that an earlier trip
25 by a different person, Jonquilla Sanders, involved

5

1    2,000 grams of Eutylone.  Again, the probation office took

2    that 2,000 grams, multiplied it by the 380-gram conversion

3    weight, and the combination of those two calculations yielded

4    1,688 kilograms of converted drug weight.  And that's where

5    the presentence report then goes through our usual big drug

6    table behind 2D1.1 and sees that that amount of converted

7    drug weight leads to an offense level 30.  So that's our

8    baseline.  That's where we're starting from.

9          We think that's wrong for a couple of reasons.  The

10   first reason that we think that is wrong is because we don't

11   know anything other than what is in 11 pills that the chemist

12   tested.  And we think, and therefore object, to the fact that

13   any calculation based on any untested substance is

14   insufficient evidence even under, as we know, you're under

15   the preponderance of the evidence standard that the Court

16   must fulfill in order to make any guideline finding.

17         THE COURT:  Now, wait.  Sampling of drugs is a

18   routine thing in Federal Court.

19         Let me ask you.  Were there any of the pills seized

20   that were chemically tested and turned out not to be a

21   controlled substance?

22         MR. KISH:  I don't see any, no.

23         THE COURT:  So what would -- why would the Court

24   not base its weight calculation on the 100 percent sampling?

25         MR. KISH:  Well, the Government has the burden of

6

1    proof on that.  And that's my response to that, Judge, is we

2    don't have the burden, frankly.  And so I don't think they

3    have fulfilled their burden for the Court.  That's our

4    position on that.

5              I understand sampling.

6              THE COURT:  That would be a radical change in

7    sentencing practice for me to conclude that the sampling was

8    accurate and that other pills in the packages would not be

9    considered.

10             MR. KISH:  Here's where I differ a little bit with

11   what you're saying there, Your Honor, which is normally when

12   we have a sampling, there's a larger substance -- quantity of

13   substance; for example, with kilogram of cocaine or heroin or

14   something like that.

15             And an analytical chemist will take a section of

16   that and test it and extrapolate that the entire substance is

17   the same as the tested.

18             But these are individual pieces.  They're pills.

19   They're separate.  That's all we know about them is that

20   these 11 pills all had Eutylone.

21             And, again, I'm just making a record here, Judge,

22   that we don't think that there's sufficient to go beyond the

23   11 tested pills.

24             Second, and subsidiary to that position, is that

25   this 2,000-gram quantity, which the Government estimates is

7

1  attributable to a trip where no drugs were seized, in which

2  no one, frankly, knows anything about, that there is

3  insufficient evidence of that in order to form the basis

4  under the 1:380 conversion rate.

5          Our third point, though, is that we shouldn't even

6  be using this 1:380 conversion rate.  And we base that on the

7  fact that the DEA in the publication which we attached to

8  both our objections to the presentence report and to our

9  sentencing memorandum, the DEA says that this substance, this

10  Eutylone, controlled substance is very similar to metholone

11  and MDMA.

12          The guidelines themselves noticed that when you

13  have pills or typical weights of certain substances, the

14  better method is to assign a weight per pill.  And we quoted

15  that part in our objections and in our sentencing memorandum

16  where under the guidelines, you look at approximately

17  250 milligrams per pill of MDMA, which is similar to

18  Eutylone.

19          The reason I found that so striking, Judge, is that

20  when you go back and do the calculation -- and like all

21  lawyers, we're not good at calculations, right, so I had to

22  have people double-check me.  But based upon the chemist in

23  this case's testimony, each pill would have weighed about

24  268 grams, which is remarkably similar to the 250 grams per

25  pill under the typical weight per pill table.

8

1          We think that is a much better and much more

2     closely aligned calculation to the facts of this case than to

3     the method that was selected in the presentence report.

4          Now, obviously we want it because I follow those

5     calculations through.  That brings our offense level to

6     either 6 or possibly 8 or 10 if you use the calculation we're

7     proposing.  So, you know, obviously that's why I'm proposing

8     that because it's much more favorable to our position.

9          But I think it also is a position that is very

10    well-grounded in the facts of this case based on the

11    transcript of the trial that I read.

12         THE COURT:  Do I understand your position to be

13    that if I were to accept that argument but reject all your

14    other arguments in terms of what the Government has shown by

15    a preponderance of the evidence and I included all the pills

16    that were seized on I guess it was the 24th and I made some

17    similar finding as to weight of the pills or the amount of

18    pills on the 17th but I did the MDMA analogy instead of the

19    conversion, that it would come out to a base offense level 6

20    to 10?

21         MR. KISH:  It would be 10 using what you just said,

22    Judge.

23         So those are our guidelines objections.  We have

24    one more on a departure, a pre-variance, in other words.

25         THE COURT:  So let me get the guidelines right and

9

1  then talk about any ultimate sentence to be imposed.

2          MR. KISH:  If we're talking guidelines because the

3  departure is different than the variance, obviously.  The

4  departure is the fact is -- I had never seen this in 40 years

5  of doing this.  Application note 27 D talks about how

6  synthetic cathinones are so rarely encountered, is maybe the

7  way to put it, that there are times when we really don't know

8  if they equate to substances that the DEA is more familiar

9  with.

10          Application note 27 D notices that -- and describes

11  how there are situations where a downward departure may be

12  warranted in cases involving metholone -- remember that's a

13  substance that the DEA says is very similar to Eutylone --

14  cases involving metholone in which a greater quantity is

15  usually needed to produce an effect on the central nervous

16  system similar to the effect produced by the typical

17  synthetic cathinone.  And in those cases, a downward

18  departure might be warranted.

19          I simply bring that up, Judge, to say that if you

20  reject all of our earlier arguments, we think that there is a

21  method under the guidelines calculations themselves to use an

22  offense level lower than 30.  That's the point we're making,

23  Judge.

24          THE COURT:  Thank you.

25          What says the Government with respect to the drug

10

1  quantity?

2        And I forgot to mention to you, Mr. Kish, that when
3  you make a presentation to the Court, if you'd use the
4  podium.  That's something our lawyers are not familiar with
5  yet, either.

6        MR. SCHEER:  That's really my job, Your Honor, so I
7  apologize to everyone.

8        THE COURT:  I didn't notice it until the very end.

9        MR. SCHEER:  Me, either.

10        MR. SIELAFF:  Yes, Your Honor.  Thank you.  The
11  defense, respectfully, I believe, does not actually want this
12  Court to treat the Eutylone like MDMA.

13        I'll refer the Court to Page 6 of the defendant's
14  objection.  I believe it's paragraph titled Third Objection.
15  Defense themselves say, "As shown below, better method on the
16  facts of this case are to assign a weight to each pill and
17  then perform the conversion to the appropriate drug
18  quantity."

19        The defense's entire argument is determining the
20  actual unconverted weight of the controlled substance.  The
21  conversion factor for MDMA is 500 grams -- I'm sorry, 1 gram
22  of MDMA equals 500 grams of converted drug weight.

23        And so what you would actually get, Your Honor, if
24  we were actually to follow the guideline, is a base offense
25  level of 30 on the seized drugs only, not even touching any

11

1  of the transactions between the defendant and Jonquilla

2  Sanders.

3         I believe the defendant is not looking for a 500:1

4  conversion but would prefer the 380.

5         The .25 per pill is just to determine when you

6  don't know and you can't actually weigh each pill like

7  Oprysko did here, you have to guess the weight first.  And

8  they use the 250 milligrams.  That's a guess of the weight of

9  a pill.

10        So if all you know is we had a 1,000-pill deal, but

11  we never seized the pills themselves, we have to kind of

12  guess.  Well, how much do those pills weigh?

13        But you still have to convert it to your controlled

14  substance that you have to the sentencing guideline converted

15  drug weight.  Just like when you know your amount of cocaine

16  and you convert it to a different drug weight.  And that's

17  where we get the converted drug weight.

18        So the defense is spending their entire argument

19  saying, hey, we want to use point -- or 250 milligrams per

20  pill instead of the 26 -- or 260 some that Oprysko actually

21  weighed out.

22        But even if you were to do that, you still have to

23  convert it.  The 380 is far better for Mr. Watkins than the

24  500 of MDMA.

25        But if you were to use MDMA, you still have to

12

1    convert it.  So you figure out your number of pills, how much
2    those pills weigh, and multiply it all.  You have to do that.
3    That's how the sentencing guidelines work.  That's how you
4    end up from a mix of controlled substances to what we know is
5    the converted drug weight.  The guidelines run on converted
6    drug weight.
7              So that's simply on the calculations themselves.
8              As for how much, again, Your Honor the amount of
9    weight that it would take of unseized weight is 240 grams.
10   The defendant seized weight is 240 grams shy of a base
11   offense level.
12             And so as I'm sure Your Honor recall from the
13   testimony Jonquilla Sanders --
14             THE COURT:  Shy of a base offense level of 30.
15             MR. SIELAFF:  Yes.
16             So the seized weight all by itself gets you to a
17   base offense level of 28 because it's 240 grams shy.  And so
18   -- I'm sorry.  I misspoke.  It's 268 grams shy.
19             So what that means, Your Honor, is the defendant
20   provided 2,391 grams that were seized from Latisha Anderson.
21   And so is it more likely than not the defendant delivered
22   less than 10 percent of that same amount to Jonquilla?
23             Now, Your Honor heard the testimony at trial.
24   Jonquilla states that she did two runs to Atlanta for Steven
25   Cloud.  The first one she got a shoebox not from the

13

1  defendant.  She looked in the shoebox and it was pills.

2        The second time Steven Cloud said I need you to go

3  back to Atlanta to do the same thing.  She didn't look inside

4  the next box, but she said she got a similar sized package

5  but from a different individual.  That individual on the

6  second run was the defendant, Mr. Watkins.

7        And so you've got essentially testimony about three

8  packages from someone being sent by Cloud to Atlanta to meet

9  with the defendant and returning.  Only one of those packages

10  was intercepted, and that was the one from Leticia Anderson.

11  But it was over 2,000 grams of pills.  And you heard

12  Jonquilla Sanders say the first package she picked up was a

13  shoebox.  She knew it was pills.  The second one, same size,

14  same weight.  She just assumed it was pills but never looked

15  inside.  So the Court has to ask itself:  What is more likely

16  than not?

17        THE COURT:  You also have the text messages between

18  co-conspirators talking about stolen quantities.

19        MR. SIELAFF:  Stolen pills, yes, Your Honor.  The

20  texts, which were included in the Government's response,

21  Cloud is speaking to Anderson before she meets with the

22  defendant in Atlanta.  And she says she needs pills.  He says

23  someone just stole 4,000.

24        And this is after, just shortly a few days after

25  Jonquilla met with the defendant and took a package back to

14

1  Cloud where he says he lost 4,000.  And then shortly after

2  that, he says, "I only got about 2,000 left."

3          So, is it more likely than not, absolutely, that

4  Jonquilla Sanders picked up at least 6,000 pills from the

5  defendant.

6          And so we believe that the base offense level of 30

7  of converted drug weight is appropriate.

8          THE COURT:  The Court's point is I don't think the

9  1B1.3 analysis is limited to drugs delivered by the

10  defendant.  It would be the relevant amount of drugs that the

11  conspiracy, that were possessed with intent to distribute

12  during the conspiracy by joint actors.

13          MR. SIELAFF:  It would, Your Honor.

14          The Government's position is we don't even need to

15  get that far.

16          So, yes, the defendant is responsible for

17  everything involved in shipping Eutylone between Charlotte

18  and Atlanta.

19          THE COURT:  That would be foreseeable to him.

20          MR. SIELAFF:  It would be foreseeable.

21          The Government's position is we don't even need to

22  get into that amount before we reach a base offense level of

23  30 because the amount that was actually seized on one

24  delivery was just shy of a base offense level of 30.  And the

25  amount Jonquilla says -- or the amount we can reasonably

15

1    conclude Jonquilla says she picked up directly from the

2    defendant was a similar size and weight.  And text messages

3    suggest that was at least 6,000:  4,000 stolen and 2,000

4    left.

5            And so without even getting into any of the other

6    shipments between Atlanta and Charlotte, we're already into a

7    base offense level 30.

8            THE COURT:  I thank you.

9            Mr. Kish, anything in response to that?

10           MR. KISH:  Briefly, Judge.

11           THE COURT:  I'm going to make you go to the podium.

12           MR. KISH:  I'm sorry, Your Honor.  I apologize,

13   Judge.  I'm normally so loud people can hear me.

14           The Government's contention about MDMA is, with all

15   due respect, a red herring.  This is not an MDMA case.

16           The Government, again, sounding like a broken

17   record here, has the burden of production.  There has been no

18   evidence that the substances in this case are MDMA.

19           Instead, we have to go through the guidelines, as

20   we attempted to do, to come up with the most rational method

21   that the Court can use for trying to, beyond the reasonable

22   doubt, making it more likely than not that a proper offense

23   level has been selected.

24           And we think that the typical weight per pill is

25   the proper method because most closely aligns with the

16

1    tracks -- with the facts in this case.

2            Thank you, Judge.

3            THE COURT:  Thank you.

4            I'm going to overrule the objection on drug weight.

5    I think that the evidence has established the base offense

6    level 30.  I find that for several reasons, responding to the

7    objections that were made by the defendant.

8            I do think that the weight conversion table on

9    Page 159 of the guidelines dealing with conversion, a

10   converted weight of 1:380 grams, 1 gram of cathinone equaling

11   a converted weight of 380 grams, I think it's consistent with

12   the evidence in the case, the scientific testimony by the

13   chemist; and it's a very reasonable way of assessing drug

14   weight, especially with respect to these facts where there's

15   a very large volume of pills, a pattern and practice

16   established over time by the evidence.

17           And I do think that offense level of 30, which

18   consists of the drugs seized on October 24th and what the

19   Court refers to as the Anderson trip, gets the government

20   really close to where it's asking the Court to go.

21           And then I do believe, having heard the evidence

22   and presided over the trial, that the evidence establishes a

23   pattern and practice of the co-conspirator Cloud sending a

24   courier from Charlotte to Atlanta to pick up a shoebox full

25   of pills and returning to Charlotte with those pills.

17

1  They're very close, temporal proximity separated by a week.

2  It does seem to the Court to be a similar MO pattern

3  involving the same co-conspirators.

4         And the Court, having heard the testimony about the

5  text messaging among co-conspirators, believes that those

6  messages dealt with the volume of pills, the depletion of

7  inventory based upon theft, and sales that are consistent

8  with the estimate that the Government is asking the Court to

9  make based upon the evidence.

10         And so I think that the estimate by the Government

11  with respect to the October 17th Sanders trip makes sense

12  based upon the evidence, text messages of stolen pills,

13  remaining pills, and a dire need for the courier trip to

14  occur to restock, I do think the Court should and can make a

15  reasonable estimate as to total drug amount that puts the

16  offense level at 30.

17         With respect to the departure argument, the Court

18  does not believe that the facts in this case warrant a

19  departure under 27 D for the reasons that I've previously

20  stated.

21         I will hear from both sides with respect to the

22  ultimate 3553(a) sentence to be imposed, including any

23  arguments for variance.  But with respect to the argument

24  made for departure under the guidelines, the Court declines

25  to follow that.

18

1    Mr. Kish, are there any other objections to the
2  presentence report?
3    MR. KISH:  No other objections to the presentence
4  report, Judge.
5    THE COURT:  Then for purposes of consulting the
6  advisory guidelines, before any consideration of departure or
7  variance, the Court finds that the correct offense level is a
8  30, the criminal history category of 2, but the resulting
9  advisory range of 108 to 135 months.
10    Having made those guideline findings, Mr. Kish,
11  I'll be glad to hear from you with respect to the ultimate
12  sentence to be imposed in the case.
13    MR. KISH:  Yes, sir.  Thank you, Judge.
14    As I mentioned earlier, we filed a sentencing
15  memorandum, and we also filed a supplemental sentencing
16  memorandum which had letters from many of the people who the
17  Court can see here in the audience.
18    I mentioned earlier I'm from Atlanta, although I
19  practice all around the country.  I know the neighborhood
20  where this family, they all come from.  It's a very solid,
21  working class, majority African-American neighborhood in
22  Atlanta with roots that run very, very deep in the community.
23    You can see from the letters --
24    THE COURT:  If you're here on behalf of
25  Mr. Watkins, would you raise your hand?  Thank you.  The

19

1    Court will take into account that.

2            MR. KISH:  Yes, sir.

3            Mr. Watkins was raised in a very large, loving,

4    intact family.  The Court can see that these are all good,

5    hardworking class people that have driven up here today, or

6    last night as some of us did, to be here today on behalf of

7    Mr. Watkins.

8            In other words, I wanted the Court -- I always want

9    the Court to see my client's family and friends.  But one of

10   the things that's impressed me over the years in doing this

11   work is that today we're going to -- you're going to impose a

12   sentence.  You're going to select the appropriate sentence.

13   But there will be a day that the sentence is over.  And it

14   always is impressive to me that a Court has the ability in

15   some sentencing hearings to know that the person who's being

16   sentenced, they're going to have a support system when the

17   case is over.  And the presence here in the audience of these

18   people shows that this is what will be out there to support

19   Mr. Watkins at the end of your sentence.

20           I focus on all that because, like all of us, we

21   want people to do their sentences and not commit more crimes.

22   And it makes it far less likely that a lengthier sentence is

23   needed, is the point I'm getting at, in order to properly

24   impose a sentence that takes into account all the 3553(a)

25   factors for Mr. Watkins.

20

1          THE COURT:  So how do you make -- how's the Court
2     to receive that argument in light of the criminal record in
3     the previously imposed lengthy sentence which I believe
4     Mr. Watkins was released from imprisonment in 2016 and then
5     engaged in this conduct, as the jury has found, just a few
6     years later?
7          MR. KISH:  Well, it's four years later.
8          And, also, the presentence report and our
9     sentencing memorandum shows that he wasn't just sitting idly
10    after being released from prison.  He created a new family
11    with Ms. Watkins who had to walk out with one of their
12    children.  He created businesses.  He reintegrated with his
13    family and friends.
14         And, again, we disagree with the ultimate verdict,
15    but this is -- there's not a lot of evidence other than these
16    trips and a few phone calls and text messages.
17         I understand that the Court is taking evidence that
18    would support the sentencing decisions that you made you, but
19    I don't think that this is a case necessarily showing an
20    absolute recidivist incapable of complying with the law.  I
21    don't think the evidence demonstrates that.  So that's how I
22    react to the point about the other sentence.
23         The other thing about that sentence is that he
24    started that when he was 19.  If you look at the presentence
25    report, that was his first encounter with the criminal

21

1   justice system.  He went from 0 to 100 miles an hour
2   immediately.
3           Very few of us in this building who wear ties and
4   suits, if we do these kinds of cases, know what that's like,
5   to be 19 in a major prison in the state of Georgia.  That is
6   a different way of growing up into your 20s and 30s.
7           To his credit, this man became religious when he
8   was inside.  You've seen -- and you'll hear from Mr. Watkins.
9   He lives his faith.  He converted to Islam.  He and
10  Ms. Childs met while he was serving his sentence.  And they
11  were so certain that their lives were right together, they
12  waited, of course, until after he'd been released to get
13  married and start their own family.
14          So this is -- and again I understand the Court's
15  point that there's crime and then there's an interlude and
16  then there's a new crime.  But I think this is a far more
17  solid person upon whom the Court can show mercy than what
18  might otherwise appear to be the case if we look just at the
19  chronology.
20          Mr. Watkins would like to address the Court if we
21  have the chance to do that.  I don't know if you want to do
22  that now or later, Judge.
23          THE COURT:  I'd be glad to hear from Mr. Watkins.
24          Mr. Watkins, you don't have to say anything.  But
25  if there's something you wish to say, I'd be glad to hear

22

1    from you.  And you can stand right there.

2            MR. KISH:  Could I just have one moment to confer

3    with Government counsel, Judge?

4            THE COURT:  You may.

5            MR. KISH:  Thank you.

6            Judge, the reason I wanted to confer with the

7    Government was because they presented me something they want

8    to present.  And I know Mr. Watkins wants to slightly respond

9    to that.

10           THE COURT:  Why don't we do that all at once.  So

11   let me hear from the Government and then hear from

12   Mr. Watkins.

13           MR. KISH:  Yes, sir.

14           THE COURT:  Mr. Sielaff?

15           MR. SIELAFF:  Yes, sir.  I do have an exhibit,

16   Sentencing Exhibit 1 for the Government.

17           THE COURT:  Mr. Sielaff, if you would take this

18   opportunity to say whatever you want to say to me in terms of

19   the ultimate sentence to be imposed.

20           MR. SIELAFF:  Absolutely.

21           To give it context, Your Honor, I will present the

22   exhibit and then offer my comments.  It is a short clip.  It

23   is an interview of the defendant which has been published on

24   YouTube. We don't have sound.

25           (Video played in open court.)

23

1          MR. SIELAFF:  So, Your Honor, I think the

2    sentencing factors that need to be considered by the Court

3    most heavily in this situation is:  What does the past tell

4    us about where we might go in the future?

5          The defendant had a 12-year sentence.  Twelve

6    years.  After that, he spent four out before coming right

7    back here.  That is an interview, Your Honor, of the

8    defendant explaining he made $30,000 a month while in prison

9    by dealing drugs and putting corrections officers on his

10   payroll.

11         And so, Your Honor, I do not doubt at all that he

12   has a lot of people that love him, that he has a lot of

13   people that support him.  And he is a human being.  I am

14   absolutely certain he cares about the people around him, his

15   friends and his family.

16         But the question is:  What, if anything, could

17   possibly deter this defendant from engaging in drugs and drug

18   sales and delivering poison into our communities?  Twelve

19   years, 144 months was insufficient.  If anything, it only

20   built that business.

21         So, Your Honor, the Government respectfully asks

22   for a guideline sentence in excess of 144 months because 144

23   months proved to be inadequate and insufficient to deter this

24   defendant from criminal conduct.  Thank you.

25         THE COURT:  Thank you.

24

1          Mr. Watkins?

2          DEFENDANT:  Yes, Your Honor.  First I want to

3    apologize to my family for having to drive all the way from

4    Atlanta, Georgia, to be here today to support me.

5          I also want to tell them thank you for driving up

6    here to support me in my time of need.

7          I wanted to say to you, Your Honor, that no video,

8    no music video, no music interview, no music verses define me

9    as a man, define me as who I am as a father, as a son, as a

10   grandson, as an uncle, as a nephew, as a brother, as a

11   cousin, and as a husband.

12         A music video do not define me who I am.  What

13   define me who I am is the people who you see in the back of

14   the courtroom.  They don't see me cutting my son umbilical

15   cord.  They don't see me teach my son's first word is daddy.

16   They don't see me teach my son whose first sentence was I

17   love you.  They don't see me take my mother to her doctor's

18   appointments when she's too sick and her bones hurt to the

19   point where she can't even go to the doctor herself.  They

20   don't see me help my dad paint around the house, help him

21   around the house.  They don't see me do countless things.

22         These are the people who know me as a person.

23   These are people who can define me who I really am.  Not no

24   interview on YouTube because that's entertainment.  That's

25   what I did for entertainment.  That's not me as a person.

25

1   That's not me who I really is as a man.  I'm a family man,
2   family-oriented.  As you can see, I got a lot of family
3   support.  And I only did entertainment to try to even support
4   my family.  But I only do that for the fans.  My fans do not
5   know who I am as a person, as an individual, as a family man,
6   as a father, as a Muslim man.
7              And I want to say to my family no matter what
8   happens today, keep your faith.  Continue to pray.  Because
9   God answers prayers.
10             And that's all I want to say, Your Honor.  Thank
11  you, sir.
12             THE COURT:  Thank you.
13             Mr. Watkins, if you would please stand.  I
14  consulted the advisory guidelines, reviewed the information
15  in the presentence report.  Of course I presided over the
16  trial of this matter.  I've made the guideline ruling that I
17  have with respect to drug amount.  I've listened to the
18  arguments of the attorneys and allocution of Mr. Watkins.  I
19  do recognize the number of people who have come a long way in
20  support of him, both family and friends.  I've considered the
21  arguments under Section 3553(a) concerning the -- not only
22  the conduct that brings Mr. Watkins in front of the court,
23  but also the other attributes of his character and history,
24  including his criminal history.  I considered all of that,
25  the arguments for variance and am prepared to state a

26

1   sentence.

2         Pursuant to the Sentencing Reform Act of 1984, it

3   is the judgment of the Court that the Defendant, Kenneth

4   Jerome Watkins, is hereby committed to the custody of the

5   Bureau of Prisons to be imprisoned for a term of 120 months.

6   A sentence of 120 months is sufficient, but not greater than

7   necessary, to accomplish the sentencing objectives of

8   Section 3553(a), including the need for the imposed sentence

9   to reflect the seriousness of the offense, to promote respect

10  for the law, to provide just punishment, adequate deterrence,

11  and to protect the public from further crimes of Mr. Watkins.

12        It takes into account the history and

13  characteristics of Mr. Watkins, both the good and the bad.

14  And large part of the bad is being convicted at age 19 for

15  armed robbery, two counts, aggravated assault, spending a

16  substantial amount of time in prison, being released in 2016

17  and then engaging in criminal conduct that brings Mr. Watkins

18  in front of this court in 2020, just four years later.

19        There's a compelling need in this case, based upon

20  the very serious nature of the criminal conspiracy which

21  Mr. Watkins was fully involved in based upon the evidence

22  that this Court heard, as well as serious prior convictions.

23        Further ordered that Mr. Watkins support all

24  dependents from prison earnings while incarcerated.

25        The Court recommends that Mr. Watkins be allowed to

27

1  participate in any educational or vocational programs.

2          The Court calls to the attention of the custodial

3  authorities Mr. Watkins has a history of substance abuse,

4  recommends he be allowed to participate in any available

5  substance abuse treatment program and, if eligible, receive

6  the benefits of 18 United States Code Section 3621(e)(2).

7          Upon release from imprisonment, Mr. Watkins shall

8  be placed on supervised release for a term of three years.

9  While on supervised release, he will comply with the

10  mandatory conditions set forth in 18 United States Code

11  Section 3583 D, as summarized in the standard conditions of

12  supervised release adopted in the Western District of

13  North Carolina.

14          He will also comply with the remaining standard

15  conditions.

16          The Court finds that each of these discretionary

17  conditions is reasonably related to the nature and

18  circumstance of the offense, characteristics of Mr. Watkins,

19  the need to afford adequate deterrence, to protect the

20  public, and to provide Mr. Watkins with needed educational or

21  vocational training, medical care, or other correctional

22  treatment in a most effective manner, that each condition

23  involves no greater deprivation of liberty than is reasonably

24  necessary, that each is consistent with the pertinent policy

25  statements issued by the sentencing commission.

28

1          In making this finding, the Court incorporates by

2     reference the details previously stated about Mr. Watkins'

3     history and characteristics, the offense conduct, and the

4     relationship to the purposes of sentencing applicable to

5     supervised release.

6          Further ordered that Mr. Watkins pay to the United

7     States a special assessment of $100 due and payable

8     immediately.

9          The Court declines to impose a fine or interest in

10    this case but will order forfeited any interest Mr. Watkins

11    has in any property seized by law enforcement as a result of

12    this investigation.

13         Other than what we've already discussed, is there

14    any legal reason why the sentence should not be imposed as

15    stated?

16         MR. KISH:  Other than those already stated, none,

17    Judge.

18         MR. SIELAFF:  No, Your Honor.

19         THE COURT:  Any geographical recommendation?

20         MR. KISH:  Yeah, I've gotten to the point that I

21    don't ask courts to make specific location recommendations,

22    but we would ask the Court to remind the Bureau of Prisons to

23    keep Mr. Watkins as close to Atlanta as possible so his

24    family can visit him.

25         THE COURT:  I'll make that part of the judgment.

29

1          MR. KISH:  Thank you, Judge.

2          THE COURT:  Let the sentence be imposed as stated.

3          Mr. Watkins, you can appeal your conviction if you

4   believe there's some defect in these proceedings.

5          You also have a right to appeal your sentence,

6   under certain circumstances, particularly if you think the

7   sentence is contrary to law.  Any notice of appeal must be

8   filed within 14 days from the entry of judgment.  And if you

9   are unable to pay the cost of an appeal, you may apply for

10  leave to appeal with no cost to you; and if you request, the

11  Clerk of Court will prepare and file a notice of appeal on

12  your behalf.

13         I recommend that you talk to your attorneys about

14  these appeal rights, but do you understand these rights as

15  I've just explained them to you?

16         DEFENDANT:  Yes, sir.

17         THE COURT:  Thank you.

18         Anything further from either side?

19         MR. KISH:  No, sir.

20         MR. SIELAFF:  No, Your Honor.

21         THE COURT:  Then this matter is concluded.

22  Mr. Watkins is remanded at this time.

23         THE CLERK:  All rise.  This court stands in recess

24  until 10:25.

25         (End of proceedings in this matter.)

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA

CERTIFICATE OF OFFICIAL REPORTER

I, Kathy Cortopassi, RDR, CRR, CRC, Federal Official Court Reporter, in and for the United States District Court for the Western District of North Carolina, do hereby certify that pursuant to Section 753, Title 28, United States Code, that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Dated this the 21st day of February 2023.


/s/ Kathy Cortopassi
Kathy Cortopassi, RDR, CRR, CRC
U.S. Official Court Reporter