IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

No. 23-4094

_____

UNITED STATES OF AMERICA,

*Plaintiff – Appellee,*

v.

KENNETH JEROME WATKINS,

*Defendant – Appellant.*

_____

Appeal from the United States District Court
for the Western District of North Carolina

*The Honorable Robert J. Conrad, Jr., District Judge*

_____

BRIEF OF THE UNITED STATES

_____

Dena J. King
United States Attorney

Amy E. Ray
Assistant United States Attorney
United States Courthouse
100 Otis Street, Room 233
Asheville, North Carolina 28801
(828) 271-4661

*Attorneys for the United States of America*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................iv

JURISDICTIONAL STATEMENT ........................................................1

ISSUES PRESENTED ...........................................................................1

STATEMENT OF THE CASE ...............................................................2

    A.    Watkins works with Cloud to distribute Eutylone.................2

        1.    October 16–17 transaction.............................................3

        2.    October 24 transaction..................................................7

    B.    A jury finds Watkins guilty of participating in a drug-trafficking conspiracy............................................................10

    C.    The district court sentences Watkins to 120 months in prison..................................................................................18

SUMMARY OF THE ARGUMENT .......................................................22

ARGUMENT

I.    The district court did not plainly err when it permitted the jury to decide whether Watkins conspired to traffic in a controlled substance.....................................................................26

    A.    Standard of Review .............................................................26

    B.    Discussion............................................................................28

1. The evidence of Sanders's October 16 trip to Atlanta supports Watkins's conviction ........................ 29

2. The evidence of the October 24 transaction supports Watkins's conviction ..................................... 35

II. The district court acted within its discretion and did not plainly err when it admitted limited evidence of rap lyrics, after Watkins presented evidence of his status as a performer and rap artist ................................................................. 39

   A. Standard of Review ............................................ 39

   B. Discussion ........................................................ 40

III. The district court acted within its discretion when it declined to instruct the jury on reasonable doubt as proposed by Watkins ................................................................ 44

   A. Standard of Review ............................................ 44

   B. Discussion ........................................................ 44

IV. Watkins's sentence is procedurally reasonable ............................ 45

   A. Standard of Review ............................................ 45

   B. Discussion ........................................................ 46

1. The district court did not clearly err in finding that at least 1,000 kilograms of converted drug weight was reasonably foreseeable to Watkins ........... 46

2. This Court should reject Watkins's challenge to the district court's denial of his request for a downward departure ..................................... 52

CONCLUSION ............................................................................. 54

REQUEST FOR DECISION ON THE BRIEFS WITHOUT
      ORAL ARGUMENT ........................................................... 55

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Gall v. United States,*
552 U.S. 38 (2007) .................................................................. 45

*United States v. Birchette,*
908 F.3d 50 (4th Cir. 2018) ................................................... 41

*United States v. Burgos,*
94 F.3d 849 (4th Cir. 1996) ....................................... passim

*United States v. Crawford,*
734 F.3d 339 (4th Cir. 2013) ................................................ 46

*United States v. Davis,*
855 F.3d 587 (4th Cir. 2017) ......................................... 27, 42

*United States v. Dennis,*
19 F.4th 656 (4th Cir. 2021) ................................................. 28

*United States v. Dinh,*
920 F.3d 307 (5th Cir. 2019) ................................................ 49

*United States v. Finley,*
245 F.3d 199 (2d Cir. 2001) .................................................. 27

*United States v. Flyer,*
633 F.3d 911 (9th Cir. 2011) ................................................ 27

*United States v. Gray-Sommerville,*
618 F. App'x 165 (4th Cir. 2015) ......................................... 27

*United States v. Haas,*
    986 F.3d 467 (4th Cir. 2021) ........................................................... 26

*United States v. Hawkins,*
    776 F.3d 200 (4th Cir. 2015) ........................................................... 45

*United States v. Jackson,*
    327 F.3d 273 (4th Cir. 2003) ........................................................... 41

*United States v. McCauley,*
    983 F.3d 690 (4th Cir. 2020) ........................................................... 44

*United States v. McLaurin,*
    764 F.3d 372 (4th Cir. 2014) ........................................................... 41

*United States v. Medford,*
    661 F.3d 746 (4th Cir. 2011) ........................................................... 39

*United States v. Miltier,*
    882 F.3d 81 (4th Cir. 2018) ............................................................. 44

*United States v. Murray,*
    65 F.3d 1161 (4th Cir. 1995) ........................................................... 39

*United States v. Olano,*
    507 U.S. 725 (1993) ....................................................................... 27

*United States v. Pauling,*
    924 F.3d 649 (2d Cir. 2019) ............................................................ 33

*United States v. Pratt,*
    239 F.3d 640 (4th Cir. 2001) ........................................................... 40

*United States v. Rahman,*
    83 F.3d 89 (4th Cir. 1996) ............................................................... 44

*United States v. Ross,*
    912 F.3d 740 (4th Cir. 2019) ............................................................. 45

*United States v. Schier,*
    438 F.3d 1104 (11th Cir. 2006) ......................................................... 27

*United States v. Shrader,*
    675 F.3d 300 (4th Cir. 2012) ............................................................. 44

*United States v. Smith,*
    21 F.4th 122 (4th Cir. 2021) .............................................................. 26

*United States v. Spirito,*
    36 F.4th 191 (4th Cir. 2022) .............................................................. 39

*United States v. Tillmon,*
    954 F.3d 628 (4th Cir. 2019) ............................................................. 28

*United States v. Villasenor,*
    236 F.3d 220 (5th Cir. 2000) ............................................................. 27

*United States v. Walker,*
    922 F.3d 239 (4th Cir. 2019) ............................................................. 45

*United States v. Williams,*
    152 F.3d 294 (4th Cir. 1998) ...................................................... 44, 45

*United States v. Williams,*
    19 F.4th 374 (4th Cir. 2021) .............................................................. 49

*United States v. Wolf,*
    860 F.3d 175 (4th Cir. 2017) ............................................................. 26

*United States v. Zayyad,*
    741 F.3d 452 (4th Cir. 2014) ............................................................. 40

**Statutes**

18 U.S.C. § 3231 ................................................................. 1

18 U.S.C. § 3553(a) ......................................................... 45

28 U.S.C. § 1291 ............................................................. 1


**Rules**

Fed. R. Crim. P. 29 ................................................... 18, 26

Fed. R. Crim. P. 33 ................................................... 18, 21

**Sentencing Guidelines**

U.S.S.G. § 2D1.1(c)(5) ...................................................... 49

U.S.S.G. § 2D1.1 cmt. n.*(K) ....................................... 19

U.S.S.G. § 2D1.1 cmt. n.5 ............................................. 47

U.S.S.G. § 2D1.1 cmt. n.6 ............................................. 19

U.S.S.G. § 2D1.1 cmt. n.8 ............................................. 19

U.S.S.G. § 2D1.1 cmt. n.8(A) ....................................... 47

U.S.S.G. § 2D1.1 cmt. n.8(D) ................................... 19, 47

U.S.S.G. § 2D1.1 cmt. n.9 ....................................... 47, 51

U.S.S.G. § 2D1.1 cmt. n.27(D) ................................. 21, 53

## JURISDICTIONAL STATEMENT

Defendant Kenneth Jerome Watkins appeals his conviction and sentence after a jury found him guilty of a drug-trafficking-conspiracy offense. The district court's subject-matter jurisdiction derives from 18 U.S.C. § 3231. The district court entered its judgment on February 15, 2023, J.A. 496; the next day, Watkins filed a timely notice of appeal, J.A. 502. This Court's appellate jurisdiction is premised on 28 U.S.C. § 1291.

## ISSUES PRESENTED

I.     The jury heard that Steven Cloud sent drug couriers who rendezvoused with Watkins and picked up pills containing Eutylone, a schedule I controlled substance. The jury heard recorded calls between Cloud and Watkins setting up rendezvous places and times for the couriers and Watkins. Police seized nearly 9,000 Eutylone pills from the second courier. Did the district court plainly err when it denied Watkins's motion for judgment of acquittal?

II.     During his direct examination of defense witnesses, Watkins elicited character testimony and asked about Watkins's career as a rap

artist. Did the district court act within its discretion when it permitted the prosecutor to ask the witnesses about rap lyrics performed by Watkins describing drug trafficking and violence?

III. This Court has held that a district court need not define reasonable doubt for the jury. Did the district court act within its discretion when it instructed the jury without defining reasonable doubt?

IV. A chemist tested one pill of each shape and size of the pills seized and found that each of the pills was the same and contained Eutylone, a synthetic cathinone. Did the district court clearly err when it found the drug quantity attributable to Watkins based on that sampling and properly determine the weight of the substance?

## STATEMENT OF THE CASE

### A.   Watkins works with Cloud to distribute Eutylone.

During the summer and fall of 2020, Watkins supplied Cloud with thousands of pills containing Eutylone, "part of a class of chemicals called substituted cathinones" and based on "cathine," a naturally-occurring compound found in certain plants including khat.   J.A. 244–

245, J.A. 253.   Eutylone is a schedule I controlled substance under the Controlled Substances Act.   J.A. 514.   Cloud, who was known as "BankkRoll Ziggy" or "Ziggy," was the leader of the Pressure Gang, a rap-music label operating in western North Carolina.   J.A. 60, J.A. 99.   Employing surveillance cameras and a three-week wiretap on Cloud's telephone, investigators learned that Cloud used Jonquilla Sanders and Latisha Anderson as drug couriers and communicated with Watkins about deliveries to Sanders and Anderson.   J.A. 60, J.A. 99.   Watkins, who was known as "Kenny" or "KennyMan," was also in numerous social-media posts and videos with Cloud.   J.A. 61, J.A. 63, J.A. 78–79, J.A. 94.

      1.   *October 16–17 transaction.*

Sanders met Cloud in 2017 and traveled with him to both Atlanta and Las Vegas.   J.A. 119–120.   She met Watkins in Atlanta at a video shoot or a club and described Watkins's relationship with Cloud as a relationship between brothers.   J.A. 120–121.

In early July of 2020, Sanders traveled with Cloud to Atlanta. J.A. 121.   A few weeks later, Cloud asked Sanders to travel to Atlanta

to "pick up some pills."   J.A. 122.   Sanders drove to Atlanta and met

someone driving a red car who gave Sanders a grocery bag containing

what looked to Sanders like "X pills."   J.A. 123, J.A. 163.   After getting

the bag of pills, Sanders drove back to Charlotte and left the pills in

Cloud's car.   J.A. 123–124.   Sanders estimated that the bag contained

approximately 10,000 pills.   J.A. 109, J.A. 153.

Several weeks later, Cloud arranged for Sanders to take a similar

trip to Atlanta to meet Watkins.   J.A. 124–129.   At approximately 7:00

in the evening on October 16, Cloud spoke with Sanders on the phone.

J.A. 124–125, J.A. 128, S.A.[1] 1.   After asking Sanders if she had a car,

Cloud told her that he needed Sanders "to god damn take a trip for

[Cloud]."   J.A. 124–125, J.A. 128, S.A. 1.   Sanders asked when, and

Cloud responded, "Now."   S.A. 1.   Sanders asked, "To where," and

Cloud responded, "You already know.   Same thing."   S.A. 1.   Sanders

---

[1] The United States is submitting with this response brief a proposed
supplemental joint appendix containing exhibits that were admitted at
trial but omitted from the parties' joint appendix.   The United States
believes these exhibits will assist this Court in resolving the issues
raised on appeal and is filing a motion for leave to file the supplemental
appendix.

understood Cloud to mean that he wanted Sanders to return to Atlanta "to pick up pills." J.A. 128–129. Cloud stated that he would send "Reggie" with Sanders. S.A. 1.

Sanders went to Cloud's house between 8:00 and 9:00 p.m. J.A. 129, J.A. 133. Cloud gave Sanders "some cash in a rubber band" that Sanders understood she was to give to Watkins when she picked up "the box." J.A. 134, J.A. 157–158. Sanders picked up Reggie and began driving to Atlanta. J.A. 134–135.

Several hours later, at 11:30 p.m., Cloud spoke with Watkins and told Watkins that "they" would be "at the studio in an hour and thirty minutes." J.A. 137, S.A. 4. Watkins responded that he would "be gone." S.A. 5. Cloud then spoke with Sanders to see where she was, and then spoke again to Watkins. S.A. 6. Watkins told Cloud that it was "cool" and that Watkins would "just hit her when" he got "out the club." J.A. 136, S.A. 6. Watkins told Cloud, "I don't have it in there," referring to the pills Sanders was traveling to get, but Watkins agreed that Sanders could meet him at Club Diamonds. J.A. 138, S.A. 7.

Cloud asked Sanders whether she heard him and asked, "you got money on you?"   S.A. 7.

At 1:30 a.m., Sanders told Cloud she was 45 minutes from Club Diamonds, and Cloud directed Sanders to find Watkins when she arrived and tell Watkins that Sanders was Cloud's "people."   J.A. 138– 139, S.A. 8.   Cloud told Sanders that he would "see [her] when [she got] back."   S.A. 9.   Cloud warned Sanders not to deal with "nobody but [Watkins]" and not to "talk to nobody but him."   S.A. 8.

Sanders arrived at Club Diamonds and met with Watkins shortly after Watkins finished performing.   J.A. 139, J.A. 140–141.   Sanders gave Watkins the cash Cloud had given Sanders.   J.A. 140–141. Watkins told Sanders to go to his studio — K3 Soundz studio — on Covington Highway in Decatur, Georgia, and wait for him there.   J.A. 140–141.   Watkins eventually arrived at the studio in a Jeep and told Sanders that he did not have "what [Sanders] was coming to get."   J.A. 142.

Watkins told Sanders to follow him, and Sanders followed Watkins to his house approximately 15 minutes away.   J.A. 142.   Once

there, Watkins went into his house and returned to Sanders with a box that may have been a shoe box. J.A. 143, J.A. 147. Sanders did not look in the box, but she believed that the box contained pills. J.A. 143, J.A. 158–159, J.A. 168. Sanders drove the box back to Charlotte and delivered it to Cloud. J.A. 143.

### 2. *October 24 transaction.*

The next day, on October 18, Cloud texted Anderson that someone had "let sumone steal [his] bag wit 4000 in it last nite." J.A. 201, S.A. 43. Anderson responded, "Damn omfg," and Cloud replied, "yea man shit got me tight." J.A. 201, S.A. 43.

Anderson texted Cloud two days later and told him that she "needed pills." J.A. 199, S.A. 41. Cloud told Anderson that he was "almost read again" and asked Anderson, "u gon take dat trip?" J.A. 199, S.A. 41. Anderson asked "when," and Cloud stated that he did not know yet and that he "[g]ot bt 2000 left." J.A. 200, S.A. 41.

On October 24, Anderson traveled to Atlanta, driving a gold colored Toyota Camry. J.A. 215–216, J.A. 300, J.A. 310. Cloud called Anderson at 11:30 in the morning, and Anderson reported that she had

"been on the road since 6:30." J.A. 183, S.A. 10–11. Anderson asked Cloud to send her "the address" and estimated that she was 20 minutes away. S.A. 11. Cloud then connected Watkins to the call, and after telling Watkins that "she been up there for an hour," Watkins replied that he was "fixing to go straight to her right now." S.A. 12. Cloud then gave Anderson the address of Watkins's studio on Covington Highway in Decatur, and Anderson told Cloud she was "17 minutes away." J.A. 184S.A. 13. Cloud told Anderson that she knew where to go and that "[b]ro god damn going to be waiting on you." S.A. 13. Watkins replied in the three-way call, "Yeah, I'm on my way over there now." S.A. 13. Anderson responded, "Alright." S.A. 13.

Forty minutes later, Watkins told Cloud, "tell your people . . . I'm on my way up there." J.A. 185–186, S.A. 14. Cloud asked Watkins how long he would be, and Watkins responded, "I'm talking about ten minutes. I'm walking out the door right now." S.A. 14. Cloud replied that he would "tell her right now." S.A. 14. Cloud then called Anderson and told her, "he said he be there in like ten minutes." S.A. 15. Anderson responded, "I'm here." S.A. 15.

Anderson texted Cloud later that she was "[b]out to leave" and would "bring [Cloud's] money when" she got "back to the city." J.A. 369, S.A. 44. At 12:42 p.m., Cloud spoke with Anderson and asked her if she was "situated." S.A. 16. Anderson responded, "yeah," and Cloud told her to "drive safe" and that he would check on her in an hour. S.A. 16.

Believing that Cloud's and Anderson's reference to "situated" meant that Anderson had the drugs she was sent to Atlanta to retrieve, Detective Michael Sardelis arranged for a Georgia sheriff's deputy to stop Anderson's car. J.A. 190–191, J.A. 207–209, J.A. 212, J.A. 214. At approximately 2:00 in the afternoon, the deputy sheriff stopped Anderson's car for traffic violations. J.A. 191, J.A. 215. After a drug canine alerted to the presence of narcotics, police seized a shoe box containing approximately 8,900 pills and more than $4,600 in cash. J.A. 101, J.A. 209, J.A. 216–221, J.A. 242, J.A. 300, J.A. 315, J.A. 322.

The pills found in the shoebox had 11 different colors and shapes and were grouped into 11 plastic bags with pills of identical shape and color stored together. J.A. 242. A forensic chemist tested one pill from

9

each of the 11 groups/baggies, and found that each pill, regardless of group, contained the same amount of Eutylone. J.A. 242, J.A. 245–246.

## B. A jury finds Watkins guilty of participating in a drug-trafficking conspiracy.

A federal grand jury indicted Watkins, Cloud, Sanders, and Anderson, among others, and charged Watkins with conspiracy to distribute and possess with intent to distribute Eutylone. J.A. 13–14. Sanders and Anderson pleaded guilty to participating in the drug-trafficking conspiracy. J.A. 117. Nine months after the grand jury indicted Watkins, his case proceeded to trial. J.A. 23.

The jury heard from Sanders and from law-enforcement officers who investigated the drug-trafficking conspiracy. J.A. 54, J.A. 117, J.A. 171, J.A. 212, J.A. 237, J.A. 258, J.A. 298, J.A. 345. Sanders testified that she pleaded guilty to conspiracy to possess with intent to distribute a controlled substance based on her transportation of pills from Watkins to Cloud on October 17. J.A. 117–118. She also testified that she assumed Cloud asked her to take Reggie with her to Atlanta because Cloud "didn't trust [Sanders] to come back with his pills." J.A. 155.

10

The jury heard evidence of geolocation analyses of phones used by Watkins, Sanders, and Anderson, corroborating other evidence of their October 2020 trips to Atlanta to meet Watkins. J.A. 174–175, J.A. 195, J.A. 274–283. Geolocation analysis of cell phones used by Watkins and Sanders on October 16 and 17 reflected that Sanders's cell phone traveled from Charlotte to Atlanta on the evening of October 16 along a path consistent with Interstate 85. J.A. 175, J.A. 274–276, S.A. 31–32. Sanders's cell phone arrived in the area of Club Diamonds at a time when one of Watkins's cell phones was also in the same area. J.A. 174–175, J.A. 277, S.A. 33. Sometime after 3:00 a.m. on October 17, Sanders's phone traveled to the area of Watkins's studio, K3 Soundz, and then headed back to Charlotte. J.A. 175, J.A. 278–279, S.A. 34.

A geolocation analysis of cell phones used by Watkins and Anderson reflected that Anderson's phone traveled from Charlotte to Atlanta on the morning of October 24. J.A. 195, J.A. 279–281, S.A. 35–36. Anderson's phone traveled to the area of K3 Soundz, started to leave the vicinity of the studio, and then returned to the studio area. J.A. 195, J.A. 281, S.A. 37. Between 11:05 a.m. and 12:15 p.m., a

phone used by Watkins traveled toward K3 Studios. J.A. 174–175, J.A. 255–256, J.A. 282–283, S.A. 37–38. After 12:30, Anderson's phone returned up Interstate 85 toward Charlotte. J.A. 195, J.A. 283, S.A. 39.

At the conclusion of the United States' case, Watkins moved for judgment of acquittal. J.A. 292–293. The district court denied Watkins's motion immediately, finding there was sufficient evidence to support the charge against Watkins. J.A. 293.

Watkins presented the testimony of several witnesses including Anderson. J.A. 298. Anderson testified that Watkins gave her the $4,500 in cash seized during the traffic stop but denied that Watkins had given her the shoe box containing Eutylone pills seized from the car she was driving on October 24. J.A. 308, J.A. 310. Anderson explained that she understood the money to be payment for some kind of "feature" or other music project Watkins and Cloud had done together. J.A. 310–311. And Anderson stated that she would not identify the "gentleman" who gave her the pills because "he's unknown." J.A. 315, J.A. 323. Anderson acknowledged that she pleaded guilty to

conspiring to distribute pills but denied that Cloud sent her to Atlanta to pick up pills, stating that she conspired with the "known and the unknown." J.A. 324.

Lashanda O'Neill testified that she rented a booth in Watkins's studio from him for hair styling and that Watkins is "just a great person." J.A. 333, J.A. 340. O'Neill testified that Watkins was "family," that she attended most of his shows, and that they socialized together. J.A. 334. O'Neill described Watkins as a "great artist" and a "great performer" and that he was engaging with the audience and good with interviews and making videos. J.A. 334–335. O'Neill testified that she was at a Chevron gas station in Charlotte on October 24 when she saw a "fair-skinned, light-skinned" guy who was "kind of tall" hand the Versace shoe box to a woman driving a brown car. J.A. 338–339, J.A. 341.

Kizzy Childs, the mother of Watkins's children, testified that she and Watkins were practicing Muslims. J.A. 345–346. Childs testified that she knew Cloud and that Watkins and Cloud produced music and videos together. J.A. 351. Childs testified that Watkins did not do

drugs and denied that Watkins and Cloud sold drugs together, explaining that Watkins was well known as a rap artist in Atlanta and he and Cloud "mesh[ed] well together" as independent artists. J.A. 351, J.A. 353. Childs testified that Watkins was "into his religion," "into his family," and "into his work ethic." J.A. 353–354.

Childs testified that she was with O'Neill at the Chevron gas station and that she also saw a "light-skinned guy" hand a "young lady" a Versace shoe box. J.A. 347–348. Childs testified that the man was driving a red sports car, and the woman was driving a "brownish, gold" car. J.A. 350. Childs saw the same woman later that day in the parking lot of Watkins's K3 Soundz studio. J.A. 361–362. Childs testified that she saw Watkins give the woman $4,500 because Watkins and Cloud had just shot a video for a song called, "Truckload," and Watkins was paying for the video. J.A. 363.

On cross-examination, the prosecutor asked Childs whether Watkins performed "gangster rap." J.A. 357. Childs responded that she "just [knew] it as rap." J.A. 357. Without objection from Watkins, the prosecutor asked whether Childs was familiar with a song Watkins

performed with Cloud called, "Don't Do It," that included the lyrics, "They've got more money than all them. We got more guns than all of them." J.A. 358. Childs testified that she was familiar with those lyrics. J.A. 358.

The prosecutor also asked Childs about a song called, "2 da Door." J.A. 359. Watkins objected on the basis of relevance, and the prosecutor explained that Watkins had elicited character evidence from Childs about Watkins's status as a practicing Muslim. J.A. 359–360. Watkins had also asked his witnesses about the type of music he performed and his collaboration with Cloud. J.A. 359. The district court overruled Watkins's objection. J.A. 360. The court explained that although it would ordinarily "prohibit this kind of cross on lyrics, . . . the door was open wide on character evidence on Direct" and that the prosecutor's cross-examination was "responsive to it." J.A. 360. The court warned the prosecutor, however, that it would "get cumulative soon." J.A. 360.

After this colloquy, the prosecutor asked two more questions related to Watkins's music. J.A. 360, J.A. 364. Childs admitted that

in a song called, "You Know It," Watkins says, "I'm a doper, for real."

J.A. 361.   And in the "Truckload" song and video, a lyric states, "I've

got truckloads and bales, don't even put it on a scale."   J.A. 364.

Watkins did not renew his motion for judgment of acquittal after

the close of his evidence or after the United States' rebuttal case.   *See*

J.A. 365–367, J.A. 371.   Before the district court instructed the jury,

Watkins proposed that the court instruct the jury that "[a] reasonable

doubt is a doubt based on reason and common sense after careful and

impartial consideration of all the evidence in the case" and that if the

jury believed there was "a real possibility that [Watkins] is not guilty,

you must give him the benefit of the doubt and find him not guilty."

WDNC Case No. 3:20CR385, Doc. 259; J.A. 373–374.   The district court

declined Watkins's invitation to define "reasonable doubt," explaining

that the instruction the court intended to give instead was "time tested"

and had "been reviewed by the Fourth Circuit."   J.A. 374.

Over Watkins's objection, the district court instructed the jury

that "the Government must prove each of the elements of the crime

charged in this indictment beyond a reasonable doubt before there can

be a conviction" and that "'reasonable doubt' means just what it says. It is doubt based upon reason and common sense." J.A. 375. The court explained that the meaning of "reasonable doubt" was "no doubt self-evident and understood by [the jury], and the Court will not attempt to define the term further." J.A. 375.

After an hour and a half of deliberations, the jury asked the district court whether it could have "clarification about the status of these individuals in the conspiracy," especially Cloud. J.A. 418, 421. The jury also asked the district court to clarify Anderson's testimony. J.A. 422. The district court responded to both requests by telling the jurors that they were required to rely upon their memory of the testimony and that they were not to be concerned about the status or guilt or any person other than the defendant. J.A. 423. After several more hours of deliberation, the jury asked for the identities and phone numbers of the people on telephone calls. J.A. 426. The jury also reported that it was "not in agreement on the verdict." J.A. 426. The district court responded that the jurors had to rely on their memory about the phone numbers and the identities of the people on a telephone

call.   J.A. 427.   The court also instructed the jury to "[p]lease continue your deliberations."   J.A. 427.   A few hours later, the jury found Watkins guilty.   J.A. 429.

Three-and-a-half months after the jury found him guilty, Watkins moved the district court for judgment of acquittal under Federal Rule of Criminal Procedure 29, arguing that the United States failed to prove that Watkins entered into an agreement to possess or distribute a controlled substance.   J.A. 436, J.A. 445.   Watkins also moved for a new trial under Federal Rule of Criminal Procedure 33, arguing that the jury's verdict was against the weight of the evidence and that the district court erred in failing to define "reasonable doubt" as requested by Watkins.   J.A. 438, J.A. 446–448.   The district court denied both motions, finding that the jury heard substantial evidence from which a reasonable juror could find Watkins guilty beyond a reasonable doubt. J.A. 463.

## C.   The district court sentences Watkins to 120 months in prison.

The district court's probation office submitted a presentence report and found that at least 4,391 grams of Eutylone were reasonably

foreseeable to Watkins.  J.A. 528.  The probation office arrived at this figure by estimating that Sanders transported approximately 2,000 grams of Eutylone on October 17, based on the quantity that she estimated was in the bag she retrieved during her first drug-courier trip to Atlanta and the 2,391 grams of Eutylone seized from Anderson.  J.A. 527–528.

Because Eutylone is not specifically referenced in the United States Sentencing Guidelines Manual, the probation office calculated what the Sentencing Guidelines refer to as "Converted Drug Weight." U.S.S.G. § 2D1.1 cmt. nn. 6,8.  "Converted Drug Weight" is a "nominal reference designation that is used as a conversion factor" to "determine the offense level for controlled substances that are not specifically referenced" in the Guidelines' drug-quantity table.  U.S.S.G. § 2D1.1 cmt n.*(K).  The probation office calculated that each gram of Eutylone, a "synthetic cathinone," J.A. 244–245, J.A. 253, was the equivalent of 380 grams of converted drug weight, for a total converted drug weight of 1,668 kilograms.  J.A. 528 (applying U.S.S.G. § 2D1.1 cmt. n.8(D)). Based on a total offense level of 30 and a criminal-history category of II,

the Sentencing Guidelines advised a sentence of between 108 and 120 months in prison, limited by the statutory-maximum term of 120 months. J.A. 534.

Watkins objected to the drug-quantity calculation, arguing that the forensic chemist only testified about the chemical properties of 11 of the seized pills and that only the 11 pills that were tested should be considered in determining drug quantity. J.A. 506, J.A. 543. Watkins also argued that there was insufficient evidence to support a finding that Sanders transported 2,000 grams of Eutylone when none of the pills from that delivery had been seized. J.A. 506, J.A. 543–544. And Watkins objected to the application of the converted drug weight applicable to synthetic cathinones. J.A. 509, J.A. 545–547. Watkins argued that under Application Note 9 of the commentary to the drug-trafficking guideline, the district court should use 250 mg per pill because Eutylone is analogous to MDMA, or Ecstasy, and that application note describes the typical weight of an MDMA pill as 250 mg. J.A. 509, J.A. 545–547.

Watkins also asked the district court to depart downward under Application Note 27(D) to the drug-trafficking guideline. J.A. 511, J.A. 548–549. That note explains that some synthetic cathinones are more potent than others. U.S.S.G. § 2D1.1 cmt. n.27(D). The note authorizes a downward departure where a greater quantity of the synthetic cathinone involved in the case "is usually needed to produce an effect on the central nervous system similar to the effect produced by a typical synthetic cathinone." *Id.*

The district court overruled each of Watkins's objections. J.A. 481. The court found that the converted weight for synthetic cathinones of 1:380 grams was consistent with the evidence and the chemist's testimony. J.A. 481. The court also noted that if the court compared Eutylone to MDMA, the drug conversion table would suggest a converted drug weight of 500 grams for every gram of Eutylone, resulting in a total converted drug weight greater than the 1:380 grams conversion yields. J.A. 481. The court noted that Cloud sent two couriers in relatively quick succession to get thousands of pills from Watkins and that this evidence supported a base offense level of 30.

J.A. 482.   The court also found that a downward departure under the commentary authorizing a downward departure for less potent substitute cathinones was not warranted because of the drug quantity and the pattern of conduct.   J.A. 482.   The district court sentenced Watkins to 120 months in prison.   J.A. 491.

## SUMMARY OF THE ARGUMENT

I.   The district court did not plainly err when it permitted the jury to decide Watkins's guilt.   The jury heard ample evidence supporting Watkins's conviction for conspiring to distribute Eutylone. Through recorded telephone calls, text-message exchanges, and Anderson's and Sanders's testimony, the jury heard evidence that Cloud sent both Sanders and Anderson to Atlanta to retrieve pills containing Eutylone from Watkins, and Watkins knowingly and voluntarily conspired with Cloud to complete these transactions.   The jury heard evidence that Sanders traveled to Atlanta twice; that she picked up a bag containing thousands of pills on her first trip; that Sanders directed Cloud to return to Atlanta to do the "same thing" a second time; that Cloud and Watkins arranged for Sanders to pick up a box from Watkins

22

during her second trip; and that after handling that box, Sanders believed she had picked up a box containing pills and pleaded guilty to having done so.

The jury also heard evidence that within a few days of that delivery, Anderson told Cloud that she needed pills, and Cloud reported that he only had about 2,000 left; that Cloud and Watkins arranged for Anderson to meet with Watkins a few days later; and that Anderson was arrested shortly after leaving Atlanta because she was traveling with a box containing nearly 9,000 Eutylone pills. This evidence well supported the jury's verdict, and the district court did not plainly err when it permitted the jury to decide Watkins's guilt.

II. The district court did not err, let alone plainly err, when it exercised its discretion to admit limited evidence of rap lyrics from songs Watkins performed in response to character evidence Watkins presented during his case in chief. O'Neill and Childs both testified about Watkins's good character, citing his work as a performer and a rap artist. And Childs denied that Watkins had any involvement with drugs, while insisting that he was entirely devoted to his religion, his

family, and his work ethic. The district court reasonably found that Watkins opened the door to evidence rebutting this character evidence. And the district court admitted only two lines of rap lyrics. Watkins has not shown that this exercise of the district court's broad discretion was plainly wrong, and the lyrics were not sufficiently prejudicial to affect the jury's verdict.

III. As Watkins concedes, the district court's reasonable-doubt instruction properly declined to define "reasonable doubt," consistent with this Court's controlling authority. His challenge to that instruction is without merit.

IV. Watkins's sentence is procedurally reasonable. First, the district court did not clearly err in finding that at least 1,000 kilograms of converted drug weight was reasonably foreseeable to Watkins. Laboratory tests of samples reflected that each of the 11 types of pills seized from Anderson contained the same amount of Eutylone. And the court reasonably inferred that each of the pills, which was identical in size and color to one of the sampled pills, also contained the same amount of Eutylone. The court reasonably estimated that Watkins

gave Sanders pills containing at least 2,000 grams of Eutylone to

deliver to Cloud, but even if that delivery included only 350 grams of

Eutylone, the district court properly applied a base offense level of 30.

Finally, the district court properly applied the 1:380-gram conversion

rate that applies to synthetic cathinones under the drug equivalence

table. Eutylone is a synthetic cathinone, and the alternative average-

weight-per-pill method of calculating drug quantity applies only when

the weight of the controlled substance is not known — a circumstance

not present in this case.

Second, this Court should reject Watkins's challenge to the district

court's denial of his request for a downward departure. Because the

district court understood its authority to depart, its decision to deny the

requested departure is unreviewable. Additionally, even if it were

reviewable, the district court's decision was reasonable. Watkins did

not present any evidence that Eutylone is less potent than the typical

synthetic cathinone, and the district court did not clearly err in finding

that using the 1:380 gram conversion rate applicable to the average

synthetic cathinone was a reasonable way of determining drug weight.

# ARGUMENT

## I. The district court did not plainly err when it permitted the jury to decide whether Watkins conspired to traffic in a controlled substance.

### A. Standard of Review

Where a defendant challenges the sufficiency of the evidence to support the jury's verdict of guilty, this Court views the evidence and all reasonable inferences in favor of the government, sustaining the verdict if any rational factfinder could find the essential elements beyond a reasonable doubt. *United States v. Smith*, 21 F.4th 122, 140–41 (4th Cir. 2021). This Court reverses for insufficient evidence only in "'the rare case where the prosecution's failure is clear.'" *United States v. Haas*, 986 F.3d 467, 477 (4th Cir. 2021) (quoting *United States v. Wolf*, 860 F.3d 175, 194 (4th Cir. 2017)).

Because Watkins "failed to renew his Federal Rule of Criminal Procedure 29 motion for judgment of acquittal after he introduced evidence of his own defense and because the district court did not reserve ruling on such motion at the close of the government's case-in-chief," this Court reviews his challenge to the sufficiency of the evidence

"only for plain error." *United States v. Gray-Sommerville*, 618 F. App'x 165, 167 (4th Cir. 2015) (unpublished decision); *accord United States v. Flyer*, 633 F.3d 911, 917 (9th Cir. 2011); *United States v. Schier*, 438 F.3d 1104, 1107 (11th Cir. 2006); *United States v. Finley*, 245 F.3d 199, 202 (2d Cir. 2001); *United States v. Villasenor*, 236 F.3d 220, 222 (5th Cir. 2000). Under plain-error review, this Court may correct an alleged error only if: (1) there was error; (2) the error is plain; (3) the error affects the defendant's substantial rights; and (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings, warranting the exercise of this Court's discretion to correct the error. *United States v. Olano*, 507 U.S. 725, 732 (1993). An error is only plain if "(1) the explicit language of a statute or rule resolves the question or (2) at the time of appellate consideration, the settled law of the Supreme Court or this Court establishes that an error has occurred." *United States v. Davis*, 855 F.3d 587, 595–96 (4th Cir. 2017).

## B.     Discussion

The district court did not commit plain or obvious error when it permitted the jury to decide Watkins's guilt because the jury heard ample evidence supporting its finding that Watkins knowingly and willfully participated in a drug-trafficking conspiracy by distributing pills containing Eutylone.    Conspiracy to possess a controlled substance with intent to distribute requires the United States to show (1) an agreement to possess a controlled substance with intent to distribute existed between two or more persons; (2) the defendant knew of the conspiracy; and (3) the defendant knowingly and voluntarily became a part of the conspiracy.    *United States v. Tillmon*, 954 F.3d 628, 640 (4th Cir. 2019).    A jury may infer the existence of a conspiracy from the facts and circumstances of the case.    *United States v. Dennis*, 19 F.4th 656, 669 (4th Cir. 2021).    The United States "need only show some evidence of a relationship between defendants."    *Id.*    The United States does not need to prove that the defendant knew the particulars of the conspiracy or all of his coconspirators.    *United States v. Burgos*, 94 F.3d 849, 858 (4th Cir. 1996) (en banc).    And once the existence of a

onspiracy is established, "only a slight connection need be made linking a defendant to the conspiracy." *Id.* at 862.

Watkins acknowledges sufficient evidence to support the existence of a drug-trafficking conspiracy, and the jury heard more than sufficient evidence to support the jury's findings that Watkins knew about and voluntarily participated in that conspiracy. The jury heard evidence that Watkins and Cloud were close and considered each other to be a brother. The jury heard evidence that they made music together, they made videos together, they appeared on social-media posts together, and they spoke regularly on the telephone. The jurors also heard evidence from which they could reasonably conclude that on at least two occasions, Watkins knowingly and voluntarily delivered a large amount of Eutylone pills to a courier sent by Cloud and after coordinating the delivery of those pills with Cloud.

1. *The evidence of Sanders's October 16 trip to Atlanta supports Watkins's conviction.*

In mid-October of 2020, Cloud called Sanders and told her that he wanted her to "god damn take a trip" for him. S.A. 1. Cloud made this request of Sanders only a couple of months after she had gone to

29

Atlanta and retrieved a plastic bag filled with thousands of pills. J.A. 200–201. Cloud had obtained so many pills that even after 4,000 pills were stolen from Cloud within a day after Sanders delivered the first batch, Cloud still had 2,000 pills "left" when he texted Anderson. J.A. 200–201. When Sanders asked Cloud where she would be going, he responded, "You already know. Same thing." S.A. 1. The jury could reasonably conclude, as Sanders concluded, that Cloud intended for Sanders to return to Atlanta "to pick up pills." J.A. 128–129. This conclusion is bolstered by Cloud's insistence that Sanders, who did not carry cash on her first trip but would be carrying a roll of cash to pay for the pills on her second trip, be accompanied by a companion of Cloud's choosing.

The jury could also reasonably conclude that Watkins knowingly and voluntarily participated in this transaction. First, the jury heard recorded telephone calls among Watkins, Cloud, and Sanders as Sanders traveled to Atlanta that supported these elements. In these calls, Cloud told Watkins when Sanders was expected to arrive, and Watkins agreed that Sanders could meet him when he got out of "the

club." S.A. 6. Cloud asked Watkins what club Watkins would be going to, and Watkins responded, "But I don't have it in there." S.A. 6–7. And after Cloud explained that he knew that but that he did not want Sanders and her companion "just sitting and shit so they might as well come get some drinks," Watson told both Cloud and Sanders that he was "going to Club Diamonds." S.A. 7. The jury could reasonably conclude that Watkins knew the purpose of Sanders's visit was to pick something up from Watkins, and he did not intend to interact with Sanders except for this purpose.

Second, the jury heard evidence that Cloud insisted that Sanders deal only with Watkins while she was in Atlanta and not to "talk to nobody but him." S.A. 8. That Sanders could not discuss the purpose of her trip with anyone but Watkins suggests that Watkins understood the purpose of her trip. It also suggests that the purpose of Sanders's trip was sensitive, supporting Sanders's belief that she was picking up illegal drugs.

Third, Sanders testified that after Watkins and Sanders left Club Diamonds and Watkins arrived at his studio, he told Sanders that he

did not have "what [Sanders] was coming to get." J.A. 142. This testimony also supports the inference that Watkins knew "what [Sanders] was coming to get."

Fourth, the jury heard evidence that Watkins handed Sanders a box that Sanders testified may have been a shoe box. Based on the shoe box containing nearly 9,000 Eutylone pills seized from Anderson, the jury could find this evidence supported Sanders's understanding that the box she carried contained pills. Additionally, having earlier felt the weight of a plastic grocery bag containing thousands of pills, Sanders continued to believe that she was transporting pills — the "same thing" she had done on her earlier trip from Atlanta for Cloud — and her belief was so certain that she pleaded guilty to conspiring to distribute a controlled substance based on this single transaction. The jury could reasonably conclude from this evidence, taken together, that Watkins knew why Sanders traveled to Atlanta and that he knowingly and voluntarily gave Sanders Eutylone pills to take to Cloud, in exchange for the roll of cash that Sanders delivered to Watkins on Cloud's behalf.

This Court should reject Watkins's suggestion that this evidence is insufficient, and the Second Circuit's decision in *United States v. Pauling*, 924 F.3d 649 (2d Cir. 2019), does not help Watkins. The Second Circuit held in *Pauling* that the United States had not presented sufficient evidence that a heroin transaction discussed between the defendant and a customer was part of the charged drug-trafficking conspiracy between the defendant and a third party because of a lack of evidence that did not exist in this case. *Id.* at 659. The United States argued in *Pauling* that the customer's request for the "same thing as the last time" supported the jury's finding that the transaction was related to the charged conspiracy, but the court rejected that argument because there was evidence that the defendant had "other suppliers" besides the third party involved in the charged conspiracy and no evidence that the earlier transaction had involved heroin supplied by the charged conspiracy. *Id.*

*Pauling* does not support Watkins's insufficiency argument because the jury heard evidence supporting the conclusion that when Cloud told Sanders that she "already knew" where Cloud wanted her to

travel because he wanted her to do the "same thing" she did the last time, Cloud intended Sanders to travel to Atlanta to "pick up pills." J.A. 128–129.   Sanders testified that she only took two trips for Cloud — the trip to Atlanta in the summer of 2020 when she picked up a bag containing thousands of pills and the trip Cloud asked her to take on October 16 of the same year when she traveled to Atlanta and picked up a box that she believed contained pills.   Watkins suggests that the trips were different because Cloud sent Reggie to accompany Sanders on her second trip.   But Watkins does not explain why Reggie's presence undermines the reasonable inference that Sanders would be traveling to Atlanta to pick up pills — the inference that Sanders herself drew.   And because Sanders was carrying a large roll of cash to pay for the pills and she suspected Cloud did not trust her, Cloud's insistence that someone he trusted accompany Sanders made sense.

Additionally, the jury heard evidence that as Sanders was traveling to Atlanta, Cloud conducted a three-way call with Watkins and Sanders to arrange their rendezvous.   Cloud warned Sanders to discuss the transaction only with the person who would give her "what

[she] was coming to get." J.A. 142. And when Watkins handed Sanders the box, Sanders, who had earlier carried a plastic bag containing thousands of pills, continued to believe she had been sent to pick up pills. The jury heard ample evidence that when Cloud told Sanders she would be taking a trip to do the "same thing" and gave her a roll of cash to pay for the delivery, he meant that she would go to the same place she had gone the last time she traveled for him and she would be going for the same purpose.

2.  *The evidence of the October 24 transaction supports Watkins's conviction.*

The evidence that Watkins knowingly and voluntarily participated in the delivery of nearly 9,000 Eutylone pills to Anderson on October 24 also and independently supports his conspiracy conviction. First, the jury heard evidence that before Anderson traveled to Atlanta, Cloud was "tight" because a bag with "4000 in it" had been stolen, and by October 20, when Anderson told Cloud that she "needed pills," Cloud had only "2000 left." J.A. 199–200, S.A. 41. In that same exchange, Cloud asked Anderson if she was "gon take dat trip," S.A. 41, and four

35

days later, she traveled to Atlanta where she retrieved a Versace shoe box containing thousands of Eutylone pills.

Second, the jury heard evidence of telephone calls among Anderson, Watkins, and Cloud, arranging for Anderson to rendezvous with Watkins and only Watkins. When Anderson was approximately a half hour away from Watkins's studio and after Watkins reported that he was "fixing to go straight to her right now," Cloud gave Anderson the address of the studio. S.A. 11–12. When Watkins did not soon appear at the studio as promised, Cloud continued to run interference, checking in with Watkins and reporting to Anderson until Watkins promised that he would be there "in like ten minutes." S.A. 15. At no time did Cloud identify any other person Anderson should meet with, and Anderson never suggested that she intended to see anyone other than Watson.

Third, the jury heard Cloud's telephone call with Anderson, initiated as Anderson was on her return drive to Charlotte, when Cloud twice asked Anderson if she was "situated." S.A. 16. Anderson answered affirmatively, and the jury heard evidence that around an hour outside of Atlanta, police stopped Anderson's car and found nearly

8,900 Eutylone pills in a Versace shoe box inside of her car, along with more than $4,600 in cash.

Although Anderson denied that Watkins gave her the box containing the pills, the jury could reasonably reject that testimony. Numerous telephone calls and text messages supported the inference that (1) Cloud sent Anderson to Atlanta to pick up pills, just as he had sent Sanders; and (2) Anderson was traveling to meet Watkins, just as Sanders had traveled to meet Watkins a week earlier. The jury could also reasonably reject Anderson's testimony that an unnamed third party gave her the box of pills because the jury heard evidence that Anderson left Atlanta shortly after she met with Watkins, and there is no evidence that Anderson interacted with anyone else in Atlanta. The geolocation data from Anderson's cell phone also supports the conclusion that Anderson stayed within the vicinity of Watkins's studio during her short time in Atlanta in the late morning and early afternoon of October 24. And, in any event, the jury was not obligated to believe Anderson. If it credited Anderson's testimony that an unnamed third party handed the box to her, moreover, the jury could

reasonably conclude that the transaction was between Watkins and Cloud and that the unnamed third party was an intermediary for Watkins, just as Anderson was an intermediary for Cloud.

Watkins suggests that Anderson's possession of more than $4,600 in cash undermines the jury's finding that Watkins delivered the box of pills to Anderson.   But Childs testified that Watkins owed Cloud money related to a music video Watkins and Cloud made together and that she saw Watkins hand the cash to Anderson.   The jury could have believed Child's testimony that Watkins owed Cloud money and that this debt was the source of Anderson's cash.   Or the jury could have rejected that testimony, along with the rest of Childs's testimony about a Versace-box transaction she observed at a gas station between a "light-skinned" man driving a red sports car and Anderson.   The jury did not need to determine where the cash came from or why it was in Anderson's car.   Possessing a large amount of cash is consistent with drug dealing.   And it is not unusual for those involved in drug transactions to possess both cash and controlled substances.

Considering all of the evidence the jury heard about both October 2020 transactions, the jury could reasonably conclude that Watkins knowingly and voluntarily delivered Eutylone to Cloud, using Cloud's couriers as intermediaries. And Watkins has not established that the district court committed a plain or obvious error by allowing the jury to reach its verdict.

## II. The district court acted within its discretion and did not plainly err when it admitted limited evidence of rap lyrics, after Watkins presented evidence of his status as a performer and rap artist.

### A. Standard of Review

When presented with a properly preserved challenge, this Court reviews a district court's evidentiary rulings for an abuse of discretion. *United States v. Spirito*, 36 F.4th 191, 211 (4th Cir. 2022). It affords them "substantial deference, and will not overturn" an evidentiary "ruling unless the decision was 'arbitrary and irrational.'" *United States v. Medford*, 661 F.3d 746, 751 (4th Cir. 2011) (quoting *United States v. Murray*, 65 F.3d 1161, 1170 (4th Cir. 1995)). And even erroneous evidentiary rulings do not warrant reversal of a verdict if the "error did not substantially sway or substantially influence" it. *Id.*

Because Watkins did not object to the admission of rap lyrics as inadmissible hearsay or propensity evidence, this Court reviews those arguments for plain error only. *See United States v. Pratt*, 239 F.3d 640, 644 (4th Cir. 2001), *overruled on other grounds*, *United States v. Perez*, 22 F.4th 430 (4th Cir. 2022). "[A]n objection on one ground does not preserve objections on different grounds on appeal." *United States v. Zayyad*, 741 F.3d 452, 459 (4th Cir. 2014) (cleaned up).

## B. Discussion

The district court did not err, plainly or otherwise, when it admitted limited evidence of rap lyrics from songs identified with Watkins. During his case in chief, Watkins presented two witnesses who testified about his good character. O'Neill testified that Watkins is "a great person" and a great rap artist whom O'Neill knows well and considers family. J.A. 333. Childs testified that Watkins is a practicing Muslim who is devoted to his religion, his family, and his work ethic. Childs denied that Watkins sold or used drugs, and both O'Neill and Childs testified that they were familiar with Watkins's work as a rap artist.

Under these circumstances, the district court reasonably concluded that Watkins opened the door to limited evidence rebutting this character evidence. "Whether or not prior bad act evidence is admissible under Federal Rule of Evidence 404(b), trial courts may admit such evidence after the opposing party has 'opened the door to its admission.'" *United States v. Birchette*, 908 F.3d 50, 61 (4th Cir. 2018) (quoting *United States v. McLaurin*, 764 F.3d 372, 383 (4th Cir. 2014)). The "new evidence must be 'reasonably tailored to rebut the original evidence.'" *Id.* (quoting *United States v. Jackson*, 327 F.3d 273, 293 (4th Cir. 2003)).

The evidence admitted by the district court was both limited in scope and reasonably tailored to rebut O'Neill's and Childs's evidence that Watkins was a "great guy" who was not involved with drugs in any way and who was devoted to his religion, his family, and his work ethic. After Watkins objected, the district court admitted evidence of only two lines from Watkins's rap songs. The jury heard that Watkins had a song in which he stated that he was "a doper, for real," J.A. 361, and another song that he performed with Cloud with the lyrics that he had

"truckloads and bales, don't even put it on a scale," J.A. 364. Even if this evidence would have otherwise been inadmissible as improper propensity evidence or inadmissible hearsay, the district court did not plainly err when it admitted it to rebut Watkins's own character evidence, which highlighted Watkins's good character and work as a rap musician. Watkins's evidence about his good character and purported lack of involvement in the drug trade opened the door to rebuttal evidence that he had boasted about drug trafficking in the music he wrote and performed.

Any error in the admission of these statements would not be plain, moreover, and their admission did not affect Watkins's substantial rights in any event. Watkins has not identified any settled law of this Court or the Supreme Court that establishes that the limited admission of rap lyrics in response to good-character testimony is error. Watkins has not, therefore, satisfied his burden of showing that the admission of the evidence was plain error under either Rule 404(b) or the rule against hearsay. *See United States v. Davis*, 855 F.3d 587, 595–96 (4th Cir. 2017).

The admission of these statements also did not affect the jury's verdict. Without objection, the jury heard evidence that Watkins performed a song with Cloud that included the lyrics, "We got more guns than all of them." J.A. 358. Evidence that Watkins also sang about being a "doper" and having "truckloads of bales" was not any more prejudicial than the evidence that was admitted without Watkins's objection. Additionally, Watkins was not charged with being a "doper" or with trafficking in truckloads of marijuana, mitigating the risk of prejudice. And the jury's questions of the district court related to Cloud's relationship to Watson and Anderson's testimony about whether and how she knew Watson demonstrate that the jury was properly focused on whether there was evidence that Watkins conspired with Cloud to distribute Eutylone, not on Watkins's propensity for drug trafficking.

## III. The district court acted within its discretion when it declined to instruct the jury on reasonable doubt as proposed by Watkins.

### A. Standard of Review

This Court reviews "a district court's decision to give a particular jury instruction for abuse of discretion" and reviews "whether a jury instruction incorrectly stated the law de novo." *United States v. Miltier*, 882 F.3d 81, 89 (4th Cir. 2018). This Court does not "minutely parse the district court's words; rather [this Court] consider[s] 'whether taken as a whole in the context of the entire charge, the instructions accurately and fairly state the controlling law.'" *United States v. Shrader*, 675 F.3d 300, 308 (4th Cir. 2012) (quoting *United States v. Rahman*, 83 F.3d 89, 92 (4th Cir. 1996)). "District courts enjoy wide latitude in formulating instructions." *United States v. McCauley*, 983 F.3d 690, 694 (4th Cir. 2020).

### B. Discussion

Watkins challenges the district court's instruction on reasonable doubt but concedes that the court's instruction was consistent with this Court's holding in *United States v. Williams* that "a district court need

not, and in fact should not, define the term 'reasonable doubt' even upon request." 152 F.3d 294, 298 (4th Cir. 1998); *see also United States v. Hawkins*, 776 F.3d 200, 212 n.9 (4th Cir. 2015). Because the district court's instruction accurately and fairly stated controlling law, Watkins's challenge to that instruction is without merit.

## IV. Watkins's sentence is procedurally reasonable.

### A. Standard of Review

This Court reviews sentences for reasonableness. *Gall v. United States*, 552 U.S. 38, 51 (2007). Review for procedural reasonableness requires this Court to consider "whether the district court properly calculated the defendant's advisory guidelines range, gave the parties an opportunity to argue for an appropriate sentence, considered the 18 U.S.C. § 3553(a) factors, and sufficiently explained the selected sentence." *United States v. Ross*, 912 F.3d 740, 744 (4th Cir. 2019). In conducting this review, this Court reviews the district court's factual findings for clear error and its legal conclusions de novo. *United States v. Walker*, 922 F.3d 239, 253 (4th Cir. 2019). This Court reviews a

district court's drug-quantity calculation for clear error. *United States v. Crawford*, 734 F.3d 339, 342 (4th Cir. 2013).

## B. Discussion

Watkins's sentence is procedurally reasonable. The district court properly applied the drug-trafficking guideline and reasonably calculated the amount of converted drug weight reasonably foreseeable to Watkins. The district court's "deliberate refusal . . . to depart downward is not appealable." *United States v. Burgos*, 94 F.3d 849, 853 (4th Cir. 1996) (en banc). And the district court properly considered and rejected Watkins's argument in favor of a downward departure in any event.

> 1. *The district court did not clearly err in finding that at least 1,000 kilograms of converted drug weight was reasonably foreseeable to Watkins.*

The district court did not clearly err when it found a base offense level of 30 based on Watkins's responsibility for at least 1,000 kilograms of converted drug weight. The commentary to the drug-trafficking guideline directs a district court to "approximate the quantity of the controlled substance" in cases in which "there is no drug seizure or the

amount seized does not reflect the scale of the offense."  U.S.S.G.

§ 2D1.1 cmt. n.5.  "In making this determination, the court may

consider . . . similar transactions in controlled substances by the

defendant."  *Id.*

The commentary also includes a drug conversion table to be used

in cases involving a controlled substance that is not specifically

referenced in the guideline's drug quantity table.  *Id.* § 2D1.1 cmt.

n.8(A), (D).  The drug conversion table includes a reference to

"synthetic cathinones" and provides that one gram of a "synthetic

cathinone" is equivalent to 380 grams of converted drug weight.  *Id.*

§ 2D1.1 cmt. n.8(D).  The table also includes a reference to MDMA, or

Ecstasy, and provides for a conversion rate of one gram of MDMA as the

same as 500 grams of converted drug weight.  *Id.*  "If the number of

doses, pills, or capsules but not the weight of the controlled substance is

known," the commentary directs a district court to multiply the number

of doses, pills, or capsules by the typical weight per dose.  *Id.* § 2D1.1

cmt. n.9.  A table in the commentary identifies the typical weight per

unit of MDMA to be 250 milligrams.  *Id.*

The district court properly applied the guideline and its commentary in approximating the amount of converted drug weight reasonably foreseeable to Watkins as at least 1,000 kilograms. First, the court did not clearly err in finding that at least 4,391 grams of Eutylone were reasonably foreseeable to Watkins. The 8,909 Eutylone pills seized from Anderson contained approximately 2,391 grams of Eutylone. J.A. 519, J.A. 528. Based on Sanders's estimate that she picked up approximately 10,000 pills for Cloud in the summer of 2020 and her belief that she picked up a similar package from Watkins in October of 2020, the district court conservatively estimated that Watkins gave Sanders pills containing at least 2,000 grams of Eutylone to deliver to Cloud. J.A. 528.

The district court also heard evidence that Eutylone is a "synthetic cathinone." J.A. 244–245. Applying the 1:380 gram conversion rate described for "synthetic cathinones," the district court did not clearly err in finding that 4,391 grams of Eutylone equaled 1,668 kilograms of converted drug weight, significantly more than the

1,000 kilograms of converted drug weight that corresponds to a base offense level of 30. *See* U.S.S.G. § 2D1.1(c)(5).

This Court should reject each of Watkins's challenges to this finding. First, the district court reasonably considered the weight of all of the Eutylone seized from Anderson, declining Watkins's invitation to consider only the weight of the 11 pills tested by the chemist. The Georgia sheriff's deputy seized 11 bags containing 11 types of pills, divided by color and shape. J.A. 219. Each of the pills in each of the plastic bags was identical. The chemist tested one pill of each type and "got the same results for all the 11 pills" he tested. J.A. 244. The district court reasonably found, based on the chemist's testing of each type of pill and his testimony that he got the "same results" for each pill, that all of the seized pills had the same amount of Eutylone. *See United States v. Dinh*, 920 F.3d 307, 313 (5th Cir. 2019) ("[S]entencing courts are permitted to extrapolate the nature and quantity of drugs involved in an offense based on lab reports that tested only a sample of the overall quantity."); *cf. United States v. Williams*, 19 F.4th 374, 380 (4th Cir. 2021) (upholding determination that defendants were

responsible for "ice" where "[a]lmost all of the samples" tested by the DEA "had substance purity of 95% or above").

Second, the district court reasonably attributed 2,000 grams of Eutylone to Watkins based on the evidence that Sanders delivered to Cloud a quantity of Eutylone like the quantity contained in the delivery of pills Sanders had earlier made and the quantity of Eutylone seized from Anderson. The guideline commentary authorizes the district court to consider "similar transactions in controlled substances by the defendant," and the district court heard evidence that (1) Sanders estimated that her first delivery to Cloud included approximately 10,000 pills; (2) Cloud told Sanders she was going to Atlanta to do the "same thing" she had done when she picked up the 10,000 pills; (3) after picking up the package from Watkins, Sanders continued to believe she had picked up pills, suggesting that the weight was similar; (4) Cloud described having thousands of pills at a time; and (5) the box of pills Watson gave Anderson contained nearly 9,000 pills. Based on this evidence, the district court's estimate that Sanders picked up pills containing 2,000 grams of Eutylone was conservative.

Additionally, the district court's converted-drug-quantity estimate of 1,668 kilograms was more than fifty percent above the 1,000 kilograms required for the base offense level of 30 that the district court applied. Based on the seizure of Anderson's 2,391 grams of Eutylone alone, application of the 1:380 gram conversion for synthetic cathinones yields 908 kilograms of converted drug weight. Even if Sanders transported just 350 grams of Eutylone, which would convert to 133 kilograms, the district court properly applied a base offense level of 30.

Third, the district court did not clearly err when it calculated the converted drug weight of the Eutylone based on the 1:380 gram conversion rate applicable to synthetic cathinones. Watkins suggests that this Court should have used the typical-weight-per-unit table in Application Note 9 to the drug-trafficking guideline and used the 250 milligrams estimated for each MDMA pill, but the commentary makes clear that this table should only be used if "the weight of the controlled substance is not known." U.S.S.G. § 2D1.1 cmt. n.9. The lab report provided the weight of the Eutylone in the samples tested, and the district court reasonably adopted, without objection from Watkins, the

probation officer's conclusion that the Eutylone seized from Anderson weighed 2,391 grams.   Because the weight of the substance seized was "known," the district court properly applied the drug conversion table and did not clearly err in finding a total drug weight of more than 1,000 kilograms of converted drug weight based on the conversion rate that applies to synthetic cathinones.

      2.    *This Court should reject Watkins's challenge to the district court's denial of his request for a downward departure.*

This Court should reject Watkins's challenge to the district court's denial of his request for a downward departure for two reasons.   First, "[i]f a district court is cognizant of its authority to depart, but does not do so," the court's "refusal to depart downward from the guideline range is simply not appealable."   *Burgos*, 94 F.3d at 876.   The record makes clear that "the district court recognized that it had the authority to depart downward," precluding appellate review of its decision.   *Id.*

Second, if the court's decision were reviewable on appeal, the court's denial of Watkins's request for a downward departure based on the lower potency of Eutylone compared with other synthetic cathinones

was well within its authority.   As described above, the commentary to the drug-trafficking guideline authorizes a district court to depart downward in cases in which a "substantially . . . greater quantity of a synthetic cathinone is needed to produce an effect on the central nervous system similar to the effect produced by a typical synthetic cathinone."   U.S.S.G. § 2D1.1 cmt. n.27(D).   The commentary identifies methylone as a synthetic cathinone that typically requires a greater quantity to produce an effect similar to the typical synthetic cathinone.

The district court reasonably denied Watkins a downward departure under this commentary, explaining that applying the 1:380 gram conversion applicable to the typical synthetic cathinone yielded the appropriate drug weight based on the chemist's testimony.   *See* J.A. 481.   Although Watkins presented the district court with a Drug Enforcement Administration document that describes Eutylone as similar to methylone, that same document also describes Eutylone as similar to MDMA.   *See* J.A. 514.   And the drug equivalency table

provides for a 1:500 gram conversion rate for MDMA, suggesting that MDMA is a more potent drug than the average synthetic cathinone.

Because Watkins presented no evidence that Eutylone is less potent than the typical synthetic cathinone and because the drug quantity found by the district court was so much greater than the drug quantity that would trigger a lower base offense level, the district court acted within its discretion in denying his request for a downward departure. Additionally, in the light of the absence of any evidence to support a downward departure, the court's explanation — that the conversion rate applicable to the typical synthetic cathinone was "a very reasonable way of assessing drug weight" — was adequate.

## CONCLUSION

The district court did not plainly err when it permitted the jury to find Watkins was guilty of drug trafficking. The court acted well within its discretion in admitting limited evidence of Watkins's rap lyrics. And Watkins's sentence is procedurally reasonable. The United States respectfully requests, therefore, that this Court affirm the judgment of the district court.

54

## REQUEST FOR DECISION ON THE BRIEFS
## WITHOUT ORAL ARGUMENT

The United States does not believe that oral argument will assist the Court in any material way and requests that this appeal be decided on the briefs.

Respectfully submitted, this 14th day of July, 2023.

DENA J. KING
UNITED STATES ATTORNEY
s/ Amy E. Ray
Amy E. Ray
NC Bar Number # 22762
Assistant United States Attorney
U.S. Courthouse, Room 233
100 Otis Street
Asheville, North Carolina 28801
Telephone: (828) 271-4661
Fax: (828) 271-4670
E-mail: Amy.Ray@usdoj.gov

# CERTIFICATE OF COMPLIANCE

1.     This brief has been prepared using Microsoft Word 2010, Century Schoolbook, 14 point typeface.

2.     EXCLUSIVE of the corporate disclosure statement; table of contents; table of citations; statement with respect to oral argument; any addendum containing statutes, rules, or regulations, and the certificate of service, the brief contains ____10,217____ words.

     I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.   If the Court so directs, I will provide an electronic version of the brief and/or a copy of the word or line print-out.

s/ Amy E. Ray
Assistant United States Attorney
USAO Asheville, NC

## CERTIFICATE OF SERVICE

I certify that I have this day served a copy of the above upon Defendant herein by serving his attorney of record, Paul S. Kish, through electronic case filing.

This 14th day of July, 2023.

s/ Amy E. Ray
Assistant United States Attorney
USAO Asheville, NC